Laura Berglan (AZ Bar No. 022120)
Heidi McIntosh* (CO Bar No. 48230)
Thomas Delehanty* (CO Bar No. 51887)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
(303) 623-9466
lberglan@earthjustice.org
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

Roger Flynn* (CO Bar No. 21078)
Jeffrey C. Parsons* (CO Bar No. 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

*Attorneys for Plaintiff Hualapai Tribe*                    *Admitted Pro Hac Vice*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona, | No.  CV-24-08154-PCT-DJH |
| *Plaintiff*, | |
| v. | **MOTION FOR TEMPORARY RESTRAINING ORDER FOLLOWED BY A PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT (ORAL ARGUMENT REQUESTED)** |
| Debra Haaland in her official capacity as the United States Secretary of the Interior; United States Bureau of Land Management; Ray Suazo in his official capacity as State Director of the United States Bureau of Land Management; and Amanda Dodson in her official capacity as Field Office Manager of the United States Bureau of Land Management Kingman Field Office, | |
| *Defendants*. | |

DATED this 16th day of August 2024.

*/s/Laura Berglan*
Laura Berglan

*Attorney for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES....................................................................................................ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

ARGUMENT ..................................................................................................................... 4

    A. The Tribe Is Likely to Succeed on the Merits. ...................................................... 4

        1.    The Tribe Has Standing. ................................................................... 4

        2.    BLM Violated the NHPA by Erroneously Finding No Historic Properties Affected by the Project. ............................................................... 5

        3.    BLM Violated NEPA by Failing to Consider Reasonable Alternatives......................... 9

        4.    BLM Violated NEPA by Failing to Take A Hard Look at Impacts on Water Resources. ...................................................................... 11

    B. The Tribe Is Likely to Suffer Immediate, Irreparable Harm Without An Injunction. .......... 13

    C. The Balance of Harms Tips Sharply in Favor of the Tribe. .................................. 15

    D. A Preliminary Injunction Advances the Public Interest. ..................................... 16

    E. The Court Should Impose No Bond........................................................... 16

CONCLUSION ............................................................................................................... 17

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

5

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) .......................................................................... 4, 13, 16

6

7

*Amoco Production Co. v. Village of Gambell,*
    480 U.S. 531 (1987)................................................................................................... 15

8

*Apache Survival Coalition. v. U.S.,*
    21 F.3d 895 (9th Cir.1994) ......................................................................................... 7

9

10

*Ayers v. Espy,*
    873 F. Supp. 455 (D. Colo. 1994).......................................................................... 9, 10

11

12

*California Sea Urchin Comm'n v. Bean,*
    883 F.3d 1173 (9th Cir. 2018) .................................................................................... 5

13

14

*Center for Biological Diversity v. Stahn,*
    No. CV-08-8031-PHX-MHM, 2008 WL 1701374 (D. Ariz. Apr. 10,
    2008) ........................................................................................................................ 17

15

16

*Center for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    No. CV 21-2507-GW-ASX, 2022 WL 4233648 (C.D. Cal. Sept. 13,
    2022) .......................................................................................................................... 6

17

18

*Center for Biological Diversity v. U.S. Forest Serv.,*
    349 F.3d 1157 (9th Cir. 2003) .................................................................................. 12

19

20

*Colorado River Indian Tribes v. Marsh,*
    605 F. Supp. 1425 (C.D. Cal. 1985) ............................................................... 7, 14, 16

21

22

*Comanche Nation v. U.S.,*
    No. CIV-08-849-D, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) ............. 8, 15, 16

23

24

*Confederated Tribes & Bands of Yakama Nation v. Klickitat Cnty.,*
    No. 1:18-CV-3110-TOR, 2018 WL 4179103 (E.D. Wash. June 28,
    2018) ........................................................................................................................ 17

25

26

*Crutchfield v. U.S. Army Corps of Eng'rs,*
    154 F. Supp. 2d 878 (E.D. Va. 2001) ........................................................................ 6

27

28

*In re Focus Media Inc.,*
 387 F.3d 1077 (9th Cir. 2004) ................................................................... 4

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
 305 F.3d 957 (9th Cir. 2002) ................................................................... 11

*Indigenous Env't Network v. U.S. Dep't of State,*
 369 F.Supp.3d 1045 (D. Mont. 2018) ...................................................... 16

*Johnson v. Couturier,*
 572 F.3d 1067 (9th Cir. 2009) ................................................................. 17

*League of Wilderness Defs./Blue Mountains Biodiversity Project v.*
 *Connaughton,*
 752 F.3d 755 (9th Cir. 2014) ............................................................. 15, 16

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992) .................................................................................. 5

*Motor Vehicles Mfrs. Ass'n v. State Farm Auto. Ins. Co.,*
 463 U.S. 29 (1983) ................................................................................... 12

*Nat. Res. Def. Council, Inc. v. Hodel,*
 865 F.2d 288, 294 (D.C. Cir. 1988) ........................................................ 11

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
 241 F.3d 722 (9th Cir. 2001) ................................................................... 15

*Native Ecosystems Council v. U.S. Forest Serv.,*
 428 F.3d 1233 (9th Cir. 2005) ................................................................. 11

*Neighbors of the Mogollon Rim v. U.S. Forest Service,*
 2023 WL 3267846 (9th Cir. 2023) ....................................................... 9, 11

*New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.,*
 434 U.S. 1345 (1977) ................................................................................ 4

*Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior,*
 755 F.Supp.2d 1104 (S.D. Cal. 2010) .......................................... 13, 15, 16

*Robertson v. Methow Valley Citizens Council,*
 490 U.S. 332 (1989) ................................................................................. 11

*S. Fork Band Council W. Shoshone Nev. v. U.S. Dep't Interior,*
 588 F.3d 718 (9th Cir. 2009) ................................................................ 4, 15

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ................................................................. 13, 16

*Solenex, LLC v. Haaland*,
    626 F.Supp.3d 110 (D.D.C. 2022) .............................................................. 7

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ...................................................................... 4

*U.S. v. Washington*,
    No. 11-2, 2015 WL 12670517 (W.D. Wash. Mar. 27, 2015) ...................... 17

*California ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
    766 F.2d 1319 (9th Cir. 1985) .................................................................... 17

*W. Watersheds Project v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013) ...................................................................... 9

*W. Watersheds Project v. Bernhardt*,
    543 F.Supp.3d 958 (D. Idaho 2021) ........................................................... 11

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ...................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................... 4

**Regulations**

36 C.F.R.
    § 800.1(a) ....................................................................................................... 5
    §§ 800.3–800.5 .............................................................................................. 5
    § 800.4(d)(1) .............................................................................................. 5, 6
    § 800.4(d)(2) ................................................................................................. 5
    § 800.5 ....................................................................................................... 5, 6
    § 800.5(a)(2)(iv) ........................................................................................... 7
    § 800.5(a)(2)(v) ............................................................................................ 7
    § 800.8 .......................................................................................................... 7
    § 800.16 ........................................................................................................ 6
    § 800.16(d) ................................................................................................... 6

40 C.F.R.
    § 1500.1(b) .................................................................................................. 11
    § 1502.25(a) ................................................................................................ 11
    § 1508.9(b) .................................................................................................... 9

**Rules**

Fed. R. Civ. Proc. 65(c) ................................................................................ 16

**Statutes**

16 U.S.C.
  § 1540(g) ............................................................................................... 14
  § 1540(g)(2)(A)(i) ................................................................................. 14

42 U.S.C. § 4332(2)(C)(iii) ......................................................................... 11

54 U.S.C. § 306108 ................................................................................. 5, 7

Hualapai Tribe Water Rights Settlement Act of 2022, Pub. L. No. 117-349;
  136 Stat. 6225 (2023) .............................................................................. 1

**Other Authorities**

Bureau of Land Mgmt. & Western Area Power Admin., *Big Sandy Energy
  Project: Supplement Analysis*. (May 2002) .............................................. 2

Indian Entities Recognized by and Eligible to Receive Services from the
  United States Bureau of Indian Affairs, 89 Fed. Reg. 944 (Jan. 8, 2024) ..................... 4

National Park Service, U.S. Dep't of the Interior, *National Register Bulletin
  38: Guidelines for Evaluating and Documenting Traditional Cultural
  Properties* (1998) .................................................................................... 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65(a), the Hualapai Tribe ("Tribe") moves for a temporary restraining order followed by a preliminary injunction to enjoin implementation of Defendants' approval of the Big Sandy, Inc. Sandy Valley Lithium Exploration Project (Phase 3) ("Project") pending adjudication of the Tribe's challenge to that approval.[1] The Project threatens to destroy a hot spring—Ha'Kamwe'—and the surrounding landscape that the Hualapai Tribe holds sacred. Ha'Kamwe' and the surrounding Project area are central to Hualapai lifeways. Tribal members regularly gather soil for pottery and other resources in the Project area and ceremonies and other traditional events regularly take place at Ha'Kamwe'. Put simply, there is no area like Ha'Kamwe' and the Project area for the Hualapai Tribe. If this Project is allowed to move forward it threatens these lifeways for the Tribe. Ground-disturbing activities have begun at the site and additional road grading and drill pad construction is expected to begin August 20, 2024. Jackson Decl. ¶ 36; Berglan Decl., Attachment 14. An injunction is warranted because the Tribe is likely to prevail on the merits of its claims, the Tribe will suffer irreparable harm if the Project proceeds, and the balance of harms and the public interest support the issuance of a temporary restraining order followed by an injunction until this case is resolved on the merits.

## BACKGROUND

Ha'Kamwe' is a sacred medicinal spring where Indigenous peoples have, since time immemorial, gone for healing, prayer, and ceremonies related to birth, young women's coming of age, and other important life transitions. Ha'Kamwe' (also known as Cofer Hot Springs) is located at Cholla Ranch, on lands recently taken into trust by the Department of the Interior for the benefit of the Hualapai Tribe.[2] In 2002, Ha'Kamwe'

---

[1] Counsel for the Tribe contacted counsel for Defendants and counsel for Arizona Lithium, Ltd. in an attempt to avoid filing this motion. Filing this motion is Plaintiff's only recourse to avoid current, ongoing damage to Ha'Kamwe'. *See* Berglan Decl.

[2] Hualapai Tribe Water Rights Settlement Act of 2022, Pub. L. No. 117-349, § 12; 136 Stat. 6225, 6252 (2023).

was determined to be a Traditional Cultural Property ("TCP") eligible for the National

Register of Historic Places.[3]



    Australian company Arizona Lithium, Ltd. (f/k/a Hawkstone Mining, Ltd.)

("Company") submitted a request in September 2019 to the Bureau of Land Management

Kingman Field Office ("BLM") to explore for lithium deposits near the spring. The

Project would allow the Company to drill 131 wells and a bulk sample site, which would

remove 100–150 tons of material from three bore holes, on lands adjacent to

Ha'Kamwe', requiring significant truck traffic, generators, heavy machinery, and other

industrial activity. The Project would disturb 21 acres of public land, and the drill holes

are expected to reach depths of approximately 300 feet, which could perforate the aquifer

that sustains the flows to Ha'Kamwe'. The Tribe has consistently communicated to BLM

that drilling activities will create significant surface and subsurface disturbances that will

impair Tribal members' traditional use and enjoyment of Ha'Kamwe'. In addition to the

---

[3] *See* Bureau of Land Mgmt. & Western Area Power Admin., *Big Sandy Energy Project: Supplement Analysis*, BLM/AZ/PL-01/004, DOE/EIS-0315, 3-9. (May 2002) ("Supp. Analysis").

noise, vibrations, and construction activity associated with the Project, the Project will disrupt Ha'Kamwe's natural flows by drilling through and into the local aquifer. That threatens to permanently destroy Ha'Kamwe's sacred character, as water flow and temperature are essential attributes of the spring's cultural and ceremonial uses. Impacts on the spring—whether on flow, temperature, or otherwise—"would result in unnatural physical and spiritual state of the spring, which would be detrimental to [] ceremonies … at Ha'Kamwe'." Jackson Decl. ¶ 13. Ha'Kamwe' and the Big Sandy area are uniquely valuable features essential to the Tribe's culture, and their diminishment would be an irreparable loss. There is no substitution or alternative to Ha'Kamwe' and the Big Sandy area, including the Project area, for the Hualapai people. *See* Jackson-Kelly Decl. ¶ 14; Jackson Decl. ¶ 13. Drilling would impact not only the wildlife, flora and fauna, gathering areas, the aquifer, and the flow of water but also the integrity, spirituality, and future of the area itself. *See* Jackson-Kelly Decl. ¶ 15; Craynon Decl. ¶ 10; Powskey Decl. ¶ 8-9.

On June 6, 2024, BLM issued a Decision Record, Finding of No Significant Impact, and Final Environmental Assessment ("EA"), approving the Project. BLM also found that there will be no adverse effect on historic resources under the National Historic Preservation Act ("NHPA"). In its Final EA, BLM considered only two "all-or-nothing" alternatives: taking no action or approving the proposed exploration plan. BLM chose the latter alternative and concluded that drilling would not impact the source of Ha'Kamwe', despite admitting that water for Ha'Kamwe' could come from the aquifer that will be drilled. Given the concerns raised by both the Tribe and the Advisory Council on Historic Preservation ("ACHP") about the BLM's NHPA Section 106 process, BLM should have found that there will be effects on historic resources and considered a middle-ground alternative that would avoid devastating harms to Ha'Kamwe'.

Ground-disturbing work at the site has started and additional work related to drill pad and road construction is expected to start August 20, 2024. Jackson Decl. ¶ 36; Berglan Decl., Attachment 14.

1

**ARGUMENT**

2       The standard for issuing a temporary restraining order is the same as the standard

3    for issuing a preliminary injunction. *See New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox*

4    *Co*., 434 U.S. 1345, 1347 n.2 (1977); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush &*

5    *Co*., 240 F.3d 832, 839 n.7 (9th Cir. 2001). To obtain a preliminary injunction, a plaintiff

6    must demonstrate (1) a likelihood of success on the merits; (2) that they are likely to

7    suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities

8    favors an injunction; and (4) that the injunction is in the public interest. *Winter v. Nat.*

9    *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Tribe meets all these requirements.

10    **A.**  **The Tribe Is Likely to Succeed on the Merits.**

11       To establish a substantial likelihood of success on the merits, a plaintiff "must

12    show a 'fair chance of success.'" *In re Focus Media Inc.,* 387 F.3d 1077, 1086 (9th Cir.

13    2004) (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)

14    (en banc)). Under this standard, a preliminary injunction is appropriate when the plaintiff

15    demonstrates that "serious questions going to the merits were raised." *All. for the Wild*

16    *Rockies v. Cottrell*, 632 F.3d 1127, 1134-1135 (9th Cir. 2011) (citing *Lands Council v.*

17    *McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). Plaintiff does not have to show a likelihood

18    of success on all claims for the preliminary injunction to be awarded. *See S. Fork Band*

19    *Council W. Shoshone Nev. v. U.S. Dep't Interior*, 588 F.3d 718, 728 (9th Cir. 2009).

20    **1.**  **The Tribe Has Standing.**

21       The Tribe is a federally recognized Indian tribe with approximately 2,300

22    members located in northwestern Arizona. It is formally recognized by the Secretary of

23    the Interior as enjoying the privileges and immunities that accompany tribal status. *See*

24    Indian Entities Recognized by and Eligible to Receive Services from the United States

25    Bureau of Indian Affairs, 89 Fed. Reg. 944 (Jan. 8, 2024).

26       Ha'Kamwe' and the cultural landscape surrounding it are considered sacred by the

27    Tribe and are central to the Tribe's lifeways. Jackson-Kelly Decl. ¶ 3-4; Craynon Decl. ¶

28    12; Powskey Decl. ¶ 3; Jackson Decl. ¶¶ 8, 10. The Tribe's members use Ha'Kamwe'

and the public lands on which the Project is located for traditional ceremonial and cultural purposes, viewing wildlife, and recreation. Powskey Decl. ¶ 3; Jackson Decl. ¶ 15. Generations of families have also used the area for farming and raising livestock. Powskey Decl. ¶ 3. The ecosystem is like no other place on Hualapai land. Craynon Decl. ¶ 8; Powskey Decl. ¶ 3. Tribal members use Ha'Kamwe' and the public lands on which the Project is located to gather and harvest soil for pottery, traditional foods and medicines, and materials for cradleboards. Craynon Decl. ¶ 8; Powskey Decl. ¶ 4-5. It is also used for cultural and social events and to teach children the Hualapai lifeways.; Craynon Decl. ¶ 8, 10; Powskey Decl. ¶ 6; Jackson Decl. ¶ 16. It is the only location known for such activities and resources. Craynon Decl. ¶ 9. Some of the plants are unique to the area. *Id*. at ¶ 10-11. These interests are all harmed by the Project. Jackson-Kelly Decl. ¶¶ 13-15; Clarke Decl. ¶ 5; Craynon Decl. ¶ 11; Powskey Decl. ¶ 10; Jackson Decl. ¶¶ 12-14.

An order setting aside the Decision Record, Finding of No Significant Impact, and the Final EA, thereby halting implementation of the Project until Defendants comply with the law, would redress those harms. The Tribe has demonstrated a legally protected interest and redressable injury if the Project moves forward and thus has standing to bring these claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Cal. Sea Urchin Comm'n v. Bean,* 883 F.3d 1173, 1180 (9th Cir. 2018), *as amended* (Apr. 18, 2018).

## 2. BLM Violated the NHPA by Erroneously Finding No Historic Properties Affected by the Project.

Section 106 of the NHPA requires federal agencies to consider the effects on "any historic propert[ies]" of projects they carry out, permit, license, or approve throughout the country. 54 U.S.C. § 306108; 36 C.F.R. § 800.1(a). It requires BLM to identify whether historic properties could be affected by the Project, 36 C.F.R. § 800.4(d)(1), (2), and, if so, whether any of those effects would be considered adverse, *id.* at § 800.5. BLM must conduct this review in consultation with other participants. *Id.* at §§ 800.3–800.5.

To determine whether the Project could affect historic properties, BLM was required to identify the "[a]rea of potential effects," meaning "the geographic area or areas within which [the Project] may directly or indirectly cause alterations in the character or use of historic properties." *Id.* at § 800.16(d). An effect under the NHPA is defined as an "alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register." *Id.* at § 800.16. Failure to evaluate the full scope of a project's potential effects violates the NHPA. *E.g.*, *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. CV 21-2507-GW-ASX, 2022 WL 4233648, at *8 (C.D. Cal. Sept. 13, 2022) (remanding where agency failed to undertake NHPA consultation because it "too narrowly defin[ed] the project at issue"); *Crutchfield v. U.S. Army Corps of Eng'rs*, 154 F. Supp. 2d 878, 905 (E.D. Va. 2001) (similar).

Ha'Kamwe' is a recognized TCP.[4] The designation establishes that Ha'Kamwe' is a historic property "that is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community."[5]

Although BLM was aware of Ha'Kamwe's existence, its status as a TCP, and its importance to the Tribe, it refused to consider the impacts of the Project on Ha'Kamwe' under the NHPA. Instead, it unlawfully constrained the area of potential effects ("APE") to exclude all Hualapai tribal lands at Cholla Ranch, including Ha'Kamwe'—despite the Project surrounding Cholla Ranch on three sides—and refused to revisit those narrow boundaries despite information from the Tribe about impacts to the spring. Consequently, BLM concluded that the Project will not so much as *affect* any historic properties under 36 C.F.R. § 800.4(d)(1), much less adversely affect them under 36 C.F.R. § 800.5. That approach vitiated BLM's bottom-line duty to "take into account the effect of the [Project]

---

[4] Supp. Analysis, *supra* note 3.
[5] National Park Service, U.S. Dep't of the Interior, *National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties*, 1 (1998).

on any historic property." 54 U.S.C. § 306108; *see also Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1436 (C.D. Cal. 1985) (holding agency violated the NHPA by improperly constraining the geographic scope of Section 106 analysis).

Worse, BLM's own National Environmental Policy Act ("NEPA") analysis[6] undermines the narrow APE definition. NEPA and NHPA review should be integrated closely. *See Apache Survival Coal. v. U.S.,* 21 F.3d 895, 906 (9th Cir.1994) (citing *Sierra Club v. Clark,* 774 F.2d 1406, 1410 (9th Cir.1985); 36 C.F.R. § 800.8. But here, there is a clear disconnect between the findings under the NHPA and the findings in the Final EA, which makes plain that the Project will (adversely) affect Ha'Kamwe'. The EA identifies numerous impacts to the spring as follows:

> (1) temporary visual effects from drilling equipment and surface disturbance; (2) temporary noise and vibration from drilling activities and vehicular travel through the area; (3) temporary disruption to cultural practices at and/or near Ha'Kamwe'; (4) impacts to native wildlife and vegetation (removal of vegetation, noise, human presence; (5) the potential for cumulative effects to natural and cultural environments.

Final EA at 15.

These findings squarely meet the definition of "effect" under the NHPA. The Project will be heard and felt at Ha'Kamwe' ("[n]oise and vibration"), be seen at Ha'Kamwe' ("visual effects"), and impede the Tribe's activities and traditions ("disruptions to cultural practices").  *See* 36 C.F.R. § 800.5(a)(2)(iv), (v); *see also Solenex, LLC v. Haaland*, 626 F.Supp.3d 110, 128 (D.D.C. 2022) (explaining physical effects that can be seen, heard, or smelled are properly considered in establishing an area of potential effect). These physical effects should have brought Cholla Ranch and Ha'Kamwe' into the area of potential effect for BLM's NHPA analysis, and they required a finding of "[h]istoric properties affected" under 36 C.F.R. § 800.4(d)(2). Yet BLM

---

[6] The Fiscal Responsibility Act ("FRA") amended NEPA on June 3, 2023. However, BLM's review of the proposed Project began prior to FRA's enactment, so the pre-FRA NEPA requirements apply.

steadfastly refused to properly define the APE or make such a finding. That position was erroneous and flies in the face of the facts set out in the Final EA itself.

Notably, the ACHP—the agency that oversees the NHPA—pointed out this contradiction to BLM and urged it to reconsider its position, but BLM still refused. The ACHP concluded, based on the EA, that "there is the clear potential for effects on the Ha'Kamwe' historic property, including noise, vibration, and disruption to cultural practices conducted by the Tribe." Delehanty Decl., Attachment 9 at 2. This conclusion is supported by the declarations of Loretta Jackson-Kelly, Duane Clarke, Marcelene Craynon, Richard Powskey, and Ka-Voka Jackson, who reiterate that their cultural and traditional practices will be significantly impacted by noise, equipment, and ground disturbance occurring close to Ha'Kamwe'. Jackson-Kelly Decl. ¶ 13; Clarke Decl. ¶ 5; Craynon Decl. ¶ 11; Powskey Decl. ¶ 7-8; Jackson Decl. ¶ 12.

BLM's attempts to characterize these adverse effects as "temporary" does not alter the fact that there will be adverse effects on Ha'Kamwe'. Final EA at 16. There is no exception for "temporary" effects under the NHPA.  Delehanty Decl., Attachment 9. The characteristics of Ha'Kamwe' that make it eligible for inclusion in the National Register include both its physical components and "the setting and feeling of Ha'Kamwe' and its environs and the cultural practices conducted there, both of which will be altered (albeit temporarily) by the drilling equipment and ground disturbance proposed in close proximity." *Id*.

Put simply, everyone but BLM agrees that the Project will have an adverse effect on Ha'Kamwe'. Rather than fulfilling its obligation under the NHPA to "stop, look and listen," BLM "merely paused, glanced, and turned a deaf ear to warnings of adverse impact." *Comanche Nation v. U.S.*, No. CIV-08-849-D, 2008 WL 4426621, at *19 (W.D. Okla. Sept. 23, 2008) (holding agency failed to engage in "good faith" consultation). Its decision to constrain the APE for its NHPA analysis was arbitrary and capricious, and belied by the record which demonstrates that historic properties will be affected. Had BLM correctly placed Ha'Kamwe' in the area of potential effects and acknowledged its

own findings of adverse effects in the EA, then BLM and the Tribe could have consulted to resolve or mitigate the Project's adverse effects on Ha'Kamwe' in accordance with the NHPA. BLM's failure to include Ha'Kamwe' undermined the required consultation process and violated the NHPA.

### 3. BLM Violated NEPA by Failing to Consider Reasonable Alternatives.

BLM eliminated from consideration reasonable alternatives that would have minimized the Project's adverse effects on Ha'Kamwe' and other resources important to the Tribe in violation of NEPA's mandate. BLM's justification for excluding other alternatives—that they would not have fewer impacts than the Proposed Action—is contrary to the record.

Under NEPA, alternatives to the proposed action are the heart of the environmental analysis. As part of its duty to consider all reasonable alternatives in an EA under NEPA, BLM is required to study "alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). "NEPA's requirement that agencies 'study, develop, and describe appropriate alternatives ... applies whether an agency is preparing an [EIS] or an [EA].'" *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (citing *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir.2008)) (BLM EA failed to consider all reasonable alternatives). "The existence of a viable but unexamined alternative renders an [EA] inadequate." *Id*. "When reviewing whether an agency considered an adequate range of alternatives, the 'touchstone for [the] inquiry' is whether the 'selection and discussion of alternatives fosters informed decision-making and informed public participation.'" *Neighbors of the Mogollon Rim v. U.S. Forest Service*, 2023 WL 3267846, *1 (9th Cir. 2023) (citing *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)). "While a federal agency need not consider all possible alternatives for a given action in preparing an EA, it must consider a range of alternatives that covers the full spectrum of possibilities." *Ayers v. Espy*, 873 F.

1     Supp. 455, 473 (D. Colo. 1994). A less harmful alternative should be considered if it is

2     feasible. *Id.*

3          The Final EA unlawfully fails to consider a reasonable range of alternatives.

4     Instead, it constrained the choices to only two alternatives: approving or denying the

5     proposed exploration plan in full, without consideration of a middle-ground alternative

6     that better protects tribal and environmental interests. The Final EA (1) unlawfully

7     ignores reasonable and feasible options for meeting the Project's stated purpose and need

8     and (2) lacks a rational explanation for the failure to consider reasonable alternatives,

9     which is not supported by the record.

10         Due to the significant concerns that the Tribe raised throughout this process, BLM

11    was required to evaluate an alternative that avoids impacts on Ha'Kamwe'. Reasonable

12    and feasible options exist, including approving only one or two of the three proposed drill

13    sites; requiring relocation of drill sites farther from Ha'Kamwe'; approving fewer total

14    wells across the three drill sites; reducing new road construction; and/or requiring stricter

15    controls on noise, light, vehicular traffic, and vibrations. Consideration of such

16    alternatives is consistent with BLM's own observation in the Final EA that the "decision

17    to be made" was to approve the plan, deny the plan, or approve the plan "subject to

18    changes or conditions necessary to meet" regulatory requirements. Final EA at 2. Yet

19    BLM ignored entirely a third of the options it identified itself.

20         BLM's explanation for not including an assessment of these alternatives is

21    arbitrary and capricious and contrary to the record. The Final EA offers that "[a]ny

22    possible alternative actions would be limited given the narrow focus of the exploration

23    drilling program" and that no such alternatives were considered because "none were

24    identified that would have fewer impacts than the Proposed Action." Final EA at 10.

25    BLM's bald assertion, however, is not grounded in fact. Moreover, its conclusion ignores

26    that the Tribe *did* request consideration of alternatives that "better meet the Hualapai's

27    concerns and provide a more appropriate balance of Hawkstone's and the public's

28    interests in resource protection." Delehanty Decl., Attachment 4 at 11. These alternatives

10

are identified above. *Supra* at Sec. A(3). Furthermore, it is not the public's responsibility to bring the agency's analysis into compliance with NEPA. Even if the Tribe had provided no information about the available alternatives, the onus is on BLM to identify and assess a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii). Its failure to do so—and its unsupported explanation for that decision—violates NEPA. *See, e.g.*, *W. Watersheds Project v. Bernhardt*, 543 F.Supp.3d 958, 982-84 (D. Idaho 2021).

In sum, BLM violated NEPA by failing to consider one or more middle-ground alternatives that would mitigate harm to tribal interests by reducing the number of total wells drilled; reducing the total surface area impacted by drilling, roads, and related activities; and/or reducing noise, light, and vibration associated with drilling activity and truck traffic. BLM's reliance on an unreasonably narrow range of action alternatives did not "foster[] informed decision-making and informed public participation;" *Neighbors of the Mogollon Rim*, 2023 WL 3267846, at *1; it undermined those goals.

### 4.  BLM Violated NEPA by Failing to Take A Hard Look at Impacts on Water Resources.

NEPA requires that agencies take a "hard look" at a project's environmental consequences. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). A "hard look" includes "considering all foreseeable direct and indirect impacts." *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir. 2002). Furthermore, a "hard look" should involve a discussion of adverse impacts. *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1241 (9th Cir. 2005). This analysis must be "fully informed," "well-considered," and based on "[a]ccurate scientific analysis." *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988); 40 C.F.R. §§ 1500.1(b), 1502.25(a). "Determining whether [an agency] took the requisite 'hard look' is judged against the APA's arbitrary and capricious standard." *Native Ecosystems Council*, 428 F.3d at 1239. As such, an agency's decision is generally considered arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence

1    before [it]." *Motor Vehicles Mfrs. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43

2    (1983).

3        BLM failed to satisfy this obligation when approving the Project here. Because of

4    the critical importance of Ha'Kamwe to the Tribe's cultural and traditional values, the

5    Tribe requested that BLM provide valid hydrological evidence that the Project would not

6    harm the spring's source. But BLM did not require the Company to conduct any studies

7    to ensure that drilling activity will not impair the spring, and it conducted no studies

8    itself. Instead, BLM relied on a single twenty-four-year-old study—focused on a different

9    project and with limited test holes—to conclude that the Project will not impact

10   Ha'Kamwe'. However, that study is inapplicable to the Company's Project. It was

11   focused on only proving that a sufficient volume of groundwater existed to satisfy the

12   demand of a proposed electrical power-generating plant. It did not attempt to determine

13   the source of groundwater for Ha'Kamwe'—the central question here. Delehanty Decl.,

14   Attachment 12. The Final EA's findings regarding Ha'Kamwe's groundwater hydrology

15   are simply not supported by the evidence in the record.

16       In fact, the only study specifically evaluating whether the Project would impair the

17   spring concluded that it would, providing that "[a]vailable data indicate that any activity

18   within the spring aquifer and recharge area, including exploration drilling, threatens the

19   flow, temperature, and chemistry of the Ha'Kamwe' spring." Delehanty Decl.,

20   Attachment 6, Memorandum at 1. While this study was provided to BLM by the Tribe,

21   the EA does not address it or explain why BLM relied on the older, inapplicable study

22   without further analysis. "Because the commenters' evidence and opinions directly

23   challenge the scientific basis upon which the [NEPA document] rests and which is central

24   to it, we hold that Appellees were required to disclose and respond to such viewpoints. …

25   The Service's failure to disclose and analyze these opposing viewpoints violates NEPA."

26   *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003)

27   (citations omitted). *See also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493

28   (9th Cir. 2011)("BLM was required to 'assess and consider ... both individually and

collectively' the public comments received during the NEPA process") (quoting *Ctr. for Biological Diversity*, 349 F.3d at 1167).

The study BLM relied on is also factually flawed. It assumes that the Big Sandy aquifer is divided into an Upper Aquifer, a Middle Aquifer, and a Lower Aquifer, leading BLM to conclude that drilling will not harm Ha'Kamwe' because it will take place in the Upper Aquifer while the spring's source is in the Lower Aquifer. The EA acknowledges, though, that this assumption may not be true. BLM admits that water for Ha'Kamwe' may also come from the Upper Aquifer. Final EA at 21 ("Whether there is any contribution of water of Cofer Hot Spring (Ha'Kamwe') from the Upper Aquifer … is unclear."). Instead of completing an assessment that would resolve a question so central to the purpose of the EA—the actual impacts of the Project—BLM simply ignored the problem and approved the Project.

This faulty analysis does not represent the hard look required under NEPA. BLM failed to explain in the Final EA why it chose to rely solely on an old study and why it disregarded the study provided by the Tribe. At a minimum, further testing and analysis are required before BLM may rationally conclude that the Project's 131 exploratory drill holes will not degrade the spring's subsurface flows.

**B.  <u>The Tribe Is Likely to Suffer Immediate, Irreparable Harm Without An Injunction.</u>**

The Tribe will suffer irreparable harm if the Project proceeds under BLM's current authorization. Irreparable harm to the Tribe is more than possible, it is assured if the Project is not enjoined. *See All. for the Wild Rockies*, 632 F.3d at 1131. Courts have long recognized that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). Additionally, "[d]amage to or destruction of any" cultural or religious sites "easily" meets the irreparable harm requirement. *Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F.Supp.2d 1104, 1120

(S.D. Cal. 2010); *Colo. River Indian Tribes v. Marsh*, 605 F.Supp.1425, 1440 (C.D. Cal. 1985) (finding irreparable harm where a proposed development would "threaten the integrity of the cultural and archeological resources.").

Here, damage to cultural and environmental resources is occurring. Contractors are already on the Project site and ground-disturbing activity is ongoing. Jackson Decl. ¶ 36. As discussed above, there will be direct effects on Plaintiff's traditional and cultural uses at Ha'Kamwe' as a result of the Project. Noise and vibrations from drilling activity will harm cultural and traditional uses. Jackson-Kelly Decl. ¶ 13; Clarke Decl. ¶ 5; Jackson Decl. ¶ 12. Increased vehicular traffic will also have an impact on traditional and cultural uses at Ha'Kamwe'. These impacts will change the setting and feeling of Ha'Kamwe' and may make it unsuitable for cultural and ceremonial uses. Jackson-Kelly Decl. ¶¶ 13-15; Craynon Decl. ¶ 11; Jackson Decl. ¶¶ 13-14, 16, 18.

Drilling will also harm plants and wildlife that the Tribe and its members use and value. Hualapai people gather plants for medicine and other purposes near Ha'Kamwe', and the Project's increased truck traffic, heavy machinery, and dust risk killing and degrading these plant communities. Craynon Decl. ¶¶ 8, 11; Powskey Decl. ¶¶ 7-8; Jackson Decl. ¶¶ 13-14. Members of the Tribe also enjoy viewing—and connecting spiritually with—wildlife that exists near the spring, including species listed under the Endangered Species Act ("ESA").[7] Craynon Decl. ¶ 11; Powskey Decl. ¶ 3; Jackson Decl. ¶ 15. This wildlife will be harmed by the noise, light, vibrations, increased human presence, and other elements of the Project. *See* Delehanty Decl., Attachment 13.

The degradation of Ha'Kamwe's character and surrounding environment establishes that the Tribe and its members will suffer irreparable harm if the Project proceeds as approved.

[7] On July 15, 2024, the Tribe sent BLM a letter pursuant to 16 U.S.C. § 1540(g) notifying the agency that its approval of the Project violated Section 7 of the Endangered Species Act ("ESA"). Delehanty Decl., Attachment 13. Once the required 60 days have elapsed on September 13, 2024, *see id.* § 1540(g)(2)(A)(i), the Tribe intends to amend its complaint to add claims against BLM under the ESA.

14

**C.  The Balance of Harms Tips Sharply in Favor of the Tribe.**

Balancing equities requires a comparison between the irreparable cultural and environmental harms that plaintiffs will suffer and the economic interests of defendants. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014). When, as here, environmental injury is "sufficiently likely," the balance of harms "will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co*., 480 U.S. at 545. While both economic losses and environmental interests are relevant factors, the balance of equities tips toward harms that are permanent, rather than temporary delays. *League of Wilderness Defs.,* 752 F.3d at 765.

Where activities approved by a federal agency would damage archaeological and burial sites, causing tribal plaintiffs irreparable cultural and spiritual harm, the balance of hardships tips in the tribes' favor. That holds true even when the project proponent faces potential economic loss. *S. Fork Band Council W. Shoshone of Nev*., 588 F.3d at 728 (finding that balance of harms weighed in favor of injunction where proposed mine would ruin a site of religious significance to plaintiff tribes); *Quechan Tribe*, 755 F. Supp. 2d at 1121 (holding that, despite developer's multi-million dollar investment, the balance of harms tipped in Tribe's favor where the project would impact hundreds of prehistoric and other sites); *Comanche Nation v. U.S.*, 2008 WL 4426621, at *19 (W.D. Okla. Sept. 23, 2008) (holding that the economic harm to defendant from an injunction "pale[s] in comparison to the prospect of irreparable harm to sacred lands and centuries-old religious traditions which would occur absent injunctive relief").

As explained, the Project here will cause precisely that kind of permanent harm: the Tribe's sacred property, used for cultural and spiritual purposes, will be degraded. Any claims of economic loss by the Company due to a delay in its Project while this case proceeds do not shift the balance. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) ("[L]oss of anticipated revenues … does not outweigh the potential irreparable damage to the environment."), *abrogated on other grounds by*

15

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). That is particularly true because any purported economic harm to the Company would be temporary. *See League of Wilderness Defs.,* 752 F.3d at 765-66; *Indigenous Env't Network v. U.S. Dep't of State*, 369 F.Supp.3d 1045, 1051-52 (D. Mont. 2018) (environmental harms to plaintiffs outweighed economic harms to developers from loss of construction season).

The balance of equities weighs squarely in favor of granting an injunction.

**D.  <u>A Preliminary Injunction Advances the Public Interest.</u>**

The public interest weighs in favor of "careful consideration of environmental impacts" and "suspending such projects until that consideration occurs 'comports with the public interest.'" *All. for the Wild Rockies*, 632 F.3d at 1138(quoting *S. Fork Band Council,* 588 F.3d at 728). Additionally, by enacting the NHPA, Congress itself determined that the public has an interest in the preservation of cultural resources and in tribes' right to consult on those resources. *Quechan Tribe*, 755 F.Supp.2d at 1122; *Comanche Nation*, 2008 WL 4426621, at * 20 (same); *Colo. River Indian Tribes*, 605 F. Supp. at 1440 (recognizing the strong public interest in the preservation of Native American cultural sites). These concerns apply in full force here. BLM failed to uphold its obligations under federal law, resulting in damage to the public's interests in preserving and responsibly managing irreplaceable environmental and cultural resources. The public interest thus favors an injunction. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007).

The Tribe has demonstrated a likelihood of success on the merits of their claims that BLM violated NEPA and NHPA when it approved the Project. Given those legal infirmities and the irreparable harm to the Tribe's and the public's interests that drilling activity will unleash, an injunction is warranted until this case can be resolved.

**E.  <u>The Court Should Impose No Bond.</u>**

The Court should not require a bond in issuing the requested injunctive relief. *See* Fed. R. Civ. Proc. 65(c) (plaintiff must generally post a bond "in an amount that the court considers proper"). Under Rule 65(c), the court has "discretion as to the amount of

security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quotation and omitted) (emphasis in original). Courts routinely waive the bond requirement or impose a nominal bond in cases involving Indian tribes or non-profits who would otherwise effectively be denied access to judicial review. *See California ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (no bond); *U.S. v. Washington*, No. 11-2, 2015 WL 12670517, at *2 (W.D. Wash. Mar. 27, 2015) (setting nominal bond for Tribe due to the Tribe's "limited financial resources" and "likelihood of prevailing on the merits" and noting that a nominal bond is "particularly warranted" because setting a high bond would "effectively discourage Tribes from seeking access to . . . adjudicative mechanisms"); *Confederated Tribes & Bands of Yakama Nation v. Klickitat Cnty.*, No. 1:18-CV-3110-TOR, 2018 WL 4179103, at *13 (E.D. Wash. June 28, 2018) (no bond for Tribe); *Ctr. for Biological Diversity v. Stahn*, No. CV-08-8031-PHX-MHM, 2008 WL 1701374, at *2 (D. Ariz. Apr. 10, 2008) (imposing a nominal bond and citing "a long line of cases that have consistently waived the bond requirement or imposed only a nominal bond in public interest environmental litigation").

This Court should do likewise. The Hualapai Tribe is unable to post a large bond, and any bond would come directly from Tribal resources needed by the Hualapai Tribe to provide essential governmental services. Thus, no bond should be required.

## CONCLUSION

For the foregoing reasons, the Tribe requests that this Court enter a temporary restraining order followed by a preliminary injunction until it has decided the Tribe's claims, barring Defendants and all persons covered under Fed. R. Civ. P. 65(d)(2) from taking any action implementing or relying on the adequacy of the Decision Record, Finding of No Significant Impact, and Final Environmental Assessment, or otherwise authorizing activity related to lithium exploration drilling in the Project area.

Respectfully submitted this 16th day of August 2024.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*/s/ Laura Berglan*
Laura Berglan (AZ Bar No. 022120)
Heidi McIntosh* (CO Bar No. 48230)
Thomas Delehanty* (CO Bar No. 51887)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
(303) 623-9466
lberglan@earthjustice.org
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

Roger Flynn* (CO Bar No. 21078)
Jeffrey C. Parsons* (CO Bar No. 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

*Attorneys for Plaintiff*

*Admitted Pro Hac Vice*