# DECLARATION OF THOMAS DELEHANTY

I, Thomas Delehanty, declare as follows:

1.　　I am an attorney with Earthjustice and represent the Hualapai Tribe in this matter.  The following information is based on my personal knowledge, obtained by reviewing the documents described below along with other documents relevant to the Tribe's claims.

2.　　An index of attachments is provided at the end of this declaration to aid in identifying and locating each document.

3.　　Attachment 1 to this declaration is a true and correct copy of a letter dated June 6, 2020 from Amanda Dodson, Field Manager for the U.S. Bureau of Land Management ("BLM") Kingman Field Office, to Damon R. Clarke, then-Chairman of the Tribe.

4.　　Attachment 2 to this declaration is a true and correct copy of a letter dated April 12, 2021 from Amanda Dodson, Field Manager for the BLM Kingman Field Office, to Damon R. Clarke, then-Chairman of the Tribe.

5.　　Attachment 3 to this declaration is a true and correct copy of a comment letter dated June 10, 2021 from Damon R. Clarke, then-Chairman of the Tribe, to Angelica Rose of the BLM Kingman Field Office.  The attachments sent with that letter are not included with Attachment 3 here.

6.　　Attachment 4 to this declaration is a true and correct copy of a supplemental comment letter dated July 9, 2021 from Damon R. Clarke, then-Chairman of the Tribe, to Angelica Rose of the BLM Kingman Field Office.  The attachments sent with that letter are not included with Attachment 4 here.

7.　　Attachment 5 to this declaration is a true and correct copy of a letter dated January 11, 2023 from Reid J. Nelson, Director of the Office of Federal Agency

1

Programs for the Advisory Council on Historic Preservation ("ACHP"), to Amanda Dodson, Field Manager for the BLM Kingman Field Office.

8.      Attachment 6 to this declaration is a true and correct copy of a memorandum dated March 11, 2024 from Winfield G. Wright of Southwest Hydro-Logic to the Hualapai Tribal Council, along with a technical report titled "Preliminary Assessment of the Hydrology and Geochemistry of Ha' Kamwe' (Cofer Hot Spring), Mohave County, Arizona, 2023" (as updated March 11, 2024).

9.      Attachment 7 to this declaration is a true and correct copy of a comment letter dated March 13, 2024 from Sherry Parker, Chairwoman of the Tribe, to Amanda Dodson, Field Manager for the BLM Kingman Field Office.  The attachments sent with that letter are not included with Attachment 7 here.

10.     Attachment 8 to this declaration is a true and correct copy of a comment letter dated May 24, 2024 from Sherry Parker, Chairwoman of the Tribe, to Amanda Dodson, Field Manager for the BLM Kingman Field Office.  The attachments sent with that letter are not included with Attachment 8 here.

11.     Attachment 9 to this declaration is a true and correct copy of a letter dated May 31, 2024 from Christopher Keoppel, Assistant Director of the Office of Federal Agency Programs for the ACHP, to Amanda Dodson, Field Manager for the BLM Kingman Field Office.

12.     Attachment 10 to this declaration is a true and correct copy of a letter dated July 17, 2024 from Raymond Suazo, State Director for the BLM Arizona State Office, to Ka-Voka Jackson, Tribal Historic Preservation Officer for the Tribe.

13.     Attachment 11 to this declaration is a true and correct copy of BLM's final decision document dated July 9, 2024 approving the Sandy Valley Exploration Project (Phase 3).

14.     Attachment 12 to this declaration is a true and correct copy of a study dated October 2000 and signed by Paul A. Manera titled "Water Resources of the Southern Portion of the Big Sandy Valley, Wikieup, Mohave County, Arizona."

15. Attachment 13 to this declaration is a true and correct copy of a letter dated July 15, 2024 from the Hualapai Tribe to Amanda Dodson, Field Manager for the BLM Kingman Field Office, and Debra Haaland, Secretary of the Interior, providing notice of BLM's violations of the Endangered Species Act under 16 U.S.C. § 1540(g).  The attachments sent with that letter are not included with Attachment 13 here.

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 9, 2024.

Thomas Delehanty

**Index of Attachments**

| No. | Document |
|---|---|
| 1 | June 2020 letter from BLM to Hualapai Tribe |
| 2 | April 2021 letter from BLM to Hualapai Tribe |
| 3 | June 2021 comments submitted by Hualapai Tribe to BLM |
| 4 | July 2021 supplemental comments submitted by Hualapai Tribe to BLM |
| 5 | January 2023 letter from ACHP to BLM |
| 6 | March 2024 Memorandum and technical report from Southwest Hydro-Logic re impacts to Ha'Kamwe |
| 7 | March 2024 comments submitted by Hualapai Tribe to BLM |
| 8 | May 2024 comments submitted by Hualapai Tribe to BLM |
| 9 | May 2024 letter from ACHP to BLM |
| 10 | July 2024 decision letter from BLM denying Hualapai Tribe's request for State Director Review |
| 11 | July 2024 BLM decision document giving final approval for the Project |
| 12 | Manera 2000 study re Big Sandy Energy Project |
| 13 | July 2024 letter from Hualapai Tribe to BLM re Endangered Species Act violations. |

# ATTACHMENT 1



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Kingman Field Office
2755 Mission Boulevard
Kingman, Arizona 86401
Phone: (928) 718-3700 Fax: (928) 718-3761
www.blm.gov/arizona/



**JUN 0 6 2020**

In Reply Refer To:
1792/3040/8110 (C010)

CERTIFIED MAIL - RETURN RECEIPT REQUESTED NO. 7016 1370 0001 2489 3147

Dr. Damon R. Clarke
Chairman, Hualapai Tribe
P.O. Box 179
Peach Springs, AZ 86434

RE: Consultation for the proposed Sandy Valley Exploration Project (Cultural Project # BLM-AZ-310-20-02)

Dear Chairman Clarke:

The Bureau of Land Management (BLM) Kingman Field Office (KFO) would like to invite you to initiate consultation with us regarding Big Sandy Inc.'s Sandy Valley Exploration Project plan of operations for mineral exploration located near Wikieup, Arizona. The BLM has determined that this is a federal undertaking as defined by 36 CFR § 800.16(y).

Big Sandy Inc. is proposing exploration activities located on BLM land to determine the quantity and quality of lithium and other poly metals within the Sandy Valley Project Area. The proposal includes 145 exploration drill holes with associated drill pads, staging areas, and a bulk sample site. Access to the area would utilize existing roads and trails as much as possible. The total estimated surface disturbance for the project is 26.16 acres. This project area is located 1.5 miles east and 5 miles southeast of Wikieup, Arizona (see enclosed map) This area was previously explored under a mining notice.

Cultural resources are among the environmental factors analyzed for this proposed undertaking. An intensive archaeological inventory was conducted by Logan Simpson for all areas that would potentially be subject to surface disturbance or other potentially adverse effects as part of the proposed undertaking. In addition to the footprint of the proposed undertaking, Logan Simpson completed an additional 586.84 acres of inventory for purposed of project plan and design, identification of exploration areas, and to ensure a sufficient buffer for the ground disturbing exploration activities. The total Area of Potential Effect (APE) to cultural resources from this project is 613 acres, which includes three discontinuous, irregularly shaped parcels located in sections of Township 16 North, Range 13 West and Township 15 North, Range 12 West east of Highway 93.

The results from the inventory include two previously discovered, pre-contact period cultural sites, two newly discovered pre-contact period cultural sites, and one contact-period cultural site (refuse scatter). Based on the initial review of the draft cultural survey report and a comparison with our site inventory and records files, the BLM has concluded that this cultural survey by Logan Simpson was professionally executed and the results accurately reported. Big Sandy Inc. will propose to avoid any direct effects to recorded cultural resources that are determined to be eligible for the National Register of Historic Places by the BLM in accordance with 36 CFR § 800.4(c)(2).

The BLM invites you to initiate consultation and comment on this proposed undertaking in accordance with the National Historic Preservation Act, as amended, and the implementing legislation contained in 36 CFR § 800, to ensure that any concerns your tribe may have about the project are fully considered. In addition, we request your assistance in identifying any cultural properties or other areas of tribal concern that may be affected by this proposed undertaking.

Thank you for your consideration of this proposed undertaking. If you would like any additional information, wish to discuss the project in more detail, or would like to arrange a meeting  or a project area visit, please contact Archaeologist Thomas Thompson, at tjthompson@blm.gov or by phone at 928-718-3752. You may also contact me at adodson@blm.gov or by phone at 928-718-3701.

Sincerely,

Amanda M. Dodson
Field Manager

cc:  Peter Bungart, THPO
     Department of Cultural Resources
     PO Box 310
     Peach Springs, AZ 86434

# ATTACHMENT 2

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Kingman Field Office
2755 Mission Boulevard
Kingman, Arizona 86401
Phone: (928) 718-3700 Fax: (928) 718-3761
www.blm.gov/arizona/

In Reply Refer to:
8100(C010)
AZA 37913

**APR 1 2 2021**

ELECTRONIC CORRESPONDENCE

Dr. Damon R. Clarke
Chairman, Hualapai Tribe
Post Office Box 179
Peach Springs, Arizona 86434

RE: Sandy Valley Exploration Project near Wikieup

Dear Chairman Clarke:

The Bureau of Land Management (BLM) Kingman Field Office (KOF) wishes to continue consultation on the proposed Sandy Valley Exploration Project (Project) located near Wikieup, Arizona. The BLM has received your letter dated June 29, 2020, accepting our invitation for consultation on the Project. We thank you for your interest and shall coordinate with you, and the Hualapai Tribal Historic Preservation Officer (THPO) Peter Bungart, in continuing consultation. KFO Archaeologist Thomas Thompson, provided the THPO with the GIS shape file mapping data for the Project in an email dated June 22, 2020, the draft cultural resources survey report in an email dated June 30, 2020, and the Project plan in an e-mail dated December 29, 2020. The preliminary Environmental Assessment (EA) for this Project is now available for review at: https://eplanning.blm.gov/eplanning-ui/project/2012598/510.

Cultural resource investigations for the Project included a Class I inventory of existing information to identify previous investigations and cultural resources within a one-mile buffer of the Project Area of Potential Effect (APE). A 100% Class III archaeological survey of the entire Project APE totaling 613 acres within three discontinuous parcels was also conducted.

The results of the Class I and Class III investigations resulted in the identification of four cultural resource sites. The BLM has determined one of these sites eligible for inclusion in the National Register of Historic Places (NRHP) under Criterion D, and three as not eligible for inclusion in the NRHP under any criteria. The BLM would ensure that Project operations avoid the NRHP eligible site for a finding of no historic properties affected.

BLM KFO invites you to comment on this proposed action in accordance with the National Environmental Policy Act and the National Historic Preservation Act, as amended, to ensure that

---

**INTERIOR REGION 8 • LOWER COLORADO BASIN**
ARIZONA, CALIFORNIA*, NEVADA*
* PARTIAL

any concerns your tribe may have about the project are fully considered and incorporated into the environmental analysis as appropriate.  In addition, we request your assistance in identifying any cultural properties that may be affected by this proposed undertaking.  Please respond with any specific concerns your tribe may have or other information you wish to share about this undertaking within 30 days of receipt of this letter.

We appreciate your interest in the Project and for consultation in the Section 106 process.  If you have any questions or concerns, please contact Archaeologist Thomas Thompson at (928) 718-3752, or by e-mail at tjthompson@blm.gov, or myself at (928) 718-3701 or by e-mail at adodson@blm.gov.

Sincerely,

Amanda M. Dodson
Field Manager

cc:  Peter Bungart
Hualapai Tribe THPO
Peter.Bungart@hualapai-nsn.gov

# ATTACHMENT 3



The Great Spirit created Man and Woman in his own image. In doing so, both were created as equals. Both depending on each other in order to survive. Great respect was shown for each other; in doing so, happiness and contentment was achieved then, as it should be now.

The connecting of the Hair makes them one person; for happiness or contentment cannot be achieved without each other.

The Canyons are represented by the purples in the middle ground, where the people were created. These canyons are Sacred, and should be so treated at all times.

The Reservation is pictured to represent the land that is ours, treat it well.

The Reservation is our heritage and the heritage of our children yet unborn. Be good to our land and it will continue to be good to us.

The Sun is the symbol of life, without it nothing is possible – plants don't grow – there will be no life – nothing. The Sun also represents the dawn of the Hualapai people. Through hard work, determination and education, everything is possible and we are assured bigger and brighter days ahead.

The Tracks in the middle represent the coyote and other animals which were here before us.

The Green around the symbol are pine trees, representing our name Hualapai – PEOPLE OF THE TALL PINES –

**HUALAPAI TRIBE**
**OFFICE OF THE CHAIRPERSON**

Damon R. Clarke, Ed. D
*Chairman*

P.O. Box 179 / 941 Hualapai Way • Peach Springs, Arizona 86434
(928) 769-2216

Shelton "Scott" Crozier
*Vice Chairman*

June 10, 2021

Ms. Angelica Rose
Bureau of Land Management
Kingman Field Office
2755 Mission Blvd
Kingman, AZ 86401

Submitted via ePlanning Commenting Portal

> Re: Comments on Sandy Valley Exploration Project (Phase 3) Environmental
> Assessment, NEPA Number DOI-BLM-AZ-C010-2021-0029-EA

Dear Ms. Rose:

The Hualapai Tribe submits the following comments on the Environmental Assessment (EA) for the Big Sandy, Inc., Sandy Valley Exploration Project (Phase 3). Under this EA, the Bureau of Land Management (BLM) is considering approving an exploration plan through which Hawkstone Mining Limited, d/b/a Big Sandy, Inc., (Hawkstone) would explore its mining claims on BLM-managed public lands for lithium and poly-metal minerals (Plan). According to the BLM, activities under the Plan would begin in the summer of 2021. We provide the below comments on the BLM's EA.

At the outset, we want to emphasize that this is not simply a situation where an Indian tribe has an interest in a federal undertaking on ancestral land—although those situations are also serious. Here, the Hualapai Tribe is the landowner immediately adjacent to this undertaking, and a Traditional Cultural Property (TCP) is located on the Tribe's land. Indeed, we are virtually surrounded on three sides by the past and proposed exploration activities. We view any further exploration or potential mining in this area to be an imminent threat to sovereign Hualapai tribal interests, which are protected under federal trust obligations and other federal laws.

1

We urge the BLM and Hawkstone to take a hard look at the implications of the exploratory drilling activities encompassed under the proposed Plan. The exploration and disturbance activities under the Plan will impact the Tribe's cultural resources and other tribal interests, and the Plan's reasonably foreseeable effects on these important interests have not been adequately examined under the EA.

Further, although the BLM may wish to limit its analysis strictly to this exploration phase under the Plan, Hawkstone's U.S. General Manager has been giving public presentations laying out detailed plans for an open pit mine and ore slurry, including to the Hualapai Tribal Council. Clearly, this exploration phase is simply a step in the process toward an open pit mine, and it would be disingenuous to imply otherwise. These presentations point to reasonably foreseeable future actions whose effects should also be considered under the EA. More robust National Environmental Policy Act (NEPA) and National Historic Preservation Act (NHPA) Section 106 review that coincides with any future approval of a mine will result in a finding of the potential of unacceptable harm to irreplaceable cultural resources and other protected tribal interests. It is in the best interests of all stakeholders to cease the investment of resources in this project now.

Additionally, we continue to assert that the BLM should have accepted the Hualapai Tribe's requests to become a cooperating agency for purpose of NEPA review and to provide ethnographic research assistance as part of NHPA Section 106 review. It is an affront that a domestic sovereign nation's request to represent its interests and provide valuable knowledge and expertise be rejected.

**BACKGROUND**

The Hualapai Tribe acknowledges and holds sacred a vast cultural landscape in northwestern Arizona that encompasses the area surrounding Wikieup, Arizona. This cultural landscape includes archaeological sites and other traditional cultural places, as well as plant, wildlife, and water resources. Ha'Kamwe (called Cofer Hot Spring in English), and the surrounding Big Sandy River Valley and adjacent mountains, hills, and deserts are part of the ancestral homelands of the Hualapai Tribe, as well as the Yavapai-Apache Nation, the Yavapai-Prescott Tribe, the Fort McDowell Yavapai Nation, the Fort Mojave Indian Tribe, the Chemehuevi Indian Tribe, the San Juan Southern Paiute Tribe, the Hopi Tribe, and the Colorado River Indian Tribes.

Cofer Hot Spring is a sacred medicinal spring where Native people have, since time immemorial, gone for healing, prayer, and to conduct ceremonies related to birth, young women's coming of age, and other important life transitions. The BLM and the Western Area Power Authority (WAPA) within the U.S. Department of Energy in 2002 determined Cofer Hot Spring to be a historic property eligible for the National Register of Historic Places as a TCP. *See* BUREAU OF LAND MGMT., *Big Sandy Energy Project: Supplement Analysis* (May 2002) at p. 2-10; *see also id.* at p. 3-9 ("[T]he Hualapai Nation considers the spring a traditional cultural resource and the spring is a National Register-eligible property to which Project impacts cannot be satisfactorily mitigated . . . ."). The Hualapai-owned land on which Cofer Hot Spring is situated is known as Cholla Canyon Ranch, and it is located immediately adjacent to BLM-managed public lands to the north, east, and south.

2

Further, Cofer Hot Spring is part of a sacred cultural landscape that is recounted in what is known collectively as the Salt Song Trail, whose songs are practiced ceremonially by the Hualapai Tribe and other neighboring tribes. One of the Hualapai keepers of the Salt Song Trail cycle, now long deceased, specifically recounts Cofer Hot Spring (Ha'Kamwe) as part of the song cycle. This was further documented in oral history interviews obtained in the 1970s, as well as an audio recording of Salt Songs in the possession of the Tribe (although considered highly sensitive and not appropriate for public dissemination).

The interconnected landscape surrounding Cofer Hot Spring is an integral part of this sacred cultural landscape. This landscape has for centuries played an essential role in the religions, traditions, and cultures of the Hualapai, Yavapai, Fort Mojave, Chemehuevi, Southern Paiute, Hopi, and Colorado River Indian Tribes. Cofer Hot Spring is a holy site and TCP with deep religious, cultural, archaeological, historical, and environmental significance.

Hawkstone, an Australian mining company, conducted exploratory drilling for lithium clays on BLM-managed public lands immediately adjacent to the Hualapai land on which Cofer Hot Spring is located in 2018–2019, under the antiquated Mining Law of 1872, 30 U.S.C. §§ 21 *et seq*.

Hawkstone has submitted an exploration plan for additional, more expansive exploration (referred to as the "Big Sandy Inc., Sandy Valley Exploration Project, Phase 3" or the "Plan") on mining claims located on BLM-managed public lands immediately adjacent to the Hualapai land on which Cofer Hot Spring is located. The Plan would create significant surface and subsurface disturbances resulting from the development of 145 drill pads, a bulk sample site, 12.5 linear miles of heavy equipment access, and other associated facilities and infrastructure and would otherwise affect the use and enjoyment of Cofer Hot Spring.

The BLM provided a letter to the Hualapai Tribe dated June 6, 2020, inviting the Tribe to participate in NHPA Section 106 tribal consultation. Letter from Amanda Dodson, Field Manager, Bureau of Land Mgmt., to Dr. Damon R. Clarke, Chairman, Hualapai Tribe (June 6, 2020). The Tribe responded in a letter dated June 29, 2020, accepting the invitation to engage in NHPA Section 106 tribal consultation, requesting to aid the BLM in identifying places of cultural significance, and requesting to serve as a NEPA cooperating agency. Letter from Dr. Damon R. Clarke, Chairman, Hualapai Tribe, to Amanda Dodson, Field Manager, Bureau of Land Mgmt. (June 29, 2020). The Tribe also put the BLM on notice of the presence of a TCP and other tribal interests that may be affected by the Plan. *Id.* When the BLM did not respond, the Tribe sent an additional letter dated November 2, 2020, raising these concerns again and requesting a response. Letter from Dr. Damon R. Clarke, Chairman, Hualapai Tribe, to Amanda Dodson, Field Manager, Bureau of Land Mgmt. (Nov. 2, 2020). In a letter dated November 10, 2020, the BLM denied the Tribe's request to participate as a cooperating agency on the basis of its assertion that the Plan would have limited impacts. Letter from James Bryan, Field Manager, Bureau of Land Mgmt., to Dr. Damon R. Clarke, Chairman, Hualapai Tribe (Nov. 10, 2020). The Tribe thereafter sent a letter to Secretary Haaland putting her on notice of the concerns the Tribe had raised to the BLM. Letter from Shelton Scott Crozier, Vice Chairman, Hualapai Tribe, to Secretary Deb Haaland, Dep't of Interior (May 6, 2021).

On April 12, 2021, the BLM released an EA for the Plan under NEPA. *See* Bureau of Land Mgmt., *Environmental Assessment, Big Sandy Inc. Sandy Valley Exploration Project (Phase 3) AZA-37913*, DOI-BLM-AZ-C010-2021-0029-EA (Mar. 2021) [hereinafter EA]. The EA's analysis of potentially affected tribal interests, rights, and resources is grossly insufficient. It does not adequately identify and consider effects on cultural resources—in large part due to its inadequate NHPA Section 106 review—and it dismisses the impacts of the Plan on religious concerns, traditional values and life ways, environmental justice, visual resources, water resources, water quality, and other tribal interests.

Additionally, the EA was not compiled with meaningful and proper input from the Hualapai Tribe, particularly in consideration of the Tribe's status as neighboring landowner and the presence of an important TCP associated with the Tribe. The BLM rejected the Hualapai Tribe's request to become a NEPA cooperating agency for the EA in November 2020, and the BLM has not otherwise sufficiently engaged in meaningful consultation under the NHPA Section 106 process with the Hualapai Tribe. Further, contributing to the inadequacy of its NHPA Section 106 review, the BLM has insufficiently defined the Plan's Area of Potential Effect (APE), and it has rejected the Hualapai Tribe's request to pursue ethnographic research as part of the BLM's obligations to identify historic properties.

The Hualapai Tribe has passed a resolution in opposition to this Plan, the Sandy Valley Exploration Project, and any further disturbance of the sacred cultural landscape and Cofer Hot Spring by mining activities (attached). The Inter Tribal Association of Arizona—which is an association of 21 tribal governments in Arizona that provides a forum for tribal governments to advocate for national, regional, and specific tribal concerns and to join in united action to address these issues—passed a similar resolution (attached).

**ANALYSIS**

The BLM's EA violates NEPA due to its failure to take a hard look at reasonably foreseeable effects on important tribal interests, including cultural resources. Its failed NEPA review is due in part to its failure to uphold its NHPA Section 106 obligations. If the BLM were to conduct sufficient NEPA and NHPA Section 106 reviews, it would become clear that exploration and any eventual mining activities are not feasible. Instead, these reviews would show that lithium exploration and any eventual mining is not the proper use of the public lands under the Federal Land Policy Management Act (FLPMA), 43 U.S.C. § 1701 *et seq*. The BLM therefore should disapprove or withhold approval of the Plan, as mitigation measures would not prevent unnecessary or undue degradation of public lands. *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.411(d)(3), 3809.5.

## I.      EA Does Not Properly Carry out NEPA Obligations

### A. BLM Did Not Properly Consider All Reasonably Foreseeable Effects of Plan on Protected Tribal Interests

The purpose of NEPA, 42 U.S.C. §§ 4321 *et seq.*, is generally to require federal agencies to assess the environmental effects of proposed major federal actions prior to making decisions—creating a process for considering effects while balancing the possibility of development. *See* 42 U.S.C. § 4331; *see also* 40 C.F.R. § 1500.1(b) ("The regulations in this subchapter are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies.").

NEPA requires that federal agencies take a "hard look" at the environmental consequences of a proposed major federal action before taking that action. *See*, *e.g.*, *Morris v. United States Nuclear Regulatory Comm'n*, 598 F.3d 677, 690 (10th Cir. 2010). Effects must be analyzed at more than a general level. *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("General statements about 'possible' effects and 'some risk' do not constitute the 'hard look' required by NEPA."). Although environmental assessments are the first preliminary step in determining the need for an environmental impact statement (EIS) under NEPA review, they must still contain a complete and accurate assessment of environmental impacts of the proposed action. 40 C.F.R. § 1501.5.

When taking a hard look, federal agencies must consider effects "from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship." 40 C.F.R. § 1508.1(g). Effects that should be analyzed include "effects that are later in time or farther removed in distance from the proposed action or alternatives." 40 C.F.R. § 1508.1(g). Courts have said that "[r]easonable forecasting and speculation is . . . implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

Here, the BLM put blinders on when looking at the effects of the Plan—essentially limiting its analysis of the exploratory drilling activities under the Plan to direct effects felt physically where drilling and associated activities would occur. It did not look at the many reasonably foreseeable impacts the exploratory drilling activities under the Plan would have on tribal interests in the surrounding and adjacent area. This shrunken view infects all of the BLM's so-called analyses of resource categories under the EA.

### B. Inadequate Review of Effects on Cultural Resources

#### i.      Inadequate Identification of Cultural Resources Affected

One specific enumerated purpose of NEPA is to "preserve important *historic, cultural*, and natural aspects of our *national heritage*, and maintain, wherever possible, an environment which supports diversity and variety of individual choice." 42 U.S.C. § 4331(b)(4) (emphasis added). Courts have highlighted Congress's declaration that "preserv[ing] important historic, cultural, and natural aspects of our national heritage" constitutes an important goal of the statute. *Nat'l*

*Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir.) (quoting 42 U.S.C. § 4331(b)(4)).

Courts have in turn recognized that protecting such resources is "an interest that NEPA's procedural mandate was intended to vindicate." *Id.* (quoting *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 529 (D.C. Cir. 2018)). During NEPA review, agencies must consider effects on cultural resources. 40 C.F.R. §§ 1502.16(a)(8), 1508.1(g)(1). During the NEPA process, federal agencies have an obligation to identify and evaluate potential impacts on cultural resources, which include TCPs and sacred sites. *See Pueblo of Sandia v. United States,* 50 F.3d 856, 859 (10th Cir. 1995); *Ely v. Velde*, 451 F.2d 1130, 1132 n.4 (4th Cir. 1971). The Department of the Interior has gone one step further, instituting additional procedures for ensuring consideration of sacred sites even when an action might otherwise fall into a NEPA categorical exclusion. 43 C.F.R. § 46.215(b), (i), (k) (including impacts on cultural resources and sacred sites and violations of tribal law as extraordinary circumstances); *see also* 43 C.F.R. § 46.435(c) (inviting comments from tribe when action could affect not only land to which tribe has title but also other trust resources or assets or tribal health and safety). Mitigation measures for protecting cultural resources must be considered. 40 C.F.R. § 1502.16(a)(8) ("Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.").

When analyzing impacts, NEPA requires that an agency first establish "baseline" information about a particular resource. *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) ("[W]ithout establishing the baseline conditions which exist in the vicinity of [a project] before [an action] begins, there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA."). With regard to obligations to identify cultural resources, "[d]etermining what constitutes a reasonable effort to identify traditional cultural properties depends in part on the likelihood that such properties may be present." *Pueblo of Sandia*, 50 F.3d at 861 (internal citations and quotation marks omitted). When a tribe puts a federal agency on notice of the likelihood of the presence of cultural resources, that burden increases. *See id.* at 860 ("[The information the tribes did communicate to the agency was sufficient to require the [agency] to engage in further investigations . . . .").

The cultural resources section of the EA limits its consideration only to the Class III archaeological survey, as indicated in Table 2 of the EA. EA at p. 8. The BLM stated that additional identification, including through ethnographic research by the Tribe, is not necessary due to the scope and magnitude of the undertaking. *See* Letter from James C. Bryant, Field Manager, Bureau of Land Mgmt., to Dr. Damon R. Clarke, Chairman, Hualapai Tribe (Nov. 10, 2020).

The BLM in its EA said that disturbances would be relocated to avoid cultural resources within the Plan's project area. EA at p. 5. It further states that scientifically important archaeological or paleontological resources and historical or cultural sites, structures, buildings, and objects would not be knowingly disturbed, altered, injured, or destroyed. *Id.* With regard to cultural resources, the BLM's EA acknowledges their presence but says they will not be affected—saying the

proposed drilling program is designed to avoid known resources identified by the BLM. *Id*. at p. 8.

The BLM's failure to adequately identify cultural resources present, including in consultation with the Hualapai Tribe, contributes to the EA's inadequate analysis of effects on cultural resources. The ethnographic research the Hualapai Tribe offered to conduct, which would identify TCPs, deserves the same standing as an archaeological survey in the identification of cultural resources. The BLM's position as indicated in the EA implies that academically based western science approaches to research take precedence over traditional Indigenous knowledge. This position is unacceptable and is not in keeping with the requirement to make a good faith effort to identify cultural resources. Additionally, the BLM's failure to properly carry out its Section 106 obligations—discussed below—including by giving proper weight to the Hualapai Tribe's voice in identification of cultural resources and historic properties, contributes to the BLM's cursory identification and analysis of cultural resources.

## ii. Inadequate Identification of Physical Scope of Cultural Resources Effected

In addition to failure to identify cultural resources within the BLM's defined project area, the BLM has also failed to properly consider the full geographic area in which cultural resources may be affected by the drilling activities under the Plan. The BLM's blinders to reasonably foreseeable effects allow it to avoid identification and discussion of cultural resources located nearby, even on land adjacent to the drilling area. As discussed above, the BLM is required under NEPA to examine reasonably foreseeable effects of the drilling activities under the Plan.

Similarly, the BLM's narrowly drawn Section 106 APE—discussed below—aids the BLM in ignoring cultural resources falling outside the APE by removing them from the discussion. That drilling activities will harm the sacred cultural landscape in which they will take place and the TCP located directly adjacent to the activities must be considered.

The Hualapai Tribe considers the Big Sandy Valley to be an integral part of its aboriginal territory and an important traditional cultural landscape. Early ethnographic studies documented that Hualapai families occupied at least four villages in the Big Sandy River Valley during the 1880s. The Tribe asserts that the intrusion of the proposed Plan, and any resulting mine, would adversely affect the traditional cultural landscape that the area represents for the Tribe as well as TCPs and cultural resources. The Tribe has put the BLM on notice of the cultural significance of the area repeatedly—and thus the need to adequately identify cultural resources that would be impacted by the Plan and any resulting mine.

The BLM has not properly identified all cultural resources that would be affected by the Plan—either through proper NHPA Section 106 review or standalone cultural resource identification under NEPA.

7

### iii.    Inadequate Assessment of Effects on Known TCP Under NEPA

Additionally, as noted above, the BLM is well aware of a TCP, Cofer Hot Spring, located adjacent to the exploration activity to take place under the Plan.  The BLM, being one of the agencies to determine Cofer Hot Spring eligible for inclusion on the National Register of Historic Places, has been aware of the TCP's significance for nearly 20 years, but the BLM completely omitted any documented analysis of it in the EA.

The draft EIS for the "Big Sandy Energy Project" from the early 2000s acknowledged the very real potential harm to the TCP, stating "the discharge from Cofer Hot Spring would be reduced, and possibly cease, as a result of groundwater withdrawal from the volcanic aquifer." BUREAU OF LAND MGMT., *Big Sandy Energy Project Draft Environmental Impact Statement*, DOE-AZ-010223-D (June 2001), https://www.energy.gov/sites/default/files/2019/09/f66/draft-eis-0315-big-sandy-energy-2001-06.pdf, at p. 3-86 [hereinafter Draft EIS].  The draft EIS documented that "the Hualapai Tribe also considers the Big Sandy River Valley to be part of a spiritual landscape that includes a segment of the Salt Song Trail, a spiritual path that runs through their aboriginal territory." *Id*. at p. 3-228.

Although the "Big Sandy Energy Project" was never completed, the same hydrogeological dynamics and concerns are obviously relevant to consider here.  In fact, these concerns should be considered as potentially even more acute in these times of climate change, as the "Big Sandy Energy Project" was being analyzed at the very onset of a severe drought period that continues to this day with no sign of relief.

Although the BLM was one of the lead agencies for the draft EIS, there is no mention of this prior documentation in the EA for the Plan, either in the cultural resources section or in the Native American religious concerns/traditional values section.  These omissions demonstrate that the BLM did not conduct adequate background research or meaningful consultation when preparing the current EA.

### iv.    Status as Fee Land or Public Lands Does Not Diminish Cultural Resource Review

NEPA and the NHPA require consideration of the effects of major federal actions and federal undertakings on cultural resources and historic properties regardless of the status of land on which those cultural resources and historic properties are located. *See* 40 C.F.R. § 1508.1(w); 36 C.F.R. § 800.2(c)(2)(ii)(D).  In fact, the NEPA regulations were recently amended to clarify that effects on tribal interests should be considered even when felt off-reservation. *See* 85 Fed. Reg. 43304, 43315 (July 16, 2020).  That the Hualapai Tribe owns the land adjacent to the exploration activities to take place under the Plan in fee does not diminish these obligations.

## C. Inadequate Review of Effects on Environmental Justice

NEPA review must take into account environmental justice concerns.  Executive Order 12898 provides that each "[f]ederal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionally high and adverse human

8

health or environmental effects of its programs, policies, and activities on minority populations and low-income populations," and Native people are covered within its mandate. Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 11, 1994). NEPA review incorporates this presidential mandate to consider environmental justice. COUNCIL ON ENVT'L QUALITY, Environmental Justice: Guidance under the National Environmental Policy Act (Dec. 10, 1997), *available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.

When an agency determines that a disproportionally high and adverse human health or environmental impact on an Indian tribe may exist, it must elicit the views of that tribe on possible alternatives and mitigation measures and then consider those views as well as the disproportional impacts when choosing an alternative or mitigation measures. *Id.* at 15, 16. In this way, an agency is required to provide "heightened attention" to the alternatives, mitigation strategies, monitoring needs, and preferences expressed by the tribe. *Id.* at 10. In assessing impacts, agencies must consider impacts on social and community structure. *Id.* at 9 (mandating consideration of "the effect of any disruption on the community structure associated with the proposed action; and the nature and degree of impact on the physical and social structure of the community").

Further, the BLM Land Use Planning Handbook provides guidance that the BLM should identify and assess environmental justice impacts of proposed actions in conjunction with the NEPA compliance process, and that identification and documentation of environmental justice concerns should proceed in coordination with the impacted environmental justice populations of concern. *Land Use Planning Handbook*, App'x D at p. 11. The Handbook states: "An explanation of how any Environmental Justice issues have been considered and, where possible, mitigated should be included in the description and rationale for the preferred alternative." *Id.* at p. 13.

Courts have recognized that "[t]he purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low income populations." *Allen v. Nat'l Institutes of Health*, 974 F.Supp.2d 18, 47 (D. Mass. 2013) (quoting *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003)). In conducting NEPA review, agencies must "consider alternatives to avoid or minimize disproportionately high adverse impacts on minority populations." *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 476 (6th Cir. 2014).

Environmental assessments that are "silent . . . on the distinct cultural practices of [a] [t]ribe and the social and economic factors that might amplify its experience of the environmental effects of [a project] . . . could seriously and disproportionately harm those individuals relative to those in nearby non-tribal communities." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engrs.*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017). And an EA that does not offer more than a "cursory" or "bare-bones conclusion that [a tribe] would not be disproportionately harmed by a [project]" does not "properly consider the environmental-justice implications of the project [and fails] to take a hard look at its environmental consequences." *Id.*

The BLM's EA states there are no environmental justice issues present—claiming that minority and low-income populations are present but not at levels that warrant their classification as such for purposes of environmental justice concerns. EA at p. 8. The EA states the Plan would not

cause any disproportionally high or adverse effects on minority or low income populations either individually or collectively.  *Id.*

The EA essentially dismisses environmental justice concerns as a resource category analyzed in the EA.  This is a serious deficiency for multiple reasons.  It is also reflective of the BLM's insistence on ignoring reasonably foreseeable effects of the drilling activities covered by the Plan—where the BLM's blinders set the stage for its conclusion that the drilling activities will not raise environmental justice concerns.

First, maintenance of the Hualapai Tribe's cultural resources is closely tied to the social and community structure of the Tribe.  Harm to the Tribe's cultural resources therefore raises environmental justice concerns.  The activities covered by the Plan have the very real potential to harm the Tribe's cultural resources.

Additionally, mining and mining exploration activities adjacent to the Hualapai Tribe's land will severely diminish the Tribe's ability to develop this land for any economic pursuits, such as agriculture or recreation.  And the operation of a mine in this area would all but destroy the market value of this land, itself, as it is still held in fee and thus the Tribe could conceivably sell it (although an application to transfer the land into trust was submitted in 2014).  In this respect, the exploration activities at issue in the Plan are a prime example of a federal agency disregarding the interests of an underserved minority community.

The BLM should have considered the Hualapai Tribe an environmental justice population of concern under Executive Order 12898, and it should have taken into account effects on the Tribe's cultural resources as well as the economic value of the Tribe's land in this analysis.  As indicated in our positions outlined in our letters to the BLM on June 29, 2020, and November 2, 2020, we have identified tribal concerns that should have been assessed by the BLM during early planning and in the EA in compliance with the BLM's environmental justice obligations.

### D. Inadequate Review of Effects on Native American Religious Concerns/Traditional Values

The BLM must consider effects on tribal cultural practices—an impact category intertwined with cultural resource and environmental justice considerations.  The BLM has significant obligations to consider impacts on tribes' ability to access and protect their sacred places, and these obligations should be considered during NEPA review.

Executive Order 13007, entitled Indian Sacred Sites, directs agencies to manage federal lands to accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and to avoid adversely affecting the physical integrity of such sacred sites.  Exec. Order No. 13007, 61 Fed. Reg. 26771 (May 24, 1996).

Additionally, the American Indian Religious Freedom Act states that "it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred

objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996; *see also* 42 U.S.C. § 1996a.

Further, protections for the rights of Native Americans to maintain their cultural traditions, practice their own religion, and strengthen their ties to their traditional homelands is clearly defined in the United Nations Declaration on the Rights of Indigenous Peoples, arts. 11–12, 25–26, Oct. 2, 2007, A/RES/61/295, which was endorsed by the United States in 2010.  Relevant excerpts are included below:

> *Article 11*
> Indigenous peoples have the right to practice and revitalize their cultural traditions and customs. This includes the right to maintain, protect and develop the past, present and future manifestations of their cultures, such as archaeological and historical sites, artefacts, designs, ceremonies, technologies and visual and performing arts and literature.

> *Article 12*
> Indigenous peoples have the right to manifest, practice, develop and teach their spiritual and religious traditions, customs and ceremonies; the right to maintain, protect, and have access in privacy to their religious and cultural sites; the right to the use and control of their ceremonial objects; and the right to the repatriation of their human remains.

> *Article 25*
> Indigenous peoples have the right to maintain and strengthen their distinctive spiritual relationship with their traditionally owned or otherwise occupied and used lands, territories, waters and coastal seas and other resources and to uphold their responsibilities to future generations in this regard.

> *Article 26*
> Indigenous peoples have the right to the lands, territories and resources which they have traditionally owned, occupied or otherwise used or acquired.

The BLM's EA states that "Native American Religious Concerns/ Traditional Values" may be a concern, but it labels their presence and affects as "To Be Determined," stating that consultation is ongoing to determine any concerns.  EA at p. 10.

This deficiently again is facilitated by the BLM's refusal to consider reasonably foreseeable effects of the Plan's drilling activities.  As discussed above, the Hualapai Tribe has repeatedly put the BLM on notice of the cultural significance of the area in which the Plan is set to take place.  In addition to permanent harm done to the landscape itself, the Hualapai Tribe's traditional practices will be disrupted.  Tribal members frequently conduct ceremonies and other spiritual activities at Cofer Hot Spring.  During previous drilling phases in 2018–2019, it was reported that the noise and vibration caused by the drilling activity was a very disruptive presence.  Considering that the proposed drilling and other work involving heavy equipment will be three times more expansive than the previous exploratory drilling, even "temporary"

disturbances will have a very disruptive effect on tribal members' ability to perform these activities over periods of several months.

The potential for the disruptive consequences of exploratory drilling and the associated disturbances caused by heavy equipment, and the AIRFA and other obligations to protect against such disturbances, was not addressed in any form in the BLM's EA. The Hualapai Tribe asserts that the presence of these activities will be an infringement on religious and spiritual practices, not to mention what might come in the future should an open pit mine become operational. Such disruptions must be considered in a NEPA review.

### E. Inadequate Review of Effects on Visual Resources

The BLM's EA states that any visual impacts "should not attract the attention of the casual observer." EA at p. 12. The EA claims that surface disturbances will be "temporary," and that ground disturbances will be reclaimed by Hawkstone. *Id.* at p. 12. Again, this inadequate analysis is facilitated by the BLM's refusal to consider reasonably foreseeable effects. The Hualapai Tribe maintains that the desert environment surrounding Cofer Hot Spring is part of the sacred cultural landscape connected to the spring and the Salt Song Trail. In any case, the EA does not define what "temporary" means. In the fragile Sonoran Desert environment encompassed by the proposed action, reclamation will likely take many years, perhaps generations before the landscape is healed back to a semblance of its former condition. Such effects must be considered in a NEPA review.

### F. Inadequate Review of Effects on Water Resources and Water Quality

Hawkstone proposes to pump water from an existing inactive well located on BLM land approximately 600 feet from Cofer Hot Spring. *See* EA at p. 16. Alternatively, purchased water from Wikieup may be trucked in to the project area should the well not be viable or otherwise available to them. *Id.* Regarding the well, and in keeping with the comment that the EA must consider reasonably foreseeable effects, there should be an analysis of potential impacts to local aquifers, including the potential for perched aquifers.

The EA states that exploratory drilling will not exceed 360 feet below the ground surface, and it claims this drilling will not reach the known groundwater table. EA at p. 3. However, "recent field measurements of this well in May 2021 indicate current groundwater level is about 69 feet below land surface (bls) and a total depth of the well is 306 feet bls. This places groundwater clearly within the exploration depths of past and proposed future exploration drilling activities." Montgomery and Associates summary report at p. 5 (attached). The EA fails to thoroughly present or analyze data that could affect water resources or water quality. Should an incident occur that affects groundwater conditions, we have serious concerns as to how this might affect Cofer Hot Spring discharge or water quality, or other water resources in the area.

The earlier-prepared draft EIS for the "Big Sandy Energy Project" contained considerable discussion about the potential water use that project would entail. Draft EIS at p. 3-57–3-93. The lower Big Sandy River valley aquifer is primarily recharged through precipitation runoff and springs from the Aquarius Mountains east of the project area. *Id.* at p. 3-57. Cofer Hot Spring

12

"emanates from the same volcanic formation that makes up the aquifer proposed for development, and is hydraulically connected to the volcanic aquifer by faulting." *Id.* at 3-79.

Keeping in mind that the previously-prepared draft EIS was prepared 20 years ago, just as our current long-term severe drought was beginning, substantial aquifer drawdown was predicted. The draft EIS said: "The Proposed Action likely would have a significant impact on the volume of water discharged from Cofer Hot Spring" and that "the available information indicates that the source of Cofer Hot Spring is connected to the lower aquifer and its flow would be reduced, or possibly eliminated, by the pumping of groundwater for the Project from the lower aquifer." *Id.* at p. 3-77. Now that we have an extraordinary abundance of accumulated long-term data that has provided a clearer picture of climate change, we should expect that any such water use will have even greater consequences.

Of particular concern regarding the presently-proposed Plan is effects on the volcanic fault that supplies water to Cofer Hot Spring, which passes through the proposed drilling area in a northwest-southeast orientation. Effects on Cofer Hot Spring's water supply inherently also raise cultural resource and traditional cultural practices concerns. We refer to the geohydrological summary by Montgomery and Associates for a more detailed discussion of potential risks (attached). The summary notes that drilling could result in impacts to thermal artesian flow to Cofer Hot Spring should uncontrolled artesian flow occur from drill holes—a possibility the summary acknowledges as real. The lack of analysis or any consideration of this risk to a National Register eligible TCP is a serious deficiency in the EA. .

Further, if Cofer Hot Spring is impacted, there is no consideration of whether there are endangered or endemic species that inhabit or depend on these waters. An important water resource that was considered in the previously-prepared draft EIS was the marsh habitat in the lower Big Sandy River Basin. *Id.* at p. 3-210–3-211. This wetland is critical habitat for willow flycatcher and yellow-billed cuckoo, and is one of the few remaining wetlands in all of Arizona. Similarly, considering that the spring creates a desert oasis surrounded by an extremely dry desert, and that aquatic species in particular may be found only in the Cofer Hot Spring environment and nowhere else, these effects should be investigated in the EA. In addition, the microenvironment created by Cofer Hot Spring is also a potential habitat for the willow flycatcher, yellow-billed cuckoo, and the recently listed Northern Mexican Gartersnake—the ranges of which all fall within or very close to the vicinity of the Plan's proposed project area. The EA fails to consider any of these outcomes in the analysis of either water resources or endangered species, again due in large part to its failure to consider reasonably foreseeable effects of the Plan's drilling activities.

In the face of extreme drought, we believe the water-related impacts noted in the previously-prepared draft EIS will only be exacerbated to an even greater scale, and planning for these contingencies should occur now rather than during a later NEPA review.

### G. Inadequate Review of Effects on Surface Water Rights

The previously-prepared draft EIS noted potential impacts on surface water rights, stating: "The surface water rights that potentially could be impacted are those pertaining to Cofer Hot Spring

13

and the Big Sandy River downstream of Granite Gorge. . . .  It has been demonstrated through aquifer testing and numerical groundwater modeling that discharge from Cofer Hot Spring would be reduced, and possibly cease, as a result of groundwater withdrawal from the volcanic aquifer."  Draft EIS at p. 2-51, 3-86.  At the time of the draft EIS, it was noted that: "Cofer Hot Spring is located on privately owned land.  Discharges from the spring are used on site and do not flow off site.  Caithness [the proponent] has agreed in concept with the landowner to provide compensation for impacts on the spring."  *Id.*

Effects on surface water rights should have been considered in the EA for the Plan.  Given that the concerns about Cofer Hot Spring are not related to water for livestock, but rather for religious and spiritual purposes, such compensation would now be irrelevant.  The EA must consider the reasonably foreseeable effects on surface water, including as it relates to the Hualapai Tribe's religious and spiritual purposes.

### H.  Inadequate Review of Effects on Indian Trust Assets

Federally recognized Indian tribes are domestic dependent nations, and the federal government is obligated to protect tribal interests, a duty that is referred to as the trust responsibility.  *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 5.04[3][a] (2012) ("Nearly every piece of modern legislation dealing with Indian tribes contains a statement reaffirming the trust relationship between tribes and the federal government.").  This trust doctrine is defined through treaties, laws, executive orders, judicial decisions, and agreements.  *See United States v. Mitchell*, 463 U.S. 206, 225 (1983).  Protection of trust land, assets, and resources is one area in which the trust responsibility is particularly enforceable.  *See id.* at 227–28.

The BLM has failed to uphold its obligations to consider reasonably foreseeable effects on the Tribe's trust assets and other tribal interests.  Additionally, when the Hualapai Tribe was first notified of Hawkstone's application to conduct further exploration, we responded affirmatively to the BLM's NHPA Section 106 consultation request, and we further requested that we become a NEPA cooperating agency.  We did this in the belief that we could provide specialized knowledge and expertise with various resource categories, but also so that we could stay apprised of the proposed actions during early planning states, rather than after the EA was completed.  Our request for cooperating agency status was denied, based on the argument that it would not be commensurate with the proposed undertaking.  Considering that the Hualapai Tribe is the landowner immediately adjacent to the proposed action, which literally surrounds Hualapai land on three sides, how could it be suggested that our involvement would not be "commensurate" with the proposed action?

The BLM's dismissal of the Tribe's request to become a cooperating agency exhibited willful disregard for tribal sovereignty and an abrogation of federal trust obligations.

### I.  Inadequate Review of Effects on Grazing Lease

The Hualapai Tribe is the current grazing leaseholder for much of the area subsumed by the Plan's project area adjacent to Hualapai land.  There is no discussion of how the proposed

exploration activity under the Plan may affect the Hualapai Tribe's ability to utilize this lease, either during or after the proposed action. EA at p. 10.

### J.  BLM Must Conduct Sufficient Studies Prior to Any Steps Towards Development, Including Exploration

Courts have found that NEPA review is sometimes necessary at the lease sale stage of oil and gas development, where the BLM took the position that such review was not necessary until later, at the application for permit to drill stage. In *New Mexico ex rel. Richardson*, the court said "assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009) (internal citations omitted). In that case, the court concluded that environmental impacts were reasonably foreseeable because considerable exploration had already occurred on adjacent land, a natural gas supply was known to exist beneath the parcels, and concrete plans and approvals for oil and gas projects were in place. *Id.*

Here, the BLM told the Hualapai Tribe additional identification of cultural resources and historic properties, including through ethnographic research by the Tribe, is not necessary due to the scope and magnitude of the undertaking—which it said is not on the magnitude of disturbance of a mining plan of operations. Letter from James Bryant, Field Manager, Bureau of Land Mgmt., to Dr. Damon R. Clarke, Chairman, Hualapai Tribe (Nov. 10, 2020). It said it would evaluate and consider ethnographic research as it pertains to the appropriate level of effort to identify historic properties as part of the environmental review conducted for any future mining plan of operations within the exploration area. *Id.*

This is not appropriate. That execution of the Plan will result in a mine is reasonably foreseeable—where two phases of exploration have already taken place, allowing Hawkstone to hone in on the location of lithium, and where Hawkstone has provided presentations detailing its mining plans. Further, on a practical level, allowing additional commitments of resources by Hawkstone, the Hualapai Tribe, the BLM, and others in pursuing or objecting to this development is an inefficient waste of resources.

### K.  Hualapai Tribe Should Have Been Granted Cooperating Agency Status

During the NEPA process, tribes are to be consulted, *see* 40 C.F.R. §§ 1505(e), 1501.2(b)(4)(ii), 1506.6(b)(3)(ii), and they may serve as cooperating agencies, 40 C.F.R. §§ 1508.1(e), 1501.8.

As part of the NEPA scoping process, a lead agency is directed to invite the participation of likely affected tribal governments, including as cooperating agencies. 40 C.F.R. § 1501.9(b); *see also* 40 C.F.R. § 1501.8(a). The BLM's Tribal Relations Handbook states:

> The BLM's land use planning process under FLPMA and the NEPA analysis that accompanies it provides an early opportunity for tribes to help inform BLM decisions with the potential to affect their interests through both formal consultation and *serving as cooperating agencies*. For example[,] tribal concerns with regard to places of traditional use or environmental justice issues are most

15

effectively identified and considered over the extended period of time afforded by
the land use planning process and associated environmental review.

BUREAU OF LAND MGMT., *Improving and Sustaining BLM-Tribal Relations* (H-1780-1), at IV-2
(Dec. 15, 2016) (emphasis added).

Cooperating agency status "provides a formal framework for . . . Tribal [governments] to engage
in active collaboration with a lead Federal agency to implement the requirements of NEPA."
BUREAU OF LAND MGMT., *Land Use Planning Handbook* (H-1601-1), at p.6 (Mar. 11, 2005).
Among other participation opportunities, cooperating agencies are allowed a seat at the table
during the NEPA scoping process, 40 C.F.R. § 1501.8(b)(2), and they may help in preparing
portions of the environmental assessment or environmental impact statement on which they have
special expertise, 40 C.F.R. § 1501.8(b)(3).

The Hualapai Tribe, owning land directly adjacent to the exploration activities considered under
the Plan and on which a TCP is located, should have been granted cooperating agency status.

## II.    BLM Failed to Comply with NHPA

### A.   Section 106 Review Must Be Allowed to Progress

The NHPA Section 106 review process places a burden on federal agencies considering a federal
undertaking to identify historic properties, assess adverse effects on them, and resolve such
adverse effects where possible. *See* 54 U.S.C. § 306108, 36 C.F.R. Part 800; *see generally* 54
U.S.C. § 300101 *et seq.*

NHPA Section 106 review should be interwoven with NEPA review, where they inform one
another. Agencies preparing a NEPA review must do so concurrently and integrated with review
under the NHPA. 40 C.F.R. § 1502.24(a); *see also* 36 C.F.R. § 800.8 (mandating coordination
between NHPA review and NEPA review). Therefore, the scope and sufficiently of the NHPA
Section 106 review directly effects the sufficiency of the NEPA cultural resource review.[1]
Further, an agency must complete the NHPA Section 106 process "prior to the approval of the
expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 36
C.F.R. § 800.1(c).

The Plan's NHPA Section 106 review has not moved forward enough to properly inform NEPA
review. Although the BLM on June 6, 2020, invited the Hualapai Tribe to engage in NHPA
Section 106 consultation, and the Tribe responded on June 29, 2020, and again November 2,
2020, accepting the invitation, the BLM did not respond until November 10, 2020. The BLM
has not engaged in sufficient dialogue with the Tribe around the Plan's potential effects on the
Tribe's historic properties—instead claiming based on its narrowly drawn APE that the BLM
will ensure that operations avoid the historic property identified, for a finding of no historic
properties affected.

---

[1] However, it is important to note that effects on cultural resources to be considered under NEPA cover a wider
range of resources than historic properties considered under the NHPA. 40 C.F.R. §§ 1508.1(g), 1502.16(a)(8).

## B. Section 106 Tribal Consultation Not Properly Carried Out

Tribes must be consulted throughout the Section 106 process, including "any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking." *See, e.g.*, 36 C.F.R. § 800.2. They must also be consulted when identifying historic properties. *See* 36 C.F.R. § 800.4. Established case law requires that "[w]hen an undertaking may affect properties of historic value to an Indian tribe on non-Indian lands, the consulting parties shall afford such tribe the opportunity to participate as interested persons." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006) (citing *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 806 (9th Cir. 1999)). Further, "tribes known to have used the area should [be] consulted to determine whether they ha[ve] a different view of potential adverse effects." *Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1153 (D. Mont. 2004).

The NHPA was amended in 2014 to specifically provide for identification of TCPs as historic properties in consultation with Indian tribes—stating "[p]roperty of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register." 54 U.S.C. § 302706(a); *see also* National Park Service, National Register Bulletin 38 (1992). The NHPA provides that, when an agency carries out its Section 106 obligations, it "shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to" such a TCP. 54 U.S.C. § 302706(b).

The BLM says it conducted a Class I inventory within a one-mile buffer of the APE and a Class III archaeological survey of the APE. Letter from James Bryant, Field Manager, Bureau of Land Mgmt., to Dr. Damon R. Clarke, Chairman, Hualapai Tribe (Nov. 10, 2020). It claims these studies are sufficient and turned down the Tribe's request to provide ethnographic data through studies specific to the proposed undertaking. *Id.* The BLM is not complying with its Section 106 tribal consultation obligations.

## C. Area of Potential Effect Too Narrowly Defined

An NHPA Section 106 review process must include "appropriate scoping, identification of historic properties, assessment of effects upon them, and consultation leading to resolution of any adverse effects." 36 C.F.R. § 800.8(a)(3). The NHPA requires federal agencies to define the APE, which is "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d). The BLM must consider all adverse effects including "reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5; *see also Coal. of Concerned Citizens To Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transportation*, 843 F.3d 886, 907 (10th Cir. 2016) (discussing NHPA indirect effects). Failure to do so renders Section 106 review insufficient.

The APE was drawn too narrowly, *see* Letter from James Bryant, Field Manager, Bureau of Land Mgmt., to Dr. Damon R. Clarke, Chairman, Hualapai Tribe (Nov. 10, 2020), resulting in the exclusion of the Hualapai Tribe's land—despite the fact that reasonably foreseeable effects, which must be analyzed under the NHPA and NEPA, will be felt on the Tribe's land and other tribal interests.  The Tribe was not consulted in determining the APE or the breadth of the cultural resources that might be impacted by the drilling activities under the Plan.

Also excluded from the APE is Cofer Hot Spring (Ha'Kamwe), a TCP of which the BLM had prior notice.  The BLM in a letter to the Tribe dated November 10, 2020, said the Hualapai Tribe "considers" Cofer Hot Spring to be a TCP, and it said the TCP is located outside the APE.  Letter from James Bryant, Field Manager, Bureau of Land Mgmt., to Dr. Damon R. Clarke, Chairman, Hualapai Tribe (Nov. 10, 2020).  However, the previously-prepared draft EIS for the "Big Sandy Energy Project" said "Western (Western Area Power Authority) and BLM have concluded, in consultation with the State Historic Preservation Officer (SHPO), and the Advisory Council on Historic Preservation (ACHP), that Cofer Hot Spring is eligible for the National Register of Historic Places.  *See* Draft EIS at p. 2-10; *see also id.* at p. 3-9.  Thus, the BLM should have been on notice that Cofer Hot Spring is a TCP located adjacent to the drilling activities under the Plan, and it should have included this TCP in its NHPA Section 106 review as well as its NEPA review.

We request that the APE be expanded to encompass effects on the Tribe's land and cultural resources and historic properties, including the Cofer Hot Spring TCP, and the interconnected sacred cultural landscape.  With an inadequate APE informing the Section 106 review, this information cannot be integrated into NEPA review—making both the NHPA and NEPA review inadequate.

### III.    BLM Failed to Properly Balance Land Use Under FLPMA

The BLM in the EA states the need for the Plan is established by the BLM's responsibility under FLPMA, 43 U.S.C. § 1701 *et seq.*, as well as the Mining Law of 1872, 30 U.S.C. § 21 *et seq.*, and the BLM surface management regulations and use and occupancy regulations, 43 C.F.R. Subparts 3715 and 3809.  EA at p. 1–2.

The purpose of FLPMA is generally to ensure that public lands in federal ownership are utilized in ways that serve the national interest, that management is undertaken on the basis of multiple use, and that use is determined through a land use planning process that involves the public.  *See* 43 U.S.C. § 1701.  One particular enumerated purpose of FLPMA is that "the public lands be managed in a manner that will protect the quality of scientific, scenic, *historical*, ecological, environmental, air and atmospheric, water resource, and *archeological values*; that, where appropriate, will *preserve and protect* certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and *human occupancy and use*."  *Id*. (emphasis added).  In determining appropriate multiple use, historical values must be considered in the balance.  43 U.S.C. § 1702(c).  Special attention is given to protecting "areas of critical environmental concern," 43 U.S.C. §§ 1712(c)(3), 1701(a)(11), which includes areas requiring special management attention to protect historic, cultural, or scenic values, 43 U.S.C. § 1702(a); *see also* 43 U.S.C. § 1711(a)

(prioritizing areas of critical environmental concern in the inventory of public lands).  Courts have emphasized that "[t]he principle of multiple use does not require BLM to prioritize development over other uses."  *Richardson*, 565 F.3d at 710.  And agencies must comply with the tribal consultation and collaboration requirements set forth in FLPMA.  *See* 43 U.S.C. § 1712(c)(9); 43 C.F.R. § 1610.3-1(a)(4).

Additionally, FLPMA obligates the BLM to maintain a current inventory of cultural resources. *See* 43 U.S.C. § 1711(a) ("The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values. . . .  This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values."); *see also* 54 U.S.C. § 306102(b)(1) (directing federal agencies to ensure that "historic property under the jurisdiction or control of the agency is identified, evaluated, and nominated to the National Register").  Instead, the BLM has allowed exploratory drilling activities to take place repeatedly throughout the sacred landscape without a reasonably thorough understanding of the location, significance, and condition of cultural resources in the area.

Thus, if the BLM seeks to comply with its obligations under FLPMA, the BLM must properly prioritize the land's status as sacred to multiple tribes and its ongoing use for traditional purposes. The BLM therefore should disapprove or withhold approval of the plan of operations, as mitigation measures would not prevent unnecessary or undue degradation of public lands.  43 C.F.R. § 3809.411(d)(3)(iii).

**CONCLUSION**

The Hualapai Tribe has a wide range of concerns that have not been adequately addressed in the EA. We cannot emphasize enough the threat we anticipate by the proposed exploratory drilling activities under the Plan and what may come in the future, should an open pit mine become operational.

The BLM's EA violates NEPA due to its failure to take a hard look at potential effects on important tribal interests, including cultural resources.  Its failed NEPA review is due in part to its failure to uphold its NHPA Section 106 obligations.  If the BLM were to conduct sufficient NEPA and NHPA Section 106 reviews, it would become clear that exploration and mining activities in this area are not feasible—and that lithium exploration and mining is not the proper use of the public lands under FLPMA.  The BLM therefore should disapprove or withhold approval of the plan of operations, as mitigation measures would not prevent unnecessary or undue degradation of public lands.

**REQUESTED ACTION**

We hereby respectfully request that the BLM halt any further consideration or review of the legally inadequate EA and instead conduct NEPA review that properly considers impacts on the Hualapai Tribe's and other tribes' interests, rights, and resources—including cultural resources.  The Hualapai Tribe and other tribes must be properly consulted, including through a meaningful implementation of NHPA Section 106 review.

19

We urge you not to issue a "Finding of No Significant Impact" based on the legally insufficient EA, and we ask that you halt the permitting of additional mining exploration at this time pending sufficient NEPA and NHPA Section 106 review. Although we appreciate and generally support efforts to develop renewable clean energy resources, we also believe it can be done in the spirit of responsible stewardship that honors tribal sovereignty and respects trust obligations toward Indian tribes.

With regard to the NHPA Section 106 review, the Hualapai Tribe requests:
(1) Expansion of the APE to properly consider all potential effects of the Plan;
(2) Additional identification of cultural resources and historic properties, including with the help of the Hualapai Tribe, both within the existing APE and in the expanded APE;
(3) Consideration of effects on the Cofer Hot Spring TCP, where the APE should include the TCP; and
(4) Proper consideration of effects on all identified historic properties in the expanded APE and mitigation measures for them.

With regard to the NEPA review, the Hualapai Tribe requests:
(1) The NHPA Section 106 process be allowed to proceed properly so that it may inform the NEPA review;
(2) The BLM not issue a "Finding of No Significant Impact" but instead conduct proper NEPA review; and
(3) The NEPA review properly consider all reasonably foreseeable effects on the rights and interests of the Hualapai Tribe and other tribes, including related to cultural resources.

Thank you for your consideration. We hope to move forward in mutual cooperation to ensure that proper NEPA and NHPA Section 106 review take place.

Sincerely,

Dr. Damon R. Clarke
Chairman
Hualapai Tribe

CC:
Mary-Ellen Walsh, Arizona SHPO, mwalsh@azstateparks.gov
Valerie Hauser, Director, Office of Native American Affairs, ACHP, vhauser@achp.gov
William Dancing Feather, Native American Program Analyst, ACHP, wdancingfeather@achp.gov
Bill Marzella, Program Analyst/BLM Liason, ACHP, bmarzella@achp.gov
Linda Otero, Director, AhaMakav Cultural Society, lindaotero@fortmojave.com
Eva Kissoon, Chairwoman, Havasupai Tribe, htchair@havasupai-nsn.gov
Carletta Tilousi, Councilwoman, Havasupai Tribe, htc2@havasupai-nsn.gov
Stewart Koyiyumptewa, THPO, Hopi Tribe, skoyiyumptewa@hopi.nsn.us
Daniel Bulletts, Director, Southern Paiute Consortium, dbulletts@kaibabpaiute-nsn.gov
Linda Ogo, Culture Research Department Director, Yavapai-Prescott Indian Tribe, logo@ypit.com

Gertrude Smith, Director, Yavapai-Apache Nation Cultural Center, yavapaiculture@yan-tribe.org
Deb Haaland, U.S. Secretary of the Interior
Bryan Newland, Principal Deputy Assistant Secretary, Office of the Assistant Secretary – Indian Affairs
Laura Daniel-Davis, Principal Deputy Assistant Secretary, Office of the Assistant Secretary – Land and
    Mineral Management
Darryl LaCounte, Director, Bureau of Indian Affairs
Nada Wolff Culver, Acting Director, Bureau of Land Management


ATTACHMENTS:
Technical Comments to Environmental Assessment, Montgomery & Associates
Resolution 24-2021, Hualapai Tribe Objection to the Sandy Valley Lithium Project
ITAA Resolution 0212 - Objection to the Sandy Valley Lithium Project

# ATTACHMENT 4

The Great Spirit created Man and Woman in his own image. In doing so, both were created as equals. Both depending on each other in order to survive. Great respect was shown for each other; in doing so, happiness and contentment was achieved then, as it should be now.

The connecting of the Hair makes them one person; for happiness or contentment cannot be achieved without each other.

The Canyons are represented by the purples in the middle ground, where the people were created. These canyons are Sacred, and should be so treated at all times.

The Reservation is pictured to represent the land that is ours, treat it well.



The Reservation is our heritage and the heritage of our children yet unborn. Be good to our land and it will continue to be good to us.

The Sun is the symbol of life, without it nothing is possible – plants don't grow – there will be no life – nothing. The Sun also represents the dawn of the Hualapai people. Through hard work, determination and education, everything is possible and we are assured bigger and brighter days ahead.

The Tracks in the middle represent the coyote and other animals which were here before us.

The Green around the symbol are pine trees, representing our name Hualapai – PEOPLE OF THE TALL PINES –

**HUALAPAI TRIBE**
**OFFICE OF THE CHAIRPERSON**

Damon R. Clarke, Ed. D
*Chairman*

P.O. Box 179 / 941 Hualapai Way • Peach Springs, Arizona 86434
(928) 769-2216

Shelton "Scott" Crozier
*Vice Chairman*

July 9, 2021

Ms. Angelica Rose
Bureau of Land Management
Kingman Field Office
2755 Mission Blvd
Kingman, AZ  86401

Submitted via ePlanning Commenting Portal

> RE:  Supplemental Comments on Sandy Valley Exploration Project (Phase 3)
> Environmental Assessment, NEPA Number DOI-BLM-AZ-C010-2021-0029-EA

Dear Ms. Rose:

The Hualapai Tribe submits these supplemental comments, which together with the Tribe's comments submitted on June 10, 2021, constitute the Tribe's comments on the Environmental Assessment ("EA") for the Big Sandy, Inc., Sandy Valley Exploration Project (Phase 3).

## I.     The Hualapai Tribe is Entitled to Be a Cooperating Agency

As set out in the Tribe's June 10, 2021, comments, the Tribe has been denied cooperating agency status by the BLM.  This decision is bewildering, especially considering the BLM's own guidance favors granting interested tribes cooperating agency status.  U.S. Dept. of Interior Bur. of Land Mgmt., 1-1781, *BLM Handbook Improving and Sustaining BLM-Tribal Relations* (2016) "BLM Handbook". The BLM Handbook provides that BLM line officers should inform tribal officials of opportunities to participate in the

development of BLM plans, including a potential cooperating agency role. *Id.* at IV-5. Information from tribes can be gained through both consultation and the tribe's cooperating agency involvement. *Id.* at IV-7. The BLM Handbook further provides that "[i]t is entirely an individual tribe's choice to become a cooperating agency when they feel that it is in their best interest to do so." *Id*. at IV-5. The BLM should review a tribe's eligibility to be a cooperating agency "based on their local knowledge of culturally distinctive uses and an understanding of the land and resources involved, which often may be wide-ranging". *Id.* at IV-6.

The Hualapai Tribe desires to be a cooperating agency, possesses local knowledge of culturally distinctive uses, and an understanding of the land and resources involved. The Tribe is entitled to be a cooperating agency under the BLM's own guidance.

## II.     Tribal Consultation Not Properly Carried Out

The National Historic Preservation Act's ("NHPA") Section 106 process requires federal agencies to "consult with any Indian tribe ... that attaches religious and cultural significance to" a historic property potentially affected by a federal undertaking. 54 U.S.C. § 302706(b); *see also id.* § 306102. The NHPA established an independent agency, the Advisory Council on Historic Preservation ("ACHP"), 54 U.S.C. § 304101, which is responsible for promulgating regulations "to govern the implementation of" Section 106, *id.* § 304108(a). The ACHP has issued a handbook that provides direction to federal agencies on how to carry out tribal consultation. Advisory Council on Historic Preservation, *Consultation with Indian Tribes in the Section 106 Process: The Handbook* (2021). This guidance document provides that: "[t]he consultation process must provide an Indian tribe a reasonable opportunity to:

   (a) Identify its concerns about historic properties
   (b) Advise on the identification and evaluation of historic properties including those of religious and cultural significance to the Indian tribe
   (c) Articulate views on the undertaking's effects on such properties; and
   (d) Participate in the resolution of adverse effects."

*Id.* at 6. The guidance further provides that "[i]n all cases, consultation should be approached with flexibility that respects the tribe's role within the overall project planning process and facilitates its full participation." *Id.* The BLM has not provided us a reasonable opportunity to participate in the consultation process regarding identification and assessment of adverse effects on historic properties in accordance with the ACHP Handbook guidance. As set out in the Tribe's June 10, 2021, comments, tribal consultation with the Tribe has not been completed. As the ACHP Handbook provides, the BLM should approach the planning process with flexibility so that it may have the Tribe's full participation.

The BLM has also developed its own Handbook to provide "direction for all BLM programs for improving and sustaining tribal relations, including government-to-government consultation." BLM Handbook at I-1. The BLM Handbook defines consultation as direct two-way communication between the agency and a tribal government regarding proposed BLM actions. BLM Handbook at III-2. The purpose of consulting is to obtain substantive tribal input and involvement during the decision-making process. The precise nature of this interaction should be mutually agreed to between the tribe and the BLM through consultation. BLM Handbook at III-2.

The BLM Handbook provides that the NEPA document must fully discuss tribal issues and provide a summary of tribal consultation in order to demonstrate that tribal concerns have been heard and their positions considered. BLM Handbook at IV-9.

The BLM Handbook explicitly recognizes the special Federal-tribal relationship and notes that tribal issues and recommendations should be fully discussed and addressed in relevant sections of the text within the NEPA document. *Id.* The BLM Handbook provides that the discussion of tribal issues and recommendations should occur in the following sections:

- Scoping and Issues. Include a specific discussion of scoping issues raised by tribes.
- Affected Environment. Include a section that introduces those tribes with interests in the project and identifies resources or issues of significance to them.
- Alternatives. Discuss how tribal issues shaped the alternatives considered.
- Environmental Impacts. Address impacts, including cumulative effects, to tribal concerns and refer to more detailed discussions in other sections, such as impacts to water, biological, or botanical resources of tribal significance.

*Id.* at IV-9.

The EA fails to fully discuss and address tribal issues and recommendations in each of these sections. This directive for full and robust tribal consultation is echoed in President Biden's recent *Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships* issued in January, finding that "it is a priority of my Administration to make respect for Tribal sovereignty and self-governance, commitment to fulfilling Federal trust and treaty responsibilities to Tribal Nations, and regular, meaningful, and robust consultation with Tribal Nations cornerstones of Federal Indian policy." 86 Fed. Reg. 7491 (Jan. 26, 2021).

In order to comply with its own agency guidance, the BLM should halt further planning on this project in order to complete tribal consultation and then fully discuss and address tribal issues and recommendations in a more robust EIS document.

## III.   The EA Fails to Take a Hard Look at the Impacts of the Project on Water Resources and Rights

A water budget for the Big Sandy basin was developed to evaluate groundwater impacts of the Big Sandy Energy Project in 2001. U.S. Dept. of Interior, Bur. of Land Mgmt., *Draft Environmental Impact Statement Big Sandy Energy Project* (June, 2001) ("DEIS"); Big Sandy Energy Project Groundwater Technical Report in Appendix F at 3-43. At the time the budget was created, the Basin appeared to be in balance – with all inflow (23,206 acre-feet per year) being used as outflow. *Id.* at 3-44; 3-47. The Basin was assumed to be in a balanced steady state based on observed water levels from six Arizona Department of Water Resources "index wells" that are measured annually. *Id.* at 3-47.

However, the budget does not appear to include any projections for future use and was based on then current uses – meaning that any additional uses would cause an overdraft on the Basin. Since the water budget was developed, the drought situation in Arizona has only gotten worse. Mohave County faces extreme to exceptional drought conditions, as does virtually all of Arizona and most of the southwestern United States. The BLM must complete a new updated water budget that assesses current use and potential imbalances, including assessing the effects of pumping projected to occur during the Phase 3 exploration activities, in order to appropriately determine the impact on groundwater in the Basin.

In the prior DEIS, a number of groundwater studies were conducted, including an 11-day constant discharge aquifer test (DEIS, Appendix D), stable isotope test, and a groundwater model (DEIS, Appendix F). DEIS 3-54. The stable isotope study showed that the lower aquifer is the groundwater source for Cofer Hot Spring. DEIS 3-57. The BLM must specify what aquifer will be pumped and update the groundwater studies in light of drought conditions to ensure that Cofer Hot Spring will not be adversely impacted.

Additionally, the Tribe has surface water rights in the area as a result of the Bill Williams River Water Rights Settlement. These rights are not addressed in the EA despite the fact that BLM guidance specifically mentions the agency researching water rights. The BLM Handbook provides that the agency should "[p]ay particular attention to land claims; boundary disputes; water rights; hunting, fishing, and gathering concerns; past and current tribal economic development proposals; ethnographic studies; and published and unpublished documentary sources." BLM Handbook at III-9.

## IV.    The EA Fails to Take a Hard Look at the Impacts of the Project on Important Cultural and Traditional Sites.

The Big Sandy Energy Project was proposed for the same general area as this project. That project was ultimately abandoned, but the Draft Environmental Impact Statement provided important data and analysis for this project. For example, the analysis in the DEIS regarding Cofer Hot Spring and the surrounding cultural landscape should have been considered in the EA.

The DEIS for the Big Sandy Energy Project concluded that "intrusion of the plant into the traditional cultural landscape of the Hualapai Tribe would be a significant impact. Even with the implementation of mitigation measures, significant impacts would remain." DEIS at S-33; 3-238.

The DEIS further noted that the visual intrusion of the plant and introduction of noise represented a long-term alteration of the setting of cultural resources. DEIS at 3-239. It further noted that from the Hualapai Tribe's perspective, these effects would be just as adverse as the direct physical destruction of part of the site. *Id.* In our comments submitted on June 10, 2021, we stated that past drilling in 2018 and 2019 caused notable noise and vibration experienced at the sacred Ha'Kamwe' (Cofer Hot Spring), and that additional extensive drilling that would occur as part of the proposed undertaking will be an intrusion on cultural practices at and near the spring.

The EA simply concludes that the recorded cultural resource sites (in this case, restricted to a consideration only of archaeological sites) will be avoided and therefore there will be no impact. EA at 5, Table 2. No analysis regarding visual and noise impacts on the cultural resources is conducted in the EA as was noted in the Tribe's June 10, 2021, comments. In fact, Native American Religious Concerns/Traditional Values are simply identified as "to be determined." EA at 10, Table 2. A "hard look" should involve a discussion of adverse impacts that does not improperly minimize negative side effects. *Native Ecosystems Council v. U.S. Forest Service,* 428 F.3d 1233, 1241 (9th Cir. 2005).

## V.    The EA Fails to Take a Hard Look at Wildlife

The DEIS for the Big Sandy Energy Project notes that Southwest Willow Flycatcher, bald eagle, Yuma clapper rail, Arizona cliffrose, and mountain plover all occur in the area around the project site. DEIS 3-200 to 3-201. The DEIS also noted that there is suitable and potential flycatcher habitat in the riparian areas around the Big Sandy River. *Id.* at 3-201. Southwest Willow Flycatcher surveys were completed in 2000 within a 2 mile stretch of the Big Sandy River around the U.S. 93 bridge crossing and 77 flycatchers were found. *Id.* at 3-202. In addition, 15 confirmed pairs occurred in

5

the survey area and it was noted as possibly one of the densest flycatcher populations in Arizona. *Id.* at 3-202.

The DEIS further found that the "region of influence" for the bald eagle included the Big Sandy River corridor and that suitable habitat was present in riparian areas along the River. DEIS at 3-201 to 3-202. The DEIS noted that it was possible that bald eagles could pass through the Big Sandy River valley. DEIS at 3-203. The DEIS also noted a number of other special status species of bats, birds (including yellow-billed cuckoo), reptiles, amphibians, fish, and plants have been documented in and around the area. *Id.* at 3-206 to 3-208.

The EA for this project, on the other hand, claims that "[t]here are no federal Threatened, Endangered species in the Project Area" and identifies the Sonoran desert tortoise as the only sensitive status species that may be present. EA at 12 tbl.2, 14-15. Similarly, the Biological Evaluation prepared for the Exploration Plan provides an in-depth analysis of impacts on only the Sonoran desert tortoise. Biological Evaluation ("BE") at 6 & tbl.3, 13-21. The Biological Evaluation makes absolutely no reference to the Yuma clapper rail, and claims, without any further explanation, that the project site does not contain suitable habitat for the Arizona cliffrose, bald eagle, southwestern willow flycatcher, and yellow-billed cuckoo. BE at 7, 11-12 & tbl.4. As the Tribe noted throughout its June 10, 2021 comments, the BLM limits its analysis to the project footprint, and does not appear to consider if there would be any direct, indirect, or cumulative impacts on these species beyond those narrow boundaries. However, NEPA requires that agencies analyze exactly those impacts.  As a result, the BLM does not provide any explanation to support its conclusion that there are no threatened, endangered, or other special status species in the area in either the EA or the Biological Evaluation. Indeed, neither document acknowledges the agency's prior findings from the DEIS on the presence of these species in the area.

The BLM's "commitment" to undertake wildlife surveys and ensure environmental awareness training cannot substitute for the agency's failure to analyze the impacts of the Exploration Plan on threatened, endangered, and special status species in the area. EA at 6. First, the majority of the "commitments" are specific to only desert tortoises, and so ignore the other species noted above that have been observed in and around the project area. *Id.* Second, without first analyzing the impact the Exploration Plan would have on threatened, endangered, and special status species in and around the project area, the BLM cannot determine what "commitments" may be necessary to limit or avoid any adverse impacts. Third, and finally, the BLM similarly failed to analyze whether its "commitments" would actually limit or avoid adverse wildlife impacts.

The BLM must take a hard look at the impacts of the Exploration Plan on species in the area before it approves any plan for further drilling in order to satisfy its obligations under NEPA. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (explaining that agencies must take a "hard look" at the impacts of their actions to "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.").

## VI.   The EA Fails to Include an Analysis of the Cumulative Effects[1] of the Proposal Combined with the Effects of the Previous Drilling and Any Other Activities in the Area

The Big Sandy drilling proposal would be the third phase of lithium prospecting using core drilling methods on the BLM lands adjacent to the Cholla Canyon Ranch, where the sacred Ha'Kamwe' (Cofer Hot Spring) is located. The BLM lands that would be impacted by the proposed drilling are home to native wildlife, as well as vegetation used for medicinal and other purposes by our people. The Sonoran desert tortoise, listed as a sensitive species, is also present in the area impacted by this phase of the drilling activity. As described in our June 10, 2021 comments, the land is part of a "vast cultural landscape [that] includes archaeological sites and other traditional cultural places, as well as plant, wildlife and water resources." Additionally, "the surrounding big Sandy River Valley and adjacent mountains, hills, and deserts are part of the ancestral homelands of the Hualapai Tribe" as well as a number of other indigenous people with ties to this area. Letter from Dr. Damon R. Clark, Chairman of the Hualapai Tribe, to Angelica Rose, Bureau of Land Management at 2 (June 10, 2021). As explained above, the EA fails to take a hard look at the impacts of drilling on these resources, including the aquifer that

---

[1] We understand that the previous administration published amendments to the NEPA regulations that purported to remove the regulatory requirement that agencies analyze cumulative impacts in their NEPA documents. However, the Interior Secretary has issued an order halting application of regulations and policies inconsistent with NEPA, Sec. Order No. 3398 (Apr. 16, 2021), and the Council on Environmental Quality recently expressed concerns about the legality of the 2020 regulations and therefore postponed by two years the date by which departments must promulgate rules implementing the regulations. 86 Fed. Reg. 34154 (June 21, 2021). At any rate, courts held NEPA required analysis of cumulative impacts even before the regulatory requirements took effect. *Hanly v. Kleindiesnt*, 471 F.2d 823, 830-31, 836 (2d Cir. 1972); *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 972 (2d Cir. 1976) (citing *Scientists' Inst. For Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1086-87 (D.C. Cir. 1973)). As a result, the BLM must provide an analysis of the cumulative impacts of the proposal, together with other relevant impacts, as explained above.

feeds Cofer Hot Spring; this flaw is compounded by the EA's failure to analyze the cumulative effects of all three drilling phases on these resources.

Despite the fact that impacts caused by the third drilling phase proposed here would add to impacts from the nearby first two phases—which would combine to surround the Cholla Canyon Ranch on three sides—the EA discusses the impacts of the third phase in a vacuum, without any analysis of the cumulative impacts of all three drilling phases. The EA does not, for example, analyze the cumulative effects of the full drilling program, of which the proposed action is one part, and explain how the program would impact the broader cultural landscape, the wildlife in the area (including the sensitive Sonoran desert tortoise, which was likely impacted by the first two drilling phases[2]), the aquifers, or the availability of native vegetation of cultural significance to our people and other indigenous peoples with ties to this area.

Impacts to the sacred Ha'Kamwe' is particularly worrisome to us, because cultural and religious interests are threatened by the drilling—not only as proposed in this EA, but exacerbated by the impacts from past drilling activity and foreseeable future activity related to the proposed mine. Yet the EA contains no information about the impacts to the Spring from all of these activities.

Moreover, Hawkstone's promotional videos and its website describe the Big Sandy River as a "major northern Arizona tributary," and explains that the river is fed by an aquifer that underlies the Big Sandy lithium mineralization. https://hawkstonemining.com.au/#test-popup-2. The EA fails to explain how the three phases of the drilling program, or the mine itself, could impact the groundwater that flows into the Big Sandy River, a rare source of water in an otherwise arid environment. Additionally, there is no information in the EA about the drilling materials, including their chemical composition, that might impact the water quality of the aquifer or, ultimately, the water quality of Cofer Hot Spring. It is insufficient to acknowledge that accidental release of hazardous materials is a possibility, but to then dismiss the potential impact with a simple statement that such material would be properly contained and cleaned up. EA at 12.

In addition to the three phases of the drilling activity, there is apparently other mining and mine-related activity in the area that could have cumulative impacts that would exacerbate the impacts associated with the drilling phase proposed here. The BLM must investigate, identify, and analyze any such impacts.

---

[2] The EA acknowledges that the tortoise is present throughout the project area and on adjacent lands, including temporary use areas and access roads. EA at 14-15. How these tortoises might have been impacted by the first two phases of the drilling program and related activities is not described in the EA, which instead limits its analysis to the 26 acres of vegetation predicted to be disturbed by the third drilling phase only. *Id*. at 16.

Failure to analyze the impacts of all three drilling phases, together with any other activity that could cause cumulative effects that would add to those caused by this proposal, violates NEPA's requirement that agencies analyze the cumulative impacts of their actions. Cumulatively significant impacts "cannot be avoided by . . . breaking [an action] down into small component parts." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) (requiring a single EIS for multiple timber sales that could cumulatively impact the "same watershed"; quoting 40 C.F.R. §1508.27(b)(7)). *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011) ("It is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now.").

## VII.   The EA Ignores NEPA's Mandate to Analyze Reasonably Foreseeable Impacts

Reasonably foreseeable effects that must be analyzed in an EA include those that "have a reasonably close causal relationship to the proposed action or alternatives, including those effects that … are later in time or farther removed in distance from the proposed action or alternatives." 40 C.F.R. § 1508.1(g). These include effects on "natural resources and on the components, structures, and functioning of affected ecosystems[], aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. *Id*. at 1508.1(g)(1).

Here, the EA's failure to analyze the impacts of the drilling proposal together with Hawkstone's stated plans to develop the mine itself violates NEPA's requirement to consider reasonably foreseeable effects. It results in an impermissibly segmented approach that obscures the full impact of the entire proposal—the drilling and the subsequent mine development—on both environmental resources but also the broader cultural landscape and on related traditional and religious practices and values held by our people and other Tribes with ancestral ties to the affected area. Hawkstone's plans to develop a mine are not speculative, but sufficiently concrete for the BLM to analyze its impact on the affected environmental and cultural resources. Accordingly, the EA must include an assessment of the impact of the mine as a reasonably foreseeable outgrowth of the drilling proposal.

It is no secret that the three drilling phases described above are just the preliminary steps that lay the groundwork of Hawkstone's larger plan to develop a lithium mine on the BLM lands surrounding the Ranch. Hawkstone has actively publicized and promoted its plan to develop a lithium mine based on the information it obtains through the drilling program. For example, it has published information online that describes how, "in February 2019, the Company commenced a fully funded 37-hole diamond drilling program on the Big Sandy project, which has produced exceptional results and high grade intercepts with a peak lithium value of 4,380 PPM to date." https://hawkstonemining.com.au/big-sandy-lithium/. Additionally, Hawkstone's website provides aerial views of the mine site and the areas of lithium deposits, predicts success

9

in developing the mine, and even refers to it as the "soon to be Big Sandy Lithium Mine." https://hawkstonemining.com.au/#test-popup-2. Hawkstone representatives have specifically informed the BLM and the public of its intent to develop a mine that would extract the lithium deposits identified through the drilling program.

In fact, Hawkstone has made public presentations which include Powerpoint slides that describe the mining phase of the project. The slides from the June 7, 2021, meeting in Wikieup, Arizona compare the Big Sandy Surface Quarry to a Copper Open Pit, describe Kingman process plant facilities, and ore slurry and return water pipelines. The slides further indicate that mine and plant construction are anticipated to commence in 2024, with initial mining operations commencing in 2025.

Thus, Hawkstone's plans to develop a mine are not speculative, but are sufficiently concrete for the BLM to analyze its impact on the affected environmental and cultural resources. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 644 (9th Cir. 2004) (rejecting argument that lower court abused its discretion by ordering cumulative impacts analysis before site-specific proposal had been made) (citing *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 563, 567 (9th Cir. 2000)). Ignoring the existing information about the proposed mine would violate NEPA by postponing analysis of an environmental consequence to the last possible moment. Instead, NEPA requires such analysis as soon as it can reasonably be done. *See Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1246 n. 9 (9th Cir.1984). "Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1092 (D.C.Cir.1973); *N. Plains Res. Council v. Surface Transp. Bd.*, 688 F.3d 1067, 1079 (9th Cir. 2011) (same). "While 'foreseeing the unforeseeable' is not required, an agency must use its best efforts to find out all that it reasonably can." *City of Davis v. Coleman*, 521 F.2d 661, 678 (9th Cir. 1975). By delaying this crucial environmental analysis until it receives individual requests for drilling permits, the BLM risks relegating the analyses to the "tyranny of small decisions." *Id.* at 1078.

While certain details about the mine may yet to be refined, the absence of such detail does not justify the BLM's failure to acknowledge the looming development of the mine altogether. Instead, it must assess what it knows and make reasonable predictions about the extent of those impacts.

## VIII.   The EA Fails to Present and Analyze a Full Range of Reasonable Alternatives

Informed and meaningful consideration of all reasonable alternatives that meet the proposal's purpose and need is central to NEPA's statutory scheme and objectives and ensures that environmental assessments accurately characterize a proposal's costs, benefits, and environmental impacts. NEPA thus requires federal agencies to "rigorously explore and objectively evaluate all reasonable alternatives to a proposed action." 40

C.F.R. § 1502.14(a).  Failure to do so renders the NEPA document inadequate.  *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005) (*NRDC v. USFS*); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (holding that EIS that failed to consider an alternative that was consistent with applicable regulation violated NEPA).  This requirement ensures that agencies "have before them and take into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit analysis."  *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988).[3]

Here, the EA considered only two alternatives:  Hawkstone's proposed drilling plan and the no action alternative.  The EA dismissed the possibility of other reasonable alternatives in just four lines of text, rationalizing that "no additional issues or environmental concerns have been raised to date necessitating analysis of additional alternatives to limit impacts.  Any possible alternative actions would be limited by the location of the mineral resource and the narrow focus of the exploration drilling program."  EA at 7.  This bare-bones approach to the alternatives requirement is flawed for at least two reasons.  First, it ignores other approaches to meeting Hawkstone's purpose and need. Second, the BLM's rationale is premature and factually unsupported since its ongoing NHPA consultation with the Tribes is still underway and the BLM has yet to gather data and information in that process that would inform its assessment of the need for, and design of, less-impactful alternatives.  Similarly, as described above, the EA's assessment of the impacts to environmental resources is so superficial (the discussion of impacts to the Tribes is non-existent, EA at 10 (noting that impacts to tribes are "To Be Determined")), that it is simply impossible for the BLM to make a reliable determination as to the feasibility or design of other reasonable alternatives.  Accordingly, the BLM must complete its consultation with the Tribes, supplement its EA with analysis that meets NEPA requirements, and then revisit its alternatives analysis with inclusion of additional alternatives that better meet the Hualapai's concerns and provide a more appropriate balance of Hawkstone's and the public's interests in resource protection.

---

[3] We acknowledge that NEPA's requirement to analyze a full range of reasonable alternatives applies with somewhat greater force for environmental impact statements. However, as noted above, the NEPA significance factors weigh strongly in favor of BLM's preparation of an EIS instead of an EA.  Thus, BLM should prepare an EIS that not only takes a hard look at the full scope of environmental impacts, but also presents and analyzes a full range of reasonable alternatives.  Yet, even if an EA were sufficient, BLM may not simply ignore reasonable alternatives that meet the proposal's purpose and need, are consistent with the agency's authority, protect the interests of the interested Tribes, and balance resource uses appropriately.  Two alternatives—the proposal and the no action alternative, as the BLM presented here—are not *per se* permissible.

## IX. The BLM Should Prepare an EIS

As demonstrated in the Tribe's June 10, 2021, comments, together with these supplemental comments, there are numerous gaps in the EA's analysis. An Environmental Impact Statement ensures that agencies consider the environmental impacts of their decision-making. 40 C.F.R. § 1502.1. An agency may prepare an EA in order to determine whether an action significantly affects the environment, such that an EIS is necessary. 40 C.F.R. § 1501.5. "If substantial questions are raised as to whether a project ... *may* cause significant degradation of some human environmental factor," the "agency must prepare an EIS." *Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1274 (9th Cir. 2017) (omission and emphasis in original) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1219 (9th Cir. 2008)). "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)). This statement of reasons is critical to determining whether the agency took the requisite "hard look" at the potential environmental impact of a project. *Blue Mountains Biodiversity Project,* 161 F.3d at 1212.

The BLM has not provided a "convincing statement of reasons" to explain why this project's impacts are insignificant. In fact, the issues raised in our comments and by other commenters demonstrate that substantial questions have been raised as to whether a project "may cause significant degradation of some human environmental factor". As a result, the BLM should prepare an EIS for this project.

## X. Conclusion

Due to the numerous issues in the EA described in the Tribe's June 10, 2021, comments, as well in these supplemental comments, the Hualapai Tribe urges the BLM to complete a robust Environmental Impact Statement for the project that will provide the requisite analysis to comply with NEPA—and we request this additional NEPA review carry forth the specific requests set forth in the "requested action" section of the Tribe's June 10, 2021 comments.

The Tribe restates its request to become a cooperating agency. The Tribe further requests that NHPA Section 106 consultation be completed before the BLM continues with any further analysis of this project—and we request this NHPA Section 106 review carry forth the specific requests set forth in the "requested action" section of the Tribe's June 10, 2021 comments.

I would be happy to discuss any of these concerns with you at a future consultation.

Sincerely,

Dr. Damon R. Clarke
Chairman
Hualapai Tribe


CC:
Mary-Ellen Walsh, Arizona SHPO, mwalsh@azstateparks.gov
Valerie Hauser, Director, Office of Native American Affairs, ACHP, vhauser@achp.gov
William Dancing Feather, Native American Program Analyst, ACHP, wdancingfeather@achp.gov
Bill Marzella, Program Analyst/BLM Liason, ACHP, bmarzella@achp.gov
Linda Otero, Director, AhaMakav Cultural Society, lindaotero@fortmojave.com
Eva Kissoon, Chairwoman, Havasupai Tribe, htchair@havasupai-nsn.gov
Carletta Tilousi, Councilwoman, Havasupai Tribe, htc2@havasupai-nsn.gov
Stewart Koyiyumptewa, THPO, Hopi Tribe, skoyiyumptewa@hopi.nsn.us
Daniel Bulletts, Director, Southern Paiute Consortium, dbulletts@kaibabpaiute-nsn.gov
Linda Ogo, Culture Research Department Director, Yavapai-Prescott Indian Tribe, logo@ypit.com
Gertrude Smith, Director, Yavapai-Apache Nation Cultural Center, yavapaiculture@yan-tribe.org
Deb Haaland, U.S. Secretary of the Interior
Bryan Newland, Principal Deputy Assistant Secretary, Office of the Assistant Secretary – Indian Affairs
Laura Daniel-Davis, Principal Deputy Assistant Secretary, Office of the Assistant Secretary – Land and
    Mineral Management
Darryl LaCounte, Director, Bureau of Indian Affairs
Nada Wolff Culver, Acting Director, Bureau of Land Management

# ATTACHMENT 5



January 11, 2023

Amanda Dodson
Field Manager, Kingman Field Office
Bureau of Land Management
2755 Mission Blvd.
Kingman, AZ 86401

Ref:   *Sandy Valley Exploration Project*
       *Mohave County, Arizona*
       *ACHP Project Number: 016998*

Dear Ms. Dodson:

In December 2022, the Advisory Council on Historic Preservation (ACHP) met with the Hualapai Tribe and their representatives to discuss the Tribe's concerns with the referenced undertaking and its potential effects on Ha'Kamwe (also known as Cofer Hot Spring). Ha'Kamwe is a sacred medicinal spring that has previously been determined eligible by the Bureau of Land Management (BLM) for listing in the National Register of Historic Places for its religious and cultural significance to the Hualapai Tribe. The Tribe also indicated that it is a sacred site important to religious and cultural practices of the Tribe. It is the ACHP's understanding that the BLM has concluded its review under Section 106 of the National Historic Preservation Act for this undertaking and reached a finding of no historic properties affected, in accordance with 36 CFR § 800.4(d)(1), in summer 2021. Based on information provided by the Tribe, the ACHP has concerns that the BLM did not adequately consider the Tribe's analysis and special expertise in evaluating the undertaking's potential to adversely affect Ha'Kamwe, notably the exploration activities' potential for noise, vibration, and impacts on attributes that make this property eligible for inclusion on the Register, including groundwater supply and quality.

The ACHP advises the BLM to reinitiate consultation with the Hualapai Tribe to consider whether its determination is adequately supported, and to reexamine its identification and evaluation measures as necessary. The ACHP also acknowledges that the Tribe has expressed concerns regarding other aspects of the BLM's analysis and decision making, including under the National Environmental Policy Act (NEPA), Executive Order 13007 ("Indian Sacred Sites"), and several applicable Secretarial Orders and BLM Instruction Memoranda regarding traditional knowledge and Indian co-stewardship. Although the ACHP does not advise on these matters independently, we remain available to provide assistance on coordinating these requirements with those of Section 106. Further, we have guidance on effective coordination of these joint requirements available on our website, including *Traditional Knowledge and the Section 106 Process*, *A Handbook for Integrating NEPA and Section 106*, and "The Relationship Between Executive Order 13007 Regarding Indian Sacred Sites and Section 106."

The ACHP provides this advice under 36 CFR § 800.9(a) to assist the BLM in complying with the Section 106 implementing regulations, and we look forward to further consultation on this matter. Please keep us informed on the status of these reviews, both for this and future exploration and mining

ADVISORY COUNCIL ON HISTORIC PRESERVATION

401 F Street NW, Suite 308 • Washington, DC 20001-2637
Phone: 202-517-0200 • Fax: 202-517-6381 • achp@achp.gov • www.achp.gov

undertakings in this location. If we may be of further assistance, please contact Bill Marzella, ACHP Liaison to the BLM, at (202) 517-0209, or via e-mail at bmarzella@achp.gov.

Sincerely,

Reid J. Nelson
Director
Office of Federal Agency Programs

CC      Shelton S. Crozier, Vice Chairman, Hualapai Tribe
        Martina Dawley, THPO, Hualapai Tribe
        Kathryn Leonard, Arizona SHPO
        Matt Basham, Deputy Preservation Officer, BLM Arizona

# ATTACHMENT 6



**Southwest Hydro-Logic**

265 Ridge Road
Durango, Colorado 81303
Phone:   (970) 259-2851
Mobile:  (970) 749-3950
Email:    info@swhydrologic.com

## MEMORANDUM

**To:**        Hualapai Tribal Council, Peach Springs, Arizona

**From:**    Winfield G. Wright, M.S., P.E., C.P.H., *Southwest Hydro-Logic (SWHL)*

**Subject:** Big Sandy Final EA Review, and forwarding of technical report by SWHL
               *Preliminary Assessment of the Hydrology and Geochemistry of Ha' Kamwe'*

**Date:**     March 11, 2024

   This memorandum provides review comments regarding the Final Environmental Assessment (Final EA) for the Big Sandy Inc., Phase 3 Big Sandy Valley Exploration Project, by the U.S. Department of the Interior, Bureau of Land Management, Kingman Field Office, February 2024.  This memorandum also forwards the SWHL informational 2023 report written for and approved by the Hualapai Tribe. Available data indicate that any activity within the spring aquifer and recharge area, including exploration drilling, threatens the flow, temperature, and chemistry of the Ha' Kamwe' spring.  Aquifer- and surface-disturbing geologic exploration were conducted during 2018-19 directly upgradient and within the recharge area of the spring.  Disturbing exploration has again been proposed, with a large increase in the number of boreholes planned, such that the recharge area for the spring will be riddled with vertical boreholes, affecting aquifer recharge, aquifer hydraulic conductivity and storativity, spring-water temperatures, and spring-water chemistry.

## I.  The Final EA Lacks Support for the Assumption
## That Exploratory Boreholes Will Be Dry

   The Final EA inaccurately depicts the groundwater hydrology of the Big Sandy Basin, presuming that exploration boreholes would be dry, and no water would be encountered.  This presumption is problematic given the following:

- The water table on the plateau upgradient 390 feet to the east of the spring is 68 to 69 feet below land surface (airstrip well).
- Proposed borehole depths of 360 feet would penetrate more than 250 feet below the Big Sandy River.
- Water levels in Test Holes near Sycamore Creek ranged from 20 feet below land surface to flowing artesian conditions (Caithness, 2000a).
- During Caithness (2000a) studies, test holes were drilled into lacustrine clay deposits, where the drill holes soon filled with water after drilling, indicating that the lacustrine deposits are not dry.  Given limestone and mudstone layers in the lacustrine deposits, development of solution enlarged karst conduits provide avenues for rapid transmission of groundwater.

Where unfractured, the lacustrine deposits are not impermeable, rather behaving as a semi-confining layer to the over-pressured artesian aquifer.

• With variable thicknesses of the lacustrine deposits that may act as a semi-confining layer, proposed borehole depths of 360 feet could penetrate the lacustrine deposits, and would encounter artesian pressures beneath the semi-confining layer, as described in Caithness (2000a).

These data indicate that proposed boreholes are likely to encounter water--the opposite of what the Final EA has assumed.  Any claim that no groundwater will be encountered needs to be backed up by data such as the 2018-19 Phase 1 and 2 drilling records.

The hydrogeologic nomenclature presented in the Final EA uses terminology from the Big Sandy Energy project, where the subsurface water-producing zones were arbitrarily divided into separate units called the upper, middle, and lower aquifer (Caithness, 2000a).  The attempts to define discrete aquifer boundaries were based on Caithness, LLC's corporate interests to establish groundwater sources as cooling water for the energy project.  However, the divisions were based on observations from a few deep wells within the energy project property.  In contrast, established documentation refers to the Big Sandy Basin as one single connected aquifer with interbedded layers of lower- and higher-permeability units (Davidson, 1973; Campbell and Jones, 1979; Cady, 1980; Arizona Dept of Water Resources, 2009).  Distinctions are made between the shallow sand and gravel alluvial aquifer and the lower-basin fill, but the Big Sandy Basin is generally viewed as a single connected aquifer.  From Davidson (1973, p. 32):

> The saturated rock units are treated as a single aquifer because they are hydraulically connected, and ground water moves from one unit to another in response to head differential. Ground water generally is under unconfined conditions near the land surface but probably is confined at depth, particularly in places where the permeability of the aquifer is not uniform with depth--a condition that generally occurs where the aquifer material is a coarse sand or gravel separated by less permeable beds of silt, clay, or marl.

The Final EA mistakenly uses the Caithness data as proof that exploration drilling will not affect Ha' Kamwe'; however, the Final EA needs to use all available references and publications.  The hydrogeologic nomenclature used by the Final EA needs to be changed to reference the established, acceptable nomenclature.  Use of the terms upper, middle, and lower aquifer needs to be abandoned.

Spring discharge monitoring data have shown that Ha' Kamwe' can be affected by groundwater withdrawals from deep artesian wells south of the spring in the Sycamore Creek area.  An appropriate analogy for this would be a bowl full of water, with a plug at the bottom of the bowl—pull the plug and the bowl will empty.  Ha' Kamwe' is located at the top of the bowl.

The location of Ha' Kamwe' is likely due to the presence of faults and fractures (indicated by lineaments) that transmit groundwater from the over-pressured deep-basin aquifer to the surface through karst aquifer conduits developed in the Big Sandy Formation **(Figure M1)**.  With the presence of limestones and mudstones in the basin-fill deposits (Shepherd and Gude, 1972), widespread karst aquifer conduit development is likely throughout the Big Sandy Valley.  Therefore, it is likely that the exploration boreholes could intersect karst aquifer conduits, causing unabated artesian flow of groundwater from the over-pressured deep basin aquifer, which could then drain the entire aquifer system, causing Ha' Kamwe' and numerous other springs and wells in the region to go dry.

**In order to prepare for the possibility of encountering the over-pressured artesian aquifer, the Final EA needs to include a contingency plan describing methods to isolate, plug, and permanently seal artesian groundwater discharges from proposed boreholes.**

## II. The Final EA Fails to Consider That the Project Could Cause Pollutant Discharges Into Waters of the US.

Of the 131 proposed boreholes in the Final EA, 39 boreholes and a large-diameter bulk sampling hole  are located directly in the Bitter Creek stream channel and riparian zone **(Figure M1)**.  As described in the plan of operation, pits would be excavated for drilling fluid containment, and drilling fluids with polymer base would likely be discharged to the stream channel, not to mention the usual fuel and oil leaks from heavy equipment.  In



2

the 2001 Big Sandy Energy, the Bitter Creek riparian zone was identified as Qualifying Waters of the US (Caithness, 2000b).  The Final EA proposes to drill, excavate, and bulk sample directly within the stream channel.  The activities are directly in a floodplain, as shown in Figure 2e of the Final EA.  Thunderstorms and flash floods during proposed activities could present human-health and pollutant discharge hazards.

**Additional analyses need to be completed in the Final EA to describe impacts of the proposed activities on waters of the US.  The Final EA needs to describe whether 404 permits are required to excavate pits and dispose drilling fluids into the stream channel.  Health and safety plans need to include an early warning and response system for thunderstorms and flash floods.**

### III.  Final EA Shows Numerous Technical and Editorial Errors

There are numerous technical and editorial problems with the Final EA.  For example, the cover page of the report shows an incomplete title.  In the January 2021 Draft EA, the project area was described as 613 acres, and Figure 1 showed two small outlines of the project boundary.  In the subject Final EA, the Project site is described as 613 acres, but the Project Boundary shown in Figure 1 encompasses more than 7,700 acres.  In this Final EA, Figures 3A, 3B, and 3C are missing; Figure 4 is supposed to show a generalized cross-section of the Project area hydrography, but there is no Figure 4 in Appendix C.  Given the expanded Project Boundary, it seems likely that samples for soil, rock, biota, and water will be collected throughout the expanded project area; therefore, these activities should be included in the Final EA.

The "Manera 2000" report citation in the Final EA is incorrect.  In the June 2001 Big Sandy Energy Draft EIS, the Manera work is incorporated into Caithness (2000a, 2000b), and referenced by the energy project applicant as (Caithness, 2000b); other environmental studies are referenced as Caithness (2000c).   In the subject Final EA, the "Manera 2000" report describes the lacustrine deposits as the Wikieup Formation, and cites the USGS report by Shepherd and Gude (1972).  But there is no such thing as the Wikieup formation; the correct name is the Big Sandy Formation.  The Caithness (2000a, 2000b) reports used incorrect geologic nomenclature, and the Final EA quoting Caithness used the incorrect geologic nomenclature.  The Final EA states that the lacustrine deposits vary in thickness from 200 to more than 600 feet (data from the Sycamore Creek energy project).  However, the USGS report indicates that due to erosional unconformities, the Big Sandy Formation varies widely in thickness, according to measured thicknesses ranging from 57 to 245 feet.  Proposed boreholes depths of 360 feet would penetrate the thinner lacustrine deposits and encounter over-pressured artesian groundwater conditions.

Arizona Administrative Code Title 12, Chapter 15: R12-15-816 specifies that boreholes must be pressure sealed using downhole tremie pipes to deliver grout to the bottom of the boreholes in order to prevent vertical migration of groundwater.  Boreholes previously drilled during 2018-19 did not use tremie pipes to seal the abandoned boreholes; therefore, those boreholes were improperly abandoned.  The Final EA needs to specify that boreholes must be sealed and properly abandoned, and the well abandonment and project completion forms must be filed with the Arizona DWR, including detailed drilling logs.  These forms were not completed for the 2018-19 drilling programs.

**References Cited**

Caithness Big Sandy, L.L.C., 2000a. Water Resources of the Southern Portion of the Big Sandy Valley, Wikieup, Mohave County, Arizona.

Caithness Big Sandy, L.L.C., 2000b. Big Sandy Energy Project Geology Report. Prepared by Manera, Inc., submitted by Caithness Big Sandy, L.L.C. June.

Caithness Big Sandy, L.L.C., 2000c, Big Sandy Energy, Application for a Certificate of Environmental Compatibility, Supplemental Information:  Prepared for State of Arizona Power Plant and Transmission Line Siting Committee, October 19, 2000.

Montgomery & Associates, 2012, Addendum to summary of aquifer testing of the confined volcanic aquifer at Well PW-2 in the Big Sandy Valley:  Technical Memorandum to Freeport-McMoran Baghdad Inc., December 17, 2012.

Sheppard, R.A., and Gude, A.J., III, 1972, Big Sandy Formation Near Wikieup, Mohave County, Arizona:  U.S. Geological Survey Bulletin 1354-C, 10 p.

**ATTACHMENT:**

Southwest Hydro-Logic, 2023, Preliminary Assessment of the Hydrology and Geochemistry of Ha' Kamwe' (Cofer Hot Spring), Mohave County, Arizona, 2023:  Southwest Hydro-Logic, Hydrologic Studies Report 2023-01, provided to the Hualapai Tribal Council July 2023, updated March 11, 2024.





**Figure M1.**  The Big Sandy River valley, Ha' Kamwe spring, faults and lineaments, outline of the basin-fill deposits, previously drilled exploration boreholes, and proposed new exploration boreholes.



# Preliminary Assessment of the Hydrology and Geochemistry of Ha' Kamwe' (Cofer Hot Spring), Mohave County, Arizona, 2023

*Hydrological Studies Report 2023-01*



Prepared for:

Hualapai Tribe
Peach Springs, Arizona



Prepared by:

*Southwest Hydro-Logic, LLC*
Durango, Colorado



(Cover:  Geologic cross section derived from available data and reports.
Stratigraphic thicknesses not to scale.  Non-linear vertical scale.)

# Preliminary Assessment of the Hydrology and Geochemistry of Ha' Kamwe' (Cofer Hot Spring), Mohave County, Arizona, 2023

*Hydrological Studies Report 2023-01*

*by Winfield G. Wright, M.S., P.E., C.P.H.*

Prepared by:

*Southwest Hydro-Logic, LLC*
Durango, Colorado



Prepared for:

Hualapai Tribe
Peach Springs, Arizona



**CONVERSION FACTORS AND ABBREVIATIONS USED IN THIS REPORT**

**CONVERSION FACTORS:**

| Multiply | By | To obtain |
|---|---|---|
| cubic foot per second (ft$^3$/s) | 0.02832 | cubic meter per second (m$^3$/sec) |
| foot (ft) | 0.3048 | meter (m) |
| gallon | 3.78 | liter (L) |
| inch | 25.40 | millimeter (mm) |

Degrees Celsius ($^o$C) may be converted to degrees Fahrenheit ($^o$F) by using the following equation:

$$^oF = 9/5(^oC) + 32$$

**ABBREVIATIONS:**

The following terms and abbreviations may be used in this report:

ft (feet)
lb (pound)
mi$^2$ (square miles)
ft$^3$/sec (cubic feet per second)
gpm (gallons per minute)
inches per year (in/yr)
acre-feet per year (acre-ft/yr)
acre-feet per month (acre-ft/mo)
milligrams per liter (mg/L)
micrograms per liter (μg/L)
micrograms per liter (ug/L)
meter (m)
milliliter (mL)
millimeter (mm)
kilometer (km)
microsiemens per centimeter at 25 degrees Celsius (μS/cm@25$^o$C)

*Southwest Hydro-Logic, LLC*
265 Ridge Road
Durango, Colorado 81303
(970) 259-2851
website: www.swhydrologic.com
email: info@swhydrologic.com
Updated March 11, 2024

NOT FOR DESIGN OR CONSTRUCTION

# CONTENTS

Page

Executive Summary .................................................................................................... i
Introduction ............................................................................................................... 1
    Climate and Weather ............................................................................................ 1
Previous Studies and Information Sources.................................................................. 1
Geologic Setting ........................................................................................................ 5
    Faults and Lineaments ......................................................................................... 6
Hydrologic Setting ..................................................................................................... 6
    Surface Water ....................................................................................................... 6
    Spring Discharges................................................................................................. 8
    Groundwater and Wells ....................................................................................... 9
    Groundwater Temperatures and Thermal Springs............................................... 9
Water Chemistry of Ha' Kamwe', Wells, and Other Springs ..................................... 9
    Water-Analysis Diagram ..................................................................................... 9
    Sources of Water for Ha' Kamwe' ....................................................................... 12
        Isotopes of Water................................................................................... 12
        Isotopes of Dissolved Sulfate ............................................................... 14
Discussion .................................................................................................................. 14
    Ha' Kamwe' Is Part of A Karst Aquifer System.................................................. 14
    Sources of Geothermal Water.............................................................................. 16
    Recharge Area for Ha' Kamwe' ........................................................................... 17
    Effects of Exploratory Drilling............................................................................ 17
    Effects of Groundwater Pumping ........................................................................ 18
    Additional Data Collection Efforts and
       Scientific Investigations Are Needed .............................................................. 18
Summary and Conclusions.......................................................................................... 18
References Cited.......................................................................................................... 20

Page

## List of Figures

1. Location of Ha' Kamwe' (Cofer Hot Spring), the Town of Wikieup,
   and the Big Sandy River ................................................................................. 2

2. Precipitation contours (annual average in inches) for Ha' Kamwe' and surrounding area ......... 3

3. Locations of sites where historical hydrologic and geochemistry data are available
   through the U.S. Geological Survey (USGS), the Arizona Division of Water Resources,
   and the National Uranium Resource Evaluation (NURE) ........................................... 4

4. Parcel boundary map showing generalized land ownership ........................................ 5

5. Depth to bedrock from land surface (thickness of basin-fill deposits)
   in the Big Sandy Valley ................................................................................. 5

6. Faults and lineaments representing fractures for groundwater
   movement in the Ha' Kamwe' area ................................................................... 6

7. Schematic geologic cross section of the Big Sandy River Valley
   near Cofer Hot Spring ................................................................................... 7

8. Streamflow discharges for the Big Sandy River near Wikieup, Arizona:
   (A) for the historical record covering 1966-2023, and (B) an example showing
   the typical high-flow period which occurs from January - April of each year ..................... 8

9. Spring discharges from Ha' Kamwe' during 2010-2022 ........................................... 8

10. Water levels in wells and spring locations in the Big Sandy River
    Valley and Ha' Kamwe' area ......................................................................... 10

11. Temperature of water from wells and springs in the Big Sandy River Valley
    and surrounding Ha' Kamwe' area ................................................................... 11

12. Water-analysis diagram showing percentages of cations (lower left triangle),
    anions (lower right triangle), and combinations of cations
    and anions (center diamond) ......................................................................... 13

13. Oxygen and deuterium isotopes of the water molecule for Ha' Kamwe'
    and other thermal springs in Arizona ............................................................... 14

14. Oxygen and sulfur isotopes of dissolved sulfate in water from Ha' Kamwe'
    and from springs in the San Juan Mountains of Colorado ....................................... 15

15. Extent of limestone outcrop inferred from geologic section mapped by
    Sheppard and Gude (1972), with arrow pointing at type location
    of the Big Sandy Formation ........................................................................... 16

16. Inferred recharge area for Ha' Kamwe' and locations of completed
    and proposed exploration boreholes ................................................................. 17

# EXECUTIVE SUMMARY

Available data and information for Ha' Kamwe' (Cofer Hot Spring) and surrounding area describes the Big Sandy Valley as a deep sedimentary basin situated on granitic and volcanic rocks, with the presence of limestone beds in the aquifer beneath the valley; hence, the spring discharges from one of these limestone beds and has the appearance and characteristics of a ***karst*** spring.  Since the spring is elevated above the Big Sandy Valley by about 200 feet, the aquifer feeding the spring could be called a perched karst aquifer.  However, the spring aquifer is connected to the basin-fill aquifer through vertical fractures; for example, the spring was depleted of its water (dried up) due to groundwater pumping from a deep well 2.5 miles to the south.  Whereas historical flows from the spring have been documented at greater than 200 gallons per minute, and the water right for the spring represents 146 gpm, recent discharge records for the spring indicate variable flows, which have been reduced due to groundwater development and aquifer pumping in the Big Sandy Valley.

Water-quality and isotope data from Ha' Kamwe' indicates mixtures of deep and shallow water, which is produced by rising deep-circulation water that mixes with shallow meteoric water, then geochemically reacts with limestone, basin-fill, and evaporite deposits.  Water-quality data from other wells and springs in the Big Sandy Valley indicates a wide range of different chemical compositions, ranging from sodium-chloride to calcium-magnesium bicarbonate type waters.  Data indicate that water from Ha' Kamwe' has high concentrations of major ions such as chloride, fluoride, sodium, sulfate, and bicarbonate.  Water from the hot spring also has dissolved arsenic concentration of 125 micrograms per liter (or parts per billion, ppb), which exceeds the drinking water standard of 10 ppb.  Other trace constituents reported in water from Cofer Hot Spring include barium, boron, chromium, copper, molybdenum, nickel, and uranium.

Using streamflow gaging data and statistical analyses for the region, the recharge zone for Ha' Kamwe' is delineated to be about 10 square miles.  While the quantities of water rising from deep thermal sources is uncertain, the recharge zone for the spring was estimated to extend east into the Aquarius Mountains from Ha' Kamwe'.

Exploratory borehole drilling has occurred directly upgradient from the spring within the recharge zone for Ha' Kamwe'.  The first 15 boreholes were drilled in 2018, which were scattered around the lower Big Sandy Valley area.  The second round of 34 boreholes were drilled in 2019 directly upgradient and about 580 feet to the east of the spring.  A third corehole drilling program has been proposed, and the Bureau of Land Management (BLM) has  issued a Final Environmental Assessment (Final EA) for the drilling program where an additional 131 exploratory boreholes could be drilled. Boreholes already drilled and improperly sealed have affected the spring.  With the proposed Final EA, the recharge area for the spring will be riddled with vertical boreholes, affecting aquifer recharge, aquifer hydraulic conductivity and storativity, spring-water temperatures, and spring-water chemistry.  Potential effects of new exploratory drilling on flows and chemistry of Ha' Kamwe' are not mentioned in the Final EA.

The location of the Ha' Kamwe' spring is likely due to the presence of faults and fractures (indicated by lineaments) that transmit groundwater from the over-pressured deep-basin aquifer to mix with surface meteoric water through karst aquifer conduits developed in the Big Sandy Formation.  With the presence of limestones and mudstones in the basin-fill deposits, widespread karst aquifer conduit development is likely throughout the Big Sandy Valley.  Therefore, it is possible that the exploration boreholes could intersect karst aquifer conduits, causing unabated artesian flow of groundwater from the over-pressured deep basin aquifer, which could then drain the entire aquifer system, causing Ha' Kamwe' and numerous other springs and wells in the region to go dry.  An analogy for the presence of the spring would be a bowl full of water, with a plug at the bottom of the bowl—pull the plug and the bowl will empty.  Ha' Kamwe' is located at the top of the bowl; therefore, any disturbances to the aquifer system are immediately reflected in the spring.



i

# Preliminary Assessment of the Hydrology and Geochemistry of Ha' Kamwe' (Cofer Hot Spring), Mohave County, Arizona, 2023

## INTRODUCTION

There is a spring near the small town of Wikieup, Arizona, called Ha' Kamwe' (pronounced **ha com way**), which means hot water spring in the Hualapai language. Located on Cholla Ranch, Ha' Kamwe' (also known as Cofer Hot Spring) and the surrounding landscape are considered ancestral and integral to the identity of the Hualapai people (Hualapai Tribal Council, 2021). Ha' Kamwe' is located above and adjacent to the Big Sandy River valley in northwestern Arizona **(Figure 1)**. The spring and its environs are being threatened by several factors, including exploratory wells and groundwater extractions. In order to chronicle and protect Ha' Kamwe', the Hualapai Tribe commissioned this report for the analysis of:

- Describe available data (geology, hydrology, water quality, and geochemistry) for Ha' Kamwe' and surrounding area.
- Describe the geologic, hydrologic, and water-quality setting of the spring and surrounding area.
- Preliminary delineation of the recharge area for the spring.
- Discuss potential threats and impacts to the spring and its environs.

## Climate and Weather

With altitudes ranging from 1,650 ft to more than 8,400 ft above sea level, and a drainage area of about 1,988 square miles (Arizona DWR, 2009), annual precipitation at Wikieup, Arizona, averaged 9.73 inches for the period of 1948-2005 (https://wrcc.dri.edu/cgi-bin/cliMAIN.pl?azwiki); however, precipitation in the Aquarius Mountains to the east of Ha' Kamwe' can range from 8 to 19 inches per year **(Figure 2)**. At Wikieup, average maximum monthly air temperature is 28.7°C (83.8°F), with the average winter minimum temperature of 8.9°C (48.2°F), and annual average temperature of about 19°C (66°F) (https://wrcc.dri.edu/). Snowfall is rare in the valleys but does occur at the higher elevations of the Aquarius Mountains where it can reach depths of more than 100 inches (https://statesummaries. ncics.org/). Snowpack plays a critical role in supplying water for mountain streams and springs such as

Ha' Kamwe'. Monsoonal rainfall systems can occur during late summer to early fall, affecting the Aquarius Mountains, which have a history of extreme rainfall and flood events (https://mohavedailynews. com/news/141820/weather-wreaks-havoc-on-local-residents/).

## PREVIOUS STUDIES AND INFORMATION SOURCES

The Atomic Energy Commission (now the Department of Energy, or DOE) collected thousands of streambed-sediment and water samples for geochemical analyses as part of the National Uranium Resource Evaluation (NURE) (https://edx.netl. doe.gov/dataset/nure-sediment). During the mid- to late-1970's, about 150 streambed sediment samples and 15 stream water samples were collected in the area surrounding Wikieup and Ha' Kamwe' **(Figure 3)**. Many of the samples were only analyzed for uranium and related minerals; however, a few samples were analyzed for more comprehensive set of parameters. As a result of different collection and analytical methods, the USGS compiled, clarified, and reformatted the NURE data during the 1990's (Smith, 1997) (https://mrdata.usgs.gov/nure/sediment/).

The Western Area Power Administration (WAPA), a division of the U.S. Department of Energy, initiated an effort to construct a natural-gas electrical power plant near Sycamore Creek south of Wikieup, which is within 2.5 miles of Ha' Kamwe'. After in-depth hydrogeologic investigations, the project was denied a permit due to the concern that groundwater development for the project would diminish or dry up Ha' Kamwe' (Caithness, 2000a; Caithness, 2000b; Caithness, 2000c; U.S. Department of the Interior, 2001; Kingman Daily Miner, 2001).

The U.S. Geological Survey (USGS) measured water levels and collected water-quality samples from springs and wells in the Wikieup area during the early 1990's **(Figure 3)**. The USGS has installed and operated streamflow gaging stations for the Big Sandy River near Wikieup (USGS site 09424450) and other sites in the area **(Figure 3)**.

Since the 1980's, as part of the Ground Water Site Inventory (GWSI) the Arizona Department of



1



Figure 1.  Location of Ha' Kamwe' (Cofer Hot Spring), the Town of Wikieup, and the Big Sandy River.



Figure 2.  Precipitation contours (annual average in inches) for Ha' Kamwe' and surrounding area.

Water Resources (https://azwatermaps.azwater. gov/gwsi) has collected and compiled records for groundwater wells across the state, including about 560 wells in Mohave County **(Figure 3)**. Reports have been published by Arizona DWR regarding hydrology and water quality of the Big Sandy basin (Cady, 1980), and the Arizona Water Atlas for the Big Sandy basin (Arizona DWR, 2009, p. 68).

Water resources of the Big Sandy area were described by Davidson (1973) in a report by the Arizona Water Commission, in cooperation with the USGS. On Plate 2 of the Davidson (1973) report, geologic faults are shown on the map in the Wikieup area, and shows that Ha' Kamwe' may be located on a small fault line. In addition, in 1983 the USGS published maps of groundwater levels, locations of springs, and spring water temperatures, including the Big Sandy area and Ha' Kamwe' (Langer and others, 1983). Data shown on the map for the Big Sandy area shows water temperature of 37°C (98.6°F) for Ha' Kamwe' (Langer and others, 1983).

Arizona Geological Survey (AZGS) published a preliminary geothermal assessment of the Big Sandy Valley (Campbell and Jones, 1979), concluding that the warm springs of the Big Sandy Valley (Cofer, Kaiser, and Big Pasture) do not meet the typical constraints necessary for geothermometry. Water from these springs is likely mixtures of deep geothermal and shallow meteoric water. During late 2012 through 2013, AZGS also investigated the geochemical makeup of groundwater from selected thermal springs and wells throughout Arizona (Love and others, 2014). Water temperature at Ha' Kamwe' was measured at 32.6°C (90.7°F), and the report similarly concluded that water from Ha' Kamwe' is a mixture of different sources of shallow and deep water.

The Arizona Department of Environmental Quality (DEQ) published a report on the groundwater quality of the Big Sandy Basin (Towne and Rowe, 2006). Water-quality data from Ha' Kamwe' indicated a water temperature of 34.2°C (93.6°F). The Town and Rowe (2006) report shows dissolved arsenic concentration of 125 micrograms per liter (or parts per billion) in water from the spring. Arizona DEQ also published a report regarding the Total Maximum Daily Loads (TMDL's) for mercury in fish tissue in Alamo Lake, which is located at the confluence of the Big Sandy and Santa Maria rivers, and published selected data for the Big Sandy River (Arizona DEQ, 2012).

The Santa Fe Pacific Railroad Company (1988), in cooperation with the Arizona Bureau of Geology



3



Figure 3. Locations of sites where historical hydrologic and geochemistry data are available through the U.S. Geological Survey (USGS), the Arizona Department of Water Resources, and the National Uranium Resource Evaluation (NURE).

and Mineral Technology and the Arizona Geological Survey, mapped the surficial geology and faults of northwestern Arizona, including the Big Sandy River Valley and Ha' Kamwe' area. Many of the geologic units and faults were derived from previous studies.

Parcel map data are available from Mohave County, Arizona (https://mcgis.mohave.gov/html5/?viewer=moh). Parcels and land ownership are mixed in the area surrounding Ha' Kamwe' **(Figure 4)**.



Figure 4. Parcel boundary map showing generalized land ownership.

## GEOLOGIC SETTING

Located in the Basin and Range province of northwestern Arizona, the Big Sandy River Valley consists of an elongated north-trending valley bounded on the east by the Aquarius Mountains and on the west by the Hualapai Mountains. The central valley is comprised of more than 4,800 feet of lacustrine deposits due to deep lakes when the valley was a closed basin. The surrounding mountains are composed of granitic crystalline rocks. Volcanic rocks overlie the granitic rocks in the mountains in the

southeastern and northern parts of the area, and these basalts are interlayered within the lacustrine sedimentary units in parts of the central valley **(Figure 5)**.

The USGS published a report describing the Big Sandy Formation (Sheppard and Gude, 1972), a name applied to lacustrine deposits of upper Miocene to Pliocene age (5.4 - 2.4 million years ago). The formation consists mainly of green and brown mudstone, limestone, and thin interbedded tuffs of volcanic ash mixed with mudstone. As extension faulting of the Basin and Range created rift zones, deep closed basins were formed that filled with sediments, with later volcanic activity in places overlying the basin-fill sediments. Most of these basin-fill sediments are poorly lithified, porous and permeable sand and gravel, but also include silt, clay, limestone, and evaporites of halite, gypsum, and anhydrite. The exposed thickness of the Big Sandy Formation was described as 245 feet (Sheppard and Gude, 1972) at the cross section location just north of Ha' Kamwe'.



Figure 5. Depth to bedrock from land surface (thickness of basin-fill deposits) in the Big Sandy Valley.



## Faults and Lineaments

In the Basin and Range Province, volcanic and sedimentary rocks were faulted and tilted due to early to middle Miocene crustal extension, characterized by large-scale low-angle normal faulting with closely spaced faults cutting and tilting volcanic and sedimentary rocks (Spencer, 2011). Many of these extension events resulted in closed basins, where extension broke apart the bedrock surface, uplifting some fault blocks and down dropping others. These down-dropped closed basins filled-in with fluvial sediments, which formed the deep basins that are host to the evaporites, mudstones, and lacustrine limestone deposits (Spencer, 2011). Fractures and faults occur in the granitic and volcanic rocks as well as the consolidated and semi-consolidated basin-fill sediments.

Fractures are present as joints, faults, and bedding-plane separations. Fractures in the rocks create features on the land surface, and the fractures may extend into the subsurface. These features are referred to as lineaments (Lattman, 1958; Lattman and Parizek, 1964). Lineaments are indicated by aligned valleys, wind and water gaps, upland sags and depressions, soil-tonal features, springs, sinkholes, and caves (Lattman, 1958; Lattman and Parizek, 1964). Lineaments in the Ha' Kamwe' area are mapped by automation using different bands of Landsat Thematic Mapper 8 (TM-8) images (Mah and others, 1995). Because small scale fractures and joints reflect vertical fractures, lineaments represent possible conduits and planes for movement of groundwater. **Figure 6** shows faults and lineaments in the area surrounding Ha' Kamwe'. Faults are from Davidson (1973). Lineaments were drawn for this report from Thematic Mapper 8 images of auto-generated lineaments features **(Figure 6)**.

With the geologic information available (Caithness Big Sandy, 2000b), a schematic cross section of the Big Sandy River Valley can be described as a bowl-shaped layer cake with numerous stratified beds of lake-bottom deposits typical of arid-region lakes **(Figure 7)**. The layers have different degrees of porosity and lithification, where some layers may act to readily transmit groundwater, and other layers acting as confining units restricting the movement of groundwater. Where present, fractures revealed as lineaments provide for vertical movement of groundwater.



Figure 6. Faults and lineaments representing fractures for groundwater movement in the Ha' Kamwe' area.

## HYDROLOGIC SETTING

### Surface Water

The U.S. Geological Survey (USGS) began collecting streamflow discharge and water-quality data in the area (including Ha' Kamwe') during the late 1950's (https://waterdata.usgs.gov/nwis/inventory?agency_code=USGS&site_no=344143113342501). The USGS began collecting streamflow discharges on the Big Sandy River near Wikieup during the mid-1960's (https://waterdata.usgs.gov/nwis/inventory?agency_code=USGS&site_no=09424450), and a newer streamflow gaging station on the Big Sandy River was established in 2018 closer to Wikieup (https://waterdata.usgs.gov/nwis/inventory?agency_code=USGS&site_no=09424425). For the Big Sandy River, streamflow discharges range from less than 10 to more than 10,000 cubic feet per second **(Figure 8)**. Streamflow discharges can increase many orders of magnitude during streamflow peaks, typically occurring during winter (December-February) of each year, indicating the variable and unsteady conditions of desert-intermontane rivers. Formed by the confluence of Knight and Trout Creeks north of Wikieup, the Big



Figure 7.  Schematic geologic cross section of the Big Sandy River Valley near Ha` Kamwe`.



Sandy River has the appearance of an ephemeral stream through many of its reaches, where flows infiltrate and disappear into alluvium; however, the river appears continuously at the surface as a perennial stream throughout the Wikieup valley.





Figure 8. Streamflow discharges for the Big Sandy River near Wikieup, Arizona: (A) for the historical record covering 1966-2023, and (B) an example showing the typical high-flow period which occurs from January - April of each year.

## Spring Discharges

Historical measurements indicate that the discharge from the spring ranges from 20 to greater than 200 gallons per minute (gpm). These variable flows may be caused by seasonal recharge from rainfall and snowmelt, or may be impacted by groundwater pumping in the Big Sandy Valley and Sycamore Creek areas. The water right for Ha' Kamwe' is listed as 236.6 acre-feet per year by

the Arizona Department of Water Resources (http://www.azwater.gov/querycenter/), which is equivalent to 146.6 gpm.

As part of the Big Sandy Energy Project, hydrogeologic studies and groundwater modeling indicated that excessive pumping of the Big Sandy Valley would impact Cofer Hot Spring (U.S. Department of Interior, 2001; Caithness, 2000a). An aquifer test was performed in a deep well near Sycamore Creek, where the flowing artesian well with potentiometric head at 60 feet above land surface was allowed to discharge, while controlled by valves. The flowing artesian test began at 760 gpm, and increased to 2100 gpm over 11 days. Spring discharges from Ha' Kamwe' measurably decreased within the 11-hour test (Caithness, 2000a). In a more recent 2011-13 study, as part of an aquifer test in the Sycamore Creek area south of Ha' Kamwe', the same deep well near Sycamore Creek was allowed to discharge for almost seven months, with pumping rates increasing to 1,300 gpm over time (Montgomery & Assoc., 2012). As the pumping rates increased late in the test, flows from Ha' Kamwe' decreased to zero **(Figure 9)**, providing evidence that the Ha' Kamwe' aquifer is located at the top of the recharge system for the basin-wide aquifer, and any perturbations to the aquifer are reflected in flows from the Ha' Kamwe spring.



Figure 9. Spring discharges from Ha' Kamwe' during 2010-13 (data from Montgomery & Associates, written commun., 2022)

## Groundwater and Wells

Groundwater in the Big Sandy Valley occurs in shallow and deep aquifers where water levels in wells can range from 14 to 2,450 feet below land surface (Arizona DWR, 2009) **(Figure 10)**.   In the lower Sycamore Creek basin, deep wells (1,200-1,500 feet) indicate flowing artesian conditions at the surface casings.  These wells draw water from the lower basin fill and bedrock aquifers; however, all of the aquifer systems appear to be connected hydrologically due to vertical fractures such as faults and lineaments shown in **Figure 6**.

## Groundwater Temperatures and Thermal Springs

Geothermal water from wells and springs can be classified as hot, or thermal, if the water temperature is more than 6°C (42.8°F) above mean annual temperature of the area (White, 1957; Miller and others, 1973).  As part of a state-wide study of hot springs in Arizona, Love and others (2014) described the factors that contribute to thermal springs as follows:

1. Upward convection of thermal water along fault zones; primary source of heat not known but possibly due to heated shallow crust.

2. Heat generated by late Quaternary dikes and sills intruded into Cenozoic sediments.

3. Heat produced from the exothermic hydration of anhydrite within basins containing extensive evaporite deposits.

Given that groundwater temperatures reflect the average annual air temperature for a region, and the annual average air temperature for the Big Sandy Valley is about 19-20°C (66-68°F), temperatures of water from domestic wells range from about 20.0°C (68°F) to 24.5°C (76.1°F).  This does not indicate the presence of thermal groundwater in wells of the Big Sandy Valley **(Figure 11)**.  Temperatures of water from non-thermal springs in the area range from 15.0°C (59°F) to 24.5°C, (76.1°F), which is also not indicative of widely dispersed thermal spring water **(Figure 10)**.  Three springs in the area, however, indicate thermal water -- Big Pasture Spring, Ha' Kamwe' (Cofer Hot Spring), and Kaiser Hot Spring, with water temperatures recorded at 31.0°C (88°F), 35.5°C (95.9°F), and 37.0°C (98.6°F), respectively **(Figure 11)**.

Temperature of water from Ha' Kamwe' has been recorded as high as 37°C (98.6°F) and as low as 32°C (89.6°F) (Montgomery&Assoc. 2012).  These measurements probably were affected by the location of the measurement-- whether at the spring box, in the pool below the spring box, or at the flume below the spring pools.

## WATER CHEMISTRY OF HA' KAMWE', WELLS, AND OTHER SPRINGS

Dissolved-constituent concentrations in water from Ha' Kamwe' are dependent on mixing of different sources of water.  When thermal groundwater rises from deep geologic settings, it mixes with shallow meteoric water, cools, interacts with the local rocks, and changes the distribution of dissolved constituents due to factors related to thermal cooling and equilibrium geochemistry (Coolbaugh and others, 2010).  Many of the hot springs in Arizona have aqueous chemistry reflecting discharge of deep groundwater.  In contrast, water from Ha' Kamwe' is described by Love and others (2014) as long-term deep circulated water mixed with younger shallow meteoric water (rainfall and snowmelt).

### Water-Analysis Diagram

General characteristics of natural groundwater quality can be described using a water-analysis diagram, which reflect water-rock interactions and sources of groundwater. This diagram, sometimes referred to as a trilinear diagram or Piper diagram, uses a method initially described by Piper (1944) to indicate the chemical quality of major ions in natural water. The water-analysis diagram shows the relations among concentrations of the cations (positively charged ions) and anions (negatively charged ions) in water from wells and springs.   The values are expressed as percentages of the total milliequivalents per liter of cations (lower left triangle) or of anions (lower right triangle) and are not expressed as actual concentrations. The central quadrilinear graph shows the combined anionic and cationic chemical quality of the water by a third point, which is at the intersection of the rays projected from the points on the cation and anion graphs.





Figure 10.  Water levels in wells and spring locations in the
Big Sandy River Valley and Ha' Kamwe' area.



Figure 11.  Temperature of water from wells and springs in the Big Sandy River Valley and surrounding Ha' Kamwe' area.



The water analyses for wells and springs in the Big Sandy Valley indicate a wide range of different chemical compositions **(Figure 12)**. Water from wells in the area shows chemistry ranging from sodium-chloride to calcium-magnesium bicarbonate type waters **(Figure 12)**. Water from Big Pasture Spring resembles shallow meteoric water with a calcium-magnesium bicarbonate signature. Water from Kaiser Hot spring has a sodium-chloride water signature. Since the middle of the center diamond-shaped plot would indicate equal mixtures of different waters, Ha' Kamwe' is relatively close to that center **(Figure 12)**, once again indicating mixtures of deep and shallow water.

With regard to dissolved trace metals and constituents, Towne and Rowe (2006) collected water-quality samples from selected wells and springs throughout the Big Sandy Valley. Results indicate that water from Ha' Kamwe' (sampled during September 2003) had high concentrations of major ions such as chloride, fluoride, sodium, sulfate, and bicarbonate. Water from the hot spring also had dissolved arsenic concentration of 125 micrograms per liter (or parts per billion, ppb), which exceeds the drinking water standard of 10 ppb. Other trace constituents detected in water from Ha' Kamwe' include barium, boron, chromium, copper, molybdenum, nickel, and uranium (Towne and Rowe, 2006; Montgomery & Associates, 2012).

## Sources of Water for Ha' Kamwe'

Isotopes are defined as atoms whose nuclei contain the same number of protons but a different number of neutrons (Hoefs, 1987). Isotopes of different elements such as oxygen, hydrogen, and sulfur are called stable isotopes, while radioactive isotopes are derived from uranium and other radioactive elements. Stable isotopes are routinely used as tracers in hydrological and geochemical investigations, where results can illustrate the history and pathways of water through the hydrologic cycle (Clark and Fritz, 1997). Since the hydrologic cycle consists of the constant cycling of evaporation and condensation (precipitation), oxygen and hydrogen isotopes of the water molecule can be altered by these processes, and has been described by Craig (1961) as a generalized linear relationship called the Global Meteoric Water Line (GWML).

### Isotopes of Water

Stable isotopes of oxygen and deuterium (a stable isotope of hydrogen) in water molecules ($H_2O$) are particularly useful for geochemical and hydrological investigations. Using the ratios of different isotopes of the water molecule, expressed in per mil (or parts per thousand) referenced to the Vienna Standard Mean Ocean Water (VSMOW) (the "delta notation"), the oxygen isotope ratio is referred to as the "delta-O-18" ($\delta^{18}O$) of water, and the deuterium isotope ratio is referred to as the "delta-D" ($\delta D$) of water. Oxygen and hydrogen isotopes, when plotted on a graph, can be used to describe the effects of evaporation and geothermal groundwater heating by deviation from the GWML. The effects of evaporation are shown by the positive shift of both the $\delta^{18}O$ and $\delta D$ values, causing a shift of isotope data to the upper right of the isotope plot.

One of the principal conclusions drawn from stable isotope studies of water from geothermal systems is that most hot spring waters are derived from local precipitation (Hoefs, 1987, p. 100), but are enriched in the O-18 by isotope exchange with rocks at elevated temperatures (Hoefs, 1987, p. 100). This positive O-18 shift has been widely recognized, and depends on the O-18 values of the original meteoric water and the O-18 contents within rocks of the geothermal reservoir (Clark and Fritz, 1997, p. 250). Hydrogen isotopes are not affected by geothermal reservoirs because of the lack of light hydrogen in most rocks (Clark and Fritz, 1997, p. 250).

Oxygen and deuterium isotopes of water from thermal springs in Arizona (Love and others, 2014) are plotted in **Figure 13** along with isotope data for Ha' Kamwe' (Montgomery & Assoc., 2012). Isotope data show that water from Ha' Kamwe' exhibits the positive O-18 shift to the right of the GWML, indicating the effects of geothermal heating on water from the spring **(Figure 13)**. While water from Kaiser Hot Spring plots firmly with other hot spring data from Arizona showing the geothermal signature, the isotope data from Ha' Kamwe' may also be indicative of an evaporation signature **(Figure 13)**, possibly due to the mixing of different sources of groundwater for the spring.



Figure 12.  Water-analysis diagram showing percentages of cations (lower left triangle), anions (lower right triangle), and combinations of cations and anions (center diamond).





Figure 13. Oxygen and deuterium isotopes of the water molecule for Ha' Kamwe' and other thermal springs in Arizona.

**Isotopes of Dissolved Sulfate**

Data for the oxygen and sulfur isotopes of dissolved sulfate (symbols $\delta^{18}O_{SO4}$ and $\delta^{34}S_{SO4}$, respectively) can provide insight into the processes that formed the sulfate (Wright and Nordstrom, 1999). In many geologic settings, sulfate isotope data can reflect the mineralogy of the dissolved-sulfate source (Clark and Fritz, 1997, p. 142). The isotopes of sulfate data also can determine whether sulfate reduction has occurred in the water. Gypsum and anhydrite are shown to be dominantly hypogene (hydrothermal) in origin with heavy sulfur and oxygen isotopic compositions ($\delta^{34}S_{SO4}$ =15 to 18 per mil and $\delta^{18}O_{SO4}$ = −3 to 5 per mil). In contrast, sulfur isotopes of mineral pyrite are significantly lighter ($\delta^{34}S$ = −7 to 2.5 per mil) (Nordstrom and others, 2004). Dissolved-sulfate isotope data in water from Ha' Kamwe' were collected by Montgomery & Associates (2012) during the aquifer test of deep wells in lower Sycamore Creek, and can be compared to other isotope data.

Isotopes of dissolved sulfate in water from springs in a mineralized hardrock mining area of the San Juan Mountains, southwestern Colorado, shows the predominant effects of pyrite oxidation on the isotopic signatures of water from springs **(Figure 14)** (Wright and Nordstrom, 1999; Nordstrom and others, 2004). Water from some of the springs indicate a mixture of the effects of pyrite oxidation and dissolution of gypsum and(or) anhydrite **(Figure 14)**. Isotope samples of water from Ha' Kamwe' similarly indicate the mixture of different sources of dissolved sulfate showing the effects of pyrite oxidation and gypsum and(or) anhydrite dissolution **(Figure 14).** It may, therefore, be inferred that water from Ha' Kamwe' is sourced from a combination of deep bedrock water containing mineral pyrite and basin fill deposits containing evaporite deposits of gypsum and(or) anhydrite.

## DISCUSSION

Ha' Kamwe' has been previously described as an artesian spring, where the water was thought to originate from a deep geothermal bedrock source where thermal water rises to the surface through a fault connected directly to this supposed artesian source. On geologic maps (Davidson, 1973; Santa Fe Pacific Railroad Company, 1988), a dashed fault line is shown at the location of Ha' Kamwe', showing that the geologist who mapped the fault hypothesized that there must be a fault at that location for the geothermal spring to exist. The occurrence of a fault at the spring site has not been confirmed. Rather, it is the hypothesis of this report that there are other explanations for the occurrence of the spring, as discussed below.

## Ha' Kamwe' Is Part of A Karst Aquifer System

Limestone is present in the geologic section of the Big Sandy Formation, as mapped by the U.S. Geological Survey (Shepard and Gude, 1972). Because limestone is soluble in water, the presence of limestone in the Big Sandy Formation indicates the possibility of development of subsurface solution-enlarged fractures and conduits that transmit groundwater. Called "karst" from the studies of limestone terrain in the former Yugoslavia (Gospodaric and Habic, 1976), the occurrences of springs, sinkholes, blind valleys, and caves are indicative of karst terrain (White, 1988). The geologic



Figure 14. Oxygen and sulfur isotopes of dissolved sulfate in water from Ha' Kamwe' and from springs in the San Juan Mountains of Colorado.



15



Figure 15.  Extent of limestone outcrop inferred from geologic section mapped by Sheppard and Gude (1972), with arrow pointing at type location of the Big Sandy Formation.

type section for the Big Sandy Formation (Sheppard and Gude, 1972) was mapped in the canyon just north of Ha' Kamwe' **(Figure 15)**.  With a bedding dip of $1^o$ to $2^o$ rising to the east, the outcrop of the limestone bed of the Big Sandy Formation was extended to show that the Ha' Kamwe' indeed emanates from the limestone bed **(Figure 15)**.  This indicates that the spring is a karst spring, and the aquifer recharging the spring is a karst aquifer.  The recharge area for the karst aquifer lies up-dip and to the east of Ha' Kamwe'.

Ha' Kamwe' is anomalous in that it resurges nearly 200 feet higher than the river valley.  This is called a **"perched aquifer,"** which is an aquifer that occurs above the regional water table due to a lower permeability geologic unit below the aquifer.  Since it is a karst aquifer, the Ha' Kamwe' aquifer is, therefore, described as a "perched karst aquifer."  While called a *perched karst aquifer*, the spring aquifer is connected to deep basin aquifers through vertical fractures, where any activity in the basin could impact the spring.

## Sources of Geothermal Water

In the description of thermal springs in Arizona (Love and others, 2014), sources of geothermal water include upward convection of thermal water along fault zones, proximity to intrusive dikes, and exothermic reactions from the hydration of evaporite minerals.  Geochemical data from Ha' Kamwe' does not align with typical constraints for characterization of geothermal resources (Love and others, 2014).  Water-quality and isotope data from Ha' Kamwe' indicate mixtures of deep and shallow water, produced by rising deep circulation water, mixed with shallow meteoric water, flowing through solution-enlarged conduits within the perched karst aquifer, geochemically reacting with limestone, basin-fill, and evaporite deposits.  Thermal heat added by hydration of evaporite minerals would by minimal, and could only result from hydration of pure anhydrite or lithium salt.  Concentration of lithium in water from Ha' Kamwe' was reported at only 0.33 milligrams per liter (ppm) (Love and others, 2014, p. 37), which does not indicate thermal heat addition due to hydration of lithium salt.



Figure 16.  Inferred recharge area for Ha' Kamwe' and locations of completed and proposed exploration boreholes.

## Recharge Area for Ha' Kamwe'

Realizing that water from Ha' Kamwe' is a mixture of shallow and deep sources, there exists a definable recharge area for the spring that extends upgradient from the spring to the east.  Using USGS streamflow gaging data and statistical analyses for the Big Sandy River, Burro Creek, and Cottonwood Wash (upper Big Sandy tributary), the annual average discharge from these sites was calculated to be about 0.03 cubic feet per second per square mile ($ft^3$/sec/mi$^2$).  Given an average discharge of 0.3 $ft^3$/sec for Ha' Kamwe', the recharge area for the spring would be about 10 mi$^2$ **(Figure 16)**. Groundwater modeling results from Caithness (2000a) indicate that the recharge area for the deep basin aquifer, that was tapped by deep wells at the energy project, is 50 to 80 square miles.  The Ha' Kamwe' recharge area shown above overlies the northern extent of that deep basin recharge area, meaning that the Ha' Kamwe' aquifer is situated at the top of the deep basin aquifer.  An appropriate analogy for this would be a bowl full of water, with a plug at the bottom of the bowl—pull the plug and the bowl will empty.  Ha' Kamwe' is located at the top of the bowl.

## Effects of Exploratory Drilling

Due to the reported occurrences of the element lithium in the basin-fill deposits, there has been extensive exploratory borehole drilling directly upgradient from the spring within the recharge zone for Ha' Kamwe' **(Figure 16)**.  The first 15 boreholes were drilled in 2018, which were scattered around the lower Big Sandy Valley area.  The second round of 34 boreholes were drilled in 2019 directly upgradient from the spring **(Figure 16)**.  A third borehole drilling program has been proposed, and the Bureau of Land Management (BLM) has issued a Final Environmental Assessment (Final EA) for the drilling program where an additional 143 exploratory boreholes could be drilled.  Possible effects of drilling on Ha' Kamwe' are not mentioned in the Final EA. Groundwater regulations (Arizona DWR, 2008; Arizona Administrative Code Title 12, Chapter 15: R12-15-816) specify that boreholes that encounter groundwater must be pressure sealed using downhole tremie pipes to deliver grout to the bottom of the boreholes in order to prevent vertical migration of groundwater.  Boreholes previously drilled did not specify the use of tremie pipes to seal the abandoned boreholes; therefore, these boreholes have been improperly abandoned (Montgomery & Associates, 2012), and have likely affected the vertical migration



17

of groundwater, impacting spring discharges and thermal spring water temperatures.

As stated in a letter from the Hualapai Tribal Council (2021) to the BLM, the Final EA purports that exploratory drilling will not exceed 360 feet below the ground surface, and it claims this drilling will not reach the known groundwater table (BLM, 2021, p. 3). However, field measurements during May 2021 indicate current groundwater level is about 69 feet below land surface within the BLM Airstrip well (309 feet deep) located about 200 feet to the east-northeast of the spring. This places groundwater clearly within the exploration depths of past and proposed future exploration drilling activities (Montgomery & Associates, 2021). From the schematic geologic section in this report (**Figure 6 and Cover**), the exploration boreholes penetrated deeper than the Big Sandy River, indicating that any alteration of the hydrology of the Ha' Kamwe' karst system would cause water from the valley aquifer to deviate from its path to pursue the paths of least resistance caused by numerous holes drilled into the fragile karst aquifer system. The Final EA fails to thoroughly present or analyze data that could affect water resources or water quality. Any development within the recharge area for the spring, especially within the immediate vicinity of the spring, will cause irreversible negative effects to the spring and its environs.

## Effects of Groundwater Pumping

As part of the Big Sandy Energy Project (U.S. Department of Interior, 2001; Caithness, 2000), hydrogeologic studies and groundwater modeling indicated that excessive pumping of the valley deposits would impact Ha' Kamwe'. The project was denied an operating permit due to the concerns that the spring would be impacted. During 2011-12, as part of an aquifer test in the Sycamore Creek area south of Ha' Kamwe', a deep production well was pumped for almost seven months. As the pumping rates increased late in the test, discharges from Ha' Kamwe' decreased to zero flow (Montgomery & Associates, 2012). This indicates that the karst aquifer feeding Ha' Kamwe' is connected to the Big Sandy Valley aquifers, and the recharge area for the spring, therefore, likely extends far into the Aquarius Mountains to the east of Ha' Kamwe' (Caithness, 2000; Montgomery & Associates, 2012).

In April 2015, the U.S. Department of the Interior and Byner Cattle Co., a subsidiary of Freeport-McMoRan, proposed an agreement to transfer water rights from the Byner Cattle Co.'s Planet Ranch holdings on the Bill Williams River to the Big Sandy Basin pumping wells (https://en. wikipedia.org/wiki/Big_Sandy_River). According to the agreement (U.S. Department of the Interior, 2015), water is being pumped from Byner Cattle Co. wells in the Big Sandy River valley to the mining town of Baghdad, Arizona in neighboring Yavapai County. Many of these production wells are located in the northern and central parts of the valley, yet previous studies have shown that the aquifers beneath the valley are interconnected (Davidson, 1973; Campbell and Jones, 1979). Additional aquifer development is anticipated from Sycamore Creek located 2.5 miles to the south of Ha' Kamwe', which could affect or dry up the spring (Caithness, 2000; BLM, 2001).

## Additional Data Collection Efforts and Scientific Investigations Are Needed

Additional data collection efforts and scientific investigations are needed to clarify and quantify the effects of exploratory drilling, groundwater development, and the potential for mining. Current, ongoing data-collection efforts to monitor flows and water temperatures from the spring should continue. New future efforts could include: (1) Sampling of water from wells and springs in the Ha' Kamwe' recharge area for analysis of major ions, trace elements, isotopes, and groundwater age-dating parameters; (2) Geochemical modeling and groundwater pathway analyses; (3) Streambed sediment analyses for trace element concentrations in the recharge area; and (4) Groundwater flow modeling of the Ha' Kamwe' recharge area.

## SUMMARY AND CONCLUSIONS

Available data and information for Ha' Kamwe' and surrounding area indicates the presence of limestone in the geologic section, hence the spring has the appearance and characteristics of a *karst spring*. Since the spring is elevated above the Big Sandy Valley by about 200 feet, the spring could be called a *perched karst spring*. However, the spring aquifer is connected to the basin-fill aquifer through vertical

fractures; for example, the spring has been depleted of its water (dried up) due to groundwater pumping from a deep well 2.5 miles to the south. Whereas historical flows from the spring have been documented at greater than 200 gallons per minute, and the water right for the spring represents 146 gpm, the spring flows have been reduced possibly due to exploratory borehole drilling and aquifer pumping in the Big Sandy Valley.

Mapped by the USGS in 1972, a geologic section of limestone outcrops in the canyon immediately north of Ha' Kamwe'. This limestone bed can be delineated to outcrop at Ha' Kamwe'. Because limestone is soluble in water, there is the likely development of subsurface solution-enlarged fractures and conduits that transmit groundwater. Called *"karst"* from the studies of limestone terrain in the former Yugoslavia, karst terrain is characterized by the occurrence of springs, sinkholes, blind valleys, and caves. The Ha' Kamwe', therefore, appears to be a *karst spring*.

Faults and lineaments in the Ha' Kamwe' area were mapped using existing geologic maps and Landsat Thematic Mapper 8 (TM-8) images. Lineaments can represent vertical fractures, subsurface conduits, and planes for movement of groundwater.

Groundwater in the Big Sandy Valley occurs in shallow and deep wells that range from 14 to 2,450 feet below land surface, with depths to water levels ranging from about 4 to 1,315 feet below land surface. Springs are typically resurgent at stream level; however, Ha' Kamwe' is anomalous in that it resurges nearly 200 feet higher than the river valley. This is called a *"perched aquifer."*

Groundwater temperatures reflect the average annual air temperature for a region, and the annual average air temperature for the Big Sandy Valley is about 19-20°C (66-68°F). Temperatures of water from wells range from about 20.0°C (68°F) to 24.5°C (76.1°F), which does not indicate the presence of thermal groundwater in wells of the Big Sandy Valley. Three springs in the area, however, indicate thermal water -- Big Pasture Spring, Ha' Kamwe', and Kaiser Hot Spring, with water temperatures recorded at 31.0°C (88.0°F), 35.5°C (95.9°F), and 37.0°C (98.6°F), respectively.

At Ha' Kamwe', historical measurements of discharge indicate that the spring discharge ranges from 20 to greater than 200 gallons per minute (gpm). These variable flows may be caused by seasonal recharge from annual rainfall and snowmelt, or may be impacted by borehole drilling and groundwater pumping in the Big Sandy Valley and Sycamore Creek areas. The water right for Ha' Kamwe' is listed as 236.6 acre-feet per year (AFY) by the Arizona DWR, which is equivalent to 146.6 gpm. Data indicate that the spring discharge frequently decreases below the 146.6 gpm threshold. Temperature of water from Ha' Kamwe' has been historically recorded as high as 37°C (98.6°F) and as low as 32°C (89.6°F). Groundwater pumping in the valley will likely affect the spring water temperatures.

Water-quality data from Ha' Kamwe' indicates mixtures of deep and shallow water, which is produced by rising deep circulation water, mixed with shallow meteoric water, geochemically reacting with limestone, basin-fill, and evaporite deposits. Water-quality data from other wells and springs in the Big Sandy Valley indicates a wide range of different chemical compositions, ranging from sodium-chloride to calcium-magnesium bicarbonate type waters. Water from Big Pasture Spring resembles shallow meteoric water with a calcium-magnesium bicarbonate signature. Water from Kaiser Hot spring has a deep circulation sodium-chloride type water signature.

Data indicate that water from Ha' Kamwe' has high concentrations of major ions such as chloride, fluoride, sodium, sulfate, and bicarbonate. Water from the hot spring also has dissolved arsenic concentration of 125 micrograms per liter (or parts per billion, ppb), which exceeds the drinking water standard of 10 ppb. Other trace constituents reported in water from Ha' Kamwe' include barium, boron, chromium, copper, molybdenum, nickel, and uranium.

Using streamflow gaging data and statistical analyses for the region, the recharge zone for Ha' Kamwe' is delineated (preliminary, needs field verification) to be about 10 square miles. While the quantities of water rising from deep thermal sources is uncertain, the recharge zone for the spring was estimated to extend east by northeast into the Aquarius Mountains from Ha' Kamwe'

Exploratory borehole drilling has occurred directly upgradient from the spring within the recharge



zone for Ha' Kamwe'.  The first 15 boreholes were drilled in 2018, which were scattered around the lower Big Sandy Valley area.  The second round of 34 boreholes were drilled in 2019 directly upgradient from the spring.  A third borehole drilling program has been proposed, and the BLM has  issued a Final Environmental Assessment (Final EA) for the drilling program where an additional 143 exploratory boreholes might be drilled.  Possible effects of drilling on Ha' Kamwe' are not mentioned in the Final EA. Boreholes already drilled and improperly sealed will affect the vertical migration of groundwater, negatively and irreversibly impacting spring water discharges, temperatures, and chemistry.

Cumulative effects include groundwater development and pumping of the Big Sandy Valley aquifer that have been ongoing for decades.  Previous studies have shown that the aquifers beneath the valley are interconnected, and additional aquifer development is scheduled for Sycamore Creek to the south of Ha' Kamwe'.  Spring discharges and temperatures of Ha' Kamwe' have been affected by deep aquifer pumping.  Exploratory drilling has contributed substantially to the cumulative effects on Ha' Kamwe'.

Current, ongoing data-collection efforts to monitor flows and water temperatures from the spring should continue.  Additional data collection efforts and scientific investigations are needed to clarify and quantify the effects of exploratory drilling, groundwater development, and the potential for mining.

## REFERENCES CITED

Arizona DWR, 2008, Well Abandonment Handbook:  Arizona Department of Water Resources, October 2008.

Arizona DWR, 2009, Arizona Water Atlas, Volume 4, Upper Colorado River Planning Area:  Arizona Department of Water Resources, 412 p., https://prism.lib.asu.edu/items/49257/view.

Arizona DEQ, 2012, Alamo Lake TMDL for Mercury in Fish Tissue:  Arizona Department of Environmental Quality, Open File Report 12-04, 64 p.

BLM, 2021, Big Sandy Inc., Sandy Valley Exploration Project (Phase 3), AZA-37913:  United States Department of the Interior, Bureau of Land Management, Environmental Assessment, DOI-BLM-AZ-C010-2021-0029-EA, March 2021, 19 p., Appendices A-F.

Cady, C.V., 1980, Depth to Water, Altitude of the Water Level, and Water Quality - Map Showing Ground-Water Conditions in the Big Sandy Area, Yavapai and Mohave Counties, Arizona:  Arizona Department of Water Resources, DWR Hydrologic Map Series Report No. 5, Sheet 1 of 1.

Caithness Big Sandy, L.L.C., 2000a. Water Resources of the Southern Portion of the Big Sandy Valley, Wikieup, Mohave County, Arizona.

Caithness Big Sandy, L.L.C., 2000b. Big Sandy Energy Project Geology Report. Prepared by Manera, Inc., submitted by Caithness Big Sandy, L.L.C. June.

Caithness Big Sandy, L.L.C., 2000c, Big Sandy Energy, Application for a Certificate of Environmental Compatibility, Supplemental Information:  Prepared for State of Arizona Power Plant and Transmission Line Siting Committee, October 19, 2000.Campbell, A., and Jones, N.O., 1979, Preliminary Geothermal Assessment of the Big Sandy Valley, Mohave County, Arizona:  Arizona Geological Survey, Open-File Report 79-15, 26 p.

Clark, I.D., and Fritz, P., 1997, Environmental Isotopes in Hydrogeology:  CRC Press LLC, New York, 328 p.

Coolbaugh, M., Lechler, P., Sladek, C., and Kratt, C., 2010, Lithium in tufas of the Great Basin--Exploration implications for geothermal energy and lithium resources: Transaction of the Geothermal Resources Council, Vol. 34, p. 521-526.

Craig, H., 1961, Isotopic variations in meteoric waters:  Science, v. 133, p. 1702-1703.

Davidson, E.S., 1973, Water Resources Appraisal of the Big Sandy Area, Mohave County, Arizona:  Arizona Water Commission Bulletin 6, in cooperation with the U.S. Geological Survey, 40 p., 2 plates.

Gospodaric, R., and Habic, P., 1976, Underground Water Tracing, Investigations in Slovenia 1972-75:  Institute of Karst Research, Yugoslavia, 312 p.

Gu, A., Eastoe, C.J., 2011, The Origins of Sulfate in Cenozoic Non-Marine Evaporites in the Basin and-Range Province, Southwestern North America:  Geosciences, v. 11, n. 455, https://doi.org/10.3390/geosciences11110455.

Hoefs, J., 1987, Stable isotope geochemistry:  Springer-Verlag, New York, 241 p.

Hualapai Tribal Council, 2021, Hualapai Tribal Objection to the Sandy Valley Lithium Project:  Hualapai Tribal Council Resolution No. 24-2021, April 22, 2021.

Kingman Daily Miner, 2001, Caithness appeals rejection of area power plant by siting panel:  Kingman Daily Miner October 4, 2001.

Langer, W.H., Mulvihill, D.A., and Anderson, T.W., 1983, Maps Showing Ground-Water Levels, Springs, and Depth to Water, Basin and Range Province, Arizona: U.S. Geological Survey Water-Resources Investigation Report 83-4114-B, 7 p., 2 plates.

Lattman, L.H., 1958, Techniques of mapping geologic fracture traces and lineaments on aerial photographs: Photogrammetric Engineering, v. 14, no. 4, p. 568-576.

Lattman, L.H., and Parizek, R.R., 1964, Relationship between fracture traces and the occurrence of ground water in carbonate rocks: Journal of Hydrology, v. 2, p. 73-91.

Love, D.S., Gootee, B.F., Cook, J.P., Mahan, M.K., and Spencer, J.E., 2014, An Investigation of Thermal Springs throughout Arizona--Geochemical, Isotopic, and Geological Characterization, Arizona Basin and Range Province: Arizona Geological Survey Open-File Report -14-06, 129 p.

Mah, A., Taylor, G.R., Lennox, P., and Balia, L., 1995, Lineament Analysis of Landsat Thematic Mapper Images, Northern Territory, Australia: Photogrammetric Engineering & Remote Sensing, Vol. 61, No. 6, June 1995, pp. 761-773.

Meazell, P.K., 2014, Porphyry Copper Exploration of the Hualapai Mountains, Mohave County, Arizona, USA--A Multi-faceted Approach: UNLV Theses, Dissertations, Professional Papers, and Capstones, 2195, 146 p.

Miller, T.P, Barnes, I., and Patton, W.W., Jr., 1973, Geologic Setting and Chemical Characteristics of Hot Springs in Central and Western Alaska: U.S. Geological Survey Open-File Report 73-188, 25 p.

Moyer, T.C., 1990, Generalized Geologic Map of the Kaiser Spring Volcanic Field, Mohave County, Arizona: Arizona Geological Survey, Contributed Map CM-90-C.

Montgomery & Associates, 2012, Addendum to summary of aquifer testing of the confined volcanic aquifer at Well PW-2 in the Big Sandy Valley: Technical Memorandum to Freeport-McMoran Baghdad Inc., December 17, 2012.

Montgomery & Associates, 2021, Technical comments to Environmental Assessment, Big Sandy Inc Sandy Valley Exploration Project (Phase 3), AZA-37913 [DOI-BLM-AZ-C010-2021-0029-EA]: Written Communication to Hualapai Tribe, Dr. Damon Clarke, Hualapai Chairman, June 21, 2021.

Nordstrom, D.K., Wright, W.G., Mast, M.A., and Bove, D.J., 2004, Aqueous-sulfate stable isotopes--a study of mining-affected and natural acidic drainage: U.S. Geological Survey Professional Paper 1651, Chapter E8.

Piper, A.M., 1944, A graphic procedure in the geochemical interpretation of water analyses: Transactions of the American Geophysical Union--Papers in Hydrology, v. 25, no. 16, p. 914-928.

Richard, S.M., Shipman, T.C., Greene, L.C., and Harris, R.C., 2007, Estimated Depth to Bedrock in Arizona: Arizona Geological Survey, Digital Geologic Map Series DGM-52.

Santa Fe Pacific Railroad Company, 1988, Geologic Map of Santa Fe Pacific Railroad Company Mineral Holdings in Northwestern Arizona: Arizona Bureau of Geology and Mineral Technology, Miscellaneous Map Series MM-88A, 1 plate, 1:250,000 scale.

Shen, L.,Wang, L., Liu, C., Zhao, Y. Sr, 2021, S, and O Isotope Compositions of Evaporites in the Lanping–Simao Basin, China: Minerals, v. 11, n. 96. https://doi.org/10.3390/min11020096

Shepherd, J.P., 2010, We Are An Indian Nation-- A History of the Hualapai People: The University of Arizona Press, 282 p.

Sheppard, R.A., and Gude, A.J., III, 1972, Big Sandy Formation Near Wikieup, Mohave County, Arizona: U.S. Geological Survey Bulletin 1354-C, 10 p.

Smith, S.M., 1997, National Geochemical Database; Reformatted data from the National Uranium Resource Evaluation (NURE) Hydrogeochemical and Stream Sediment Reconnaissance (HSSR) Program, Version 1.41 (2006): U.S. Geological Survey Open-File Report 97-492, accessed November 9, 2017 at http://pubs.usgs.gov/of/1997/ofr-97-0492/index.html.

Spencer, J.E., 2011, Preliminary Evaluation of Cenozoic Basins in Arizona for CO2 Sequestration Potential: Arizona Geological Survey, Open-File Report OFR-11-05, V1.2, 14 p.

Towne, D.C., and Rowe, L., 2006, Ambient Groundwater Quality of the Big Sandy Basin: A 2003-2004 Baseline Study: Arizona Department of Environmental Quality Open-file Report 06-09, 67 p.

U.S. Department of the Interior, Bureau of Land Management; U.S. Department of Energy, Western Area Power Administration, 2001, Big Sandy Energy Project Environmental Impact Statement: BLM/AZ/PL-01/O04 DOEIEIS-0315.

U.S. Department of the Interior, 2015, Planet Ranch Lease Draft Environmental Assessment LC-14-15, Appendix B- Big Sandy River-Planet Ranch Water Rights Settlement Agreement: Bureau of Reclamation, Lower Colorado Region, Boulder City, Nevada, April, 2015.

White, D. E., 1957, Thermal waters of volcanic origin: Geol. Soc. America Bull., v. 68, p. 1637-1658.

White, W.B., 1988, Geomorphology and Hydrology of Karst Terrains: Oxford University Press, New York, 464 p.

Wright, W.G., and Nordstrom, D.K., 1999, Oxygen isotopes of dissolved sulfate as a tool to distinguish natural and mining-related dissolved constituents *in* U.S. Geological Survey Toxics Substances Hydrology Program--Proceedings of the technical meeting, Charleston, South Carolina, March 8-12, 1999.





# ATTACHMENT 7



The Great Spirit created Man and Woman in his own image. In doing so, both were created as equals. Both depending on each other in order to survive. Great respect was shown for each other; in doing so, happiness and contentment was achieved then, as it should be now.

The connecting of the Hair makes them one person; for happiness or contentment cannot be achieved without each other.

The Canyons are represented by the purples in the middle ground, where the people were created. These canyons are Sacred, and should be so treated at all times.

The Reservation is pictured to represent the land that is ours, treat it well.

The Reservation is our heritage and the heritage of our children yet unborn. Be good to our land and it will continue to be good to us.

The Sun is the symbol of life, without it nothing is possible – plants don't grow – there will be no life – nothing. The Sun also represents the dawn of the Hualapai people. Through hard work, determination and education, everything is possible and we are assured bigger and brighter days ahead.

The Tracks in the middle represent the coyote and other animals which were here before us.

The Green around the symbol are pine trees, representing our name Hualapai – PEOPLE OF THE TALL PINES –

## HUALAPAI TRIBE
## OFFICE OF THE CHAIRPERSON

Sherry J. Parker
*Chairperson*

P.O. Box 179 / 941 Hualapai Way • Peach Springs, Arizona 86434
(928) 769-2216

Shelton "Scott" Crozier
*Vice Chairman*

*Via Email*

March 13, 2024

Amanda Dodson
Field Manager
U.S. Department of the Interior
Bureau of Land Management
Colorado River District, Kingman Field Office
2755 Mission Boulevard
Kingman, AZ 86401
adodson@blm.gov

### Re: Comments on Environmental Assessment (EA) Big Sandy Inc., Phase 3 Big Sandy Valley Exploration Project, No: DOI-BLM-AZ-C010-2021-0029-EA

Dear Ms. Dodson:

As part of its role as a cooperating agency, the Hualapai Tribe ("Tribe") submits these comments on the Bureau of Land Management's ("BLM") February 2024 Environmental Assessment ("EA") for the Big Sandy Valley Exploration Project ("Project"). These comments supplement and incorporate by reference all previous Tribal comments on this Project, especially as the EA fails to adequately respond to those comments. [1]

As detailed below, BLM's review and proposed approval of the Project violates several federal laws and regulations, including the National Historic Preservation Act ("NHPA"), Federal Land Policy

---

[1] It should be noted that there are numerous clerical errors throughout the EA. For example, the cover page of the EA does not contain the correct name of the Project. In addition, Figures 3A, 3B, and 3C are missing; Figure 4 is supposed to show a generalized cross-section of the Project area hydrography, but there is no Figure 4 in Appendix C.

Management Act ("FLPMA"), and the National Environmental Policy Act ("NEPA").

**I.      BLM Has Failed to Comply With Section 106 of the National Historic Preservation Act.**

As the Tribe expressed in its comments submitted on June 10, 2021, and July 9, 2021, BLM has not complied with the NHPA's Section 106 process, which requires federal agencies to "consult with any Indian tribe … that attaches religious and cultural significance to" a historic property potentially affected by a federal undertaking. 54 U.S.C. § 302706(b); *see also id.* § 306102. The Advisory Council on Historic Preservation ("ACHP") is responsible for promulgating regulations "to govern the implementation of" Section 106. *Id.* § 304108(a).

Section 106 reviews must be complete prior to issuance of a federal decision, so that a broad range of alternatives may be considered during the planning process. Section 106 provides that "prior to the issuance of any license," the Federal agency "shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. The ACHP has promulgated rules to guide the implementation of this requirement, and they are found within 36 C.F.R. § 800.8, entitled "Coordination with the National Environmental Policy Act." The portion of the regulation that addresses the use of the NEPA process for section 106 purposes provides:

> If the agency official has found, during the preparation of an … EIS that the effects of an undertaking on historic properties are adverse, the agency official shall develop measures in the EA, [draft] EIS, or EIS to avoid, minimize, or mitigate such effects.... The agency official's responsibilities under section 106 and the procedures in this subpart shall then be satisfied when *either*:
> >   (i) A binding commitment to such proposed measures is incorporated in:
> > >    (A) The ROD, if such measures were proposed in a DEIS or EIS; *or*
> > >    (B) An MOA drafted in compliance with § 800.6(c) ....

36 C.F.R. § 800.8(c)(4); *see also Conserve Sw. Utah v. U.S. Dep't of Interior*, No. CV 21-1506 (ABJ), 2023 WL 7922785, at *8 (D.D.C. Nov. 16, 2023)

Here, the Phase III Cultural Resources Survey fails to identify or address the existence of the Ha'Kamwe Traditional Cultural Property ("TCP"). *See* Tribal Council Resolution at <u>Attachment A</u>. The Phase III Survey should, at the very least, be amended to include a discussion of Ha'Kamwe. The BLM has indicated that Ha'Kamwe is a TCP eligible for listing on the National Register of Historic Places and the TCP will be adversely affected by the Project by:

- Temporary visual effects from drilling equipment and surface disturbance,
- Noise and vibration from drilling activities and vehicular travel through the area,
- Disruption to cultural practices at and/or near Ha'Kamwe

EA at 15.

Since there will be adverse effects to Ha'Kamwe, a TCP eligible for listing, the Cultural Resources listed in Table 2 should be updated to indicate that cultural resources will be affected. EA at 10. Executive Order 13007, *Indian Sacred Sites*, directs federal land managing agencies to accommodate access to, and ceremonial use of, Indian sacred sites by Indian religious practitioners and to avoid adversely affecting the physical integrity of such sacred sites. Exec. Order No. 13007, *Indian Sacred Sites*, 61 Fed. Reg. 26,771. Under E.O. 13007, BLM must consult with the Tribe to avoid disruption of cultural practices at

or near Ha'Kamwe. Finally, NHPA regulations require that if an undertaking will or may adversely affect historic properties, the federal agency must consult with the THPO and other parties to negotiate and execute a Section 106 agreement document that sets out the measures the federal agency will implement to resolve those adverse effects through avoidance, minimization, or mitigation. 36 C.F.R. § 800.6(b)(1)(i-iv). The BLM must commence consultation with the Tribe for a Section 106 agreement document. The Tribe requests that the ACHP participate in those consultations.

## II.     The EA Fails to Take a Hard Look at the Impacts of the Project on Water Resources.

The EA accurately recognizes that water is a sensitive resource within the Project area and vicinity but relies on a single twenty-four-year-old study—focused on a different outcome, and with limited test holes—to conclude that the Project will not impact Ha'Kamwe. The EA makes a minor attempt at proposed mitigation for Ha'Kamwe by eliminating one water well, but overall, the water analysis in the EA has numerous data gaps. The Manera 2000 study[2], which the BLM solely relies on in Section 3.2.5.1 for the proposition that Ha'Kamwe's source water comes only from the Lower Aquifer, was focused on proving a sufficient volume of groundwater existed to satisfy the demand of a proposed electrical power-generating plant, not determining the source of groundwater for Ha'Kamwe. The EA's findings regarding Ha'Kamwe's groundwater hydrology are simply not supported by the evidence in the record, and further testing is required. *See* Win Wright, Memorandum on Big Sandy Final EA Review and Preliminary Assessment of the Hydrology and Geochemistry of Ha' Kamwe' (Cofer Hot Spring), Mohave County, Arizona, 2023 (March 11, 2024), at <u>Attachment B.</u>

**First,** the EA fails to adequately consider historical hydrologic test data in the Project area. Section 3.2.5 of the EA assumes that exploration boreholes will be dry. EA at 19-21. However, available test data does not support BLM's assumption that exploration boreholes will be dry. EA at 6. For example, the upgradient water table on the plateau 390 feet to the east of Ha'Kamwe is 68 to 69 feet below the land surface.[3] Further, even in Caithness, the water levels in test holes near Sycamore Creek range from 20 feet below the land surface to flowing artesian conditions.[4] Proposed borehole depths of 360 feet would penetrate more than 250 feet below the Big Sandy River. This data indicates that boreholes are *likely* to encounter water—the opposite of what BLM has assumed.

**Second,** the EA does not adequately evaluate the area's hydrology and instead cherry-picks a single study that mischaracterizes the source of Ha'Kamwe from a lower confined aquifer. *See* <u>Attachment B.</u> The Final EA adopts terminology from the Big Sandy Energy project that arbitrarily divided the Big Sandy Basin into separate units called the upper, middle, and lower aquifers. Caithness 2000a. The attempts to define discrete aquifer boundaries were based on Caithness, LLC's corporate interests in establishing groundwater sources as cooling water for the energy project. However, the divisions were based on observations from a few deep wells within the energy project property. In contrast, other studies consistently refer to the Big Sandy Basin as one single connected aquifer with interbedded layers of lower- and higher-permeability

---

[2] The Manera 2000 study is more accurately referenced in Caithness 2000a. Caithness 2000a will be used throughout these comments.

[3] Montgomery & Associates, 2012, Addendum to summary of aquifer testing of the confined volcanic aquifer at Well PW-2 in the Big Sandy Valley: Technical Memorandum to Freeport-McMoran Baghdad Inc., December 17, 2012 ("Montgomery, 2012").

[4] Caithness Big Sandy, L.L.C., 2000a. Water Resources of the Southern Portion of the Big Sandy Valley, Wikieup, Mohave County, Arizona ("Caithness 2000a").

units:

> The saturated rock units are treated as a single aquifer because they are hydraulically connected, and ground water moves from one unit to another in response to head differential. Ground water generally is under unconfined conditions near the land surface but probably is confined at depth, particularly in places where the permeability of the aquifer is not uniform with depth—a condition that generally occurs where the aquifer material is a coarse sand or gravel separated by less permeable beds of silt, clay, or marl.[5]

Distinctions are made between the shallow sand and gravel alluvial aquifer and the lower-basin fill, but the Big Sandy Basin is generally viewed as a single-connected aquifer. It is true that Ha'Kamwe can be affected by deep groundwater withdrawals from 1500-feet-deep wells in fractured basalt, but the analogy for this would be a bowl full of water, with a plug at the bottom of the bowl—pull the plug and the bowl will empty. Ha'Kamwe, however, is located at the top of the bowl, meaning it's depleted by withdrawals from shallow and intermediate zones too. The Final EA mistakenly uses the Caithness data to claim that exploration drilling will not affect Ha'Kamwe but disregards the prevailing view that the Big Sandy Basin is a single, interconnected aquifer—as shown in studies that received technical review prior to publication. This unexplained disregard for all but one cherry-picked study is arbitrary and capricious and violates NEPA.

Furthermore, even if it were accurate, the Caithness study does not support BLM's determination that a fully confining layer exists. For example, the Caithness study acknowledges that the presence or the extent of an aquitard above the Lower Aquifer is "only indirectly known." Caithness 2000a at 14. This supposed aquitard (comprising the lacustrine basin-fill deposits) will not isolate the exploration boreholes from encountering groundwater. During the energy project studies, test holes were drilled into the lacustrine clay deposits, where the drill holes soon filled with water after drilling, indicating that the lacustrine deposits are not dry, and are permeable enough to transmit groundwater. *Id.* During drilling into this layer, the drill "slows only slightly when it encounters the top of the confined layer and the cuttings are extremely fine." *Id.* The USGS geologic report indicates that due to erosional unconformities, the Big Sandy Formation varies widely in thickness, from measured sections ranging from 57 to 245 feet.[6] In addition, Caithness discusses the variable thicknesses of the lacustrine deposits. Caithness 2000a. Therefore, the proposed borehole depths of 360 feet would penetrate the thinner lacustrine deposits and encounter over-pressured artesian groundwater conditions.

**Third**, the EA provides no analysis of geologic faults and related impacts on the source for Ha'Kamwe. Faults and fractures can become conduits for water between aquifers. Figure 1. The drilling proposed in the Project would encounter faults and fractures (defined by lineaments) providing a pathway for the transmission of groundwater to the Ha'Kamwe spring. *See* Attachment B, Figure M1. Caithness discusses faulting of the area, yet the EA fails to analyze the potential for exploration boreholes to intersect faults and fractures which would further impact the source of groundwater for Ha'Kamwe. Caithness 2000a. Therefore, it is likely that the exploration boreholes could intersect karst aquifer conduits, causing unabated artesian flow of groundwater from the over-pressured deep basin aquifer, which could then drain

---

[5] Davidson, E.S., 1973, Water Resources Appraisal of the Big Sandy Area, Mohave County, Arizona: Ariz. Water Comm'n Bull. 6, at 32; *see also* Cady, C.V., 1980, Depth to Water, Altitude of the Water Level, and Water Quality - Map Showing Ground-Water Conditions in the Big Sandy Area, Yavapai and Mohave Counties, Ariz.; Ariz. Dep't of Water Resources, 2009, Ariz. Water Atlas, Vol. 4, Upper Colorado River Planning Area, https://prism.lib.asu.edu/items/49257/view.

[6] Sheppard, R.A., and Gude, A.J., III, 1972, Big Sandy Formation Near Wikieup, Mohave County, Arizona: U.S. Geological Survey Bull. 1354-C.

the entire aquifer system, causing Ha'Kamwe and numerous other springs and wells in the region to go dry. To prepare for the possibility of encountering the over-pressured artesian aquifer, the EA needs to analyze methods to isolate, plug, and permanently seal artesian groundwater discharges from proposed boreholes.



Figure 1

Additionally, of the 131 proposed boreholes in the Final EA, 39 boreholes and a large-diameter bulk sampling hole are located directly in the Bitter Creek stream channel and riparian zone (Attachment B, Figure M1). As described in the plan of operation, pits would be excavated for drilling fluid containment, and drilling fluids with polymer bases would likely be discharged to the stream channel. In the 2001 Big Sandy Energy, the Bitter Creek riparian zone was identified as Qualifying Waters of the US.[7] The Final EA proposes to drill, excavate, and bulk sample directly within the stream channel. The activities are directly in a floodplain, as shown in Figure 2e of the Final EA. Thunderstorms and flash floods during proposed activities could present human health and pollutant hazards. The EA fails to analyze the impacts of these activities on a potential water of the United States.

There is insufficient information in the EA to support the finding that Ha'Kamwe source waters will not be affected by the Project. Further geological testing of the Project area is required to identify the full scope of the project's impact.

---

[7] Caithness Big Sandy, L.L.C., 2000b. Big Sandy Energy Project Geology Report. Prepared by Manera, Inc., submitted by Caithness Big Sandy, L.L.C. ("Caithness 2000b").

III.    **The EA Violates NEPA By Failing to Evaluate a Reasonable Range of Alternatives.**

NEPA requires BLM to consider "a reasonable range of alternatives to the proposed agency action." 42 U.S.C. § 4332(2)(c)(iii); *see also* 40 C.F.R. § 1502.14; *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999). In our July 9, 2021, supplemental comment letter, we cautioned that BLM's draft EA violated NEPA by evaluating only two alternatives: the proposed drilling plan and the no-action alternative. Letter from Dr. Damon R. Clarke, Chairman, Hualapai Tribe, to Angelica Rose, BLM (July 9, 2021), at 10–11 ("Supp. Letter"). In particular, BLM's approach in the draft EA 1) ignored other options for meeting the project's stated purpose and need and 2) lacked factual support given the draft EA's inadequate and superficial assessment of impacts on Tribal interests. *Id.* at 11. We urged BLM to "complete its consultation with the Tribes, supplement its EA with analysis that meets NEPA requirements, and then revisit its alternatives analysis with inclusion of additional alternatives that better meet the Hualapai's concerns and provide a more appropriate balance of Hawkstone's and the public's interests in resource protection." *Id.*

We are therefore disappointed that this draft of the EA once again unlawfully fails to consider a reasonable range of alternatives. As before, it considers only two alternatives: approving or denying the proposed exploration plan in full, with no consideration of a middle-ground alternative that better protects Tribal and environmental interests. For example, given the concerns we've raised, BLM should evaluate an alternative approving only one or two of the three proposed drill sites; an alternative requiring relocation of drill sites farther from Ha'Kamwe, approving fewer total wells across the three drill sites; an alternative involving less new road construction; and/or an alternative requiring stricter controls on noise, light, and vibrations. Consideration of such an alternative is consistent with BLM's observation in the EA that the "decision to be made" is to approve the plan, deny the plan, or approve the plan "subject to changes or conditions necessary to meet" regulatory requirements. EA at 2; *see Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1037 (9th Cir. 2019) (finding failure to consider middle-ground alternative unlawful where agency "was aware that a different number of turbines and different siting decisions were possible and potentially desirable").

BLM's explanation for not including such an alternative is arbitrary and capricious. The EA offers that "[a]ny possible alternative actions would be limited given the narrow focus of the exploration drilling program" and that no such alternatives were considered because "none were identified that would have fewer impacts than the Proposed Action." EA at 9. However, this explanation ignores that the Hualapai Tribe *did* request consideration of alternatives that "better meet the Hualapai's concerns and provide a more appropriate balance of Hawkstone's and the public's interests in resource protection." Supp. Letter at 11. Furthermore, it is not the public's responsibility to bring the agency's analysis into compliance with NEPA. BLM is responsible for identifying and assessing a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii). Its failure to do so—and its unsupported explanation for that decision—violates NEPA. *See, e.g.*, *W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 982–84 (D. Idaho 2021).

In sum, BLM must consider one or more middle-ground alternatives that focus on reducing harm to tribal and environmental interests by reducing the number of total wells drilled; reducing the total surface area impacted by drilling, roads, and related activities; and/or reducing noise, light, and vibration associated with drilling activity and truck traffic. Failure to do so would violate NEPA.

IV.    **The Project Fails to Prevent Unnecessary or Undue Degradation of Public Land Resources.**

FLPMA requires that the BLM "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). This is known as the "prevent unnecessary or undue

degradation" standard. This duty to "prevent UUD" is "the heart of FLPMA [that] amends and supersedes the Mining Law." *Min. Pol'y Ctr v. Norton*, 292 F.Supp.2d 30, 33 (D.D.C. 2003). "FLPMA, by its plain terms, vests the Secretary of the Interior [and the BLM] with the authority—indeed the obligation—to disapprove of an otherwise permissible mining operation because the operation, though necessary for mining, would unduly harm or degrade the public land." *Id* at 42.

The 43 C.F.R. Part 3809 regulations implement FLPMA's mandate to prevent UUD through two primary provisions: 1) the definition of UUD at 3809.5; and 2) the Performance Standards at 3809.420. BLM must fully consider the UUD mandate and protect public resources. The Performance Standards in Part 3809 mandates that all operations "must take mitigation measures specified by BLM to protect public lands." 43 C.F.R. § 3809.420(a)(4). BLM cannot approve a mineral project that would cause UUD. 43 C.F.R. § 3809.411(d)(3)(iii). "FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and by state law." *Ctr for Biological Diversity v. Dep't. of Interior*, 623 F.3d 633, 644 (9th Cir. 2010). BLM complies with this mandate "by exercising case-by-case discretion to protect the environment through the process of (1) approving or rejecting individual mining plans of operation." *Id.* at 645, quoting *Min. Pol'y Ctr*, 292 F.Supp.2d at 44:

> Mitigation measures fall squarely within the actions the Secretary can direct to prevent unnecessary or undue degradation of the public lands. An impact that can be mitigated, but is not, is clearly unnecessary." Mining Claims Under the General Mining Laws; Surface Management, 65 Fed. Reg. 69,998, 70,052 (Nov. 21, 2000) (preamble to BLM's 43 C.F.R. Part 3809 mining regulations). Furthermore, if a UUD cannot be prevented through mitigation measures, BLM must reject the plan of operations. *Kendall's Concerned Area Residents*, 129 IBLA 130, 138 (1994) ("If unnecessary or undue degradation cannot be prevented by mitigation measures, BLM is required to deny approval of the plan.").

BLM's mitigation policy, as detailed by the Solicitor for the Department of the Interior, acknowledges the agency's mitigation duties under the FLPMA UUD standard. "[I]n the hardrock mining context, the BLM has long recognized that the UUD requirement creates a 'responsibility [for the BLM] to specify necessary mitigation measures' when approving mining plans of operations." Solicitor's Opinion M-37039, U.S. Dep't of Interior, *The [BLM]'s Authority to Address Impacts of its Land Use Authorizations through Mitigation*, at 19 (Dec. 21, 2016) (citations omitted). The 2016 mitigation opinion was temporarily revoked in 2017 but was recently reinstated by the Solicitor. Solicitor's Opinion M-37075, U.S. Dep't of Interior, *Withdrawal of M-37046 and Reinstatement of M-37039* (April 15, 2022).

> The BLM regulations addressing surface management of hardrock mining operations on public lands have consistently included mitigation as a requirement for preventing UUD, including as part of the general performance standards in the current regulations... Although mitigation may contribute in some instances to the avoidance of UUD, in other cases, the impacts to resources may be of a nature or magnitude such that they cannot be mitigated sufficiently to prevent UUD.

Solicitor's Opinion M-37039 at 19–20 (citations omitted).

In the EA, BLM failed to require adequate mitigation measures to protect the religious, cultural, water, wildlife, species, habitats, soils, and other resources affected by the Project in order to prevent UUD. An especially stark example of this is the failure to address mitigation of Ha'Kamwe as discussed further in Section I. That analysis must include detailed identification of direct and indirect impacts as well as cumulative impacts. It must identify specific mitigation measures that address each impact and also include

an analysis of the effectiveness of each measure in order to meet BLM's duties under NEPA as well as FLPMA. As detailed in these comments, the EA fails to adequately address environmental impacts and as a result, has also failed to show it has prevented UUD.

**V.     The EA Failed to Fully Analyze Direct, Indirect, and Cumulative Impacts.**

The EA fails to conduct the required "hard look" at the Project's direct, indirect, and cumulative environmental impacts of the proposed action. As a prime example, the EA essentially has no review of the cumulative impacts of the Project and other reasonably foreseeable activities in the area.

BLM's Response to Comments states that "[t]he Final EA has been updated to address past, present, and reasonably foreseeable future actions per the current Council on Environmental Quality regulations issued July 2020." EA, Appx. E at 4. First, as noted above, the 2020 NEPA regulations do not apply to BLM's review of this Project.

Further, the EA contains no analysis of the cumulative impacts from any past, present, or reasonably foreseeable future actions. These are the "cumulative effects/impacts" under NEPA. Cumulative effects/impacts are defined as:

> Effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.1(g)(3). In a cumulative impact analysis, an agency must take a "hard look" at all actions.

> An EA's analysis of cumulative impacts must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment. … Without such information, neither the courts nor the public ... can be assured that the [agency] provided the hard look that it is required to provide.

*Te-Moak Tribe of Western Shoshone v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (citations omitted) (rejecting BLM-issued EA for mineral exploration that had failed to include detailed analysis of impacts from nearby proposed mining operations).

NEPA's mandate to analyze cumulative impacts applies to all "past," "present," and "reasonably foreseeable future actions." 40 C.F.R. §1508.1(g)(3). BLM must include "mine-specific or cumulative data." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1105 (9th Cir. 2016), quoting *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006). It must provide a detailed "quantified" analysis of other projects combined environmental impacts, and "identify and discuss the impacts that will be caused by each successive project. Including how the combination of those various impacts is expected to affect the environment" within the area. *Id.*

The EA does not analyze the cumulative impacts from the other proposed activities within the cumulative effects study area on environmental justice, cultural resources and uses, wildlife, recreation, air

Here, the adverse impacts from the Project when added to other past, present, or reasonably foreseeable future actions are clearly essential to the BLM's determination (and duty to ensure) that the Project complies with all legal requirements and minimizes all adverse environmental impacts under FLPMA and NEPA. BLM's failure to obtain this information and make the necessary showings for all direct, indirect, and cumulative impacts violates NEPA and FLPMA.

BLM failed to fully consider the cumulative impacts from all past, present, and reasonably foreseeable future projects in the region on, at a minimum, religious and cultural values, environmental justice, water resources (quality and quantity), air quality, recreation, wildlife, scenic and visual resources, etc. BLM must fully review and subject such review to public comment in a revised draft EA or EIS, the cumulative impacts from all other past, present, and reasonably foreseeable future actions including mining/exploration, grazing, recreation, energy development, roads, ORV use, *etc.*, in the region. The EA's failure to include these reviews violates NEPA.

## VI.     The EA fails to fully review all baseline conditions.

The EA contains little, if any, of the required detailed analysis of potential impacts to all potentially affected resources. The EA admits that there will be adverse effects on various critical resources, such as water, Native American religious/cultural, wildlife, etc., *see* EA at Ch. 3 & Table 2, yet there is no baseline data or analysis of the current baseline conditions of these resources.

The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process whether an EA or EIS is prepared:

> NEPA clearly requires that consideration of environmental impacts of proposed projects take place *before* [a final decision] is made. *LaFlamme v. FERC*, 842 F.2d 1063, 1071 (9th Cir.1988) (emphasis in original). Once a project begins, the 'pre-project environment' becomes a thing of the past, thereby evaluating the project's effect on pre-project resources impossible. *Id.* Without establishing the baseline conditions which exist in the vicinity … before [the project] begins, there is simply no way to determine what effect the proposed [project] will have on the environment and, consequently, no way to comply with NEPA.

*Half Moon Bay Fisherman's Mark't Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988). "In analyzing the affected environment, NEPA requires the agency to set forth the baseline conditions." *Western Watersheds Project v. BLM*, 552 F.Supp.2d 1113, 1126 (D. Nev. 2008) (citation omitted). "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." Env't'l Protection Agency, *Consideration of Cumulative Impacts in EPA Review of NEPA Documents* (May 11, 1999). "NEPA requires that the agency provide the data on which it bases its environmental analysis. Such analyses must occur before the proposed action is approved, not afterward." *Northern Plains v. Surf. Transp. Brd.*, 668 F.3d 1067, 1083 (9th Cir 2011) (citations omitted) (concluding that an agency's "plans to conduct surveys and studies as part of its post-approval mitigation measures," in the absence of baseline data, indicate failure to take the requisite "hard look" at environmental impacts). Baseline information and analysis must be part of the environmental review and be subject to public review and comment under NEPA.

Federal courts have repeatedly rejected EAs for mineral exploration projects that do not contain detailed analysis of baseline conditions for all potentially affected resources, such as groundwater, wildlife, etc. *See Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, **27-33 (D. Or. 2014) (BLM EA for mineral exploration failed to analyze baseline groundwater conditions); *Cascade Forest Conservancy v.*

quality, and other potentially affected resources.

As BLM is aware, and as addressed in the Tribe's previous comments (as well as from other submitted comments), many proposed or ongoing mineral and other activities in the area will cumulatively



affect Tribal and public resources. The BLM has mapped some of these mineral activities near the current Project that the EA fails to analyze, let alone even recognize.

BLM is also aware of, but failed to mention or analyze, several other projects in the area. Figure 2. *See* Attachment C, attached mineral notices, plans, and letters regarding the Burro, Zenolith/Wikieup, and other projects.

Figure 2

But the EA has no analysis, let alone any mention, of these other activities and their cumulative effects. It should also be noted that although the EA indicates that the Project is a 613-acre exploration area, the project boundaries set out in Appendix C total closer to 7,000 acres. The Tribe can only assume that this larger acreage is set aside for future projects. This activity could overlap with other mining activity in the area and should be analyzed in the EA.

*Heppler*, 2021 WL 641614, *17–20 (D. Oregon 2021); *ICL v. U.S. Forest Serv.*, 2012 WL 3758161, *14–17 (D. Idaho 2012); *ICL v. U.S. Forest Serv.*, 429 F. Supp. 3d 719, 730–32 (D. Idaho 2019).

Here, the EA failed to obtain this baseline information on all potentially affected resources, including, but not limited to, groundwater quality and quantity, affected plants and animals, other native and non-native vegetation and wildlife, air quality, recreation, cultural, religious, and historical resources, as well as soils, among other potentially affected resources.

## VII.    The EA failed to include an adequate mitigation plan under NEPA and FLPMA

As noted in Section III and elsewhere herein, the EA does not provide a plan to mitigate the significant impacts on cultural and environmental resources as required by NEPA, FLPMA, and BLM regulations. *See, e.g.*, 43 C.F.R. Part 3809.  Most glaringly, there is no mitigation for the loss of Native American religious and cultural use and values at and around the Project site.  As detailed above, the primary "mitigation" to prevent impacts to Ha'Kamwe—the removal of the use of one water well—has not been shown to be effective in eliminating the risk to Ha'Kamwe.

Under NEPA, the agency must have an adequate mitigation plan to minimize or eliminate all potential project impacts.  NEPA requires the agency to "include appropriate mitigation measures not already included in the proposed action or alternatives." 40 C.F.R. § 1502.14(e).  NEPA regulations define "mitigation" as "measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives." 40 C.F.R.§§1508.1(s).  "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). CEQ requires that the agency discuss mitigation measures, with "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Id.*

An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective. *Compare Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381 (9th Cir.1998) (disapproving an EIS that lacked such an assessment) *with Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 477 (9th Cir.2000) (upholding an EIS where "[e]ach mitigating process was evaluated separately and given an effectiveness rating").  The Supreme Court has required a mitigation discussion precisely to evaluate whether anticipated environmental impacts can be avoided. *Robertson*, 490 U.S. at 351–52 (citing 42 U.S.C. § 4332(C)(ii)).

A mitigation discussion without at least some evaluation of effectiveness is useless in making that determination. *S. Fork Band Council v. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (BLM failed to conduct an adequate review of mitigation and mitigation effectiveness under NEPA).  "The comments submitted by [plaintiff] also call into question the efficacy of the mitigation measures and rely on several scientific studies.  In the face of such concerns, it is difficult for this Court to see how the [agency's] reliance on mitigation is supported by substantial evidence in the record." *Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1251 n. 8 (D. Wyo. 2005). *See also Diné Citizens v. Klein*, 747 F.Supp.2d 1234, 1258–59 (D. Colo. 2010) (finding "lack of detail as the nature of the mitigation measures" precluded "meaningful judicial review").

## VIII.   Failure to Prepare EIS Violates NEPA

BLM's proposed issuance of a FONSI, and failure to prepare an EIS, violates NEPA and FLPMA.

At the outset, due to the fundamental NEPA deficiencies in the EA noted above, BLM cannot issue a FONSI. BLM's deficient EA renders its FONSI inadequate. "[I]f the EA is deficient under NEPA in one of the ways Plaintiff has previously argued, then the [agency's] DN/FONSI is necessarily arbitrary and capricious because it relied on the 2012 EA." *Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, *40 (D. Or. 2014) (BLM FONSI and EA for approval of mineral exploration projects violated NEPA).

This follows a line of well-established Ninth Circuit precedent. *See Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010) (USFS violated NEPA in issuing FONSI based on inadequate analysis); *Ctr. for Biological Diversity v. NHTSA*, 508 F.3d 1212, 1223–24 (9th Cir. 2007) (When an EA fails to comply with NEPA requirements, it "do[es] not constitute a 'hard look' at the environmental consequences of the action as required by NEPA. Thus, the FONSI is arbitrary and capricious.").

Here, BLM's decision not to prepare an EIS was made without the critical information regarding cumulative and other impacts, alternatives, mitigation, and baseline conditions detailed above. As such, the FONSI is consequently invalid. "If an agency decides not to prepare an EIS, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Native Ecosystems Council*, 599 F.3d at 937 (quotation omitted). An "EIS must be prepared if substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quotation omitted). "Thus, to prevail on a claim that the [agency] violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur." *Id.* (quotation omitted). "It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." *Id.* (quotation omitted).

The Ninth Circuit has described the bar for whether significant effects may occur as a "low standard." *See, e.g.*, *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). Applying these principles, the Ninth Circuit has ordered EISs where plaintiffs raise substantial questions as to whether there may be significant impacts. *See, e.g.*, *Blue Mountains*, 161 F.3d at 1212–16; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731–732 (9th Cir. 2001); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005); *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 868 (9th Cir. 2020); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878–879 (9th Cir. 2022).

Courts have ordered an EIS where cursory analysis in an EA—like BLM's analysis here—renders effects highly controversial, unknown, or uncertain and, thus, potentially significant. The Ninth Circuit held that an EA with "data gaps" and "lack of data" concerning potential effects requires an EIS. *See Nat'l Parks*, 241 F.3d at 733 (an agency's "lack of knowledge does not excuse the preparation of an EIS; rather it requires the [agency] to do the necessary work to obtain it."); *Blue Mountains*, 161 F.3d at 1212–16 (lack of supporting data and cursory treatment of environmental effects in EA warranted preparation of EIS). Similarly, in *Hausrath v. U.S. Dep't of the Air Force*, 491 F. Supp. 3d 770 (D. Idaho 2020), the court found effects were controversial and required preparation of an EIS where plaintiffs "identified serious gaps in the USFAF's analyses concerning the effects of noise from the proposed action" to the community and wildlife. 491 F. Supp. 3d at 802. The court also found that an EIS was required because the action in *Hausrath* had uncertain effects due to "the absence of baseline noise data actually measuring the ambient noise levels in the affected communities." *Id.* at 802–03.

IX.     **The EA Fails to Take a Hard Look at Direct and Indirect Impacts to Wildlife.**

NEPA requires BLM to take a "hard look" at the impacts of its actions to "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349. These impacts must include all "reasonably foreseeable" effects, including both direct effects—those that are "caused by the action and occur at the same time and place"—and indirect effects—those that are "caused by the action and are later in time or farther removed in distance." 43 C.F.R. § 1508.1(g); *see also, e.g., N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) ("[a] hard look includes considering all foreseeable direct and indirect impacts" (cleaned up)).

In our prior comments, we explained that BLM's draft EA failed to take a hard look at impacts on wildlife because it focused exclusively on direct, on-site impacts—primarily those affecting the Sonoran Desert tortoise. We noted that the project might directly *or indirectly* affect a host of other reptiles, amphibians, fish, and plant species, including those that use or occupy nearby habitats outside the defined project area. We specifically identified several bird species that the project could harm, including the southwestern willow flycatcher, bald eagle, Yuma clapper rail, Arizona cliffrose, mountain plover, and the western yellow-billed cuckoo. Finally, we explained that BLM's "commitment" to undertake on-site wildlife surveys and ensure "[e]nvironmental awareness training" does not obviate the agency's duty to analyze the full range of likely impacts. Supp. Letter at 5–6.

This draft fails to remedy those deficiencies. As before, the EA considers only on-site impacts related to direct, actual destruction of Sonoran Desert tortoises, their burrows, and migratory songbird nests. *See* EA at 8, 21–22; *see generally* EA, Appx. G, Biological Evaluation. The EA concludes that "no long-term impacts to wildlife (including migratory birds) are anticipated from the temporary loss of desert scrub vegetation in the Project area." EA at 22. This cursory analysis is deficient for at least two reasons.

First, it fails to consider how elements of drilling activity beyond direct surface disturbance and vegetation removal—namely noise, light, and vibrations—will impact tortoises, migratory birds, and other species in and around drilling sites. The significant harms of noise, light, and vibrations are well documented across a wide range of species, including many found in and around the proposed project site (and/or related taxa). *See* Attachment D. The EA notes that noise, vibration, and visual impacts "would be temporary" and will be "reduce[d]" by practices like minimizing equipment idling (without any concrete details or assessment of the efficacy of such measures). EA at 8–9. However, it does not attempt to quantify noise pollution, light pollution, or vibration levels and compare those with known effects to tortoises, songbirds, and other species. This oversight violates NEPA's hard-look requirement. *E.g., Defs. of Wildlife v. U.S. Forest Service*, No. 14-cv-02446, 2015 WL 14070482, at *7 (D. Ariz. Sept. 15, 2015) (finding agency violated NEPA by failing to provide "a convincing explanation" why noise from exploratory drilling project would not impact Mexican spotted owls).

Second, the EA wholly fails to evaluate wildlife impacts outside the defined project area. Most notably, the EA fails to even acknowledge that the project site sits adjacent to—and the project's primary road runs through and along—designated critical habitat for the federally endangered southwestern willow flycatcher and the federally threatened western yellow-billed cuckoo. *See* Designation of Critical Habitat for Southwestern Willow Flycatcher, 78 Fed. Reg. 344, 517 (Jan. 3, 2013); Designation of Critical Habitat for the Western Distinct Population Segment of the Yellow-Billed Cuckoo, 86 Fed. Reg. 20,798, 20,967 (Apr. 21, 2021) (maps of habitat along Big Sandy River adjacent to project site). The EA instead "excluded" these species from its analysis simply because "there is no riparian habitat *in the project area*," i.e., within the project boundary lines drawn on the map. EA, Appx. G at 12 (emphasis added).

That conclusion is arbitrary and capricious and violates NEPA's requirement to take a hard look at

the project's indirect effects in two ways. First, cuckoos and flycatchers using the nearby habitat are sensitive to anthropogenic disturbances like noise from drilling activity and traffic. Scientific literature has found that flycatchers and cuckoos are among the taxa known to be sensitive to noise and other anthropogenic disturbances.[8] Similarly, the U.S. Fish and Wildlife Service determined that significant threats to the designated critical habitat along the Big Sandy River include "vehicular traffic, and associated noise." 86 Fed. Reg. at 20,852 (Table 2 – code "Q" defined in footnote). Second, cuckoos may in fact occupy habitat within the project area. "[I]n addition to the known use of riparian woodlands," the western yellow-billed cuckoo is now known to breed in "ephemeral drainages with relatively high humidity" along with "woody side drainages, terraces, and hillsides immediately adjacent to the main drainage." *Id.* at 20,813, 20,836 (characterizing this as a "new understanding"). In Arizona specifically, breeding often occurs in xeroriparian habitat. *Id.* at 20,836. That behavior is particularly relevant here because "Bitter Creek and the various smaller washes in the project area are lined with xeroriparian vegetation." EA, Appx. G at 5. BLM's failure to consider this information—and to instead ignore impacts to the cuckoo and flycatcher based on a lack of riparian habitat within the project area—is irrational, unsupported, and unlawful.

To comply with NEPA, BLM must quantify and assess all reasonably foreseeable impacts to wildlife, including those from noise, light, and vibrations, both within and outside the defined project area. The analysis should give particular attention to the southwestern willow flycatcher and the western yellow-billed cuckoo given the adjacency of their designated critical habitat.

For the same reasons, BLM should conduct a biological assessment to determine whether formal consultation is required under Section 7 of the Endangered Species Act. *See* 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12; *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006).

## X.    Conclusion

The EA fails to comply with the NHPA. Due to adverse effects to Ha'Kamwe, a TCP eligible for listing in the National Register of Historic Places, detailed in the EA, BLM must immediately begin consultation with the Tribe on a Section 106 agreement. No further progress on the Project should continue until a Section 106 agreement is negotiated with the Tribe.

The EA also fails to comply with FLPMA and NEPA for the reasons set forth above, and an EIS should be completed for the Project.

To commence consultation with the Tribe regarding a Section 106 agreement to address the adverse effects on Ha'Kamwe, please contact Ka-Voka Jackson at simone.jackson@hualapai-nsn.gov.

Sincerely,

Sherry J. Parker
Chairwoman

---

[8] Attachment D: Nathan J. Kleist, et al., *Chronic anthropogenic noise disrupts glucocorticoid signaling and has multiple effects on fitness in an avian community*, 115 PNAS E648 (2018); Sarah Goodwin and Greg Shriver, *Effects of Traffic Noise on Occupancy Patterns of Forest Birds*, 25 Conservation Biology 406 (2010).

cc:   Bill Marzella, ACHP
      Kathryn Leonard, SHPO

# ATTACHMENT 8



The Great Spirit created Man and Woman in his own image. In doing so, both were created as equals. Both depending on each other in order to survive. Great respect was shown for each other; in doing so, happiness and contentment was achieved then, as it should be now.

The connecting of the Hair makes them one person; for happiness or contentment cannot be achieved without each other.

The Canyons are represented by the purples in the middle ground, where the people were created. These canyons are Sacred, and should be so treated at all times.

The Reservation is pictured to represent the land that is ours, treat it well.

The Reservation is our heritage and the heritage of our children yet unborn. Be good to our land and it will continue to be good to us.

The Sun is the symbol of life, without it nothing is possible – plants don't grow – there will be no life – nothing. The Sun also represents the dawn of the Hualapai people. Through hard work, determination and education, everything is possible and we are assured bigger and brighter days ahead.

The Tracks in the middle represent the coyote and other animals which were here before us.

The Green around the symbol are pine trees, representing our name Hualapai – PEOPLE OF THE TALL PINES –

## HUALAPAI TRIBE
### OFFICE OF THE CHAIRPERSON
P.O. Box 179  / 941 Hualapai Way • Peach Springs, Arizona 86434
(928) 769-2216

Sherry J. Parker
*Chairperson*

Shelton "Scott" Crozier
*Vice Chairman*

*Via Email*

May 24, 2024

Amanda Dodson
Field Manager
U.S. Department of the Interior
Bureau of Land Management
Colorado River District, Kingman Field Office
2755 Mission Boulevard
Kingman, AZ 86401
adodson@blm.gov

**Re: Response to May 13, 2024 Revised Draft Final Environmental Assessment (EA) Big Sandy Inc., Phase 3 Big Sandy Valley Exploration Project, No: DOI-BLM-AZ-C010-2021-0029-EA**

Dear Ms. Dodson:

As part of its role as a cooperating agency, the Hualapai Tribe ("Tribe") submits these responses to the May 13, 2024, Revised Draft Final Environmental Assessment ("EA") for the Big Sandy Valley Exploration Project ("Project"). These comments supplement and incorporate by reference all previous Tribal comments on this Project, especially as the EA fails to adequately respond to the Tribe's previous comments, particularly the Tribe's March 13, 2024, comments on the Draft Final EA.[1] For ease of reference, the Tribe will use the same subject headers as the March 13, 2024, letter.

As detailed below, BLM's review and proposed approval of the Project violates several federal laws and regulations, including the National Historic Preservation Act ("NHPA"), Federal Land Policy Management Act ("FLPMA"), and the National Environmental Policy Act ("NEPA").

---

[1] As noted in the Tribe's March 13, 2024 comments, clerical errors continue to occur in the May 13, 2024, EA. For example, Appendix D omits Figures 1, 2A, and 2B.

I.      **BLM Has Failed to Comply With Section 106 of the National Historic Preservation Act.**

As the Tribe expressed in its comments submitted on June 10, 2021, July 9, 2021, and March 13, 2024, BLM has not complied with the NHPA's Section 106 process. The Tribe understands that the Advisory Council on Historic Preservation ("ACHP"), the agency charged with administering and ensuring federal agency compliance with the NHPA, has advised BLM to reconsider its Section 106 finding of effects regarding Ha'Kamwe in light of the impacts described in the EA. Further, the Tribe understands that the ACHP disagrees that adding the word "temporary" to the Project's adverse effects on Ha'Kamwe in the EA exempts BLM from compliance with the NHPA. It does not.

BLM attempts in its May 13, 2024, EA to now downplay the adverse effects to Ha'Kamwe as a result of the Project's "noise and vibration from drilling activities and vehicular travel through the area" and to "disruption to cultural practices at and/or near Ha'Kamwe'" by adding the word "temporary" to those impacts. EA at 17. However, as the ACHP points out, adding the word "temporary" to these impacts does not mean that there are no adverse effects to the TCP. "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 CFR § 800.5(a)(1).

As advocated by the ACHP, BLM must engage the Tribe and SHPO in reevaluating the Area of Potential Effects and the Section 106 evaluation for this Project. As set out in the Tribe's March 13, 2024, letter, a Section 106 agreement document is required for this Project due to the adverse effects on the TCP. The Tribe requests a consultation with BLM to include ACHP and SHPO to discuss the development of a Section 106 agreement document.

II.     **The EA Fails to Take a Hard Look at the Impacts of the Project on Water Resources.**

The May 13, 2024, EA continues to suffer from numerous data gaps regarding water resources. The May 13, 2024, EA does not address the Tribe's concern about BLM's failure to address historical test data in the Project area. Instead, BLM has added one purported mitigation measure regarding water intersection during the drilling process being plugged, however, provides no analysis that these measures will be effective. Further, there is no analysis regarding the potential impacts to hydrology by plugging these wet holes. If wet holes are plugged into faults, for example, this could impact groundwater flow. This issue just further underscores the Tribe's concerns regarding BLM's failure to take a hard look at this Project's impact on water resources. Additional geological testing is required in order to ensure that the source of Ha'Kamwe is not impacted by this Project.

In response to the Tribe's concern that the EA does not adequately evaluate the area's hydrology, fails to analyze geologic faults and related impacts, and instead cherry-picks a single study that mischaracterizes the source of Ha'Kamwe from a lower confined aquifer, BLM concedes that the hydrology of the area is not understood and points again to the purported mitigation. However, if the hydrology of the area is not understood, then BLM can not ensure that the purported mitigation will help to mitigate any impacts. The failure to take a hard look at the hydrology of the area and instead rely upon one cherry-picked study and purported mitigation is arbitrary and capricious and violates NEPA.

In response to the Tribe's concerns about large-diameter bulk sampling holes located in the Bitter Creek stream channel and riparian zone, BLM merely responds that the applicant has a spill control plan.

RTC at 1. However, the May 13, 2024, EA provides no analysis of the Tribe's concern that thunderstorms and flash floods during drilling activities could present human health and pollutant hazards. The May 13, 2024, EA fails to analyze the impacts of these activities on a potential water of the United States.

There is insufficient information in the EA to support the finding that Ha'Kamwe source waters will not be affected by the Project. Further geological testing of the Project area is required to identify the full scope of the project's impact.

### III.    The EA Violates NEPA By Failing to Evaluate a Reasonable Range of Alternatives.

In our last two comment letters, we explained that the EA violates NEPA by failing to consider "a reasonable range of alternatives to the proposed agency action." 42 U.S.C. § 4332(2)(C)(iii); *see also* 40 C.F.R. § 1502.14; *Nat. Res. Def Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999). This problem persists: the final EA still evaluates just two alternatives: approving or denying the proposed exploration plan in full, with no consideration of a middle-ground alternative that would better protect Tribal and environmental interests.

BLM's most recent explanation for not including such an alternative is arbitrary and capricious. The response to our last comment letter summarily states: "[t]he BLM determined that the two alternatives for this project proposal is sufficient, Chapter 2." Response to Comments ("RTC") at 1. This cursory response wholly fails to engage with our prior comments, which urged BLM to complete its consultation with the Tribes, supplement its EA with analysis that meets NEPA requirements, and then revisit its alternatives analysis with the inclusion of additional alternatives that meet the Hualapai's concerns and protect the public's interests in resource protection. For example, we encouraged BLM to evaluate an alternative approving only one or two of the three proposed drill sites; an alternative requiring relocation of drill sites farther from Ha'Kamwe'; an alternative approving fewer total wells across the three drill sites; an alternative involving fewer new road construction; and/or an alternative requiring stricter controls on noise, light, and vibrations. BLM's continued failure to consider such an alternative violates NEPA.

### IV.    The Project Fails to Prevent Unnecessary or Undue Degradation of Public Land Resources.

FLPMA requires that the BLM "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). This is known as the prevent undue and unnecessary degradation standard referred to as UUD. The May 13, 2024, EA does not address the Tribe's concerns regarding UUD. The Tribe's March 13, 2024, comments point out the failure of BLM to take mitigation measures to address impacts to Ha'Kamwe. BLM's failure on this point is underscored by its refusal to follow ACHP's recommendation to revisit BLM's Section 106 findings in light of the impacts to Ha'Kamwe and enter into a Section 106 agreement as further described in Section I.

Although Section 3.2.7 adds the measure of plugging drill holes that intersect water, it should be noted that this purported mitigation measure has not been discussed with the Tribe nor has any analysis been completed regarding whether such action could adversely impact groundwater flow as further discussed in Section II.

In the May 13, 2024, EA, BLM failed to require adequate mitigation measures to protect the religious, cultural, water, wildlife, species, habitats, soils, and other resources affected by the Project in order to prevent UUD.

## V.     The EA Failed to Fully Analyze Direct, Indirect, and Cumulative Impacts.

BLM did not adequately respond to the Tribe's concerns regarding cumulative impacts and failed to fully review all direct, indirect, and cumulative environmental impacts of the Project. Lacking such analysis, BLM cannot issue a valid Finding of No Significant Impact ("FONSI"). "[I]f the 2012 EA is deficient under NEPA in one of the ways Plaintiff has previously argued, then the [agency's] DN/FONSI is necessarily arbitrary and capricious because it relied on the 2012 EA." *Gifford Pinchot Task Force v. Perez*, 13-CV-00810, 2014 WL 3019165, at *40 (D. Or. 2014). This follows a line of well-established Ninth Circuit precedent. *See Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010) (USFS violated NEPA in issuing FONSI based on inadequate analysis); *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1223-24 (9th Cir. 2008) (When an EA fails to comply with NEPA requirements, it "do[es] not constitute a 'hard look' at the environmental consequences of the action as required by NEPA. Thus, the FONSI is arbitrary and capricious.").

> In a cumulative impact analysis, an agency must take a 'hard look' at all actions. An [EIS's] analysis  of cumulative impacts 'must give a sufficiently detailed catalogue of past, present, and future projects,  and provide adequate analysis about how these projects, and differences between the projects, are  thought to have impacted the environment.' ... 'Without such information, neither the courts nor the  public ... can be assured that the [agency] provided the hard look that it is required to provide.'

*Te-Moak Tribe of Western Shoshone v. U.S. Dept. of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (BLM EA for mineral exploration drilling project violated NEPA for failing to conduct an adequate cumulative impact analysis).

The Ninth Circuit has repeatedly faulted the BLM's failures to fully review the cumulative impacts of mining projects. In one case, vacating BLM's approval of the Mt. Hope Mine, the court stated that "'in a cumulative impact analysis, an agency must take a 'hard look' at *all* actions that may combine with the action under consideration to affect the environment.'" *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016) (quoting *Te-Moak Tribe*). BLM violated NEPA here because it "did not 'identify and discuss the impacts that will be caused by each successive project, including how the combination of those various impacts is expected to affect the environment.'" *Id.* at 1105 (quoting *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973-74 (9th Cir. 2006)).

In *Great Basin Mine Watch*, the Ninth Circuit required "mine-specific ... cumulative data," a "quantified assessment of their [other projects] combined environmental impacts," and "objective quantification of the impacts" from other existing and proposed mining operations in the region. 456 F.3d at 972-74. The agency cannot "merely list other [projects] in the area without detailing impacts from each  one." *Id.* at 972. *See also ONRC v. Goodman*, 505 F.3d 884, 893 (9th Cir. 2007).

Overall, the EA is severely lacking in the required full analysis of the cumulative impacts from all the other past, present, and reasonably foreseeable future activities in the area. For all affected resources such as wildlife, plants, air and water, cultural, economic, recreation, etc.. Instead, the EA provides only generalized mentions of potential cumulative impacts, with none of the required detailed quantification of cumulative impacts.

Further, the Ninth Circuit has squarely rejected the BLM's reliance on a list of acreages along with a brief mention of impacts from other activities – ruling that such a cursory review violates NEPA in striking down a Nevada BLM EIS for a large mining project:

The Bureau responds that the acreage of surface disturbance with the Pete Project, at least, is implicitly included in the cumulative effects analysis for other resources, such as soils and vegetation. We have held, however, that this is insufficient under NEPA. **"A calculation of the total number of acres to be [impacted by other projects] in the watershed is a necessary component of a cumulative effects analysis, but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres."** *Klamath-Siskiyou*, 387 F.3d at 995. The Bureau also gives no explanation for why other mining projects were not explicitly discussed in the cumulative impacts analysis. *Great Basin Mine Watch*, 456 F.3d at 973 (emphasis added).

**VI.      The EA fails to fully review all baseline conditions.**

The May 13, 2024, EA continues to contain little, if any, of the required detailed analysis of potential impacts to all potentially affected resources. The EA admits that there will be adverse effects on various critical resources, such as water, Native American religious/cultural, wildlife, and other resources, *see* EA at Ch. 3 & Table 2, yet there continues to be no baseline data or analysis of the current baseline conditions of these resources.

BLM indicates in its RTC that it has added "additional information and protection measures to protect water resources" referencing Sections 2.1.1 and 3.25 of the EA. RTC at 2. However, these additions do not address or analyze baseline conditions of the affected environment, which is required by NEPA and has been continually requested by the Tribe.

The EA failed to obtain this baseline information on all potentially affected resources, including, but not limited to, groundwater quality and quantity, affected plants and animals, other native and non-native vegetation and wildlife, air quality, recreation, cultural, religious, and historical resources, as well as soils, among other potentially affected resources.

**VII.      The EA failed to include an adequate mitigation plan under NEPA and FLPMA**

As noted in our previous comment letters, the EA does not provide a plan to mitigate the significant impacts on cultural and environmental resources as required by NEPA, FLPMA, and BLM regulations. See, e.g., 43 C.F.R. Part 3809. The May 13, 2024, EA continues to not sufficiently mitigate the loss of Native American religious and cultural use and values at and around the Project site. There have been no additional changes to mitigate the noise, visual, and vibration effects that will impact Ha'Kamwe nor has there been any analysis of potential mitigation measures. Instead, the effects are labeled as temporary. RTC at 17. Finally, the additional measure of plugging holes during the core hole drilling process is not sufficient to fulfill an adequate mitigation plan.

Under NEPA, the agency must have an adequate mitigation plan to minimize or eliminate all potential project impacts. NEPA requires the agency to "include appropriate mitigation measures not already included in the proposed action or alternatives." 40 C.F.R. § 1502.14(e). NEPA regulations define "mitigation" as "measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives." 40 C.F.R.§§1508.l(s). "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). CEQ requires that the agency discuss mitigation measures, with "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Id.*

The EA does not evaluate the effectiveness of the additional core hole drill plugging mitigation measure or other mitigation measures like site monitoring. As discussed in Section II, there are many data gaps in the water analysis in the EA. Those gaps must be filled to fully assess the effectiveness of these measures. Without a reasonably complete discussion of mitigation measures, the EA does not fulfill the NEPA, FLPMA, and BLM regulations.

## VIII.   Failure to Prepare EIS Violates NEPA

BLM's proposed issuance of a FONSI, and failure to prepare an EIS, violates NEPA and FLPMA. BLM's only response to this comment was to thank the Tribe for the comment. "If an agency decides not to prepare an EIS, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Native Ecosystems Council v. Tidwell,* 599 F.3d 926, 937 (9th Cir. 2010). The Project's impacts here are not insignificant. An EIS should be prepared for this Project.

## IX.   The EA Fails to Take a Hard Look at Direct and Indirect Impacts to Wildlife.

In our two prior comment letters, we explained that the EA fails to take a hard look at impacts on wildlife because it focuses exclusively on direct, on-site impacts—primarily those affecting the Sonoran Desert tortoise. We noted that the project might directly *or indirectly* affect a host of other species that use or occupy a habitat within *or close to* the formally defined project area.[2] We also explained that BLM's plans to undertake on-site wildlife surveys and ensure "[e]nvironmental awareness training" does not obviate the agency's duty to analyze the full range of likely impacts. EA at 9; *see* 43 C.F.R. § 1508.1(g); *Robertson*, 490 U.S. at 349 (1989); *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006).

The final EA's analysis of wildlife impacts is substantively unchanged from prior drafts, meaning these legal deficiencies persist.

## X.   Conclusion

BLM continues to fail to comply with the NHPA. As recommended by the ACHP, BLM should engage in consultation with the Tribe and SHPO to revisit the finding of no adverse effect on cultural resources. Adverse effects to Ha'Kamwe, a TCP eligible for listing in the National Register of Historic Places, must be addressed via a Section 106 agreement.

The EA also fails to comply with FLPMA and NEPA for the reasons set forth in the Tribe's comments and an EIS should be completed for the Project.

To commence consultation with the Tribe regarding a Section 106 agreement to address the adverse effects on Ha'Kamwe, please contact Ka-Voka Jackson at Ka-Voka.Jackson@hualapai-nsn.gov. The Tribe

---

[2] Furthermore, Mojave and Sonoran desert scrub plants take from 76-600 years to recover to pre-disturbance conditions compared to neighboring un-disturbed habitat. *See* S. R. Abella, *Disturbance and plant succession in the Mojave and Sonoran deserts of the American Southwest.* 7 Int. J. Env't Res. Pub. Health 1248–84 (Apr 2010), https://doi.org/10.3390/ijerph7041248; Kristin H. Berry et al., *Bidirectional recovery patterns of Mojave Desert vegetation in an aqueduct pipeline corridor after 36 years: I. Perennial shrubs and grasses.* 124 J. Arid Env'ts 413–25. (2016), https://doi.org/10.1016/j.jaridenv.2015.03.004. Therefore, there will be long-term effects on wildlife and their habitat and food sources—an effect the EA ignores.

looks forward to discussing these issues with you at our May 28, 2024, meeting.

Sincerely,

Sherry J. Parker, Chairwoman
Hualapai Tribal Council

cc:     Bill Marzella, ACHP
        Kathryn Leonard, SHPO

# ATTACHMENT 9



May 31, 2024

Amanda Dodson
Field Manager, Kingman Field Office
Bureau of Land Management
2755 Mission Blvd.
Kingman, AZ 86401

Ref:   *Sandy Valley Exploration Project*
       *Mohave County, Arizona*
       *ACHP Project Number: 016998*

Dear Ms. Dodson:

In January 2023, the Advisory Council on Historic Preservation (ACHP) provided the enclosed letter to the Bureau of Land Management (BLM), advising the BLM to conduct additional consultation with the Hualapai Tribe to consider the Tribe's concerns with the referenced undertaking and its potential effects on Ha'Kamwe' (also known as Cofer Hot Spring). Ha'Kamwe' is a sacred medicinal spring that has previously been determined eligible by the BLM for listing in the National Register of Historic Places for its religious and cultural significance to the Hualapai Tribe. The Tribe has also expressed that it is a sacred site important to the religious and cultural practices of the Tribe.

At that time, the BLM had concluded its review under Section of the National Historic Preservation Act for this undertaking and reached a finding of no historic properties affected, in accordance with 36 CFR § 800.4(d)(1). Based on evidence provided by the Tribe at that time, the ACHP stated that we had concerns that the BLM failed to adequately consider the Tribe's special expertise in evaluating the undertaking's potential to adversely affect Ha'Kamwe', notably the mineral exploration activities' potential for noise, vibration, and impacts on groundwater supply and quality. The BLM responded in writing to the ACHP's letter that they intended to continue consultation with the Hualapai Tribe to respond to these concerns and had invited the Tribe to be a cooperating agency for its review under the National Environmental Policy Act (NEPA). However, the BLM has not formally reevaluated its Section 106 finding of effect.

In April 2024, the BLM provided a draft of its final Environmental Assessment (EA) being prepared to document its NEPA analysis to the ACHP. The EA describes modifications the BLM has integrated into the proposed action to reduce potential impacts on Ha'Kamwe', such as eliminating the use of groundwater for water supply, moving staging areas away from the spring, and removing redundant overland travel routes by consolidating access roads. Although the ACHP appreciates these measures, based on our review of the EA draft, particularly the excerpted portion below, it seems apparent that the BLM had identified potential impacts to the eligible Ha'Kamwe', including on the Tribe's ability to conduct cultural practices there, that warrant revisiting the Section 106 finding. We describe further as follows:

### 3.2.1.2 Environmental Consequences

ADVISORY COUNCIL ON HISTORIC PRESERVATION

401 F Street NW, Suite 308 ▢ Washington, DC 20001-2637
Phone: 202-517-0200 • Fax: 202-517-6381 • achp@achp.gov • www.achp.gov

**Proposed Action**

Impacts with the proposed drilling operations on religious concerns/traditional values include the following:

- Temporary visual effects from drilling equipment and surface disturbance,
- Noise and vibration from drilling activities and vehicular travel through the area,
- Disruption to cultural practices at and/or near Ha'Kamwe',
- Impacts to native wildlife and vegetation (removal of vegetation, noise, human presence),
- The potential for cumulative effects to natural and cultural environments.

Visual, noise, and vibration effects from drilling activities would be temporary. Coordination with and providing notice to the Hualapai Tribe of drilling activities in the vicinity of the Ha'Kamwe' may reduce impacts to cultural practices at or near the hot spring.[1]

The ACHP's interpretation of this analysis is that there is the clear potential for effects on the Ha'Kamwe' historic property, including noise, vibration, and disruption to cultural practices conducted by the Tribe. This interpretation has been supported by information provided by the Tribe in conversation with the ACHP. The ACHP met with the BLM on April 22, 2024 to discuss these discrepancies between the NEPA and Section 106 analyses. The BLM's initial response was that they consider these impacts to be temporary and non-physical, and do not meet the definition of "effects" under Section 106. The ACHP disagreed with this assessment; as defined in 36 CFR § 800.16(i), effect "means alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register." In this case, the characteristics of the historic property qualifying it for inclusion in the National Register include (in addition to the physical components of the property, such as the spring itself and surrounding landscape features) the setting and feeling of Ha'Kamwe' and its environs and the cultural practices conducted there, both of which will be altered (albeit temporarily) by the drilling equipment and ground disturbance proposed in close proximity. During this conversation, we encouraged the BLM to consult further with the Tribe and Arizona State Historic Preservation Officer to reconsider its evaluation in light of its updated NEPA analysis. The ACHP reiterates this request here.

The ACHP's recommendation on this matter is advisory and ultimately the BLM is responsible for making determinations pursuant to its Section 106 review. Additionally, as the Section 106 review has concluded, there is no formal dispute resolution or objection process available to the Tribe or other consulting parties at this time. Therefore, although it is not incumbent upon the BLM to reconsider, we feel the discrepancies between the Section 106 and NEPA analyses are worthy of further review.

With this letter, we are also providing a copy of the ACHP's recently adopted policy statement on *Indigenous Knowledge and Historic Preservation*, available here. As described in the policy statement, the "special expertise" recognized in 36 CFR § 800.4(c)(1) is a component of Indigenous Knowledge and is an aspect of the best available science. The Section 106 regulations require federal agencies to acknowledge the special expertise of Indian Tribes in identifying and assessing the eligibility of historic properties that may be of religious and cultural significance to them. Acknowledgement in this context means to recognize and defer to Tribal interpretation of the property's significance and integrity. The ACHP interprets this requirement to include a consideration of Indigenous Knowledge provided by the Tribe in the federal agency's assessment of how that property would be affected by the proposed undertaking.

---

[1] U.S. Department of the Interior, Bureau of Land Management, Big Sandy Inc. Phase 3 Project Valley Exploration Project Final Environmental Assessment, February 2024, 15.

The ACHP provides this guidance under 36 CFR § 800.9(a) to assist the BLM in complying with the Section 106 implementing regulations, and we look forward to further consultation on this matter. Please keep us informed on the status of these reviews, both for this and future exploration and mining undertakings in this location. If we may be of further assistance, please contact Mr. Rodney Parker, ACHP Liaison to the BLM, at (202) 517-0198, or via e-mail at rparker@achp.gov.

Sincerely,

Christopher Koeppel
Assistant Director
Office of Federal Agency Programs
Federal Property Management Section

CC      Shelton S. Crozier, Vice Chairman, Hualapai Tribe
        Martina Dawley, THPO, Hualapai Tribe
        Kathryn Leonard, Arizona SHPO
        Matt Basham, Deputy Preservation Officer, BLM Arizona

Enclosure

# ATTACHMENT 10




# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Arizona State Office
One North Central Avenue, Suite 800
Phoenix, Arizona  85004-4427
www.blm.gov/arizona

July 17, 2024

In Reply Refer To:
3809 (AZ920)

CERTIFIED MAIL - RETURN RECEIPT REQUESTED No. 7014 2870 0000 1116 0219

Ka-Voka Jackson
Tribal Historic Preservation Officer
Hualapai Tribe
PO Box 310
Peach Springs, Arizona 86434

Re: Request for State Director Review and Request for Stay for the Phase 3 Sandy Valley
Exploration Project

Dear Ms. Jackson:

On July 1, 2024, the Bureau of Land Management (BLM) Arizona State Office received a
request for State Director review and stay pursuant to 43 CFR § 3809.805, for the Phase 3 Sandy
Valley Exploration Project.  Pursuant to 43 CFR § 3809.806(a), I am declining the request to
review the Phase 3 Sandy Valley Exploration Project decision.

**Appeal of the Field Office Decision**

Consistent with 43 CFR § 3809.801(a)(2), you may appeal the June 5, 2024, Field Office
decision to the Interior Board of Land Appeals (IBLA) within 30 days of your receipt of this
letter. Any appeal to the IBLA must be in accordance with the regulations at 43 CFR Part 4 and
the enclosed Form 1842-1. Your Notice of Appeal must be filed with the Bureau of Land
Management, Kingman Field Office, 2755 Mission Blvd., Kingman, AZ 86401, and with the
Solicitor's Office at U.S. Department of the Interior, Phoenix Field Office, 401 West
Washington Street, Suite 404, Phoenix, Arizona 85003. The appellant has the burden of showing
that the decision appealed from is in error.

The Field Office decision will remain in effect while the IBLA reviews the case unless a stay is
granted by the IBLA. If you request a stay, you have the burden of proof to demonstrate that a
stay should be granted.

Request for a Stay

If you wish to file a petition pursuant to regulations 43 CFR 4.21 for a stay of the effectiveness of the Field Office decision during the time that your appeal is being reviewed by the IBLA, the petition for a stay must accompany your notice of appeal. Copies of the notice of appeal and petition for a stay must also be submitted to each party named in the decision and to the IBLA and to the appropriate Office of the Solicitor (see 43 CFR 4.413) at the same time the original documents are filed with the Field Office.

Standards for Obtaining a Stay

Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a decision pending appeal must show sufficient justification based on the following standards:

1. The relative harm to parties if the stay is granted or denied.
2. The likelihood of the appellant's success on the merits.
3. The likelihood of immediate and irreparable harm if the stay is not granted.
4. Whether the public interest favors granting the stay.

Sincerely,

RAYMOND SUAZO
Digitally signed by
RAYMOND SUAZO
Date: 2024.07.17 09:06:04
-07'00'

Raymond Suazo
State Director

Enclosure

cc: Western Mining Action Project
Attention: Roger Flynn
P.O. Box 349,
440 Main St. #2
Lyons, CO 80540

Earthjustice
Attention: Laura Berglan
633 17th Street, Suite 1600
Denver, CO 80202

Field Manager, Kingman Field Office
Office of the Field Solicitor, Phoenix Office

# ATTACHMENT 11



# United States Department of the Interior



**BUREAU OF LAND MANAGEMENT**
Kingman Field Office
2755 Mission Boulevard
Kingman, Arizona 86401
Phone: (928) 718-3700 Fax: (928) 718-3761
www.blm.gov/arizona/

July 9, 2024

In Reply Refer To:
3809 (C010)
AZAZ106090656

CERTIFIED MAIL - RETURN RECEIPT REQUESTED NO. 9589 0710 5270 2069 7980 48

## DECISION

| Big Sandy Inc. | : | 43 CFR 3809 |
|---|---|---|
| 615 West Elliot Road | : | Surface Management |
| Tempe, Arizona 85284 | : | AZAZ106090656 |

<u>Exploration Plan Approved – Conditions of Approval Required</u>
<u>Determination of Required Financial Guarantee</u>

The Exploration Plan (AZAZ106090656) for the Sandy Valley Exploration Project (Phase 3) is hereby approved subject to conditions of approval listed below. Big Sandy Inc. must conduct operations as described in the Exploration Plan and in accordance with the following Bureau of Land Management (BLM) conditions of approval (COA).

<u>Conditions of Approval:</u>

1) Removal of saguaros (Carnegiea gigantea) 12 inches (30 centimeters [cm]) diameter at breast height (dbh), or greater, would be avoided. Saguaros that cannot be avoided, and meet salvage criteria, would be transplanted adjacent to the disturbed area.
2) Big Sandy Inc. would protect all survey monuments found within the study area. Survey monuments include, but are not limited to, General Land Office and BLM Cadastral Survey Corners, reference corners, witness points, U.S. Coast and Geodetic Survey benchmarks and triangulation stations, military control monuments, and recognizable civil (both public and private) survey monuments.
3) Native American tribes overseeing, or otherwise coordinating, use of Ha'Kamwe' (Cofer Hot Spring) will be provided reasonable notice before drilling activities commence and given the anticipated duration of these activities. This will ensure that cultural practices are either not disrupted or will be subject to only limited, temporary disruption.

Financial Guarantee – Based on your reclamation cost estimate and the BLM review of the cost estimate, the required financial guarantee amount is hereby set at $45,500. Big Sandy Inc. must provide a financial guarantee in the amount of $45,500 using one or more of the acceptable financial guarantee instruments listed under 43 CFR 3809.55. The financial guarantee must be provided to the BLM Kingman Field Office (KFO) at the above address. The KFO will forward the financial guarantee and supporting documentation to the BLM Arizona State Office and that office will issue you a decision as to the acceptability of your financial guarantee. You must not begin activities under the approved Exploration Plan until you receive notification from the BLM Arizona State Office that the financial guarantee has been accepted and obligated.

Approval of an Exploration Plan by the BLM does not constitute a determination regarding the validity, or ownership, of any unpatented mining claim involved in the mining operation. Big Sandy Inc. is responsible for obtaining any use rights and local, state, or Federal permits, licenses, or reviews that may be required for the operation.

Appeal of the Decision
Pursuant to 43 CFR 3809.800 (a), you may ask the Arizona State Director to review this decision. If you request State Director review of this decision, your written request must be a single package that includes a brief written statement explaining why the BLM should change its decision and any documents that support your written statement (See 43 CFR 3809.805 (a)). This decision will remain in effect during the period of State Director review, unless a stay is granted by the State Director (See 43 CFR 3809.808 (a)). Requests for State Director review must be sent to the BLM, State Director review, c/o 2755 Mission Boulevard, Kingman, Arizona 86401. When you submit your request for a State Director review, you may also request a meeting with the State Director (See 43 CFR 3809.805 (b)).

If you have requested a State Director review, you may terminate this review by filing an appeal with the IBLA during the 30 days immediately following the date of the original decision. If you have requested a State Director review, and the State Director decides not to review the decision in your case, you may appeal to the Interior Board of Land Appeals (IBLA). An appeal to IBLA must be taken during the 30 day period following the date the State Director decides not to review the decision. If the State Director does not make a decision within 21 days of your request, you should consider your request for State Director review declined, and you have 30 days following that 21 day period in which you may appeal the original decision to IBLA (See 43 CFR 3809.806). You may also appeal an unfavorable decision resulting from the State Director review. If appealing an unfavorable decision from a State Director's review, you have 30 days from the date you receive or are notified that decision to appeal to IBLA.

You may also file an appeal directly to IBLA and bypass completely the State Director review (See 43 CFR 3809.800 (b)). If you wish to bypass State Director review and appeal directly to IBLA, your appeal must be filed within 30 days of the date you received this decision.

Any appeal taken with IBLA must be in accordance with 43 CFR 4.400 et seq. If you decide to appeal, your Notice of Appeal (NOA) must be filed in writing and in accordance with Form 1842-1 (enclosed) at the Kingman Field Office, 2755 Mission Boulevard, Kingman, Arizona 86401; and with Office of the Solicitor (Department of the Interior, Office of the Field Solicitor,

Sandra Day O'Connor U.S. Court House #404, 401 W. Washington Street SPC44, Phoenix, AZ 85003-2151).

The required Statement of Reasons (SOR), (see 43 CFR 4.412), may be filed with the NOA. If not filed with the NOA, it must be filed with the IBLA, Office of Hearings and Appeals, U.S. Department of the Interior, MS 300-QC, Arlington, VA 22203, within 30 days after the NOA was filed. (see also required service at 43 CFR 4.413).

The decision, signed by the Field Manager, will remain in effect during the appeal unless a stay is granted. If you wish to file a petition pursuant to regulations 43 CFR 4.21 for a stay of the effectiveness of this decision during the time that your appeal is being reviewed by the IBLA, or for a stay pursuant to 43 CFR 3809.808 (b) during a State Director review, the petition for a stay must accompany your NOA or with your package requesting State Director review. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a decision shall show sufficient justification based on the following standards:

Standards for Obtaining a Stay

1. The relative harm to the parties if the stay is granted or denied,
2. The likelihood of the appellant's success on the merits,
3. The likelihood of immediate and irreparable harm if the stay is not granted, and
4. Whether the public interest favors granting the stay.

If you have any questions, please contact Geologist Paul Misiaszek at (928) 718-3728 or pmisiasz@blm.gov.

Amanda M. Dodson
Field Manager

Enclosure:

Form 1842-1, Information on taking appeals to the Interior Board of Land Appeals

Form 1842-1
(September 2020)

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT

## INFORMATION ON TAKING APPEALS TO THE INTERIOR BOARD OF LAND APPEALS

### DO NOT APPEAL UNLESS
1. This decision is adverse to you,

**AND**

2. You believe it is incorrect

### IF YOU APPEAL, THE FOLLOWING PROCEDURES MUST BE FOLLOWED

| | |
|---|---|
| **1. NOTICE OF APPEAL** .................... | A person who wishes to appeal to the Interior Board of Land Appeals must file in the office of the officer who made the decision (not the Interior Board of Land Appeals) a notice that they wish to appeal. A person served with the decision being appealed must transmit the *Notice of Appeal* in time for it to be filed in the office where it is required to be filed within 30 days after the date of service. If a decision is published in the FEDERAL REGISTER, a person not served with the decision must transmit a *Notice of Appeal* in time for it to be filed within 30 days after the date of publication (43 CFR 4.411 and 4.413). |
| **2. WHERE TO FILE**<br>NOTICE OF APPEAL ............ | BUREAU OF LAND MANAGEMENT<br>KINGMAN FIELD OFFICE<br>2755 MISSION BOULEVARD<br>KINGMAN, AZ 86401 |
| WITH COPY TO<br>SOLICITOR ............... | FIELD SOLICITOR, US DEPARTMENT OF THE INTERIOR<br>SANDRA DAY O'CONNOR, US COURTHOUSE SUITE 404<br>401 WEST WASHINGTON STREET, SPC 44<br>PHOENIX, ARIZONA 85003-2151 |
| **3. STATEMENT OF REASONS** | Within 30 days after filing the *Notice of Appeal*, file a complete statement of the reasons why you are appealing. This must be filed with the United States Department of the Interior, Office of Hearings and Appeals, Interior Board of Land Appeals, 801 N. Quincy Street, MS 300-QC, Arlington, Virginia 22203. If you fully stated your reasons for appealing when filing the *Notice of Appeal*, no additional statement is necessary (43 CFR 4.412 and 4.413). |
| WITH COPY TO<br>SOLICITOR ............... | FIELD SOLICITOR, US DEPARTMENT OF THE INTERIOR<br>SANDRA DAY O'CONNOR, US COURTHOUSE SUITE 404<br>401 WEST WASHINGTON STREET, SPC 44<br>PHOENIX, ARIZONA 85003-2151 |
| **4. SERVICE OF DOCUMENTS** | A party that files any document under 43 CFR Subpart 4, must serve a copy of it concurrently on the appropriate official of the Office of the Solicitor under 43 CFR 4.413(c) and 4.413(d). For a notice of appeal and statement of reasons, a copy must be served on each person named in the decision under appeal and for all other documents, a copy must be served on each party to the appeal (including intervenors). Service on a person or party known to be represented by counsel or other designated representative must be made on the representative. Service must be made at the last address of record of the person or party (if unrepresented) or the representative, unless the person, party or representative has notified the serving party of a subsequent change of address. |
| **5. METHOD OF SERVICE** .... | If the document being served is a notice of appeal, service may be made by (a) Personal delivery, (b) Registered or certified mail, return receipt requested; (c) Delivery service, delivery receipt requested, if the last address of record is not a post office box; or (d) Electronic means such as electronic mail or facsimile, if the person to be served has previously consented to that means in writing. All other documents may be served by (a) Personal delivery; (b) Mail; (c) Delivery service, if the last address of record is not a post office box; or (d) Electronic means, such as electronic mail or facsimile, if the person to be served has previously consented to that means in writing. |
| **6. REQUEST FOR STAY** ............... | Except where program-specific regulations place this decision in full force and effect or provide for an automatic stay, the decision becomes effective upon the expiration of the time allowed for filing an appeal unless a petition for a stay is timely filed together with a Notice of Appeal (43 CFR 4.21). If you wish to file a petition for a stay of the effectiveness of this decision during the time that your appeal is being reviewed by the Interior Board of Land Appeals, the petition for a stay must accompany your Notice of Appeal (43 CFR 4.21 or 43 CFR 2801.10 or 43 CFR 2881.10). A petition for a stay is required to show sufficient justification based on the standards listed below. Copies of the Notice of Appeal and Petition for a Stay must also be submitted to each party named in this decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (43 CFR 4.413) at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.<br>Standards for Obtaining a Stay. Except as otherwise provided by law or other pertinent regulations, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards: (1) the relative harm to the parties if the stay is granted or denied, (2) the likelihood of the appellant's success on the merits, (3) the likelihood of immediate and irreparable harm if the stay is not granted, and (4) whether the public interest favors granting the stay. |

Unless these procedures are followed, your appeal will be subject to dismissal (43 CFR 4.402). Be certain that **all** communications are identified by serial number of the case being appealed.

**NOTE:** A document is not filed until it is actually received in the proper office (43 CFR 4.401(a)). See 43 CFR Part 4, Subpart B for general rules relating to procedures and practice involving appeals.

(Continued on page 2)

**43 CFR SUBPART 1821-GENERAL INFORMATION**

Sec. 1821.10  Where are BLM offices located?  (a) In addition to the Headquarters Office in Grand Junction, CO and seven national level support and service centers, BLM operates 12 State Offices each having several subsidiary offices called Field Offices. The addresses of the State Offices can be found in the most recent edition of 43 CFR 1821.10.  The State Office geographical areas of jurisdiction are as follows:

STATE OFFICES AND AREAS OF JURISDICTION:

Alaska State Office ---------- Alaska
Arizona State Office ------------ Arizona
California State Office --------- California
Colorado State Office ---------- Colorado
Eastern States Office ----------- Arkansas, Iowa, Louisiana, Minnesota, Missouri
                                   and, all States east of the Mississippi River
Idaho State Office -------------- Idaho
Montana State Office --------- Montana, North Dakota, and South Dakota
Nevada State Office------------- Nevada
New Mexico State Office ------ New Mexico, Kansas, Oklahoma, and Texas
Oregon State Office ------------ Oregon and Washington
Utah State Office --------------- Utah
Wyoming State Office --------- Wyoming and Nebraska

(b) A list of the names, addresses, and geographical areas of jurisdiction of all Field Offices of the Bureau of Land Management can be obtained at the above addresses or any office of the Bureau of Land Management, including the Headquarters Office, Bureau of Land Management, 760 Horizon Drive, Grand Junction, CO 81506.

(Form 1842-1, September 2020)

# ATTACHMENT 12

*REPORT*

# WATER RESOURCES OF THE SOUTHERN PORTION OF THE BIG SANDY VALLEY, WIKIEUP, MOHAVE COUNTY, ARIZONA

*Submitted by:*

Caithness Big Sandy, LLC
7887 E. Belleview Avenue
Suite 1100
Englewood, CO 80111

October 2000



# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

GEOLOGY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Granitic Gneiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Arkosic Gravel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Volcanic Rocks of the Sycamore Creek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Volcanic Rocks of the Kaiser Spring Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        Lower Basin Fill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        Upper Basin Fill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        Stream and Flood-Plain Alluvium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Regional Geology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Geology of the Southern Portion of the Big Sandy Basin . . . . . . . . . . . . . . . . . . 9
    Results of the Exploration Drilling Program . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

GROUND WATER RESOURCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Aquifers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        Aquicludes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            Wikieup formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            Top of the Volcanic Rocks of Sycamore Creek . . . . . . . . . . . . . . 14
        Extent of the Confined Aquifer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Water Quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SUBSURFACE INVESTIGATIONS AND AQUIFER TESTING . . . . . . . . . . . . . . . . . . 19
    Big Sandy Alluvium Aquifer Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Test Hole Drilling Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Developmental Well Drilling and Installation . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Aquifer Step-Drawdown Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Aquifer Testing Protocol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        Aquifer Testing Well Array . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Baseline Monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Constant Rate Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        Aquifer Test Analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        Hydrologic Parameters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

PROJECTED EFFECT OF WITHDRAWAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Estimation of Water Use by Simplified Water Balance Methods . . . . . . . . . . . . . 32

# TABLE OF CONTENTS (Continued)

POTENTIAL IMPACTS ASSOCIATED WITH AQUIFER DEVELOPMENT . . . . . . . . . . . . 34

PROPOSED MONITORING PROGRAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## Figures

| | | |
|---|---|---|
| Figure 1 | Site Map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| Figure 2 | Geologic Map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |
| Figure 3 | Well Location Map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| Figure 4 | Idealized Stratigraphic Column . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| Figure 5 | Fence Diagram of Drill Holes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| Figure 6 | Map of Aquifer Extent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |

## Tables

| | | |
|---|---|---|
| Table 1 | Well Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| Table 2 | Aquifer Test Wells . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| Table 3 | Transmissivity and Storativity Values . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
| Table 4 | Typical Transmissivities and Storage Values . . . . . . . . . . . . . . . . . . . . | 29 |
| Table 5 | Hydraulic Conductivity Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| Table 6 | Typical Conductivity and Porosity Ranges for Basalt . . . . . . . . . . . . . . . | 30 |

## Appendices

| | |
|---|---|
| Appendix A | Lithologic Logs |
| Appendix B | Laboratory Analysis |
| Appendix C | Big Sandy Alluvial Aquifer Test Results |
| Appendix D | Test Hole Drilling Results |
| Appendix E | Lithologic Logs and Well Construction Diagrams |
| Appendix F | Well Hydrographs |
| Appendix G | Aquifer Test Analyses Plots and Data |

# EXECUTIVE SUMMARY

A water resources investigation was conducted in the southern portion of the Big Sandy Valley, south of Wikieup, to determine if adequate water resources exist for the development of the proposed Big Sandy Energy Project, a gas fired power plant. The investigation consisted of the testing of the alluvial aquifers in the valley, an exploration drilling program that culminated in the defining of three separate aquifers in the southern end of the basin, an Upper Aquifer consisting of the Upper Basin fill and Recent Stream and Flood Plain deposits, a Middle Aquifer consisting of the Lower Basin fill and the discovery of a confined basaltic aquifer, apparently limited to the southern end of the basin.

One production well was completed in the Lower (confined) Aquifer and seven observation wells were completed in the Upper, Middle and Lower Aquifers to allow monitoring of the effects of withdrawal from the Lower Aquifer.

The results of investigation indicates that a minimum volume of 1,420,281 million acre feet of water is stored in the Lower Aquifer. Nine and three-quarters percent of the volume of water in storage in the confined basaltic aquifer will provide water for the life of the Big Sandy Energy Project. This determination was made based upon geologic research to determine the aquifer areal extent and the results of an aquifer pumping test. These results were obtained through a water balance calculation.

The results of the investigation indicates that withdrawal from the confined basaltic aquifer would not impact other aquifers in the area. Drawdown was not apparent in any of the wells in either the overlying Middle Aquifer or the Upper Alluvial aquifer. The Upper Alluvial aquifer is utilized for almost all the water supplies in the valley.

The only impact that was determined from the results of the investigation is the probability that water flow will be reduced or cease from the Cofer Hot Spring over a period of time as a result of the withdrawal from the confined aquifer. This impact appears likely since the spring emanates from the same volcanic formation that is proposed for development.

A monitoring program is proposed to be established in which six of the existing observation wells would be equipped with pressure transducers and dataloggers. The dataloggers would collect one water level point per day per well. The data would be downloaded and reviewed on a quarterly basis and a report of this data and analysis would be issued annually.

The conclusions reached on the basis of this investigation are:

- the Lower (confined) Basaltic Aquifer is a heretofore undocumented aquifer which has not been utilized by any wells or withdrawal;

- the Lower (confined) Basaltic Aquifer and its recharge area has a minimum areal extent of approximately 57 square mile of which 31 square miles is within the Big Sandy Basin and the remaining 26 square miles, forming the recharge area, consists of the Volcanic Rocks of Sycamore Creek to the east of the basin;

- the minimum volume of water in storage in the Lower (confined) Basaltic Aquifer is 1.4 million acre feet;

- the maximum demand of the power plant over the 40 year period of the proposed project is 193,561 acre feet;

- recharge to the Lower (confined) Basaltic Aquifer will replace 55,854 acre feet in the 40 year life of the project;

- during the life of the project, the project will withdraw 9.75 percent of the volume of water in storage;

- withdrawal from the Lower (confined) Basaltic Aquifer does not effect the water levels in the Middle or Upper Aquifers, therefore, the withdrawal to satisfy the demand of the project will not impact the existing wells which penetrate only the Upper Aquifer or the Recent Stream and Flood Plain alluvial fill;

- there is sufficient water available in the Lower (confined) Basaltic Aquifer to satisfy the demands of the project for 40 years without depleting the aquifer and without impacting the existing wells.

# INTRODUCTION

Caithness Big Sandy, L.L.C. purchased the Banegas Ranch located in the southern end of the Big Sandy River Valley near Wikieup in southeastern Mohave County, Arizona with the intention of developing a gas fired power plant in Section 5, T. 15 N., R. 12 W. Gila and Salt River Base and Meridian.

The Ranch property consists of portions of Sections 5 and 7, T. 15 N., R. 12 W., Sections 12 and 13, T. 15 N.,  R. 13 W. and Section 36, T. 16 N., R. 13 W.

This report is the result of the exploration program to determine the potential of developing a sufficient quantity of water to supply the project for a forty year time period within the property boundaries.  The location of the project is depicted on **Figure 1.**



LEGEND

• Well
▲ Highway
— Secondary Road
— River/Stream

Transverse Mercator Projection
1927 North American Datum
Zone 12

SCALE   1 : 100,000

BIG SANDY ENERGY PROJECT

**FIGURE 1**
**PROJECT LOCATION**

# GEOLOGY

## LITHOLOGIC UNITS

The descriptions of the lithologic units in that portion of the Big Sandy Basin extending from Deluge and Tule Wash (T. 16 ½ N) south to the Big Sandy River outlet through Signal Gorge were obtained from earlier studies (Davidson, 1973, Sheppard and Gude, 1972 and Moyer, 1982) with modifications based on field observation and description length (refer to Davidson and or Sheppard and Gude for complete descriptions of the rock units).   The lithologic units from the oldest to the youngest are:

## Granitic Gneiss

The granitic gneiss forms the core of both the Aquarius Mountains on the east and the Hualapai Mountains forming the western boundary of the Big Sandy basin.  The granitic gneiss appears to underlie the sedimentary and volcanic rocks filling the basin.  The granitic gneiss is considered to be Pre-cambrian in age (Wilson and Moore, 1959) with dikes and small intrusive bodies of granitic composition of younger age.

The gneiss of the Aquarius Mountains is a banded and foliated light-yellow to yellowish-white granodiorite.  The main dark mineral is chloritized biotite mica.  The granodiorite generally is medium grained and uniform in texture, although it contains a few segregations of very coarse granodiorite and bands of pegmatite.  The gneiss that forms the Hualapai Mountains consists of banded and foliated, fine to medium grained light yellow granodiorite, coarse to pegmatic pink granite to granodiorite, banded quartzite and schistose rocks that contain more dark minerals than most of the gneiss outcrops.

## Arkosic Gravel

The arkosic gravel is exposed in a few scattered outcrops in the southeastern part of the area.  The most extensive exposures are near the confluence of Cane Springs Wash and the Big Sandy River and along Bitter Creek.  The arkosic gravel underlies dated volcanic rocks and probably is Oligocene and Miocene in age.

The arkosic gravel in most of the area is reddish-brown, planar to lenticular bedded, semiconsolidated, and composed entirely of fragments of graodiorite and granodiorite gneiss.  No volcanic rock fragments were noted in the unit except in the upper few inches, where the unit is directly overlain by an andesite flow.

*Geology*

## Volcanic Rocks of the Sycamore Creek

The centers of volcanic activity extruding the volcanic rocks of Sycamore Creek appear to have been faults and vents in the Aquarius Mountains. The volcanic rocks crop out extensively along Sycamore Creek and eastward into the Aquarius Mountains. The aggregate thickness of the volcanic rocks exceeds 1,000 feet in the Aquarius Mountains and in other places east of the Big Sandy River. The age of the volcanic rocks of Sycamore Creek are placed at Oligocene and Miocene based on lithologic similarities to volcanic rocks in the Paulden and Milk Creek areas to the east of the study area.

The volcanic rocks consist mainly of andesitic flow, flow breccia, tuff and agglomerate. Rhyolitic flows, welded tuff and volcanic conglomerate are present but significantly less common than the andesitic rocks. The flows and flow breccia are generally dark greenish gray. The tuff and agglomerate are white to light grey.

The volcanic rocks encountered in the drill cuttings in Sections 5 and 7, T. 15 N., R. 12 W. appear to be cinders or scoriaceous flows. These materials have been exposed to extended saturation and flow of ground water as illustrated by the presence of water deposited copper minerals observed in the drill cuttings.

## Volcanic Rocks of the Kaiser Spring Area

The volcanic rocks of the Kaiser Spring area rest directly on the Precambrian gneiss and granodiorite forming the crystalline basement. Small areas of arkose and laucustrine deposits are present directly on the basement complex which are covered by the volcanics.

The volcanic rocks are predominantly thick tuff units with interbedded ash flows and basalt flows. The tuff units have been subdivided by Moyer (1982), based on lithic types, into the basement lithic tuff, the basement and basalt lithic tuff and the lava lithic tuff. Basaltic eruptions filled the Burro Creek channel and spilled over the tuff platform forming a thick sequence of basalt layers on top of the tuff units.

### Lower Basin Fill

The lower basin fill, composed of sedimentary rocks, crops out extensively along dissected ridges east of the Hualapai Mountains and is exposed in canyons and low ridges in most of the area east of the Big Sandy River. As much as 3.000 feet of the unit is exposed, but the total thickness is unknown.

The lower basin fill includes the flat lying Big Sandy formation member of Sheppard and Gude (1972) and a more extensive moderately tilted and faulted sedimentary deposit. The Big Sandy formation member crops out in the southern and central parts of the valley of the Big Sandy River and the moderately tilted and faulted sedimentary deposit is the main unit of outcrop in the Big

Sandy area. Sheppard and Gude (1972, p. 5)describe the Big Sandy formation as follows "The Big Sandy formation consists chiefly of green and brown laucustrine mudstone or a calcareous silty or sandy variant. These rocks grade laterally into coarser clastic rocks, including conglomerate." The more extensive sedimentary deposit ranges from a sandy gravel to silt and marl. Sheppard and Gude (1972) believe that the Big Sandy formation unconformably overlies the more steeply dipping surrounding sediment, mainly because the Big Sandy formation is flat lying and the surrounding sedimentary deposit generally is more tilted and faulted, however, no exposed contact between these two units has been observed in the field.

The lower basin fill is Pliocene in age based on vertebrate fossils (Lance, 1960, p. 156) found in the Big Sandy formation. Sheppard and Gude (1972) stated that the Big Sandy formation is definitely Pliocene and probably late Pliocene in age.

That lower basin fill encountered by the drill in Section 7, T. 15 N., R. 12 W. consisted of the Big Sandy formation overlying layers of granitic sand and gravel alternating with layers of volcanic sands and gravel. The granitic sand and gravel are usually reddish in color while the volcanic rocks are predominantly light to dark grey.

In Section 5, T. 15 N., R. 12 W., the Big Sandy formation rests directly on the volcanic rocks of Sycamore Creek.

## Upper Basin Fill

The upper basin fill is present mainly along the central axis of the basin. The thickness of the upper basin fill is about 300 feet thick at Wikieup and extends downstream in the Big Sandy River bed to the Signal Gorge. The upper basin fill presumably is Pleistocene in age.

The upper basin fill is a silty gravel to a sandy silt that is loosely consolidated. The upper basin fill overlies the lower basin fill in an erosional unconformity and is itself eroded and overlain by the alluvium of the present day stream system. During deposition of the upper basin fill, the streamflow direction was toward the present course of the Big Sandy River and then southward toward the present outlet. The drainage system was through going, as is the present system, but the streams were aggradational and sediment was deposited in a broad trough carved into the faulted lower basin fill.

## Stream and Flood-Plain Alluvium

The stream and flood-plain alluvium is an unconsolidated deposit of Holcene gravel and sand that underlies the streams and their flood-plain. The alluvium commonly is bounded by steep stream-cut banks as much as 15 feet high. The alluvium ranges from 30 feet to 50 feet thick.

The alluvium consists of lenses of sandy gravel, sand and silt. The unit is pale brown and contains well rounded to subrounded grains of quartz and feldspar and eroded detritus from all the older formations in the area.

## Regional Geology

The Big Sandy River basin is one of the typical northwest - southeast trending valleys in the Sonoran Desert Section of the Basin and Range Province of Fenneman (1931 p. 328). Lease (1981) describes the regional geology of the area in the following manner.

> "The geology of the province is very complex. In the Sonoran Desert section of the province, block faulting began as early as the Oligocene and continued into late Cenozoic time. It was during this time that the many basins were formed between the block faulted mountain ranges and were filled with fluvial and lacustrine sediments and volcanics of various types and compositions. Each of the basins records a complex geologic history since it was formed by Basin and Range faulting and even though the overall geologic history of the basins is similar, each basin appears to be a distinctly separate geologic feature.

> In the Arizona portion of the Basin and Range Province, east of the Colorado river, the late Pre-cambrian and Paleozoic sedimentary rocks are thin, consequently, the exposed cores of the mountain ranges are predominantly Pre-cambrian to Mesozoic intrusive and metamorphic rock types.

> The area of study has undergone multiple tectonic events. Only the latter two events have affected Tertiary basin fill sediments, first, early Tertiary (Laramide) uplift created high relief, then erosion stripped vast amounts of detritus from the uplands, dissecting and exposing Mesozoic, Paleozoic and later Pre-cambrian rocks throughout the area. The detrital materials were transported by streams and deposited in intermontane basins and vallleys. This was accompanied and followed by high-angle, normal faulting, which is present everywhere in the desert and mountain regions of Arizona. Most of these faults are middle and late Tertiary age, although some predate the Laramide orogeny and others are as young as Pleistocene. The early Tertiary basin deposits were tilted by the later faulting and covered by later Tertiary deposits. In some basins these fluvial and lacustrine sediments, accumulated to thicknesses of thousands of feet. Sedimentation during Tertiary time was accompanied by volcanic activity, and locally, volcanic flows are present in the sedimentary column. The effects of basement topography, discontinuous faulting, and volcanic activity were intermittently dammed streams, which created lakes, playas and swamps. These effects and/or climatic changes resulted in the sporadic intercalation of lacustrine/paludal limestone, siltstone, clay and mudstone beds within the predominantly fluvial sequence.

> The second tectonic event reactivated Basin and Range type faulting and continued intermittently throughout the Quaternary. Both uplift and erosion were renewed. The resulting abundant detritus deeply buried the earlier Cenozoic basin fill sequence under younger, predominantly fluvial and minor lacustrine deposits.

> The stratigraphic relationships of the valley fill sediments are complex. Depositional facies change over short distances and local unconformities are common. These factors make surface and subsurface correlations dififcult."

## Geology of the Southern Portion of the Big Sandy Basin

The Big Sandy Valley is a graben extending from approximately ten miles south of Wikieup northward to Interstate 40. The basin in this area is roughly five miles wide at the southern end and widens to ten miles north of Wikieup. The graben extends both south and north beyond these limits, however, the graben becomes shallower and less pronounced to the south and the Basin narrows to the north as it passes into the Hualapai basin.

During the Laramide tectonic disturbance, the graben was formed by the uplifting and tilting of the Pre-cambrian rocks to form the Hualapai Mountains on the western boundary and the Aquarius Mountains on the eastern boundary with the central block of Pre-cambrian rock downthrown in relation to the two mountain ranges. Normal faulting occurs on both sides of the graben. The bounding fault on the west side of the Aquarius Mountains may be a southerly extension of the Grand Wash fault system (Young, 1979).

The southern portion of the Big Sandy basin, that portion of the basin south of Deluge and Tule Washes, differs from the northern portion of the basin, in that various forms of extruded volcanic rocks intermingle with the alluvial sequence. In general, there were two areas of volcanic activity, the Volcanic Rocks of Sycamore Creek in the study area and the Volcanics of the Kaiser Spring area (Moyer, 1982) to the south.

Moyer (1982) states:

> *"That this region (the Kaiser Spring area) was a crystalline highland is evident in the paucity of fluvial or alluvial arkosic sediments. A thin, local, high-alumina basalt was deposited unconformably on the on the basement rocks probably during middle Tertiary time, although no age date has been obtained for this unit (p. 24)."*

thus indicating that the alluvial materials are absent at the southern end of the Big Sandy basin and that the Kaiser Springs volcanics effectively dams the southern end of the basin. **Figure 2** is a geological map of the area of study.

During the period, June through October, 1979, the Department of Energy (DOE) drilled 18 test holes in northwestern Arizona to determine the lateral extent of uranium-bearing, paludal/ lacustrine deposits. Six of these test holes were located in the Big Sandy Valley. Based on the drill hole cutting log data (Lease, 1981), the thickness of the alluvial fill in the basin exceeds 5,008 feet in



FIGURE 2-2
GEOLOGIC MAP

BIG SANDY ENERGY PROJECT

*Geology*

Section 8 T. 16 N., R. 13 W. and Section 12, T. 16 N., R.14 W. (PQ-25 and PQ-10), north of Wikieup. The depth to the top of the basement complex and, consequently, the thickness of the alluvial fill in the area south of Wikieup, in the study area, is approximately 3,500 feet in Sections 12 (PQ-26) and 28 (PQ-29) T. 15 N., R. 12 W. The locations of six test holes PQ-10 and PQ-25-29 are shown on (**Figure 3**) and the lithologic logs for PQ-25, PQ-26, and PQ-29 are included in **Appendix A.**

The lithologic log of PQ 26, located in Section 12, T. 15 N., R. 13 W., within one mile of Test Site 2 (northwest corner of Section 12, T. 15 N., R. 12W) does not appear to encounter either the Wikieup formation or the volcanic aquifer.

## Results of the Exploration Drilling Program

The exploration drilling program was established to determine the presence of a sufficient volume of ground water to satisfy the demand of the proposed electrical power generating plant.

Initially, four test holes were drilled, logged, geophysically logged when possible and abandoned. Test Hole 1 was drilled in the Big Sandy flood plain in Section 36, T. 16 N., R. 13 W. The drill encountered only the Upper Basin fill with possibly some Recent stream deposits on the top. Test Holes 2 and 4 were drilled in the northwest quarter of Section 7, T. 15 N., R. 12 W. Both wells penetrated or encountered the Wikieup formation, the Lower Basin fill and a confined aquifer in the Volcanic Rocks of Sycamore Creek. The confined aquifer was encountered at a depth of 1,135 feet in both holes. Test Hole 3 penetrated 600 feet of the Wikieup formation and 600 feet of the Volcanics Rocks of Sycamore Creek. It is believed that the volcanics penetrated in Test Hole 3 are in the confined aquifer, however, the collar elevation is higher than the piezometric surface elevation; therefore, the well does not flow under artesian pressure.

Based on this information, additional drilling, including one production well, additional piezometric wells in the confined aquifer, observation wells in the Lower Basin fill, Upper Basin fill and Recent Stream and Flood-Plain Alluvium, was instituted.

The Tertiary basin fill sequence in the southern portion of the Big Sandy basin, based on four test holes, a production well and seven piezometric wells, from bottom to top are: volcanic rocks of Sycamore Creek, Lower Basin fill (sand and gravel facies), Lower Basin fill (Wikieup formation facies), Upper Basin fill and Recent Stream Bed and Flood Plain alluvium.




Project Site

BIG SANDY ENERGY PROJECT

**FIGURE 3**
**WELL LOCATION MAP**

SCALE 1 : 50,000

# GROUND WATER RESOURCES

## AQUIFERS

There are at least three separate aquifers in the Big Sandy Basin south of Wikieup. These, from upper to lower, are:

| | |
|---|---|
| The Upper Aquifer | composed of the Recent Stream and Flood-Plain Alluvium and the underlying Upper Basin fill. In the southern portion of the basin, this aquifer is partially saturated in the entrenched riverbed and flood plain of the Big Sandy River. |
| The Middle Aquifer | composed of the Older Basin fill. The Middle Aquifer is saturated in most of the southern portion of the Big Sandy basin. |
| The Lower Aquifer | composed of the Volcanic Rocks of Sycamore Creek. Four hundred and fifty (450) feet of these volcanics were penetrated by the drill. However, only 300 feet or 66 percent of the volcanic penetrated was considered aquifer as a conservative consideration The confined aquifer is fully saturated with a piezometric surface elevation of 2,079 feet. |

Prior drilling by the Department of Energy (Lease, 1981) penetrated 3,500 feet of alluvial fill or volcanic materials in the area south of Wikieup. As this work was completed to determine the presence of uranium, the water producing potential of the material was not documented. Drilling completed as part of the exploration program for the present project (Caithness Big Sandy Energy Project) only tested the formations to a depth of 1,600 feet. The volcanics or alluvial fill below 1,600 have not been penetrated by drilling during the exploration program in the area of study. Therefore, the presence and productivity of those potential aquifers is not documented at this time.

## Aquicludes

Two known aquicludes, which separate the three known aquifers, are present in the study area. These are the:

### Wikieup formation

The Wikieup formation (Sheppard and Gude, 1982), a lacustrine clay, varying in thickness from 200 feet to more than 600 feet, is the upper member of the Lower Basin fill. Observation Well 8 (OW8) was drilled and perforated entirely in the clay. The clay appears dry, although it did yield water after 24 hours indicating low permeability, and consequently, an aquiclude.

### Top of the Volcanic Rocks of Sycamore Creek

The aquiclude, forming the top of the confined aquifer, is only indirectly known. The drill slows only slightly when it encounters the top of the confined layer and the cuttings are extremely fine. The aquiclude appears to be about ten feet thick and volcanic in nature. The fact that the artesian flow starts as soon as the layer is penetrated, signifies the presence of the aquiclude. **Figure 4** depicts an idealized stratigraphic column.

## Extent of the Confined Aquifer

The probable limits of the confined aquifer, based on the geological information available, are:

- The western boundary is approximately one half mile west of Site 2, i.e. one half the distance between Site 2 and PQ-26 (PQ-26 does not appear to have encountered the confined aquifer or the Volcanic Rocks of Sycamore Creek)

- The northern boundary trends across the basin near Wikieup (Section15, T. 16 N., R. 13 W). The rationale for this is that waters issued from Cofer Hot Spring (Section 25, T. 16 N., R.13 W.) are similar in chemical composition to waters collected from Test Site 2, therefore the confine aquifer extends north of Cofer Hot Spring but not as far north as PQ-25 (Section 8, T. 16 N., R. 13 W.) which penetrates primarily the Wikieup formation and does not encounter volcanic rocks or confined water.

- The southern boundary is located near the end of the Big Sandy Basin formed by the Volcanic Rocks of Kaiser Spring. The volcanic rocks are present in PQ-29 indicating that the southern boundary is south of PQ-29. The collar elevation is above the piezometric surface, therefore, there is no record of artesian flow.

- Eastward, the Volcanic Rocks of Sycamore Creek rise to the surface, evidenced in Test Hole 3, where they were encountered at 600 feet and become exposed one mile east of Test Hole 3, extending eastward for an additional six miles.

These relationships are depicted on **Figure 5**.

The exposed Volcanic Rocks of Sycamore Creek appear to be the recharge area for the confined aquifer present under Sections 5 and 7, T. 15 N., R. 12 W. The calculated area of the confined aquifer without the recharge area is 30.85 square miles and the recharge area is 26.19 square miles. The areal extent is depicted on **Figure 6.**



| Aquifer | Lithology | Thickness | Formation | Aquifer/Aquiclude |
|---------|-----------|-----------|-----------|-------------------|
| **Upper Aquifer** | Sand/ Gravel | 40 Ft. | Alluvium | (Upper Aquifer) |
| | Clay | 200-600 Ft. | Wikieup Formation | (Aquiclude) |
| **Middle Aquifer** | Sand/ Gravel, some clay | 735 Ft. | Intrusive and extrusive sand and granite with some clay layers | (Aquifer) |
| | Basalt | 10-15 Ft. | Basaltic Aquiclude | (Aquiclude) |
| **Confined (Lower) Aquifer** | Basalt | 450+ Ft. | Basalt aquifer | (Aquifer) |

**BIG SANDY ENERGY PROJECT**

*FIGURE 4*
*IDEALIZED STRATIGRAPHIC COLUMN*

| DATE: 10/16/00 | AutoCAD File: Figure 4.dwg |
|----------------|----------------------------|
| SCALE: AS NOTED | DRAWN BY: MM |

MANERA INC.



BIG SANDY ENERGY PROJECT

FIGURE 5
FENCE DIAGRAM OF DRILL HOLES
after lease, 1982

| DATE: 10/13/00 | AutoCAD File: 891-fence.dwg |
|---|---|
| SCALE: AS NOTED | DRAWN BY: ML |



LEGEND

- • Well
- —— Highway
- —— Secondary Road
- —— Minimum Aquifer Area
- ═══ Maximum Aquifer Area
- ▨ Aquifer Recharge Zone

Geology
- ▨ Basalt
- ▨ Granite and related crystalline intrusive rocks
- ▨ Granite gneiss
- ▨ Sand, gravel, and conglomerate
- ▨ Silt, sand, and gravel

SCALE   1 : 100,000

Transverse Mercator Projection
1927 North American Datum
Zone 12





BIG SANDY ENERGY PROJECT

**FIGURE 6**
**MAP OF AQUIFER EXTENT**

| DATE: 10/1/2000 | |
|---|---|
| | Produced By: JD |

# WATER QUALITY

Results of the chemical analysis of water samples collected from the initial flow of the confined water from well OW4, located in the SE1/4, SE1/4, NW1/4 of Section 7, T. 15 N., R. 12 W. states a total dissolved solids content of 746 milligrams per liter (mg/l) with all constituents, with the exception of arsenic and fluoride, falling within the Drinking Water Standards of the Arizona Department of Environmental Quality.

The reported arsenic content was reported as 0.08 mg/l in one analysis and 0.141 mg/l in another. In both cases, this exceeds the limit for drinking water of 0.05 mg/l. Additional analysis will be made to confirm the arsenic content of the confined water. The reported fluoride content was reported as 3.7 mg/l in both analyses. Although within the acceptable limits of 4.0 mg/l, the fluoride is high for long term human consumption. The temperature of the water in the confined aquifer was 96 degrees Fahrenheit when collected in the field as shown on the Chain of Custody Record.

The water quality is satisfactory for industrial use. Additional water samples were collected from the various aquifers as part of the test hole drilling program. The analytical data associated with these samples is included with the analyses of OW4 in **Appendix B**.

# SUBSURFACE INVESTIGATIONS AND AQUIFER TESTING

Aquifer testing was performed at the proposed Big Sandy Energy Project to determine the potential for development and impacts that could be associated with the utilization of groundwater for the project. The aquifer tests were performed as part of a comprehensive assessment of the hydrologic resources of the proposed site.

The assessment was conducted in a phased approach:

- The initial phase of investigation was conducted by testing the Recent Stream Bed and Flood Plain alluvium and possibly a portion of the Upper Basin fill via a shallow well (Banegas Well) located in the SW1/4, NW1/4, NE1/4 of Section 13, T. 15 N., R. 13 W.

- The second phase of the investigation was conducted by drilling a series of test borings to determine the lithology and potential for water resources in deeper lithologic units. The results of the test drilling indicated the potential for a deep aquifer source.

- These results initiated a third phase of investigation to determine the potential for the development of this deeper aquifer. This third phase consisted of the installation of several wells to monitor the shallow and middle aquifers and to test and monitor the deeper aquifer.

- Testing was subsequently conducted in a fourth phase of investigation. This series of investigations is summarized below.

## Big Sandy Alluvium Aquifer Test

A pump test was conducted on an existing well (Banegas Well) on October 29-30, 1999. A report was issued detailing results of this test on November 2, 1999. The test consisted of pumping water from this well at a rate of 387 gallons per minute (gpm) for a period of 1,635 minutes. The well pumped during the test had a total depth of 105 feet and was reportedly perforated in the bottom 20 feet. A second well located 200 feet from the pumping well was utilized as an observation well. This second well has a total depth of 60 feet, and the perforated interval is unknown.

The analyses of the drawdown in the pumped well indicates a transmissivity (T) value of 204,000 gpd/ft for the first 300 minutes and then the T value decreases to 2,064 gpd/ft for the remainder of the pumping period. The T value calculated from the data obtained from the observation well was 65,500 gpd/ft

The T values 204,000 gpd/ft during the early portion of the pumped well data and the 65,500 gpd/ft from the observation well data fall within the reported values of T of the stream bed alluvium in the Big Sandy Basin (Davidson, 1973). The change in the T values exhibited during this test may have resulted from the dewatering of a thin layer of the alluvium leaving only the lacustrine clay deposits

*Aquifer Testing*

to supply water to the well, or a hydrologic boundary may have impacted the pumping rate. Copies of the data and analyses are included in **Appendix C.**

## Test Hole Drilling Program

Following the testing of the well screened in the Big Sandy Alluvium, an exploration drilling program was initiated. The investigation was completed and a report issued in March 22, 2000. The investigation consisted of the drilling of four test holes to determine the lithology and potential for development of groundwater. Specific results can be found in the report "Results Test Hole Drilling Program Wikieup, Mohave County, Arizona" included as **Appendix D.**

The test borings were drilled by means of the dual wall, air rotary drilling method. The drill cutting samples were logged and downhole geophysical logs were performed when possible. The test boring drilling program indicated that the subsurface materials below 400 feet to a minimum depth of 1200 feet were water bearing and offered a reasonable potential for the development of sufficient ground water to satisfy the demands of the energy plant.

Test Hole 1 was located in Section 36, T 16 N, R 13 W. This test hole was drilled to a total of 700 feet and encountered layers of intrusive igneous sand and gravel alternating with layers of sandstone. The sandstone as described by Lease (1981) consists of a siltstone and sandstone, very fine to fine-grained, white to medium gray, friable to well cemented with calcite, micaceous. Water was encountered at approximately 20 feet below grade with water volumes increasing with depth. At 700 feet below grade, the hydrostatic head of the confined water forced the drilling fluid out of the hole and a flow of 15 gpm occurred.

Test Hole 2 was located in Section 7 (NW1/4, NW1/4, NW1/4), T 15 N, R 12 W. This test hole was drilled to a depth of 1,155 feet below grade and encountered clay to a depth of 350 feet. Below the clay layer, alternating layers of granitic sand and gravel and volcanic sand and gravel were encountered to 1,135 feet. At 1,135 feet a cap rock on top of a volcanic rock was encountered and penetrated to the total depth of the boring. Water was encountered immediately below the clay, but the piezometric head was below the collar elevation until encountering the volcanic layer at 1,135 feet where water began to flow under artesian conditions. The volcanic layer appears to be confined.

Test Hole 3 was drilled in Section 5 (SW1/4, SW1/4, SW1/4),  T 15 N, R 12 W. The lithology encountered during the drilling of this well was igneous intrusive sand and gravel (Upper Basin fill) from surface to 55 feet, clay (Wikieup formation Lower Basin fill facies) from 55 to 160 feet, and volcanic (extrusive) igneous rocks or sand and gravel to a total depth of 780 feet (total depth of the boring). The static water level in the hole was approximately 20 feet below surface as the collar elevation was 21 below the collar elevation, consequently, there was no artesian flow.

Test Hole 4 was drilled in Section 7 (SE1/4, SE1/4, NW/14), T 15 N, R 12 W. The test hole extended to a total depth of 1,200 feet with the initial 120 feet consisting of granitic sand and gravel (Upper Basin fill).  The Wikieup fill was encountered from 120 feet, and from 300 feet to a depth of 1,135 feet, alternating layers of volcanic sand and gravel, granitic sand and gravel, with some clay

was penetrated. At 1,135 feet below grade a volcanic layer was penetrated which was under artesian conditions. The flow rate under artesian conditions was in excess of 125 gpm with a close in pressure of 39 psi.

On the basis of the results of the test boring program, the most likely area to develop a well field appears to be in the western half of Section 7 and possible on the plant site in Section 5, T 15 N, R 12 W. Subsequent to this investigation, a series of wells were drilled to investigate the potential for the development of the basaltic artesian aquifer.

## Developmental Well Drilling and Installation

Developmental well drilling and installation was performed based upon the results of the test hole program. The objective of the developmental program was to investigate the potential of the volcanic confined aquifer as a groundwater source and to provide a network of wells that could provide information regarding potential impacts of withdrawal of the proposed groundwater development.

Based upon the test hole drilling program, a number of wells were installed to assess the potential for the development of the confined basaltic aquifer and the potential for impacts to the overlying aquifers. A total of four wells were installed in the lower aquifer, one well in the middle aquifer, and three wells were installed in the upper (alluvial) aquifer. One of the wells indicated as being installed in the upper (alluvial) aquifer, MW8, was actually installed in lacustrine clay, the upper member of the Lower Basin fill. The four lower aquifer wells were installed to determine the hydrologic properties of this aquifer via aquifer testing. The wells installed in the middle and upper aquifers were installed to determine potential impacts on these aquifers associated with the development of the lower aquifer.

Each of the wells was installed utilizing reverse circulation rotary drilling techniques. Locations of the wells is presented on **Figure 3**. Completions of the wells are detailed on **Table 1**. Lithologic logs and well construction diagrams are included in **Appendix D.**

## Aquifer Step-Drawdown Test

On August 28, 2000 a step-drawdown test was performed on Production Well 2 (PW2). The test was conducted by pumping the well over a 24-hour period with the discharge rate being increased every six hours. The steps consisted of an artesian free flow at 760 gallons per minute (gpm), and pumping discharge rates of 1,204 gpm, 1,800 gpm, and 2,100 gpm.

In addition to monitoring the pumped well, a number of observation wells were monitored to observe the responses of the pumping of PW2. The observation wells that were monitored isolated all three of the aquifers, the lower confined aquifer, the middle aquifer, and the upper aquifer. Each of the wells was equipped with an In-Situ Troll or Mini-Troll in-well datalogger and transducer. The dataloggers in wells in the middle aquifer (OWMA2 and OW3) and the lower aquifer (PW2 and OW4) were all set with logarithmic data collection time schedules that were synchronized to the start of the test. The results of the aquifer test proved that OW3 was penetrated in the confined basaltic aquifer.

## Table 1
## Well Data
## Big Sandy Energy Project

| Well Designation (Currently Drilled/ Installed) | Township | Range | Section | 1/4 1/4 Section | Latitude | Longitude | Collar Elevation feet | Purpose (monitor/ production/ exploration) |
|---|---|---|---|---|---|---|---|---|
| Test Hole #1 | 16N | 13W | 36 | SW1/4,NW1/4,SW1/4 | 34 40' 43.4" | 113 34' 54" | | Exploration |
| Test Hole #2 | 15N | 12W | 7 | NW1/4,NW1/4,NW1/4 | 34 39' 44.6" | 113 33' 44.6" | | Exploration |
| Test Hole #3 | 15N | 12W | 5 | SW1/4,SW1/4,SW1/4 | 34 39' 45.3" | 113 32' 47.5" | | Exploration |
| Test Hole #4 | 15N | 12W | 7 | SE1/4,SE1/4,NW1/4 | 34 39' 39.2" | 113 33' 24.5" | | Exploration |
| Obs Well at Site 1 | 16N | 13W | 36 | SW1/4,NE1/4.SW1/4 | 34 40' 48.6" | 113 34' 53.5 | 1,884.73 | Piezometric |
| Obs Well OWMA at Site 2 | 15N | 12W | 7 | NW1/4,NW1/4,NW1/4 | 34 39' 41.7" | 113 33' 43.2" | 1,994.47 | Piezometric |
| Prod Well at Site 2 | 15N | 12W | 7 | NW1/4,NW1/4,NW1/4 | 34 39' 42.4" | 113 33' 45.4" | 1,991.03 | Production |
| Obs Well OWC at Site 2 | 15N | 12W | 7 | NW1/4,NW1/4,NW1/4 | 34 39' 40.4" | 113 33' 46.9" | 1.981.32 | Piezometric |
| Obs well at Site 3 | 15N | 12W | 5 | SW1/4,SW1/4,SW1/4 | 34 39' 46.7" | 113 32' 47.2" | 2,100.36 | Piezometric |
| Ob Well at Site 4 | 15N | 12W | 7 | SE1/4,SE1/4,NW1/4 | 34 39' 19.0" | 113 33' 21.6" | 1,991.22 | Piezometric |
| Obs Well at Site 7 | 15N | 13W | 1 | SW1/4, SW1/4, SE1/4 | 34 39' 44.2" | 113 34'18.2" | 1,931.58 | Piezometric |
| Obs Well at Site 8 | 15N | 13W | 12 | NE1/4,NE1/4,SW1/4 | 34 39' 11.7" | 113 34' 29.6" | 1,852.58 | Piezometric |
| **Planned Wells** | | | | | | | | |
| Prod Well at Site 4 | 15N | 12W | 7 | SE1/4,SE1/4,NW1/4 | 34 39' 39.2" | 113 33' 24.5" | | Production |
| Prod Well at Site 5 | 15N | 12 | 7 | NE1/4,NE1/4,NW1/4 | 24 39' 41.7 | 113 33' 21.0" | | Production |
| Prod Well at Site 6 | 15N | 12W | 7 | SW1/4,NW1/4,SW1/4 | 34 39' 06.3" | 113 33' 50.6" | | Production |
| **Other Wells** | | | | | | | | |
| Harris Well | 15N | 13W | 13 | NW1/4,NW1/4,SE1/4 | 34 38' 21.9" | 113 34' 15.2" | 1,784.05 | Piezometric |
| Denton Well | 15N | 13W | 24 | SE1/4,SE1/4,NW1/4 | 34 37' 39.8" | 113 34' 29.3" | 1,782.93 | Piezometric |
| Banegas Rch Well 2 | 15N | 13W | 13 | SW1/4,NW1/4,NE1/4 | 34 38' 45.2" | 113 34' 20.1" | 1,786.99 | Piezometric |

**Table 1 (continued)**
**Well Data**
**Big Sandy Energy Project**

| Well Designation (Currently Drilled/ Installed) | Aquifer | Depth (Feet) | Casing Diameter | Borehole Diameter | Screened Interval (Feet) | Gravel Pack (annulus) feet | Cement annulus feet | Lithologic Unit |
|---|---|---|---|---|---|---|---|---|
| Test Hole #1 | | 700 | None | 6  7/8 | | 0 | 0 | Alluvium |
| Test Hole #2 | | 1,155 | None | 6  7/8 | | 0 | 0 | Alluvium |
| Test Hole #3 | | 780 | None | 6  7/8 | | 0 | 0 | Volcanics |
| Test Hole #4 | | 1,200 | None | 6  7/8 | | 0 | 0 | Alluvium |
| Obs Well at Site 1 | Upper | 110 | 5" | 9  7/8 | 20-110 | 15 - 110 | 0 - 15 | Alluvium |
| Obs Well OWMA at Site 2 | Middle | 730 | 3" | 6  7/8 | 393 - 693 | 315 - 693 | 0 - 315 | Alluvium |
| Prod Well at Site 2 | Confined | 1,500 | 20"/12" | 28"/17.5"* | 1,135 - 1,600 | 1,135 - 1,600 | 0 - 1,135 | Volcanics |
| Obs Well OWC at Site 2 | confined | 1,600 | 5" | 12   1/4 | 1,140 - 1,600 | 1,119 - 1,600 | 0 - 1,119 | Volcanics |
| Obs well at Site 3 | Middle | 1,200 | 12" | 17   1/2 | 578 - 1,180 | 565 - 1,200 | 0 - 565 | Volcanics |
| Ob Well at Site 4 | Confined | 1,500 | 3" | 12   1/4 | 1,070 1,500 | 1,070 - 1,500 | 0 - 1,070 | Volcanics |
| Obs Well at Site 7 | | 190 | 3" | 6  7/8 | 20 - 190 | 20 - 190 | 0 - 20 | Lakebed clay |
| Obs Well at Site 8 | Upper | 150 | 5" | 9 7/8 | 90 - 150 | 30 - 150 | 0 - 30 | Alluvium |
| **Planned Wells** | | | | | | | | |
| Prod Well at Site 4 | Confined | 1,800 | 20" | | 1,400 1,800 | | | |
| Prod Well at Site 5 | Confined | 1,500 | 20" | | 1,100 1,500 | | | |
| Prod Well at Site 6 | Confined | 1,500 | 20" | | 1,100 1,500 | | | |
| **Other Wells** | | | | | | | | |
| Harris Well | Upper | <200 | 8" | | unk | | | Alluvium |
| Denton Well | Upper | 100 | | | unk | | | Alluvium |
| Banegas Rch Well 2 | Upper | 105 | | | 85 105 | | | Alluvium |

**Table 1 (continued)**
**Well Data**
**Big Sandy Energy Project**

| Well Designation (Currently Drilled/ Installed) | Artesian Flow/Pressure (gpm/psi) | Date Drilled | Actual or Projected Water Levels |
|---|---|---|---|
| Test Hole #1 | 0 | Dec-00 | Plugged |
| Test Hole #2 | 125/30 | Feb-00 | Plugged |
| Test Hole #3 | 0 | Feb-00 | Plugged |
| Test Hole #4 | 140/29 | Mar-00 | Plugged |
| Obs Well at Site 1 | 0 | Sep-00 | 12 |
| Obs Well OWMA at Site 2 | 0 | Aug-00 | 85.3 |
| Prod Well at Site 2 | 765/38 | Aug-00 | Flowing |
| Obs Well OWC at Site 2 | unk/38 | Sep-00 | Flowing |
| Obs well at Site 3 | 0 | Jun-00 | 16 |
| Ob Well at Site 4 | 125/38 | Jun-00 | Flowing |
| Obs Well at Site 7 | 0 | Aug-00 | 114 |
| Obs Well at Site 8 | 0 | Aug-00 | 63.8 |
| **Planned Wells** | | | |
| Prod Well at Site 4 | | | |
| Prod Well at Site 5 | | | |
| Prod Well at Site 6 | | | |
| **Other Wells** | | | |
| Harris Well | 0 | | 39.6 |
| Denton Well | 0 | | 42.2 |
| Banegas Rch Well 2 | 0 | | 20.3 |

The dataloggers in the observation wells in the upper unit (OW1, OW7, OW8, Banegas, and Harris) were set to take data at arithmetic intervals during the test with initiation of data collecting prior to the start of the test program. In addition, a piezometer was installed in the Big Sandy alluvium approximately 2 mile south of the boundary of Sections 12 and 13, T 15 N, R 13 W. This piezometer was also set to obtain water levels at 30-minute intervals throughout the testing period. Down stream (approximately 100 feet) of the piezometer a v-notch weir was installed to measure flow in the Big Sandy River. Photographs of the pumping test apparatus, v-notch weir installation, and piezometer are attached.

Prior to the test, a heavy rainfall event occurred. This rain commenced on the morning of August 27th and continued throughout the day. The rain resulted in runoff in the washes, and visually increased flow in the Big Sandy River. The v-notch weir was installed in the Big Sandy River as previously described on August 28, 2000. No readings from this weir or the piezometer are included in this data, since on the morning of August 29th, a second rainfall event started at 0700 hours and continuing throughout the remainder of the test (1400 hours). Based on visual observation, this event appeared larger than the event on August 27th. The weir and piezometer were removed the morning of August 29th to avoid a potential loss of these devices from the resultant flow in the river. River measurements during this test would have reflected these storm events, and influences from pumping would not have been distinguishable in the data.

## Aquifer Testing Protocol

A protocol was developed for the constant rate test as a result of the consensus among the hydrologists that represent URS Consultants, State of Arizona, Bureau of Land Management, Western Area Power Administration, U. S. Fish and Wildlife Service, Manera, Inc. and Greystone Environmental Consultants. The aquifer test was designed to determine the aquifer parameters of the lower confined aquifer and to determine whether flow exists between the lower, middle and upper aquifers. The generalized sequence of aquifers (from surface to depth) at the proposed site are an unconfined upper alluvial aquifer (underflow of the Big Sandy River), a middle aquifer, and a lower confined aquifer. Separating the upper unconfined aquifer from the middle aquifer is a layer of lacustrine clay ranging in thickness from 150 feet to more than 500 feet. Separating the middle and lower aquifers is a basalt or well indurated volcanic layer.

### Aquifer Testing Well Array

The aquifer test consisted of removal of water from well PW2, while measuring responses in the surrounding wells. Prior to the constant rate pumping test, baseline monitoring and a step-drawdown test were conducted. The wells that were selected for the test are presented in **Table 2.**

## Baseline Monitoring

Measurements of depth to water were conducted daily to establish a baseline for the water levels in the wells and flow at the surface station. Along with the depth to water, the time, date and weather conditions were noted. This data collection commenced approximately two weeks prior to the test.

*Aquifer Testing*

| Table 2 Aquifer Test Wells Proposed Big Sandy Energy Project Wikieup, Arizona | | | | |
|---|---|---|---|---|
| **Upper Aquifer Wells** | **Screened Interval** | **Drilled Depth** | **Datalogger Yes/No** | **Logging Schedule** |
| OW1 | 20 to 150 | 150 | Yes | Arithmetic |
| OW7 | 70 to 200 | 200 | Yes | Arithmetic |
| OW8 | 20 to 150 | 150 | Yes | Arithmetic |
| Benagus Well | 85 to 105 | 105 | Yes | Arithmetic |
| **Middle Aquifer Wells** | | | | |
| OWMA2 | 540-1000 | 1000 | Yes | Log |
| **Lower Aquifer Wells** | | | | |
| PW2 | 1100 to 1500 | 1500 | Yes | Log |
| OW2 | 1100 to 1500 | 1500 | Yes | Log |
| OW4 | 1070 to 1500 | 1500 | Yes | Log |
| OW3 | 578 - 1180 | 1200 | Yes | Log |

For the wells that were not yet installed, measurements were conducted as the wells were installed. Daily measurements continued throughout the step-drawdown and constant rate tests.

Data from the baseline monitoring was included within plots for the aquifer test. This data was added at the time when recorded, and hydrographs generated. These hydrographs indicate the overall trend within monitor wells from the time prior to the test, through test and through recovery. Examination of the data plots indicates that groundwater elevations within the middle aquifer and upper (alluvial) aquifer wells were not affected by the aquifer test. Copies of the hydrographs are included as **Appendix F**.

## Constant Rate Test

The constant rate test was to be performed at 2,000 gpm based upon the results of the step drawdown test and as agreed upon by the hydrology team. The average discharge over the period of the testing program was 1,931 gpm. The test consisted of pumping PW2 at a constant rate while observing and recording the responses in the observation wells. The observation wells that were utilized are listed on **Table 2**. No impacts to the upper (alluvial) aquifer wells were apparent during the test.

During the various phases of the aquifer test, the discharge water was dispersed by means of large sprinkler guns. These guns were positioned in Section 7, T 15 N, R 12 W.

For each well, a pressure transducer and an in-situ data logger was installed. Within **Table 2**, the schedule of data collection and the wells that were equipped with data loggers is detailed. These data loggers are devices that measure the depth to water in the well and record this level at prescribed intervals. For all the wells, except as noted, a logarithmic time scale was utilized for the data collection. All logarithmic transducers were set to start at a time synchronized with the start of pumping. Pump flow measurements were also obtained utilizing a continuous rate flow meter and totalizer. Redundant water level measurements were taken by hand to provide a backup to the electronic data gathering. Time intervals that are obtained by hand were of a greater time interval than those taken by electronic means and were for backup purposes only. Following the aquifer pumping test, data was gathered during the recovery of the aquifer.

**Aquifer Test Analyses**

Aquifer test analyses was conducted utilizing AQTESOLV, Aquifer Test Solver software. The methods utilized for the analyses of the test were Theis and Cooper-Jacob. Both of these methods are for confined aquifers. The Theis methodology assumes the following:

- The aquifer has infinite areal extent.
- The aquifer is homogeneous, isotropic and of uniform thickness.
- The aquifer potentiometric surface is initially horizontal.
- The pumping rate is constant.
- The pumping well is fully penetrating.
- The flow to the pumping well is horizontal.
- The aquifer is confined.
- The flow is unsteady.
- Water is release instantaneously with a decline in hydraulic head.
- The diameter of the well is very small so that storage in the well can be neglected.

The Cooper-Jacob solution makes the same assumptions as Theis but also assumes:

- Values of u are small (i.e. radius from the pumping well to the observation well is small and time since pumping began is large)

These methods of analyses were chosen since the aquifer is confined and of an areal extent that is great enough for no boundary conditions to be apparent in the test data. Although many of conditions specified by the methodology are not met, these two methodologies represent the closest

*Aquifer Testing*

approximation to the site conditions. In addition, several examples exist witihin the literature where these conventional methodologies of analyses have been utilized (Singhal and Gupta, 1999).

## Hydrologic Parameters

The hydraulic characteristics of basalts and volcanic rocks are dependent on the rate of cooling, viscosity of the magma and the degassing that occurs during cooling (Singhal and Gupta, 1999). The openings that impart porosity and permeability to basaltic rocks are scoariae, breccia zones, cavities, shrinkage cracks or columnar joints, gas vesicles, lava tubes and fractures and lineaments (Stearns, 1942; UNESCO, 1975). The variation in permeability encompasses almost nine orders of magnitude (Singhal and Gupta, 1999).

The results of the Big Sandy Energy Project aquifer test analyses indicate transmissivity values (T) of lower aquifer ranging from 12,520 ft$^2$/day to 12,960 ft$^2$/day utilizing the Cooper-Jacob methodology. The T values determined by the Theis methodology ranged from 10,105 ft$^2$/day to 11,193 ft$^2$/day. These values present a standard deviation of 184 for the Cooper-Jacob analyses and a corresponding standard deviation of 448 for the Theis analyses. Average transmissivity of the Cooper-Jacob analyses is 12,709 ft$^2$/day and the corresponding average of the Theis results is 10,689 ft$^2$/day.

The low standard deviations of the results of the aquifer test and the directional variation of the well array indicates that the aquifer is highly homogeneous with regard to transmissivity. The relatively close results between the two types of analyses combined with the low standard deviation of the data provide a high degree of confidence in the T values.

The storativity values associated with these same wells ranges over four orders of magnitude. The values were 0.29 for OWC2, 0.00057 from OW3, and 0.00118 from OW4 utilizing the Cooper-Jacob analyses. Similar results are provided by the Theis-based analyses. Although the values vary widely, only the value from the well OWC2 is not within the normal range for a confined basaltic aquifer. The other two values are more representative of the typical basaltic aquifers. A summary of the transmissivity and storativity values from each of the analyses and each is well is presented in **Table 3** and a summary of typical values from other basaltic aquifers is provided in **Table 4.**

*Aquifer Testing*

| Table 3 Transmissivity and Storativity Values Big Sandy Energy Project Wikieup, Arizona | | | | |
|---|---|---|---|---|
| **Well Name** | **Theis Value** | | **Cooper- Jacob Value** | |
| | **Transmissivity (ft2/day)** | **Storativity** | **Transmissivity (ft2/day)** | **Storativity** |
| OWC2 | 10770 | 0.3816 | 12520 | 0.2971 |
| OW3 | 11193 | 0.00069 | 12647 | 0.00057 |
| OW4 | 10105 | 0.00163 | 12960 | 0.00118 |

| Table 4 Typical Transmissivities and Storage Values Big Sandy Energy Project Wikieup, Arizona | | | | |
|---|---|---|---|---|
| **Rock Type** | **Age** | **Location** | **T (ft²/day)** | **S** |
| **Basalt** | Miocene | Columbia Snake River Area, USA | 2173 - 24511 avg - 55198 | 2 x 10⁻² 6 x 10⁻² |
| **Basalt** | Miocene Quaternary | Gran Canaria, Spain | 538 - 3228 | -- |
| **Basalt (fractured)** | Pleistocene-Holocene | Mexico | 6509 - 9307 | -- |
| **Basalt** | Pliocene | Republic of Djibouti | 365 - 54876 | $10^{-2} - 10^{-4}$ |

(modified from Singhal and Gupta, 1999)

Further analyses of the data was performed by utilizing the Cooper-Jacob straight line analyses. This analyses evaluates the data from all observation wells to determine the transmissivity and storativity. This analyses was performed on the two distant wells, OW3 and OW4, since the storativity value determined by the well OWC2 is considered suspect. The results of the Cooper-Jacob straight line method indicated a transmissivity value of 163,000 g/day/ft or 21,791 ft²/day. While this value is higher than the values determined from the individual observation wells, the value does add confidence that the transmissivity of the aquifer is high. A copy of the analyses of the individual observation wells and the straight line determination is included in **Appendix G.**

In addition to transmissivity, hydraulic conductivity can be determined utilizing the equation T=kb, where T is transmissivity, k is the hydraulic conductivity and b is the aquifer thickness. Utilizing the transmissivity values derived from the aquifer testing and the aquifer thickness (300 ft) as determined by the test drilling, the hydraulic conductivity values were determined. Hydraulic conductivity of the aquifer ranged from 41.7 ft/day to 43.2 ft/day by the Cooper-Jacob analyses. Correspondingly, the results of the Theis analyses ranged from 33.7 ft/day to 37.3 ft/day. **Table 5**

summarizes the hydraulic conductivity values as determined by aquifer testing. These hydraulic conductivities are within the normal ranges for basaltic aquifers. For comparative purposes, hydraulic conductivities of differing basalt types are presented on **Table 6.**

| Table 5 | | |
|---|---|---|
| **Hydrualic Conductivity Values** | | |
| **Big Sandy Energy Project** | | |
| **Wikieup, Arizona** | | |
| **Well Name** | **Theis Value** | **Cooper- Jacob** |
| | **Hydraulic Conductivity (ft/day)** | **Hydraulic Conductivity (ft/day)** |
| OWC2 | 35.9 | 41.7 |
| OW3 | 37.3 | 42.2 |
| OW4 | 33.7 | 43.2 |

| Table 6 | | |
|---|---|---|
| **Typical Conductivity and Porosity Ranges for Basalt** | | |
| **Big Sandy Energy Project** | | |
| **Wikieup, Arizona** | | |
| **Basalt type** | **Porosity (%)** | **Hydraulic Conductivity (ft/day)** |
| Dense | 0.1-1 | $10^{-6}$-$10^{-2}$ |
| Vesicular | 5-11 | $10^{-3}$-$10^{-2}$ |
| Fractured, weathered | 10-17 | $10^{-3}$-$10^{4}$ |

(modified from Singhal and Gupta, 1999)

Based upon the values of hydraulic conductivity determined from the aquifer test, the basalt type would appear to be fractured and or weathered. The corresponding porosity of the aquifer would therefore appear to range from 10-17 percent. In consideration that the hydraulic conductivity of the aquifer is $10^{1}$, a conservative porosity of 13-14% could be assumed.

Examination of the hydrographs from the middle aquifer and alluvial aquifer wells in the area does not indicate any influence from the pumping test. No calculation can be made regarding the transmissivity of these aquifers from this test data, nor can any vertical hydraulic conductivity value be derived for the confining layers that exist between these aquifers. The test indicates that little, if any interconnection may exist between the basaltic aquifers and the other aquifers in the Big Sandy Valley. Copies of the hydrographs from all wells are included in **Appendix F.**

# PROJECTED EFFECT OF WITHDRAWAL

Based upon the results of the geological research and the aquifer testing, a simplified water balance for the aquifer was utilized to determine the potential impacts to the aquifer.  For the models a average withdrawal rate of 3,000 gpm was utilized.

In the first methodology, the minimum and maximum extent of the aquifer (as estimated in the geology section) is utilized along with the estimated porosity and aquifer thickness to determine the volume of water in storage.  For each of the aquifer minimum and maximums:

**Minimum extent:**

Area of the aquifer

$57.04 \text{ mi}^2$ x $27878400 \text{ ft}^2/\text{mi}^2 = 1.59 \times 10^9 \text{ ft}^2$

Volume of the aquifer

$1.59 \times 10^9 \text{ ft}^2$ (aquifer extent) x 300 feet (assumed aquifer thickness) = $4.77 \times 10^{11} \text{ ft}^3$ (aquifer volume)

$4.77 \times 10^{11} \text{ ft}^3$ (aquifer volume) x 7.48 gallons/$\text{ft}^3$ = $3.56 \times 10^{12}$ aquifer volume in gallons

Water Stored in the Aquifer

$3.56 \times 10^{12}$ gallons (aquifer volume) x 0.13 porosity = $4.6 \times 10^{11}$ gallons, or $4.6 \times 10^{11}$ / 325,851 (gallons per acre foot) = 1,420,281 acre feet of water stored in the aquifer

**Maximum extent:**

Area of the aquifer

$80.14 \text{ mi}^2$ x $27878400 \text{ ft}^2/\text{mi}^2 = 2.24 \times 10^9 \text{ ft}^2$

Volume of the aquifer

$2.24 \times 10^9 \text{ ft}^2$ (aquifer extent) x 300 feet (assumed aquifer thickness) = $6.73 \times 10^{11} \text{ ft}^3$ (aquifer volume)

$6.73 \times 10^{11} \text{ ft}^3$ (aquifer volume) x 7.48 gallons/$\text{ft}^3$ = $5.03 \times 10^{12}$ aquifer volume in gallons

Water Stored in the Aquifer

  5.03 x $10^{12}$ gallons (aquifer volume) x 0.13 porosity = 6.54 x $10^{11}$ gallons, or

  6.54 x $10^{11}$ / 325,851 = 2,004,000 acre feet of water stored in the aquifer

Therefore the volume of water stored in the aquifer is between 1,420,000 acre feet and 2,004,000 acre feet.

Water enters the aquifer through recharge. Assuming that recharge only occurs as a result of precipitation directly on the outcrop, then a conservative estimate of the average annual recharge to the aquifer can be made. Meteorological data from Wikieup indicates that 10.00 inches of precipitation occurs on an annual basis (Western Regional Climate Center, 2000). Recharge in basaltic aquifers in arid regions is approximately 10 % of the annual rainfall (UNESCO, 1975). Therefore:

**Recharge Zone Area:**

  26.19 $mi^2$ x 27878400 $ft^2/mi^2$ = 7.3 x $10^8$ $ft^2$

**Annual Recharge Volume:**

  7.3 x $10^8$ $ft^2$ (recharge area) x 0.8333 ft (precipitation in feet) x 0.10 (percentage to the aquifer) = 6.08 x $10^7$ $ft^3$ of water as total annual recharge to the aquifer.

  6.08 x $10^7$ $ft^3$ (total recharge in $ft^3$) x 7.48 $g/ft^3$ = 4.55 x $10^8$ gallons, or

  4.55 x $10^8$ / 325,851 = 1,396 acre feet of annual recharge.

Discharge from the aquifer is assumed to be equal to the amount of recharge into the aquifer. The recharge rate equates to approximately 865gpm. Some discharge does occur through springs in the area such as Cofer Hot springs. The total amount of discharge is also assumed to be 865 gpm.

**Estimation of Water Use by Simplified Water Balance Methods**

One very conservative method to determine potential drawdown in the aquifer is assume the aquifer receives no recharge and to subtract the water needs for the facility from the amount of water in storage in the aquifer. While this is not a realistic scenario, this does illustrate the requirements and available supplies in a simple manner. Considering that the facility requires a maximum of 3,000 gpm or approximately 4,850-feet/year for approximately 40 years, and the total water volume in the aquifer is approximately 1.4 million acre feet (lowest estimate), then:

*Projected Effect of Withdrawal*

**Total Facility Requirements**:

3,000 gpm x 1440 minutes/day x 365 days/year x 40 years / 325,851 gallons/acre feet = 193,561 acre feet

**Total Amount of Water Remaining Stored in the Aquifer (Minimum Extent):**

1,420,000 acre feet (minimum stored in aquifer) - 193,561 acre feet (required for plant) = + 55,854 acre feet (recharge) =  1,282,293 acre feet (remaining stored in aquifer)

**Percentage of Water in the Aquifer Utilized (Minimum Extent):**

1,282,293 acre feet (remaining stored in the aquifer) / 1,420,767 acre feet (stored in the aquifer) = 9.75 percent utilized leaving 90.25 % of the original volume of water in storage.

This calculation includes the volume of water that would recharge the aquifer during the forty years of operations.  In addition, this calculation was performed based upon the minimum extent of the aquifer believed to exist.

# POTENTIAL IMPACTS ASSOCIATED WITH
# AQUIFER DEVELOPMENT

The aquifer proposed for development is a highly confined aquifer that does not appear to interconnected to the overlying aquifers.  This lack of interconnection is evidenced  in the hydrographs of  measurements made in the observation wells in the Upper and Middle Aquifers, which shows no change in the trend of the water levels prior to, during and following the pumping test.  Therefore, withdrawal from the Lower (confined) aquifer appears not to impact the Upper Aquifer or the flow in the Big Sandy River and consequently, will not impact the existing wells which presently penetrate only the Recent Stream and Flood Plain and the Upper Basin fill deposits. Further, it appears that the Middle Aquifer will not be effected.

Only one naturally occurring  discharge point of the confined aquifer  has been clearly identified through pump testing and water quality analyses.  This natural discharge point issues as  Cofer Hot Springs.  The only impact determined from the investigation that will probably occur as withdrawal from the Lower (confined) Aquifer continues is that flow will be reduced or cease from the Cofer Hot Spring.  No other currently identified springs will likely be impacted.

The Owner of Cofer Hot Spring has agreed to negotiate mitigation that will compensate for loss of flow.

# PROPOSED MONITORING PROGRAM

To verify the projections made as part of this assessment of the ground water potential of the area, a monitoring program is proposed. This monitoring program is designed to verify the drawdowns and potential impacts in the Upper Alluvial, Middle and Lower aquifers. The monitoring program will utilize both existing and proposed wells.

Currently, wells exist in the Upper Alluvial Aquifer at sites 1, 7, and 8. One Middle Aquifer well exists at Site 2. In addition to these wells, Lower Aquifer wells exist at site 4 and site 2. Each of these well is proposed to be utilized as part of the proposed monitoring program. In addition to these wells, it is proposed that an additional monitoring well be installed near Cofer Hot Springs. This well will be screened in the lower aquifer and will be utilized for monitoring the lower aquifer.

Water levels in these wells will be monitored over the period of operations on a daily basis by means of transducers and data loggers. The equipment for each well will consist of an In-Situ® Troll, Mini-Troll or similar device. The water level values will be downloaded and analyzed on a quarterly basis. Repairs and or replacement of the equipment will be performed during the download periods.

The data derived from the monitoring program will be summarized and presented in an Annual Hydrology Report. This report will analyze the previous years data and project the probable drawdown for the coming year. As part of this analysis, the impact, if any, on the Middle or Upper Aquifer will be determined. The report will be available to the agencies and the public at the beginning of each monitoring year.

# CONCLUSION

The conclusions reached on the basis of this investigation are:

- the Lower (confined) Basaltic Aquifer is a heretofore undocumented aquifer which has not been utilized by any wells or withdrawal;

- the Lower (confined) Basaltic Aquifer and its recharge area has a minimum areal extent of approximately 57 square mile of which 31 square miles is within the Big Sandy Basin and the remaining 26 square miles, forming the recharge area, consists of the Volcanic Rocks of Sycamore Creek to the east of the basin;

- the minimum volume of water in storage in the Lower (confined) Basaltic Aquifer is 1.4 million acre feet;

- the maximum demand of the power plant over the 40 year period of the proposed project is 193,561 acre feet;

- recharge to the Lower (confined) Basaltic Aquifer will replace 55,854 acre feet in the 40 year life of the project;

- during the life of the project, the project will withdraw 9.75 percent of the volume of water in storage;

- withdrawal from the Lower (confined) Basaltic Aquifer does not effect the water levels in the Middle or Upper Aquifers, therefore, the withdrawal to satisfy the demand of the project will not impact the existing wells which penetrate only the Upper Aquifer or the Recent Stream and Flood Plain alluvial fill;

- there is sufficient water available in the Lower (confined) Basaltic Aquifer to satisfy the demands of the project for 40 years without depleting the aquifer and without impacting the existing wells.

# REFERENCES

Anderson, C. A.., Scholz, E. A. and Strobell, Jr., J. D., 1955 Geology and Ore Deposits of the Bagdad Area,Yavapai County, AZ. U. S. Geological Survey Professional Paper 278, 101 p., 4 Sheets, Washington, D. C.

Anderson, T. W., 1995, Summary of the Southwest Alluvial Basins, Regional Aquifer-System Analysis, South-Central Arizona and Parts of Adjacent States, U. S. Geological Survey Professional Paper 1406-A, 30 p., Washington, D. C.

Cady, C. V., 1981, Map Showing Ground Water Conditions in the Big Sandy Area, Yavapai and Mohave Counties, Arizona – 1980 Department of Water Resources Hydrologic Map Series Report Number 5, 1 Sheet, Phoenix, AZ.

Campbell, A. and Jones, N. O., 1979, Preliminary Geothermal Assessment of the Big Sandy Valley, Mohave County, Arizona., Arizona Bureau of Geology and Mineral Technology Open-File Report 79-15, 26p., 6 sheets., Tucson, AZ

Davidson, E. S., 1973, Water-Resources Appaisal of the Big Sandy Area, Mohave County, Arizona., Arizona Water Commission Bulletin 6, 40 p., 2 Sheets., Phoenix, AZ

Duffield, G. M., 1999, AQTESOLV for Windows, HydroSOLVE, Inc., software,  Reston, VA.

Evans, L. G. and Haimson, J. S., 1982, SWAB/RASA Aquifer Parameter Study, Final Report for U. S. Geological Survey Contract 14-08-0001-18268, Arizona Department of Water Resources, 21 p.,  Phoenix, AZ.

Feethey, G. W., and Anderson, T. W., 1986, Predevelopment Hydrologic Conditions in the Alluvial Basins of Arizona and Adjacent Parts of California and New Mexico, U. S. Geological Survey Hydrologic Investigations Atlas HA-664, 3 Sheets, Washington, D. C.

Fenneman, N. M., 1931, Physiography of the Western United States, McGraw-Hill Book Company, Inc., 534 p.,  New York, N. Y.

Gillespie, J. B., Bentley, C. B. and Kam, W., 1966, Basic Hydrologic Data of the Hualapai, Sacramento and Big Sandy Valleys, Mohave County, Arizona, Arizona State Land Department Water Resources Report No. 26, 39 p., Phoenix, AZ.

Gray, F., Miller, R. J., Pitkin, J. A., Bagby, W. C., Hassemer, J. R., McCarthy, J. H., Hanna, W. F., Callas, M. L. C. and Lane M. E., 1989, Mineral Resources of the Arrastra Mountain/Peoples

Canyon Wilderness Study Area, La Paz, Mohave and Yavapai Counties, AZ.   U. S. Geological Survey Bulletin 1701, Chapter E., E1 - E28 p., 1 Sheet, Washington, D. C.

Heath, R. C., 1982, Basic Ground Water Hydrology, U. S. Geological Survey Water Supply Paper 2220, 84 p., Washington, D.C.

Halpenny, L.C., 1952, Ground Water in the Gila River Basin and Adjacent Areas, Arizona - A Summary, U.   S. Geological Survey Open File Report, 224 p., Tucson, AZ.

House, P. K., and Hirschboeck, K. K., 1995, Hydroclimatological and Paleohydrological Context of Extreme Winter Flooding in Arizona, 1993, Arizona Geological Survey Open-File Report 95-12,   27 p., Tucson, AZ.

House, P. K. and Pearthree, P. A., 1994, A Geomorhologic and hydraulic Evauation of an Extraordinary Flood Discharge Estimate: Bronco Creek, Arizona, Arizona Geological Survey Open-File Report 94-19, 19 p., Tucson,  AZ.

Klawon, J. E., 2000, Hydrology and Geomorphology of the Santa Maria and Big Sandy Riversand Burro Creek, Western Arizona, Arizona Geological Survey Open-File Report 00-02, 46 p., Tucson, AZ.

Koester, E. A., Conley, J. N., and Rauzi, S. L., 1996, Wells Drilled for Hydrocaron, Helium, and Geothermal Resources; Statigraphic Information and Selected Wells Drilled for Water, Well Location Map, Mohave County, Arizona, Arizona Geological Survey OG-8, Tucson, AZ.

Lance, J. F., 1960, Stratigraphic and Structural Position of Cenozoic Fossils Localities in Arizona Arizona Geological Society Digest, v. 3, p. 155-159, Tucson, AZ.

Lease, L. W., 1981, Summary Geologic report on Drilling in Western Prescott and Williams Quadrangles, Mohave County, AZ, U. S. Department of Energy Report GJBX-293(81), 82 p., 9 microfiche, 2 sheets, Grand Junction, CO.

Lee, W. T., 1908, Geologic Reconnaissance of a part of Western Arizona, with notes on the Igneous Rocks of Western Arizona, by Albert Johannsen, U. S. Geological Survey Bulletin 352, 96 p., Washington, D. C.

Morrison, R. B., 1940, Ground Water Resources of the Big Sandy Valley, Mohave County, Arizona, Office of the Arizona State Water Commissioner, 20 p., Phoenix, AZ.

Moyer, T. C., 1981, The Volcanic Geology of the Kaiser Spring Area, Southeastern Mohave County, Arizona, Arizona State University, MS thesis, 220 p., Tempe, AZ.

1990, Generalized Geologic Map of the Kaiser Spring Volcanic Field, Mohave County, Arizona, Arizona Geological Survey Contributed Map CM-90-C, 18 p., 1 Sheet, Tucson, AZ.

Santa Fe Railroad Company, 1981, Geologic Map of Santa Fe Railroad Company Mineral Holdings in Northwestern Arizona, Arizona Bureau of Geology & Mineral Technology Miscellaneous Map Series MM-88A, 1 Sheet, Tucson, AZ.

Scarborough, R. B., 1985, Geologic Cross Sections of Western Arizona Basin and Range, with Accompanying Geologic Maps and Other Information, Arizona Bureau of Geology and Mineral Technology Open-File Report 85-20, 10 p., 34 Sheets, Tucson, AZ.

Scarborough, R. B. and Wilt, J. C., 1979, A Study of Uranium Favorability of Cenozoic Rocks, Basin and Range Province, Arizona, Part I, General Geology and Chronology of Per-late Miocene Cenozoic Sedimentary Rocks, Arizona Geological Survey Open-File Report 79-1, 101 p., Tucson, AZ.

Sheppard, R. A. and Gude, A. J. III, 1972, Big Sandy Formation Near Wikieup, Mohave County, Arizona, in Contributions to Stratigraphy. U. S. Geological Survey Bulletin 1354-C, p C1 - C10, Washington, D. C.

Singhal, B. B. S. and Gupta, R. P., 1999, Applied Hydrogeology of Fractured Rocks, Kluwer Academic Publishers, p. 400, Dordrecht, The Nertherlands,

Smith, G. E. P., 1938, The Physiography of Arizona Valleys and the Occurrence of Groundwater University of Arizona, College of Agriculture, Agricultural Experiment Station, Technical Bulletin No. 77, p. 45 - 91, Tucson, AZ.

Stearns, H. T., 1942, Hydrology of Volcanic Terrains, (ed O. E. Meinser) Dover Publications, pp. 678 - 703, New York, N.Y.

UNESCO, 1975, Analytical and Investigational Techniques for Fissured and Fractured Rocks in Ground Water Studies, (eds. Brown, et. al.), Studies and Reports in Hydrology (Chapter 14) Supplement 2, Paris, France.

Wilson, E. D., and Moore, R. T. with additional data by others, 1959, Geologic Map of Mohave County, Arizona. Arizona Bureau of Mines, University of Arizona, 1 Sheet, Tucson, AZ.

Young, R. A., 1979, Laramide Deformation, Erosion and Plutonism Along the Southwestern Margin of the Colorado Plateau, Tectonophysics, v. 61, p. 25 - 47,

# APPENDIX A
# LITHOLOGIC LOGS

# APPENDIX B
# LABORATORY ANALYSIS

# APPENDIX C
# BIG SANDY ALLUVIAL AQUIFER TEST RESULTS

# APPENDIX D
# TEST HOLE DRILLING RESULTS

# APPENDIX E
## LITHOLOGIC LOGS AND WELL CONSTRUCTION DIAGRAMS

# APPENDIX F
# WELL HYDROGRAPHS

# APPENDIX G
## AQUIFER TEST ANALYSES PLOTS AND DATA

# APPENDIX A
# LITHOLOGIC LOGS



Well Description

Lithologic

0

No samples.

300

600

900

1200

Sandstone, tan calcareous, locally abundant
tan mudstone, partially sandy, trace of free
pyrite, locally limonite stained.

1500

1800

Mudstone, light gray, calcareous, pyritic.

Limestone, light gray, micritic, hard,
scattered clusters of pyrite crystals.

2100

Siltstone, light gray, micaceous, much limestone as above.
Limestone, variegated gray to brown, dense, micritic.
Limestone, dirty gray, and siltstone, medium gray, calcareous.

2400

Siltstone and mudstone, medium gray, calcareous.
Limestone, light gray to tan, micritic, dense.
Mudstone and claystone, medium gray, siltstone, gray,
trace sandstone, very fine grained.

2700

Limestone, dark gray and tan, dense, micritic, abundant pyrite.
Siltstone, medium gray, biotitic, pyritic, partially finely banded, calcareous.
Claystone, medium gray, calcareous, abundant gray limestone and tan siltstone.

3000

Limestone, as above, and tan, siltstone, calcareous.
Siltstone, tan as above, and shale, gray.
Siltstone, buff, calcareous, sandstone, tan, very fine grained, micaceous, friable.
Siltstone or mudstone, tan, hard (poor samples).

3300

Siltstone and limestone as above.
Quartzite, 20% very fine to coarse quartz grains, light gray, limestone 40%,
tan-gray, some shale and mudstone, gray, partially micaceous (poor samples).
Shale and limestone as above.

3600

Limestone, gray, finely crystalline (some granitic material in sample).

3900

Siltstone and shale, gray, calcareous; some limestone as above.

4200

Granite wash.
Granite wash and brown mudstone.
Granite wash unconsolidated coarse sandstone and granitic liths and minerals.
Interbedded biotitic siltstone and shale as above, and granite wash.

4500

Shale and siltstone as above, biotite.

Sandstone, tan, medium to coarse grained, arkosic, unconsolidated.

4800

Granite wash and siltstone, medium gray, biotitic, calcareous.

Claystone, gray, calcareous and granite wash with coarse sandstone, arkosic,
angular to subangular, unconsolidated.

5100

## BIG SANDY ENERGY PROJECT

### OBS WELL SITE PQ-25
### AFTER LEASE, 1982
### LITHOLOGIC LOG

MANERA INC.

| DATE: 10/16/00 | AutoCAD File:891_pq-25.dwg |
| SCALE: AS NOTED | DRAWN BY: MM |

891_PQ-25.dwg
10/16/00



| Well Description | Lithologic |
| --- | --- |

0

No samples.

Siltstone and sandstone, very fine to fine grained, white to medium gray, friable to well cemented with calcite, micaceous.

300

Sandstone as above.

Cement

Siltstone and sandstone as above.

600

Sandstone as above partially feldspathic.

Sandstone, gray, medium to coarse grained, poorly sorted, angular to subrounded, some biotite, abundant granite fragments, 5-10% magnetite, unconsolidted. (Verging on granite wash.)

900

1200

Granite wash, highly oxidized.

1500

Sandstone, fine to very coarse grained, arkosic, angular, unconsolidated.
Granite wash.

Sandstone, dark reddish brown, very fine grained, calcareous, tight, biotitic, arkosic.

1800

Volcanic rock same color as above.
Granite wash.

Volcanic rock, dark brown (basalt?), iron rich, partially altered.

2100

Granite wash.
Amphibolite, (conglomerate or breccia?).

2400

2700

Granite wash.

3000

3300

Quartz diorite, coarsely crystalline quartz, feldspar, biotite, abundant green clay-like mineral with pyrite - sometimes associated with biotite, mostly along fractures (hydrothermal alteration?).

3600

**BIG SANDY ENERGY PROJECT**

*OBS WELL SITE PQ-26*
*AFTER LEASE, 1982*
*LITHOLOGIC LOG*

| DATE: 10/16/00 | AutoCAD File:891_pq-26.dwg |
| --- | --- |
| SCALE: AS NOTED | DRAWN BY: MM |

MANERA INC.



Well Description | Lithologic

0 — No samples.
Conglomerate, unconsolidated, sand to pebble size volcanic and metamorfic lithic clasts, quartz and feldspar.
Volcanics (andesite?), bright red to light gray, firm to hard, partially slightly vesicular with calcite fill.

300 —

Cement 600 — Crystal tuff (albite) and biotite crystals in white tuff matrix.

900 —

1200 — Volcanics (andesite?), light brown, aphanitic to porphyritic, locally slightly vesicular.

1500 —

1800 —

Perlite, medium gray, viterous.
Tuff, off-white.
2100 — Mudstone, reddish-buff, partially silty, calcareous.

2400 —

2700 — Granite wash, locally fine to coarse sandstone, feldspathic and reddish brown, silty mudstone, scattered fragments of chert, chalcedony and quartzite. Dark red to black very finely crystalline, hard igneous rock clasts scattered through interval 2300' - 2420' (701-741m).

3000 —

3300 — Granite gneiss, light to dark gray, hard, limonite stained (15%).

3600 —

## BIG SANDY ENERGY PROJECT

### OBS WELL SITE PQ-29
### AFTER LEASE, 1982
### LITHOLOGIC LOG

| DATE: 10/16/00 | AutoCAD File:891_pq-29.dwg |
| SCALE: AS NOTED | DRAWN BY:  MM |

MANERA INC.

# APPENDIX B
# LABORATORY ANALYSIS



**BOLIN**
**LABORATORIES·INC**
*Legend Technical Services of Arizona*

17631 N. 25th Avenue ▪ Phoenix, Arizona ▪ 85023 ▪ (602) 942-8220 ▪ fax (602) 942-1050 ▪ ADHS# AZ0004

Manera Inc.                                     Received:      5/25/00
8316 N. 53rd Street                             Reported:      6/19/00
Paradise Valley, AZ 85253-2512                  Invoice No:    .065879

Attn:  Paul A. Manera

Project Name:      MCEDA Big Sandy

| PARAMETER | METHOD | RESULTS | UNITS | PQL | DATE ANALYZED |
|---|---|---|---|---|---|
| Matrix: | Drinking Water | | | | |
| Sample No: | 0005-04716-001 | | Time Sampled: 13:00 | | |
| Sample ID: | Big Sandy 4B (B15-12 7BDD Deep Mntr) | | Date Sampled: 5/25/2000 | | |
| Colilert | SM 9223B | 0 | P/A | | 5/27/00 |
| Antimony | EPA 200.9 | <0.004 | mg/L | 0.004 | 5/31/00 |
| Arsenic | EPA 200.9 | 0.141 | mg/L | 0.05 | 6/09/00 |
| Barium | EPA 200.7 | 0.06 | mg/L | 0.01 | 6/12/00 |
| Beryllium | EPA 200.7 | <0.002 | mg/L | 0.002 | 6/12/00 |
| Calcium | EPA 200.7 | 48. | mg/L | 10 | 6/12/00 |
| Cadmium | EPA 200.9 | <0.0002 | mg/L | 0.0002 | 6/01/00 |
| Chromium | EPA 200.7 | <0.005 | mg/L | 0.005 | 6/12/00 |
| Copper | EPA 200.7 | <0.015 | mg/L | 0.015 | 6/12/00 |
| Hardness, Calcium | EPA 200.7 | 120 | | 2.5 | 6/12/00 |
| Hardness, Total (Ca & Mg) | SM 2340B | 178 | | 7. | 6/16/00 |
| Lead | EPA 200.9 | <0.005 | mg/L | 0.005 | 6/30/00 |
| Langlier Index | CALCULATION | 0.120 | | -5 | 6/12/00 |
| Magnesium | EPA 200.7 | 14. | mg/L | 1. | 6/15/00 |
| Mercury | EPA 245.1 | <0.0002 | mg/L | 0.0002 | 5/31/00 |
| Nickel | EPA 200.7 | <0.02 | mg/L | 0.02 | 6/12/00 |
| Selenium | EPA 200.9 | <0.005 | mg/L | 0.005 | 6/30/00 |
| Sodium | EPA 200.7 | 195. | mg/L | 20 | 6/12/00 |
| Thallium | EPA 200.9 | <0.001 | mg/L | 0.001 | 6/07/00 |
| Total Alkalinity (as CaCO3) | SM 2320B | 252. | mg/L | 2. | 6/07/00 |
| Asbestos | EPA 100.2 | <.2 | MFL | .2 | 5/26/00 |
| Cyanide, Total | SM4500 CNE | <0.01 | mg/L | 0.01 | 6/01/00 |
| Fluoride | SM 4500-FC | 3.7 | mg/L | 0.1 | 6/01/00 |
| Nitrogen as Nitrite | SM4500 NO2B | <0.1 | mg/L | 0.1 | 5/26/00 |
| Nitrate plus Nitrite | SM 4500-NO3 F | 1.3 | mg/L | 0.1 | 5/26/00 |
| Nitrogen as Nitrate | CALC. | 1.3 | | | 5/26/00 |
| pH | EPA 150.1 | 7.6 | Std Unit | | 5/26/00 |
| Sulfate | EPA 300.0 | 154. | mg/L | 30 | 5/31/00 |
| Total Dissolved Solids | SM 2540C | 746. | mg/L | | 5/30/00 |
| 1,2-Dibromoethane (EDB) | EPA 504.1 | <0.00001 | mg/L | 0.00001 | 6/02/00 |
| 1,2-Dibromo-3-Chloropropane | EPA 504.1 | <0.00002 | mg/L | 0.00002 | 6/02/00 |
| Extraction | EPA 504.1 | | | | 5/31/00 |

**Phoenix ▪ Tucson ▪ St.Paul ▪ Fargo ▪ Mosinee**
**www.legend-group.com**



**B O L I N**
**L A B O R A T O R I E S · I N C**
*Legend Technical Services of Arizona*

17631 N. 25th Avenue ■ Phoenix, Arizona ■ 85023 ■ (602) 942-8220 ■ fax (602) 942-1050 ■ ADHS# AZ0004

Matrix:        **Drinking Water**
Sample No:   **0005-04716-001**                                    Time Sampled:  13:00
                                                                                    Date Sampled:  5/25/2000

| PARAMETER | METHOD | RESULTS | UNITS | PQL | DATE ANALYZED |
|---|---|---|---|---|---|
| Aldrin | EPA 508 | <0.00002 | mg/L | 0.00002 | 6/02/00 |
| Lindane (HCH-gamma) | EPA 508 | <0.00002 | mg/L | 0.00002 | 6/02/00 |
| Chlordane | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| Dieldrin | EPA 508 | <0.00002 | mg/L | 0.00002 | 6/02/00 |
| Endrin | EPA 508 | <0.00001 | mg/L | 0.00001 | 6/02/00 |
| Heptachlor | EPA 508 | <0.00003 | mg/L | 0.00003 | 6/02/00 |
| Heptachlor Epoxide | EPA 508 | <0.00002 | mg/L | 0.00002 | 6/02/00 |
| Hexachlorobenzene | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| Methoxychlor | EPA 508 | <0.00003 | mg/L | 0.00003 | 6/02/00 |
| Propachlor | EPA 508 | <0.00005 | mg/L | 0.00005 | 6/02/00 |
| Toxaphene | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| PCB's, Total | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| PCB 1016 | EPA 508 | <0.00008 | mg/L | 0.00008 | 6/02/00 |
| PCB 1221 | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| PCB 1232 | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| PCB 1242 | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| PCB 1248 | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| PCB 1254 | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| PCB 1260 | EPA 508 | <0.0001 | mg/L | 0.0001 | 6/02/00 |
| Extraction | EPA 508 | | | | 6/01/00 |
| Surrogate: | EPA 508 | | | | 6/02/00 |
| ***Decachlorobiphenyl | EPA 508 | 78 | % Recovery | | 6/02/00 |
| ***Tetrachloro-m-xylene | EPA 508 | 103 | % Recovery | | 6/02/00 |
| Dalapon | EPA 515.1 | <0.001 | mg/L | 0.001 | 6/06/00 |
| Dicamba | EPA 515.1 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 2,4-D | EPA 515.1 | <0.0001 | mg/L | 0.0001 | 6/06/00 |
| Pentachlorophenol | EPA 515.1 | <0.00004 | mg/L | 0.00004 | 6/06/00 |
| 2,4,5-TP (Silvex) | EPA 515.1 | <0.0002 | mg/L | 0.0002 | 6/06/00 |
| Dinoseb | EPA 515.1 | <0.0002 | mg/L | 0.0002 | 6/06/00 |
| Picloram | EPA 515.1 | <0.0001 | mg/L | 0.0001 | 6/06/00 |
| Extraction | EPA 515.1 | | | | 5/31/00 |
| ***DCAA | EPA 515.1 | 79 | % Recovery | | 6/06/00 |
| Alachlor | EPA 525.2 | <0.001 | mg/L | 0.001 | 6/09/00 |
| Atrazine | EPA 525.2 | <0.0015 | mg/L | 0.0015 | 6/09/00 |
| Benzo (a) pyrene | EPA 525.2 | <0.0001 | mg/L | 0.0001 | 6/09/00 |
| Bis(2-ethylhexyl)adipate | EPA 525.2 | <0.003 | mg/L | 0.003 | 6/09/00 |
| Bis(2-ethylhexyl)phthalate | EPA 525.2 | <0.003 | mg/L | 0.003 | 6/09/00 |
| Butachlor | EPA 525.2 | <0.001 | mg/L | 0.001 | 6/09/00 |
| Hexachlorocyclopentadiene | EPA 525.2 | <0.001 | mg/L | 0.001 | 6/09/00 |
| Metolachlor | EPA 525.2 | <0.001 | mg/L | 0.001 | 6/09/00 |
| Metribuzin | EPA 525.2 | <0.001 | mg/L | 0.001 | 6/09/00 |
| Simazine | EPA 525.2 | <0.001 | mg/L | 0.001 | 6/09/00 |



**BOLIN**
**L A B O R A T O R I E S • I N C**
*Legend Technical Services of Arizona*

17631 N. 25th Avenue ■ Phoenix, Arizona ■ 85023 ● (602) 942-8220 ● fax (602) 942-1050 ■ ADHS# AZ0004

Matrix:          Drinking Water
Sample No:    0005-04716-001                              Time Sampled:  13:00
                                                                       Date Sampled:  5/25/2000

| PARAMETER | METHOD | RESULTS | UNITS | PQL | DATE ANALYZED |
|---|---|---|---|---|---|
| Extraction | EPA 525.2 | | | | 6/07/00 |
| Surrogate: | EPA 525.2 | | | | 6/09/00 |
| •••Pyrene-d10 | EPA 525.2 | 102. | % Recovery | | 6/09/00 |
| •••Triphenylphosphate | EPA 525.2 | 112. | % Recovery | | 6/09/00 |
| •••Perylene-d12 | EPA 525.2 | 99.9 | % Recovery | | 6/09/00 |
| Glyphosate | EPA 547 | <0.02 | mg/L | 0.006 | 6/07/00 |
| Endothall | EPA 548.1 | <0.009 | mg/L | 0.009 | 6/03/00 |
| Extraction | EPA 548.1 | | | | 6/01/00 |
| Diquat | EPA 549.1 | <0.0004 | mg/L | 0.0004 | 6/01/00 |
| Extraction | EPA 549.1 | | | | 5/30/00 |
| Dioxin | EPA 1613 | <5.0 x 10(-9) | mg/L | | 6/07/00 |
| Gross Alpha | CO-PRECIP. | 12.1 +/- 1.7 | pCi/L | | 6/02/00 |
| Temperature, Field | | 96 | Degrees C | | 5/25/00 |
| Chloromethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Vinyl Chloride | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Bromomethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Chloroethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,1-Dichloroethylene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Dichloromethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| MTBE | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| trans 1,2-Dichloroethylene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,1-Dichloroethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| cis 1,2-Dichloroethylene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 2,2-Dichloropropane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Chloroform | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,1,1-Trichloroethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,1-Dichloropropene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Carbontetrachloride | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,2 Dichloroethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Benzene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Trichloroethylene (TCE) | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,2-Dichloropropane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Dibromomethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Bromodichloromethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| cis 1,3-Dichloropropene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Toluene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| trans-1,3-Dichloropropene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,1,2-Trichloroethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,3-Dichloropropane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Tetrachloroethylene (PCE) | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Dibromochloromethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Chlorobenzene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |



**BOLIN**
LABORATORIES · INC
*Legend Technical Services of Arizona*

17631 N. 25th Avenue ▪ Phoenix, Arizona ▪ 85023 ▪ (602) 942-8220 ▪ fax (602) 942-1050 ▪ ADHS# AZ0004

Matrix:       Drinking Water
Sample No:    0005-04716-001                          Time Sampled: 13:00
                                                       Date Sampled: 5/25/2000

| PARAMETER | METHOD | RESULTS | UNITS | PQL | DATE ANALYZED |
|---|---|---|---|---|---|
| 1,1,1,2-Tetrachloroethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Ethylbenzene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Styrene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Bromoform | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,1,2,2-Tetrachloroethane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,2,3-Trichloropropane | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Bromobenzene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 2-Chlorotoluene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 4-Chlorotoluene (para) | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,3-Dichlorobenzene (meta) | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,4-Dichlorobenzene (para) | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,2-Dichlorobenzene (ortho) | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| 1,2,4-Trichlorobenzene | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Xylenes, Total | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Total Trihalomethanes | EPA 524.2 | <0.0005 | mg/L | 0.0005 | 6/06/00 |
| Surrogate: | EPA 524.2 | | | | 6/06/00 |
| ***1,2-dichlorobenzene-d4 | EPA 524.2 | 115 | % Recovery | | 6/06/00 |
| ***4-Bromofluorobenzene | EPA 524.2 | 117 | % Recovery | | 6/06/00 |
| Radium 226 | EPA 903.1 | 0.5 +/- 0.2 | pCi/L | | 6/08/00 |

Asbestos analyzed by Fiberquant, Phx AZ, #AZ0904.
Dioxin performed by Pace Analytical Services, Minn. MN, #AZ
Radiochemistry analyzed by Lucas Labs, Sedona AZ, #AZ0141.
EPA Methods 508, 515, and 524 analyzed by ATEL, Melmore OH, #AZ0117.

NOTE:
Interpretation of Colilert Results:
       0 = Negative for Coliform bacteria
       1 = Positive for Coliform bacteria and Negative for E.coli
           (fecal bacteria)
       2 = Positive for Coliform bacteria and Positive for E.coli
           (fecal bacteria)

*Melissa Crane* (signature)

Authorized Signatory

## DRINKING WATER RADIOCHEMICAL ANALYSIS REPORT
### >>>> INFORMATION PROVIDED BY THE SYSTEM <<<<
Received  05/31/00

*Manera*

[ ___-___ ] [ __

System ID        System name

[ 05/25/00 ] [ 13:00 ] (24 hr)

Sample date: mm/dd/yy    Sample time

[ _ ] [ _ ]

Owner/Contact FAX #          Owner / Collector Name / Phone #

**COMPLIANCE SAMPLE TYPE**          **SAMPLE COLLECTION POINT/ID**

☐ Reduced Monitoring/Grab sample      Point of Entry # [__ ]

☐ Composite of four quarterly samples    Surface      [ _____ ]

☐ Quarterly                Well      [ _____ ]

Date Q1 collected [ _____ ]

Date Q2 collected [ _____ ]

Date Q3 collected [ _____ ]

Date Q4 collected [ _____ ]

### RADIOCHEMICAL ANALYSES: RESULTS BY THE LABORATORY

| Analysis Method | MCL value | MDL (pCi/L) | Contaminant name | Cont. code | Analysis Date | Result ± 2σ | Exceeds MCL |
|---|---|---|---|---|---|---|---|
| | 15 pCi/L | | **Gross Alpha, Adjusted\*** | **4000** | | | ☐ |
| | | 3 | Gross Alpha, Measured | 4002 | 06/02/00 | 12.1 ± 1.7 | |
| | | | Uranium | 4006 | | | |
| | | | Radon | 4004 | | | ☐ |
| | 5 pCi/L | | **Combined Radium (226+228)** | 4010 | | | ☐ |
| 417 | | 1 | Radium 226 | 4020 | 06/08/00 | 0.5 ± 0.2 | |
| 419 | | 1 | Radium 228 | 4030 | | | |
| | 4 mrem/y | | **Gross Beta, Dose** | **4100** | | | ☐ |
| | | | Gross Beta, Measured | 4101 | | | |
| 999 | 20,000\*\* | 1,000 | Tritium | 4102 | | | |
| | 8\*\* | 2 | Strontium-90 | 4174 | | | |

MDL    Method (Analytic) Detection Limit, 1.96 σ, from counting, Statutory, not to exceed.
\*    Adjusted Gross Alpha is measured gross alpha minus radon 222 and/or combined uranium.
\*\*    Lifetime exposure at these concentrations is assumed to result in a radiation dose of 4 mrem/y.
\*\*\*    Trigger for identification of Man Made Nuclides in addition to Tritium, and Strontium

### >>>>> LABORATORY INFORMATION <<<<<

Sample ID  WS-10226

[ AZ0141 ]  [ Lucas Laboratory, Inc

Lab ID      Lab name          Authorised Signature

Bolin 0005-04716-001

Comments

Requested by:  BOLIN LABORATORIES, INC.

Date Water System/Requestor notified June 9, 2000

Revised November 12, 1999



**ATEL**

*Aqua Tech Environmental Laboratories, Inc.*



MTBE
added

## - CERTIFICATE OF ANALYSIS -

**Client #:** I1097

Bolin Laboratories Inc
17631 N 25th Ave
Phoenix, AZ 85023
**Attn:** Celeste Washington

**Report Date:** 16-Jun-00

**Phone:** (602) 942-8220   **Ext:**
**FAX:** (602) 942-1050

**Our Lab#:** MEL00-08449
**Date Logged In:** 6/6/00
**Sample Type:** Water
**Project #:**

**Your Sample ID:** 0005-04716-001
**Sample Source:** SDWA/WTP's
**Client Project #:**
**Date Submitted to Lab:** 6/6/2000   **PO#:** 00-0950-SM

### - COLLECTION INFORMATION -

**Date/Time/By:**   5/25/00   1:00 PM

| EPA Method | Analyst | Prep Date | Analysis Date | | |
|---|---|---|---|---|---|
| 524.2 | SLC | | 6/6/00 | | |
| | CAS Number | Parameter | | Result | Typical Report Limit |
| | 71-43-2 | Benzene | | < 0.5 ug/l | 0.5 |
| | 108-86-1 | Bromobenzene | | < 0.5 ug/l | 0.5 |
| | 74-97-5 | Bromochloromethane | | < 0.5 ug/l | 0.5 |
| | 75-27-4 | Bromodichloromethane | | < 0.5 ug/l | 0.5 |
| | 75-25-2 | Bromoform | | < 0.5 ug/l | 0.5 |
| | 74-83-9 | Bromomethane | | < 0.5 ug/l | 0.5 |
| | 104-51-8 | n-Butylbenzene | | < 0.5 ug/l | 0.5 |
| | 135-98-8 | sec-Butylbenzene | | < 0.5 ug/l | 0.5 |
| | 98-06-6 | tert-Butylbenzene | | < 0.5 ug/l | 0.5 |
| | 56-23-5 | Carbon tetrachloride | | < 0.5 ug/l | 0.5 |
| | 108-90-7 | Chlorobenzene | | < 0.5 ug/l | 0.5 |
| | 75-00-3 | Chloroethane | | < 0.5 ug/l | 0.5 |
| | 67-66-3 | Chloroform | | < 0.5 ug/l | 0.5 |
| | 74-87-3 | Chloromethane | | < 0.5 ug/l | 0.5 |
| | 95-49-8 | 2-Chlorotoluene | | < 0.5 ug/l | 0.5 |
| | 106-43-4 | 4-Chlorotoluene | | < 0.5 ug/l | 0.5 |
| | 96-12-8 | 1,2-Dibromo-3-chloropropane | | < 0.5 ug/l | 0.5 |
| | 124-48-1 | Dibromochloromethane | | < 0.5 ug/l | 0.5 |
| | 106-93-4 | 1,2-Dibromoethane (EDB) | | < 0.5 ug/l | 0.5 |
| | 74-95-3 | Dibromomethane | | < 0.5 ug/l | 0.5 |
| | 95-50-1 | 1,2-Dichlorobenzene | | < 0.5 ug/l | 0.5 |

**Your Sample ID:** 0005-04716-001

*Lab Number MEL00-08449*



**ATEL**

Aqua Tech Environmental Laboratories, Inc.

## - CERTIFICATE OF ANALYSIS -

| CAS Number | Parameter | Result | Typical Report Limit |
|---|---|---|---|
| 541-73-1 | 1,3-Dichlorobenzene | < 0.5 ug/l | 0.5 |
| 106-46-7 | 1,4-Dichlorobenzene | < 0.5 ug/l | 0.5 |
| 75-71-8 | Dichlorodifluoromethane | < 0.5 ug/l | 0.5 |
| 75-34-3 | 1,1-Dichloroethane | < 0.5 ug/l | 0.5 |
| 107-06-2 | 1,2-Dichloroethane | < 0.5 ug/l | 0.5 |
| 75-35-4 | 1,1-Dichloroethene | < 0.5 ug/l | 0.5 |
| 156-59-2 | cis-1,2-Dichloroethene | < 0.5 ug/l | 0.5 |
| 156-60-5 | trans-1,2-Dichloroethene | < 0.5 ug/l | 0.5 |
| 78-87-5 | 1,2-Dichloropropane | < 0.5 ug/l | 0.5 |
| 142-28-9 | 1,3-Dichloropropane | < 0.5 ug/l | 0.5 |
| 594-20-7 | 2,2-Dichloropropane | < 0.5 ug/l | 0.5 |
| 563-58-6 | 1,1-Dichloropropene | < 0.5 ug/l | 0.5 |
|  | 1,3-Dichloropropene (cis&trans) | < 0.5 ug/l | 0.5 |
| 100-41-4 | Ethylbenzene | < 0.5 ug/l | 0.5 |
| 87-68-3 | Hexachlorobutadiene | < 0.5 ug/l | 0.5 |
| 98-82-8 | Isopropylbenzene | < 0.5 ug/l | 0.5 |
| 99-87-6 | p-Isopropyltoluene | < 0.5 ug/l | 0.5 |
| 75-09-2 | Methylene chloride | < 0.5 ug/l | 0.5 |
| 91-20-3 | Naphthalene | < 0.5 ug/l | 0.5 |
| 103-65-1 | n-Propylbenzene | < 0.5 ug/l | 0.5 |
| 100-42-5 | Styrene | < 0.5 ug/l | 0.5 |
| 630-20-6 | 1,1,1,2-Tetrachloroethane | < 0.5 ug/l | 0.5 |
| 79-34-5 | 1,1,2,2-Tetrachloroethane | < 0.5 ug/l | 0.5 |
| 127-18-4 | Tetrachloroethene | < 0.5 ug/l | 0.5 |
| 106-88-3 | Toluene | < 0.5 ug/l | 0.5 |
| 87-61-6 | 1,2,3-Trichlorobenzene | < 0.5 ug/l | 0.5 |
| 120-82-1 | 1,2,4-Trichlorobenzene | < 0.5 ug/l | 0.5 |
| 71-55-6 | 1,1,1-Trichloroethane | < 0.5 ug/l | 0.5 |
| 79-00-5 | 1,1,2-Trichloroethane | < 0.5 ug/l | 0.5 |
| 79-01-6 | Trichloroethene | < 0.5 ug/l | 0.5 |
| 75-69-4 | Trichlorofluoromethane | < 0.5 ug/l | 0.5 |
| 95-63-6 | 1,2,4-Trimethylbenzene | < 0.5 ug/l | 0.5 |
| 108-67-8 | 1,3,5-Trimethylbenzene | < 0.5 ug/l | 0.5 |
| 96-18-4 | 1,2,3-Trichloropropane | < 0.5 ug/l | 0.5 |
| 75-01-4 | Vinyl chloride | < 0.5 ug/l | 0.5 |
| 95-47-6 | o-Xylene | < 0.5 ug/l | 0.5 |
| 108383/106 | m&p Xylenes | < 0.5 ug/l | 0.5 |
| 1634-04-4 | Methyl-tert-butylether | < 5.0 ug/l | 5 |

Your Sample ID: 0005-04716-001                                 *Lab Number MEL00-08449*

8878 S. STATE ROUTE 100 • P.O. BOX 76 • MELMORE, OH 44845-9999
PHONE 419-397-2659 • 1-800-858-8869 • FAX 419-397-2229



**ATEL**

Aqua Tech Environmental Laboratories, Inc.

## - CERTIFICATE OF ANALYSIS -

### --- Surrogate Recoveries ---

| QC Lab# | EPA Method | Surrogate Name | Percent Recovery | Lower Limit | Upper Limit |
|---------|-----------|----------------|------------------|-------------|-------------|
| MEL00-08449 | 524.2 | 1,2-Dichlorobenzene-d4 (Surr) | 115 %R | 70 | 130 |
| MEL00-08449 | 524.2 | Bromofluorobenzene (BFB) (Surr) | 117 %R | 70 | 130 |

*End of Report*

Report Approved By:  *Karen J. Plott*

Karen J. Plott

*This report shall not be reproduced, except in its entirety, without the written approval of the laboratory.*



**ATEL**

*Aqua Tech Environmental Laboratories, Inc.*

## - CERTIFICATE OF ANALYSIS -

| | |
|---|---|
| **Client #:** I1097 | **Report Date:** *12-Jun-00* |

Bolin Laboratories Inc

17631 N 25th Ave

Phoenix, AZ 85023

**Attn:** Celeste Washington

**Phone:** (602) 942-8220   **Ext:**
**FAX:** (602) 942-1050

| | | | |
|---|---|---|---|
| **Our Lab#:** MEL00-08195 | **Your Sample ID:** 0005-04716-001 | | |
| **Date Logged In:** 5/31/00 | **Sample Source:** SDWA/WTP's | | |
| **Sample Type:** Water | **Client Project #:** | | |
| **Project #:** | **Date Submitted to Lab:** 5/31/2000 | **PO#:** 00-0911-SM |

### - COLLECTION INFORMATION -

**Date/Time/By:**   5/25/00   1:00 PM

| EPA Method | Analyst | Prep Date | Analysis Date |
|---|---|---|---|
| 508 | SH | 6/1/00 | 6/2/00 |

| CAS Number | Parameter | Result | Typical Report Limit |
|---|---|---|---|
| 309-00-2 | Aldrin | < 0.02 ug/l | 0.02 |
| 58-89-9 | gamma-BHC (Lindane) | < 0.02 ug/l | 0.02 |
| 57-74-9 | Chlordane(Total) | < 0.10 ug/l | 0.1 |
| 60-57-1 | Dieldrin | < 0.02 ug/l | 0.02 |
| 72-20-8 | Endrin | < 0.01 ug/l | 0.01 |
| 76-44-8 | Heptachlor | < 0.03 ug/l | 0.03 |
| 1024-57-3 | Heptachlor epoxide | < 0.02 ug/l | 0.02 |
| 118-74-1 | Hexachlorobenzene | < 0.10 ug/l | 0.1 |
| 77-47-4 | Hexachlorocyclopentadiene | < 0.10 ug/l | 0.1 |
| 72-43-5 | Methoxychlor | < 0.03 ug/l | 0.03 |
| 1918-16-7 | Propachlor | < 0.05 ug/l | 0.05 |
| 8001-35-2 | Toxaphene | < 0.10 ug/l | 0.1 |
| 12674-11-2 | Aroclor 1016 | < 0.08 ug/l | 0.08 |
| 11104-28-2 | Aroclor 1221 | < 0.10 ug/l | 0.1 |
| 11141-16-5 | Aroclor 1232 | < 0.10 ug/l | 0.1 |
| 53469-21-9 | Aroclor 1242 | < 0.10 ug/l | 0.1 |
| 12672-29-6 | Aroclor 1248 | < 0.10 ug/l | 0.1 |
| 11097-69-1 | Aroclor 1254 | < 0.10 ug/l | 0.1 |
| 11096-82-5 | Aroclor 1260 | < 0.10 ug/l | 0.1 |

**Your Sample ID:** 0005-04716-001

*Lab Number MEL00-08195*



**ATEL**

*Aqua Tech Environmental Laboratories, Inc.*

## - CERTIFICATE OF ANALYSIS -

| EPA Method | Analyst | Prep Date | Analysis Date |
|---|---|---|---|
| 515.1 | DAW | 5/31/00 | 6/6/00 |

| CAS Number | Parameter | Result | Typical Report Limit |
|---|---|---|---|
| 75-99-0 | Dalapon | < 1.0 ug/l | 1 |
| 1918-00-9 | Dicamba | < 0.50 ug/l | 0.5 |
| 94-75-7 | 2,4-Dichlorophenoxyacetic acid (2,4-D) | < 0.10 ug/l | 0.1 |
| 88-85-7 | Dinoseb | < 0.20 ug/l | 0.2 |
| 87-86-5 | Pentachlorophenol | < 0.04 ug/l | 0.04 |
| 1918-02-1 | Picloram | < 0.10 ug/l | 0.1 |
| 93-72-1 | Silvex | < 0.20 ug/l | 0.2 |

### --- Surrogate Recoveries ---

| QC Lab# | EPA Method | Surrogate Name | Percent Recovery | Lower Limit | Upper Limit |
|---|---|---|---|---|---|
| MEL00-08195 | 508 | Decachlorobiphenyl (Surr) | 78 %R | 70 | 130 |
| MEL00-08195 | 508 | Tetrachloro-m-xylene (Surr) | 103 %R | 70 | 130 |
| MEL00-08195 | 515.1 | DCAA (Surr) | 79 %R | 70 | 130 |

*End of Report*

Report Approved By: *Karen J Plott*

Karen J. Plott

*This report shall not be reproduced, except in its entirety, without the written approval of the laboratory.*





Pace AnalyticalServices, Inc.
1700 Elm Street - Suite 200
Minneapolis, MN 55414

Tel: 612-607-1700
Fax: 612-607-6444

### Drinking Water Analysis Results
### 2,3,7,8-TCDD -- USEPA Method 1613

Sample ID................0005-04716-001
Client...........................Bolin Laboratories
Lab Sample ID...........2059532

Date Collected............05/25/2000
Date Received............05/31/2000
Date Extracted............06/01/1999

| | Sample 0005-04716-001 | Method Blank | Lab Spike | Lab Spike Dup |
|---|---|---|---|---|
| [2,3,7,8-TCDD] | **ND** | ND | -- | -- |
| PRL | 5 pg/L | 5 pg/L | -- | -- |
| Spike Recovery | -- | -- | 104% | 108% |
| Spike Recovery Limit | -- | -- | 73-146% | 73-146% |
| RPD | | | | -3.4% |
| IS Recovery | **100%** | 89% | 90% | 91% |
| IS Recovery Limits | 31-137% | 31-137% | 25-141% | 25-141% |
| CS Recovery | **101%** | 101% | 102% | 105% |
| CS Recovery Limits | 42-164% | 42-164% | 37-158% | 37-158% |
| Filename | A00607E_1 | A00605J_13 | A00605J_10 | A00605J_11 |
| Analysis Date | 06/07/2000 | 06/05/2000 | 06/05/2000 | 06/05/2000 |
| Analysis Time | 11:20 | 22:41 | 20:53 | 21:29 |
| Analyst | MASB | MASB | MASB | MASB |
| Volume | 1.000L | 1.004L | 1.014L | 1.047L |
| Dilution | NA | NA | NA | NA |
| ICAL Date | 05/23/2000 | 05/23/2000 | 05/23/2000 | 05/23/2000 |
| CCAL Filename | A00607A_1 | A00605J_8 | A00605J_8 | A00605J_8 |

| | |
|---|---|
| ! | = Outside the Control Limits |
| ND | = Not Detected |
| PRL | = Pace Reporting Limit |
| Limits | = Control Limits from Method 1613 (10/94 Revision), Tables 6A and 7A |
| RPD | = Relative Percent Difference of Lab Spike Recoveries |
| IS | = Internal Standard |
| CS | = Cleanup Standard |

Project No..............00-1033174



Manura ✓

## Determination of Asbestos in Water using TEM

| JobNumber: | 2000-2558 |
|---|---|

Client:

**BOLIN LABORATORIES INC**

17631 N 25TH AVE

PHOENIX, AZ       85023-0000
Office Phone:   (602) 942-8220
FAX:        (602) 942-1050

# Samples:  2   TEM   Rec: 5/26/00   Method: EPA 100.1        TEM Water
Client Job: 0005-04715, 04716      PO Number: 00-0906-SM      Routing Number: ·
Date Analyzed:   6/7/00

**Method and Analysis Information:**

Samples are analyzed using the protocols given in EPA method 100.1, as amended by the 1993 EPA guidance. Samples should be un-preserved water in 1 L containers having about 200 ml headspace for shaking. There is a 48 hr deadline between the time the sample is taken and the time it is filtered to minimize loss of asbestos fibers due to biological interference. Each sample is shook for 1 minute, and ultrasonicated for at least 10 minutes, shaking every 5 minutes to disperse any fibers that are present. A measured amount of sample is then filtered through a 0.1 um pore size polycarbonate filter, backed by a 5 um pore size MCE filter QC a glass frit. Several volumes of liquid may be filtered for each sample in order to assure that a properly loaded sample is obtained. A portion of each resulting filter (and blanks) is then coated with 100-200 um of carbon in a Denton 502A Carbon Evaporator. The carbon encapsulates all of the larger and most of the smaller particulate on the filter. Three mm square pieces of the coated filter are placed on three or more copper TEM grids, and the original filter material is dissolved away in a Jaffe wick and/or condensation washer. The finished replica in carbon containing the particulate is then examined on a Phillips 300 transmission electrom microscope at 10,000 to 20,000x magnification. All asbestos fibers >10um in length are tabulated and characterized as asbestos or non-asbestos using a combination of morphology, electron diffraction characteristics, and elemental composition. The result is calculated in millions of fibers per liter (MFL). The grid is scanned until 20 grid openings have been observed, or until an analytical sensitivity (the hypothetical observation of one fiber) of 0.2 MFL has been reached. The nominal 20 grid opening cut-off is used for those samples containing so much non-asbestos particulate that the desired analytical sensitivity is impractical to attain.

The method was designed to determine EPA drinking water compliance. The standard for drinking water is <7 MFL as measured by this method.

Overall, the coefficient of variation can be expected to be approximately 0.5 for analyses in which >20 asbestos fibers have been counted, ranging up to 1.00 for analyses in which only a few asbestos fibers are counted.

The analysis was performed under an ongoing quality assurance program which includes: Lab blanks, prepared with each set of samples, and analyzed at the rate of one per 25 samples analyzed. Each analyst has suitable background credentials, such as at least a bachelor's degree in geology or chemistry, and has undergone extensive 2-6 month training in TEM techniques and mineralogy specific to TEM asbestos analysis before being allowed to perform client analyses. Unknown reference samples are routinely identified to ensure that each analyst can collect and correctly interpret TEM information. The TEM is aligned and its performance checked daily. Magnification, electron diffraction pattern size, and analytical performance characteristics are calibrated routinely. Samples are re-analyzed sometimes by the same analyst and sometimes by a different analyst in order to determine accuracy and precision. The total of QC analyses (blanks + recounts) are greater than 10% of analyzed samples. Each analyst participates in interlab round robins and proficiency testing in order to show correlation to other lab's analyses. Because TEM samples are not analyzed in batches, which would be traditional for most water analyses, and not every blank is read, and not every sample has a duplicate or replicate analysis associated with it, it is not possible to include a traditional QC report with the analysis. QC reports are produced monthly, and are available on request. Fiberquant is accredited by NVLAP to perform TEM analysis of asbestos in air samples, and has been found to be proficient in the EPA water proficiency program. Accreditation or proficiency does not imply endorsement by the EPA, any other United States governmental agency or any private agency or association. Each lab analysis refers only to the sample tested, and may not, due to the sampling process, be representative of the material sampled. This report may not be reproduced except in full and with the approval of Fiberquant Analytical Services.

**Job Analysis Notes:**

| | Date | Time |
|---|---|---|
| Received: | 5/26/00 | 12:20 |
| Filtered: | 5/26/00 | 18:10 |
| Analyzed: | 6/7/00 | 19:10 |

**Analysis Results:**

| Lab Number | Client Number | Date | Filtered Vol (ml) | #GOs | GO Area | MFL | AsbestosType | Sensitivity (MFL) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Job Number: | 2000-2558 |
| 2000-2558- 1 | 0005-04715-001 | 5/25/00 | 90 | 5 | 0.00967 | <.2 | - | .2 |
| 2000-2558- 2 | 0005-04716-001 | 5/25/00 | 20 | 20 | 0.00967 | <.2 | - | .2 |

07-Jun-00

Analyst:  DAVID M. SCHALLER

Larry S. Pierce, Approved Accreditation Signatory

| Job Number: | 2000-2558 |
|---|---|

| QA Report: | Job Number: | 2000-2558 |
|---|---|---|

| 1. Calibrations | |
|---|---|
| TEM magnification, date of last. | 6/4/00 |
| TEM camera constant, date of last. | 6/31/00 |
| EDS performance check (k-factors, resolution, low-a perf.), date of last. | 1/20/00 |
| TEM stage drift, minimum beam size, date of last. | 1/20/00 |
| plasma asher, date of last. | 6/19/00 |

| 2. Blanks (1/25 samples required) | X | not required this job | str/mm2 |
|---|---|---|---|

| 3. Recounts (1/17 samples required) | X | not required this job | Rel %Diff |
|---|---|---|---|

| 4. Analyst Performance | |
|---|---|
| NVLAP proficiency testing | X   current |
| verified counts, cum. % true positives | 89.3 |
| verification of diffraction pattern identifications, cum. % correct | 99.5 |
| verification of EDS spectra, cum. % correct | 94.9 |

5025 S. 33rd Street     Phoenix, Arizona     85040-2816     Phone: 602-276-6139     1-800-743-2687     FAX: 602-276-4558

Fiberquant, Inc.



# Bolin Laboratories Inc.

❏ 17631 N. 25th Ave Phoenix AZ 85023
(602) 942-8220 • Fax (602) 942-1050

❏ 4837 East Fifth Street, Suite 103, Tucson AZ 85711
(520) 327-1234 • Fax (520) 327-0513

Page _____ of _____



## DRINKING WATER CHAIN OF CUSTODY RECORD

**Laboratory Sample No.**
0005-04716

**Please Print Clearly**

### CLIENT INFORMATION

| Client Name | Address | City | State | Zip | Phone | Fax |
|---|---|---|---|---|---|---|
| MANERO INC. | 8316 N 53RD ST | PARADISE VLY | AZ | 85253 | 480 948-9118 | 480 596-8776 |

| System Name | PWS# | Contact | P.O. No. | Fax Results ☑ | QC Report ❏ |
|---|---|---|---|---|---|
| MCEDC BIG SANDY | | PAUL MANERO | | NO 4/150 | |

### IOC OPTIONS

IOC's I: Sb, As, Ba, Be, Cd, Cr, Hg, Ni, Se, Tl, Cn, F

IOC's II (New Source): Sb, As, Ba, Be, Ca, Cd, Cr, Cu, Pb, Hg,
Mg, Ni, Se, Na, Tl, Ca Hardness, Total Hardness, Alk, Asbestos, Cn,
F, Langelier, NO₂, NO₃, pH, SO₄, TDS, Temp (in field)   96 °F

### REQUESTED ANALYSIS

SOC's

| Client's Sample Identification | Date | Time | POE # / DWR # | Compliance | No. of Containers | pH ✓ (Bolin Use Only) | Coliform | IOC's (see left) | IOC's II (see left) | Asbestos | Lead/Copper | Nitrate (NO₃) | Nitrite (NO₂) | Radiochemical | Sodium (Na) | Sulfate (SO₄) | 524 (TTHM) | 524 (VOC's) | 504 | 508 | 515 | 525 | 547 | 548 | 549 | 1613 (Dioxin) | 508A (PCB Detects) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Sandy 4B DS(5-25)7800 DRLP MONITER | 3/25 | 13:00 | | | | ✓ | | ✗ | | | | ✗ | | | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | | ✗ | | -01 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | -02 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**PLEASE INDICATE IF BOLIN SHOULD COMPOSITE SAMPLES.**

**Comments:** NEW SOURCE APPROVAL

~40+ Dissolved in the field
resample - not till Paul 596 5a

### TURN AROUND TIME

❏ Standard 10 - 15 Day
❏ Other _____

★ Laboratory Authorization Required for Rush ★

### SAMPLE CONDITION UPON RECEIPT

| No. of Containers | 3 |
|---|---|
| Temperature | 2 C |
| Custody Seals | Y  Ⓝ |
| Seals Intact | Y  N |
| Preserved | Ⓨ  N |

### RELINQUISHED BY / RECEIVED BY

| | Signature | Date 5-25-00 | Signature | Date 5/25/00 |
|---|---|---|---|---|
| ① | Sampler Printed Name PAUL S. MANERO | Time 13:30 | Printed Name WW SWANSON | Time 1730 |
| ② | Signature | Date | Signature | Date |
| | Printed Name | Time | Printed Name | Time |
| ③ | Signature | Date | Signature | Date |
| | Printed Name | Time | Printed Name | Time |

WHITE-LAB    YELLOW-LAB    PINK-CLIENT



### B O L I N
**L A B O R A T O R I E S · I N C**
*Legend Technical Services of Arizona*

17631 N. 25th Avenue ■ Phoenix, Arizona ■ 85023 ■ (602) 942-8220 ■ fax (602) 942-1050 ■ ADHS# AZ0004

| | |
|---|---|
| Manera Inc. | Received: 7/21/00 |
| 8316 N. 53rd Street | Reported: 8/08/00 |
| Paradise Valley, AZ 85253-2512 | Invoice No: 067337 |

Attn:  Paul A. Manera

Project Name:     Manera Inc.

| PARAMETER | METHOD | RESULTS | UNITS | PQL | DATE ANALYZED |
|---|---|---|---|---|---|
| Matrix: | Groundwater | | | | |
| Sample No: | 0007-06417-001 | | Time Sampled: 9:15 | | |
| Sample ID: | Big Sandy 4BMO4 B(15-12)7 bdd | | Date Sampled: 7/21/2000 | | |
| pH | EPA 150.1 | 7.6 | Std Unit | | 7/24/00 |
| Conductivity | SM 2510B | 1320. | umhos/cm | 10. | 7/26/00 |
| Total Dissolved Solids | SM 2540C | 684. | mg/L | | 7/27/00 |
| Solids, Total Suspended | EPA 160.2 | <1. | mg/L | | 7/25/00 |
| Calc. Bicarbonate (CaCO3) | SM 2320B | 244. | mg/L | | 7/25/00 |
| Total Alkalinity (as CaCO3) | SM 2320B | 244. | mg/L | 2. | 7/25/00 |
| Calc. Carbonate (CaCO3) | SM 2320B | 0.0 | mg/L | | 7/25/00 |
| Nitrogen as Nitrite | SM4500 NO2B | <0.1 | mg/L | 0.1 | 7/21/00 |
| Nitrate plus Nitrite | SM 4500-NO3 F | 1.2 | mg/L | 0.1 | 7/24/00 |
| Nitrogen as Nitrate | CALC. | 1.2 | mg/L | | 7/21/00 |
| Hydroxide Calculation | SM 2320B | 0.0 | mg/L | | 7/25/00 |
| Total Phosphorous as P | EPA 365.3 | 0.06 | mg/L | 0.05 | 7/26/00 |
| Total Phosphate | CALCULATION | 0.2 | mg/L | 0.15 | 7/26/00 |
| Alkalinity, Phenolphthalein | SM 2320B | 0.0 | mg/L | | 7/25/00 |
| Nitrogen, Total | CALCULATION | 1.82 | mg/L | | 7/31/00 |
| Fluoride | SM 4500-F C | 3.7 | mg/L | 0.1 | 7/28/00 |
| Silica Dioxide | CALCULATION | 10 | mg/L | 0.02 | 8/01/00 |
| Nitrogen as Ammonia | EPA 350.1 | 0.14 | mg/L | 0.1 | 7/25/00 |
| Total Kjeldahl Nitrogen | EPA 351.3 | 0.62 | mg/L | 0.03 | 7/25/00 |
| Metals Digestion for ICP | EPA 200.7 | | | | |
| Metals Digestion for GFAA | SM 3030E | | | | |
| Aluminum | EPA 200.7 | <0.5 | mg/L | 0.5 | 7/27/00 |
| Barium | EPA 200.7 | 0.06 | mg/L | 0.01 | 7/27/00 |
| Boron | EPA 200.7 | 1.08 | mg/L | 0.01 | 7/27/00 |
| Cadmium | EPA 200.7 | <0.002 | mg/L | 0.002 | 7/27/00 |
| Calcium | EPA 200.7 | 55 | mg/L | 0.01 | 7/27/00 |
| Chromium | EPA 200.7 | <0.01 | mg/L | 0.01 | 7/27/00 |
| Copper | EPA 200.7 | <0.01 | mg/L | 0.01 | 7/27/00 |
| Iron | EPA 200.7 | 0.82 | mg/L | 0.01 | 7/27/00 |
| Magnesium | EPA 200.7 | 16 | mg/L | 0.01 | 7/27/00 |
| Nickel | EPA 200.7 | <0.01 | mg/L | 0.01 | 7/27/00 |
| Potassium | EPA 200.7 | 8.8 | mg/L | 0.1 | 7/27/00 |



**BOLIN**
**LABORATORIES·INC**
*Legend Technical Services of Arizona*

17631 N. 25th Avenue ▪ Phoenix, Arizona ▪ 85023 ▪ (602) 942-8220 ▪ fax (602) 942-1050 ▪ ADHS# AZ0004

| PARAMETER | METHOD | RESULTS | UNITS | PQL | DATE ANALYZED |
|---|---|---|---|---|---|
| Matrix: | Groundwater | | | | |
| Sample No: | 0007-06417-001 | | Time Sampled: 9:15 | | |
| Sample ID: | Big Sandy 4BMO4 B(15-12)7 bdd | | Date Sampled: 7/21/2000 | | |
| Silica | EPA 200.7 | 19 | mg/L | 0.05 | 7/31/00 |
| Sodium | EPA 200.7 | 232 | mg/L | 1 | 7/31/00 |
| Strontium | EPA 200.7 | <0.01 | mg/L | 0.01 | 7/31/00 |
| Zinc | EPA 200.7 | 0.05 | mg/L | 0.01 | 7/27/00 |
| Arsenic | SM 3113 B | 0.08 | mg/L | 0.03 | 7/27/00 |
| Lead | SM 3113B | 0.03 | mg/L | 0.03 | 7/27/00 |
| Selenium | SM 3113B | <0.02 | mg/L | 0.02 | 7/27/00 |
| Tin | EPA 200.7 | <0.02 | mg/L | 0.02 | 7/27/00 |
| Mercury | EPA 245.1 | <0.0002 | mg/L | 0.0002 | 7/27/00 |

Metals, Reactive Silica, Ammonia and TKN were analyzed by Aquatic Consulting, Tempe AZ. #AZ0003.

*Melissa Cram*

Authorized Signatory



**BOLIN** LABORATORIES · INC

□ 17631 N. 25th Ave. Phoenix AZ 85023
(602) 942-8220 · Fax(602) 942-1059

□ 4837 East Fifth Street, Suite 103, Tucson AZ
(520) 327-1234 · Fax(520) 327-0518



# CHAIN OF CUSTODY RECORD

*Please Print Clearly*

Page _____ of _____

Laboratory Sample No. __6067-+ 006417__

**CLIENT INFORMATION**

| Client Name | Address | City | State | Zip | Phone | Fax |
|---|---|---|---|---|---|---|
| MANERA INC. | 8316 N 53RD ST. | Paradise Valley | AZ | 85253 | 480-948-9816 | 480-596-8726 |

| Project Name | Project Number | Contact | P.O. No. | Fax Result □ QC Report □ | Special Detection Limits □ |
|---|---|---|---|---|---|
| Cattness Big Sandy | | Paul Manera | | | |

**SAMPLE TYPE CODES**

DW=Drinking Water    S=Soil/Solid
WW=Wastewater    T=Travel Blank
SW=Surface Water    F=Food
GW=Groundwater    G=Sludge
O=Other

**TURN AROUND TIME**

□ Standard 10 - 15 Day
□ Other _____

**Laboratory Authorization
Required for Rush**

★ ★

**REQUESTED ANALYSES**

| Client's Sample Identification | Date | Time | Sample Location | Composite | Grab | Sample Type | Compliance | No. of Containers | pH ✓ (Bolin Use Only) | NTU x | pH | Turb. | Bicarb Ca/A | AVR 102 Nitrate | NH3 TKN | Alk P/Alk | NH3 TKN | F | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Sandy, 4B 2404 | 7-21-09 | 0915 | B(15-12) 7 BDD | | | | | | | X | X | X | X | X | X | X | X | X | X | | | | − | OUT |
| B(15-12) 7 bdd | | | | | | | | | | | | | | | | | | | | | | | | |

**TO ENSURE COMPLETION OF ANALYSIS SAMPLER MUST BE RECEIVED AT LEAST 3 HOURS PRIOR TO THE HOLD TIME EXPIRATION**

Comments / Special Instructions: ★ Ca, Mg, Na, K, # Si, SiO₂, Fe, Al, As, Ba, B, Cd, Cu, Cr, Pb, Hg, Ni, Se, Sr, Tin, Tin
2n

(left margin, vertical) Ion Results

| **SAMPLER CONDITION UPON RECEIPT** | | **RELINQUISHED BY** | | **SAMPLES RECEIVED BY** | |
|---|---|---|---|---|---|
| No. of Containers | 4 | Signature: P. J. Manera | Date: 7-21-09 | Signature: | Date: 7/21/0 |
| Temperature | 16.5 ℃ | Sampler Printed Name: PAUL J. MANERA | Time: 9:25 PM | Printed Name: Tonight Miranda | Time: 14:25 |
| Custody Seals | Y (N) | Signature: | Date: | Signature: | Date: |
| Seals Intact | (Y) N | Printed Name: | Time: | Printed Name: | Time: |
| Preserved | (Y) N | Signature: | Date: | Signature: | Date: |
| | | Printed Name: | Time: | Printed Name: | Time: |

WHITE-LAB    YELLOW-LAB    PINK-CLIENT



**BOLIN** LABORATORIES · INC

□ 11601 N. 26th Ave. Phoenix AZ 85029
(602) 942-8220 · Fax(602) 942-1059

□ 4837 East Fifth Street, Suite 103, Tucson AZ 857~
(520) 327-1234 · Fax(520) 327-0518

# CHAIN OF CUSTODY RECORD

*Please Print Clearly*

Page_____ of_____

Laboratory Sample No.
1007 - 7 047

## CLIENT INFORMATION

| Client Name | Address | City | State | Zip | Phone | Fax |
|---|---|---|---|---|---|---|
| MANERA INC. | 8516 N 53RD ST | Prescott Valley | AZ | 85253 | 480-948-9818 | 480-596-8728 |

| Project Name | Project Number | Contact | P.O. No. | Fax Results □ | QC Report □ | Special Detection Limits □ |
|---|---|---|---|---|---|---|
| Carlness Big Sandy | | Paul Manera | | Fax (w/a) | | |

## SAMPLE TYPE CODES

DW=Drinking Water  S=Soil/Solid
WW=Wastewater  T=Travel Blank
SW=Surface Water  F=Food
GW=Groundwater  G=Sludge
O=Other _____

## TURN AROUND TIME

□ Standard 10 - 15 Day
□ Other _____

★ **Laboratory Authorization Required for Rush** ★

| Client's Sample Identification | Date | Time | Sample Location | Composite | Grab | Sample Type | Compliance | No. of Containers | pH √ (Bolin Use Only) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Sandy #5 M04 | 2-2-09 | 4:15 | B(15-12)7BDD | | | | | | | X | X | X | X | X | X | X | X | X | X | |
| B(15-12)7bdd | | | | | | | | | | | | | | | | | | | | |

**Comments / Special Instructions:** TK, Mg, Na, K, pH, SPD, TDS, Fe, Al, As, Ba, B, Cd, Cu, Cr, Pb, Hg, Ni, Se, Sb, Th, Tl, Zn

**TO ENSURE COMPLETION OF ANALYSIS, SAMPLES MUST BE RECEIVED AT LEAST 3 HOURS PRIOR TO THE HOLD TIME EXPIRATION**

## SAMPLE CONDITION UPON RECEIPT

| No. of Containers | 4 |
|---|---|
| Temperature | |
| Custody Seals | Y / N |
| Seals Intact | Y / N |
| Preserved | (Y) / N |

WHITE-LAB   YELLOW-LAB   PINK-CLIENT

① Signature [signed] Date 2-2-09  | Signature [signed] Date 7/31/9
Sampler Printed Name Paul S. Manera Time 2:25 PM | Printed Name Time 4:22

② Signature | Date | Signature | Date
Printed Name | Time | Printed Name | Time

③ Signature | Date | Signature | Date
Printed Name | Time | Printed Name | Time



**BOLIN**
LABORATORIES•INC
*Legend Technical Services of Arizona*

17631 N. 25th Avenue ▪ Phoenix, Arizona ▪ 85023 ▪ (602) 942-8220 ▪ fax (602) 942-1050 ▪ ADHS# AZ0004

| | |
|---|---|
| Manera Inc. | Received:    7/24/00 |
| 8316 N. 53rd Street | Reported:    8/30/00 |
| Paradise Valley, AZ 85253-2512 | Invoice No:   068160 |

Attn:  Paul A. Manera

Project Name:    Manera Inc.

| PARAMETER | METHOD | RESULTS | UNITS | PQL | DATE ANALYZED |
|---|---|---|---|---|---|
| Matrix: | Groundwater | | | | |
| Sample No: | 0007-06444-001 | | Time Sampled: 12:45 | | |
| Sample ID: | Big Sandy MD4 BC(15-13) 7bdd | | Date Sampled: 7/24/2000 | | |
| | | | | | |
| Sulfate | EPA 375.4 | 180. | mg/L | 25 | 7/27/00 |
| Chloride | SM 4500-CL B | 189. | mg/L | 5.0 | 7/25/00 |
| Carbon Dioxide | SM4500 CO2 | 4. | mg/L | 2 | 7/25/00 |
| Silt Density Index | DuPont 491 | 82 | | | 8/22/00 |
| Turbidity | EPA 180.1 | 5.3 | N.T.U. | 1.0 | 7/25/00 |
| Biochemical Oxygen Demand | EPA 405.1 | 2. F | mg/L | | 7/24/00 |
| Total Organic Carbon | SM 5310C | <1.0 | mg/L | 1.0 | 7/25/00 |
| Cyanide, Total | SM4500 CNE | <0.01 | mg/L | 0.01 | 7/26/00 |
| Coliform, Fecal (MF) | SM 9222D | <10 | CFU/100mL | 10 | 7/24/00 |
| Chromium, hexavalent | SM 3500-CR D | <0.015 | mg/L | 0.015 | 7/24/00 |
| Phenolics, Total | EPA 420.1 | <0.0050 S | mg/L | 0.0050 | 7/28/00 |

S = Spike or surrogate recovery outside acceptance criteria.  Blank spike recovery was acceptable.
F = The oxygen depletion for the BOD seed was outside laboratory acceptance criteria.  The associated GGA check standard was acceptable.
Total Recoverable Phenolics analyzed by Transwest Geochem, Phoenix AZ, #AZ0133.
Carbon Dioxide and Silt Density Index analyzed by Aquatic Consulting, Tempe AZ. #AZ0003.

*[signature]*

Authorized Signatory



**BOLIN** LABORATORIES · INC

☐ 17631 N. 25th Ave. Phoenix AZ 85023
   (602) 942-8210 • Fax(602) 942-1059

☐ 4837 East Fifth Street, Suite 103, Tucson AZ 85711
   (520) 327-1234 • Fax(520) 327-0518

# CHAIN OF CUSTODY RECORD

*Please Print Clearly*

Page ___1___ of ___1___

Laboratory Sample No. 0507-02644

| Client Name | Address | City | State | Zip | Phone | Fax |
|---|---|---|---|---|---|---|
| MANERO INC. | 8316 N 53RD ST | Paradise Valley | AZ | 85253 | 480-948-9818 | 480-596-8776 |

| Project Name | Project Number | Contact | P.O. No. | Fax Results ☑ QC Report ☐ Special Detection Limits ☐ |
|---|---|---|---|---|
| CATNESS BIG SANDY | | Paul MANERO | | Aug 9/10 |

**SAMPLE TYPE CODES**
DW=Drinking Water    S=Soil/Solid
WW=Wastewater    T=Travel Blank
SW=Surface Water    F=Food
GW=Groundwater    G=Sludge
O=Other

**TURNAROUND TIME**
☐ Standard 10 -15 Day
☐ Other _____

**Laboratory Authorization Required for Rush**
★ ★

| Client's Sample Identification | Date | Time | Sample Location | Composite | Grab | Sample Type | Compliance | No. of Containers | pH (Bolin Use Only) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Sandy MD 4 BC15-13 7bdd | 7-27-09 | 12:45 | | | | | | | | | | | | | | | | | (1) |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |

TO ENSURE COMPLETION OF ANALYSIS, SAMPLES MUST BE RECEIVED AT LEAST 3 HOURS PRIOR TO THE HOLD TIME EXPIRATION

Comments / Special Instructions:

| **SAMPLE CONDITION UPON RECEIPT** | | **RELINQUISHED BY** | | | | **SAMPLES RECEIVED BY** | | |
|---|---|---|---|---|---|---|---|---|
| No. of Containers | 1 | Signature | Scott Manero | Date 7-29-09 | Signature | | Date 7-29 |
| Temperature | 24.6 | Sampler Printed Name  Paul S. MANERO | Time 15:14 | Printed Name  Monica _____ | Time 16:14 |
| Custody Seals | Y (N) | Signature | Date | Signature | Date |
| Seals Intact | Y ___ | Printed Name | Time | Printed Name | Time |
| Preserved | (Y) N | Signature | Date | Signature | Date |
| | | Printed Name | Time | Printed Name | Time |

WHITE-LAB    YELLOW-LAB    PINK-CLIENT

P.02

Zalco Laboratories, Inc.
4309 Armour Avenue
Bakersfield, CA 93308

*Handwritten:* Test Hole 1 / SW¼ Sec 36 T1LN R13 EX / Confined Water 400'-700'

GENERAL MINERAL & PHYSICAL & INORGANIC ANALYSIS (9/99)

te of Report: 00/01/21                          Sample ID No.0001181-1
boratory                                         Signature Lab
me: ZALCO LABORATORIES, INC.                     Director:
ne of Sampler:T. DeRoucher            Employed By: Coso Operating
te/Time Sample          Date/Time Sample              Date Analyses
llected:99/12/18/0900   Received @ Lab:00/01/13/1100    Completed:00/01/20

stem                                              System
me:COSO OPERATING COMPANY                         Number: 15CXX15
ne or Number of Sample Source:Well Pump Test

User ID: 15C                              Station Number:          *
Date/Time of Sample: |99|12|18|0900|      Laboratory Code: 7625 *
                YY MM DD TTTT                              YY MM DD *
                                    Date Analysis completed: |00|01|20| *
Submitted by: _____         Phone #: _____ *

| MCL | REPORTING UNITS | CHEMICAL | ENTRY # | ANALYSES RESULTS | DLR |
|-----|------|----------|---------|---------|-----|
| | mg/L | Total Hardness (as CaCO3) (mg/L) | 00900 | 140 | |
| | mg/L | Calcium (Ca) (mg/L) | 00916 | 36 | |
| | mg/L | Magnesium (Mg) (mg/L) | 00927 | 13 | |
| | mg/L | Sodium (NA) (mg/L) | 00929 | 260 | |
| | mg/L | Potassium (K) (mg/L) | 00937 | 15 | |

Total Cations          Meq/L Value: 14.55

| MCL | REPORTING UNITS | CHEMICAL | ENTRY # | ANALYSES RESULTS | DLR |
|-----|------|----------|---------|---------|-----|
| | mg/L | Total Alkalinity (AS CaCO3) (mg/L) | 00410 | 250 | |
| | mg/L | Hydroxide (OH) (mg/L) | 71830 | 0 | |
| | mg/L | Carbonate (CO3) (mg/L) | 00445 | 0 | |
| | mg/L | Bicarbonate (HCO3) (mg/L) | 00440 | 310 | |
| * | mg/L+ | Sulfate (SO4) (mg/L) | 00945 | 190 | .5 |
| * | mg/L+ | Chloride (Cl) (mg/L) | 00940 | 140 | |
| 45 | mg/L | Nitrate (as NO3) (mg/L) | 71850 | 2.4 | 2.0 |
| ** | mg/L | Fluoride (F) Temp. Depend. (mg/L) | 00951 | 3.8 | .1 |

Total Anions          Meq/L Value: 13.22

| MCL | REPORTING UNITS | CHEMICAL | ENTRY # | ANALYSES RESULTS | DLR |
|-----|------|----------|---------|---------|-----|
| | Std.Units+ | PH (Laboratory) (Std.Units) | 00403 | 8.1 | |
| *** | umho/cm+ | Specific Conductance (E.C.) (umho/cm) | 00095 | 1300 | |
| **** | mg/L+ | Total Filterable Residue@180C(TDS)(mg/L) | 70300 | 900 | |
| | Units | Apparent Color (Unfiltered) (Units) | 00081 | 40 | |
| | TON | Odor Threshold at 60 C (TON) | 00086 | < 1.0 | |
| | NTU | Lab Turbidity (NTU) | 82079 | 83 | |
| 0.5 | mg/L+ | MBAS (mg/L) | 38260 | < 0.05 | |

* 250-500-600   ** 0.6-1.7   *** 900-1600-2200   **** 500-1000-1500

INORGANIC CHEMICALS              0001181-1

| MCL | REPORTING UNITS | CHEMICAL | ENTRY # | ANALYSES RESULTS | DLR |
|---|---|---|---|---|---|
| 50 | ug/L | Arsenic (As) (ug/L) | 01002 | 31 | 2.0 |
| 1000 | ug/L+ | Copper (Cu) (ug/L) | 01042 | < 50 | 50.0 |
| 300 | ug/L+ | Iron (Fe) (ug/L) | 01045 | 27000 | 100.0 |
| 50 | ug/L+ | Manganese (Mn) (ug/L) | 01055 | 280 | 30.0 |
| 5000 | ug/L | Zinc (Zn) (ug/L) | 01092 | 290 | 50.0 |

ADDITIONAL ANALYSES

| 1000 | ug/L | Nitrite as Nitrogen (N) (ug/L) | 00620 | < 400 | 400 |

+ Indicates Secondary Drinking Water Standards

boratory comments and description of any additional components found:

sed on the above analyzed constituents the submitted water sample

. not with Title 22 specifications for safe drinking water.

e following is exceeded: Iron, Manganese, Fluoride, Color, Turbidity

Test Hole #2

# AQUATIC CONSULTING & TESTING, INC.

1525 W. University Drive, Suite 106
P.O. Box 1510
Tempe, Arizona 85281
Phone: (480) 921-8044 • FAX: (480) 921-0049

Lic. No. AZ0003

## LABORATORY REPORT

**Client:** Manera, Inc.
8316 N. 53rd St.
Paradise Valley, AZ 85253

**Date Submitted:** 1/31/00
**Date Reported:** 03/09/00

**Attn:** Paul Manera

**Sample Type:** Drinking Water
**Sample Time:** 01/28/00 17:00

**Client ID:** BS2
**ACT Lab No.:** BG00950

## RESULTS

| Parameter | Analysis Date Start | End | Method No. | Result | Unit |
|---|---|---|---|---|---|
| Alkalinity | 2/25/00 | 2/25/00 | SM 2320 | 276. | mg/L as CaCO3 |
| Chloride | 2/25/00 | 2/25/00 | 325.3 | 140. | mg/L |
| Cyanide | 2/7/00 | 2/7/00 | SM4500CN CE | <0.01 | mg/L |
| Fluoride | 2/1/00 | 2/1/00 | SM4500F C | 3.5 | mg/L |
| Silica | 2/11/00 | 2/11/00 | SM4500Si DE | 6.21 | mg/L as SiO2 |
| Sulfate | 2/28/00 | 2/28/00 | 375.4 | 212. | mg/L |
| Total Hardness | 2/25/00 | 2/25/00 | 130.2 | 182. | mg/L as CaCO3 |
| Antimony | 2/11/00 | 2/11/00 | 200.9 | <0.003 | mg/L |
| Arsenic | 2/11/00 | 2/11/00 | 200.9 | <0.005 | mg/L |
| Barium | 2/8/00 | 2/8/00 | 200.7/6010 | 0.11 | mg/L |
| Beryllium | 2/3/00 | 2/3/00 | 200.7/6010B | <0.002 | mg/L |
| Cadmium | 2/3/00 | 2/3/00 | 200.7 | <0.002 | mg/L |
| Calcium | 2/28/00 | 2/28/00 | 200.7 | 60. | mg/L |
| Chromium | 2/3/00 | 2/3/00 | 200.7 | <0.01 | mg/L |
| Copper | 2/7/00 | 2/7/00 | 200.7 | <0.01 | mg/L |
| Iron | 2/28/00 | 2/28/00 | 200.7 | 0.17 | mg/L |
| Lead | 2/25/00 | 2/25/00 | 200.9 | <0.005 | mg/L |
| Magnesium | 2/28/00 | 2/28/00 | 200.7 | 18. | mg/L |
| Manganese | 2/7/00 | 2/7/00 | 200.7 | 0.05 | mg/L |
| Mercury | 2/9/00 | 2/9/00 | 245.1 | <0.0002 | mg/L |
| Nickel | 2/3/00 | 2/3/00 | 200.7 | <0.01 | mg/L |

**Sample Type:** Drinking Water                                  **Client ID:** BS2
**Sample Time:** 01/28/00 17:00                                  **ACT Lab No.:** BG00950

## RESULTS

| Parameter | Analysis Date Start | End | Method No. | Result | Unit |
|---|---|---|---|---|---|
| Selenium | 2/10/00 | 2/10/00 | 200.9 | <0.005 | mg/L |
| Silver | 3/1/00 | 3/1/00 | 200.9 | <0.002 | mg/L |
| Sodium | 2/28/00 | 2/28/00 | 200.7 | 229. | mg/L |
| Thallium | 2/3/00 | 2/3/00 | 200.9 | <0.001 | mg/L |
| Zinc | 2/28/00 | 2/28/00 | 200.7 | <0.01 | mg/L |
| Total Dissolved Solids | 2/25/00 | 2/25/00 | 160.1 | 811. | mg/L |

Reviewed by: _____
Frederick A. Amalfi, Ph.D.
Laboratory Director

bma

# AQUATIC CONSULTING & TESTING, INC.

**1525 W. University Drive, Suite 106**
**P.O. Box 1510**
**Tempe, Arizona 85281**
**Phone: (480) 921-8044 • FAX: (480) 921-0049**

Lic. No. AZ0003

# LABORATORY REPORT

**Client:** Manera, Inc.
8316 N. 53rd St.
Paradise Valley, AZ 85253

**Date Submitted:** 2/11/00
**Date Reported:** 03/03/00

**Attn:** Paul Manera

**Sample Type:** Aqueous
**Sample Time:** 02/10/00 17:00

**Client ID:** B(15-12) 5ccc
**ACT Lab No.:** BG01481

## RESULTS

| Parameter | Analysis Date Start | End | Method No. | Result | Unit |
|-----------|------|-----|------------|--------|------|
| Alkalinity | 2/18/00 | 2/18/00 | SM 2320 | 265. | mg/L as CaCO3 |
| Cyanide | 2/22/00 | 2/22/00 | SM4500CN CE | <0.01 | mg/L |
| Fluoride | 2/17/00 | 2/17/00 | SM4500F C | 4.0 | mg/L |
| Langelier Index | 2/15/00 | 2/15/00 | SM2330 D | See Attached * | mg/L as N |
| Nitrate + Nitrite - N | 2/16/00 | 2/16/00 | SM4500NO3 E | 1.43 | mg/L as N |
| Nitrite - N | 2/11/00 | 2/11/00 | SM4500NO2 B | <0.01 | mg/L as N |
| Silica | 2/11/00 | 2/11/00 | SM4500Si DE | 5.97 | mg/L as SiO2 |
| Sulfate | 2/28/00 | 2/28/00 | 375.4 | 208. | mg/L |
| Total Hardness | 2/16/00 | 2/16/00 | 130.2 | 182. | mg/L as CaCO3 |
| Antimony | 2/17/00 | 2/17/00 | 200.9 | <0.003 | mg/L |
| Arsenic | 2/16/00 | 2/16/00 | 200.9 | 0.048 | mg/L |
| Barium | 2/18/00 | 2/18/00 | 200.7/6010 | 0.04 | mg/L |
| Beryllium | 2/18/00 | 2/18/00 | 200.7/6010B | <0.002 | mg/L |
| Cadmium | 2/18/00 | 2/18/00 | 200.7 | <0.002 | mg/L |
| Calcium | 2/18/00 | 2/18/00 | 200.7 | 42. | mg/L |
| Chromium | 2/18/00 | 2/18/00 | 200.7 | <0.01 | mg/L |
| Copper | 2/18/00 | 2/18/00 | 200.7 | <0.01 | mg/L |
| Lead | 2/15/00 | 2/15/00 | 200.9 | <0.005 | mg/L |
| Magnesium | 2/18/00 | 2/18/00 | 200.7 | 16. | mg/L |
| Mercury | 2/25/00 | 2/25/00 | 245.1 | <0.0002 | mg/L |
| Nickel | 2/18/00 | 2/18/00 | 200.7 | <0.01 | mg/L |

**Sample Type:** Aqueous
**Sample Time:** 02/10/00 17:00

**Client ID:** B(15-12) 5ccc
**ACT Lab No.:** BG01481

## RESULTS

| Parameter | Analysis Date Start | End | Method No. | Result | Unit |
|-----------|------|-----|-----------|--------|------|
| Selenium | 2/16/00 | 2/16/00 | 200.9 | <0.005 | mg/L |
| Sodium | 2/23/00 | 2/23/00 | 200.7 | 234. | mg/L |
| Thallium | 2/18/00 | 2/18/00 | 200.9 | <0.001 | mg/L |
| pH | 2/11/00 | 2/11/00 | 150.1 | 8.3 | SU |
| Total Dissolved Solids | 2/15/00 | 2/15/00 | 160.1 | 770. | mg/L |

Reviewed by: _____

Frederick A. Amalfi, Ph.D.
**Laboratory Director**

bma

# APPENDIX C
# BIG SANDY ALLUVIAL AQUIFER TEST RESULTS

# PRELIMINARY EVALUATION

## of the

# WATER RESOURCES

## of the

# BIG SANDY BASIN

# MOHAVE COUNTY, ARIZONA

Manera, Inc.
8316 North 53rd Street
Paradise Valley, Arizona 85253
Telephone 480-948-9818



November 2, 1999

# INTRODUCTION

## Location of Study Area

The general area of this investigation consists of the southern portion of the Big Sandy River basin south of Wikieup, Mohave County, Arizona.  Specifically, the property held in fee consists of the:

> SW1/4 of Section 5;
> W1/2 of Section 7, and;
> W1/2, SW1/4 of Section 18, all in T. 15 N., R. 12 W, and;
> E1/2 of Section 12;
> NW1/4, the E1/2 of the NW1/4 and the E1/2 of the SE1/4 of Section 13, all in T. 15 N., R. 13 W.

The area is shown on Figure 1.

## Scope of Work

Due to time constraints, the scope of this study was to generate a preliminary evaluation of the water available to the property based on the available data and testing of existing water sources.

One pumping test was run on a well on the Ranch property, located in the SW1/4, NW1/4, NE1/4 of Section 13, T. 15 N., R. 13 W.

Much of this report is based on previous literature, particularly that of Davidson (1973) with the testing program used as corroborating data.

# GEOHYDROGLOGY

## Description of Geology

The reader is referred to Appendix A for a description of the rocks types and geology of the basin.

## Abstract

The following abstract is taken from the report "Water Resources Appraisal of the Big



R. 13 W.   R. 12 W.

T. 15 N.

RANCH AT WIKIEUP

LOCATION OF PROPERTY

FIGURE 1

Sandy Area, Mohave County, Arizona" (E. S. Davidson, 1973, Arizona Water Commission Bulletin 6, included as Appendix A)

The Big Sandy area comprises 700 square miles in the valley of the Big Sandy River in southeastern Mohave County, Arizona. The area is mainly grazing land, except for a small amount of irrigated pasture and cropland in the central valley. The area is drained to the south by the Big Sandy River and is bounded on the east and west by mountains composed of crystalline rocks.

The central valley is underlain by several hundred to a few thousand feet of semiconsolidated to unconsolidated deposits that store large amounts of ground water; the principal water-yielding units are the stream and flood plain alluvium, the upper basin fill, the lower basin fill, and the arkosic gravel. In the southern part of the area ground water from the sedimentary deposits drains into the channel of the Big Sandy River and supplies moisture to the dense vegetation along the river. Ground water is replenished by recharge along the mountain fronts and by intermittent flow in the main stream channels in the central valley. The depth to ground water below the land surface ranges from less than 1 foot in places along the Big Sandy River to 750 feet in the northern part of the area.

The mean annual precipitation ranges from 10 inches in the central valley to 20 inches in the mountains and is equivalent to about 1 million acre feet of water in the 1,770 square mile drainage basin of the Big Sandy River upstream from the granite gorge near Wikieup. About 4.6 percent of the precipitation leaves the area as surface water and ground water outflow; the rest of the precipitation is lost to evaporation or is transpired by vegetation. In general streamflow is intermittent and occurs only in response to precipitation or snowmelt.

Ground water and surface water generally are of good chemical quality except for the fluoride content; calcium, magnesium, and bicarbonate are the dominant dissolved ions, and the dissolved solids content of the water ranges from 350 to 800 mg/l (milligrams per liter) in most of the area. However, fluoride concentrations in the ground water generally are more than 1.2 mg/l but in some places exceed 2.0 mg/l; a fluoride concentration of more than 1.4 mg/l is cause for rejection of the supply[for drinking purposes in light of the mean annual air temperature in the study area. [*The allowable fluoride content for drinking water has been raised to 4.0 mg/l, with some caveats*].

The average surface water outflow is about 24,900 acre feet per year. The total ground water outflow - which comprises evapotranspiration in an area of dense riparian growth, consumptive use for irrigation and public supply, and underflow is about 21,500 acre feet per year. Only a few thousand acre feet of water per year is used by the inhabitants in the

area, and the available water resources will support considerable additional development.

Additional ground water supplies are available in many undeveloped parts of the Big Sandy area; in areas where ground water has been developed most wells do not penetrate the entire saturated thickness of the aquifer. The greatest potential for future ground water development is in the stream and flood plain alluvium, the upper basin fill, and the lower basin fill in the area along the Big Sandy River from Cane Springs Wash to the granite gorge south of Wikieup. In addition, the upper basin fill and arkosic gravel may support greater ground water development west of the Big Sandy River.

## Basin Outflow

Basin outflow occurs in two forms, surface flow and ground water flow.

### Surface Outflow

In general, the Big Sandy River flows only in response to precipitation, but from Wikieup south though the granite gorge outlet to the basin, perennial flow occurs in the river. Based on measurements by Kam (Davidson, 1973) during the period 1959 -1964, the perennial flow through the granite gorge is about 1,800 acre feet per year. The approximate long term mean annual flow of the Big Sandy River at the granite gorge was calculated to be 24,900 acre feet (Davidson, 1973).

### Ground Water Outflow

The total ground water outflow is estimated to be 21,500 acre feet per year of which approximately 800 acre feet discharges through granite gorge, 2,300 acre feet is utilized for domestic and irrigation use and the remaining 18,400 acre feet is transpired by the riparian vegetation along the river.

## Riparian Use

The amount of acreage covered by riparian vegetation, adjusted to a basis of 100 percent density, is about 4,600 acres. The evapotranspiration rate for riparian vegetation in the Big Sandy River area is estimated to be 5 acre feet per acre giving an evapotranspiration loss of 18,400 acre feet per year.

## Water In Storage

The amount of recoverable ground water in storage to a depth of 700 feet below the

ground surface was based on the thickness of the aquifer and the specific yield of the aquifer.  Based on a specific yield of 15 percent, and eliminating those areas where the thickness of the aquifer was less than 200 feet or was primarily silt or clay, the estimated volume of recoverable ground water in storage in the Big Sandy River basin is 13 million acre feet.

Change in Water Levels

The water levels in the shallow wells of the Big Sandy basin have remained relatively constant since 1945, with variations measured in only a few feet.  This reflects the fact that there is little withdrawal from the basin for domestic and irrigation purposes and that seasonal variations in recharge are minor, even in dry periods.

Pumping Test Analysis

A pumping test was conducted on an existing well located in the SW1/4, NW1/4, NE1/4 of Section 13, T. 15 N., R. 13 W. on October 29 - 30, 1999.

The total depth of the well was measured as105 feet and the owner stated the casing was perforated only in the bottom 20 feet of the well.  A second well, with a total depth of 60 feet, located approximately 200 feet from the pumped well, was used as an observation well during the testing period.

The pump was run at an average discharge of 387 gallons per minute (gpm) for a period of 1,635 minutes.

Analysis of the drawdown in the pumped well, Figure 2, shows a transmissivity (T) value of 204,000 gpd/ft for the first 300 minutes, then the T value drops to 2,064 gpd/ft for the remainder of pumping period.  The T value calculated from the observation well data, Figure 3, collected during the test was 65,500 gpd/ft.

The T values 204,000 gpd/ft during the early portion of the pumped well data and the 65,500 gpd/ft from the observation well data fall within the reported values of T of the stream bed alluvium in the Big Sandy basin (Davidson, 1973).  The radical change in the value of T when the pumping level dropped below 30 feet is not so clear cut.  The possible reasons for this change are that the cone of depression dewatered a thin layer of stream alluvium leaving only the underlying lacustrine deposits to supply water to the well or there may have been a hydrologic boundary which impacted the pumping level.

Considering the T values of the alluvial fill, it is expected that perforating the entire casing below the water level would allow the development of shallow wells capable of yielding approximately 300 gpm in the streambed and floodplain alluvial fill.

The field data sheets are included as Appendix B.



RANCH AT WIKIEUP

SW1/4, NW1/4, NE1/4 of Section 13, T. 15 N., R. 13 W.

Pumped Well

Drawdown when Q = 387

$$T_E = \frac{264\,Q}{s} = \frac{264 \times 387}{0.5} = 204{,}336 \text{ gpd/ft}$$

$$T_L = \frac{264\,Q}{s} = \frac{264 \times 387}{49.5} = 2{,}064 \text{ gpd/ft}$$

Figure 2

0.5 feet

49.5 feet

Time, t, in minutes



RANCH AT WIKIEUP

SW1/4, NW1/4, NE1/4 of Section 13, T. 15 N., R. 13 W.

Observation Well

Drawdown when Q = 387

$$T = \frac{264\ Q}{s} = \frac{264 \times 387}{1.56} = 65{,}492 \text{ gpd/ft}$$

Figure 3

Time, t, in minutes

# CONCLUSIONS

The following conclusions were predicated on review of the available data.  As additional data becomes available, these conclusions may be modified.

1.  The perennial flow of 1,800 acre feet of water per year plus a portion of the long term average annual flow of 24,900 acre feet of water which flow out of the basin through the granite gorge can be harvested by diversion from the river at the Ranch property in Sections 12 and 13, T. 15 N., R. 13 W.  This assumes that surface water rights for such diversion are held.;

2.  The ground water outflow through the granite gorge in the amount of 800 acre feet per annum can be harvested at the Ranch property by withdrawal from shallow wells.;

3.  Clearing the riparian vegetation from the property for the purpose of planting crops will release approximately 5 acre feet for every acre cleared of pheatophytes.  Assuming clearing 640 acres would release 3,200 acre feet which could be harvested at the Ranch property, through withdrawal from shallow wells in the stream alluvium.

4.  Then, the estimated total volume available at the Ranch property consists of:

| | |
|---|---|
| • perennial flow | 1,800 acre feet |
| • long term mean annual flow | 500 |
| • ground water outflow | 800 |
| • riparian release | 3,200 |
| | |
| potential harvest | 6,300 acre feet |

# RECOMMENDATIONS

It is recommended that one or more test wells be drilled to a minimum depth of 1,600 feet or until crystalline bedrock is encountered.  The test hole should then be logged with a suite of downhole logging tools to determine the types of subsurface materials present and their water yielding characteristics.

Should results of the test hole indicate a potential aquifer, then a deep production well can be drilled and completed to determine the yield of the deep aquifers.

An estimated price for such a well is included as Appendix C.

# REFERENCES

Davidson, E. S., 1973, Water Resources Appraisal of the Big Sandy Area, Mohave County, Arizona, Arizona Water Commission, Bulletin 6, Phoenix, Arizona.

Gillespie, J. B., Bentley, C. B. and Kam, W., 1966, Basic Hydrologic Data of the Hualapai, Sacramento and Big Sandy Valleys, Mohave County, Arizona, Arizona State Land Department Water Resources Report Number 26, Phoenix, Arizona.

Morrison, R. B., 1940, Ground Water Resources of the Big Sandy Valley, Mohave County, Arizona, Office of the State Water Commissioner, Phoenix, Arizona.

Sheppard, R. A. and Gude, A. J. 3d, 1972, Big Sandy Formation Near Wikieup, Mohave County, Arizona Contributions to Stratigraphy, U. S. Geological Survey Bulletin 1354-C, Washington, D. C.

# APPENDIX A

Water Resources Appraisal of the Big Sandy Area, Mohave County, Arizona

WR A2 51
c.2



ARIZONA WATER COMMISSION
BULLETIN 6



# WATER-RESOURCES APPRAISAL OF THE BIG SANDY AREA

## MOHAVE COUNTY, ARIZONA

BY E. S. DAVIDSON

PREPARED BY THE GEOLOGICAL SURVEY
UNITED STATES DEPARTMENT OF THE INTERIOR

PHOENIX, ARIZONA          DECEMBER 1973

# CONTENTS

Page

Abstract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
    Purpose of the investigation and scope of the report  . . . .    3
    Location and description of the area  . . . . . . . . . . . . . .    3
    Methods of the investigation  . . . . . . . . . . . . . . . . . . .    7
    Previous investigations  . . . . . . . . . . . . . . . . . . . . . .    9
    Acknowledgments  . . . . . . . . . . . . . . . . . . . . . . . . . .    9
Physical setting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
Rock units and their hydrologic properties . . . . . . . . . . . . . . . .   10
    Granitic gneiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
    Arkosic conglomerate  . . . . . . . . . . . . . . . . . . . . . . . .   13
    Arkosic gravel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
    Volcanic rocks of Sycamore Creek . . . . . . . . . . . . . . . . .   19
    Basalt flows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
    Lower basin fill  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
    Terrace gravel of Tule Wash . . . . . . . . . . . . . . . . . . . . .   23
    Upper basin fill  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23
    Stream and flood-plain alluvium . . . . . . . . . . . . . . . . . .   26
Hydrology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
    Surface water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
    Ground water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
        Aquifer characteristics  . . . . . . . . . . . . . . . . . .   32
        Movement and depth to water . . . . . . . . . . . . . . .   33
        Quality of ground water  . . . . . . . . . . . . . . . . . .   34
        Ground-water outflow  . . . . . . . . . . . . . . . . . . .   35
Additional water development  . . . . . . . . . . . . . . . . . . . . . . . .   37
References cited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

# ILLUSTRATIONS

[Plates are in pocket]

Plate 1.    Geologic map showing the concentration of dissolved
        solids a n d selected ions in water in the Big Sandy
        area.

III

# WATER RESOURCES APPRAISAL OF THE BIG SANDY AREA, MOHAVE COUNTY, ARIZONA

By

E. S. Davidson

## ABSTRACT

The Big Sandy area comprises 700 square miles in the valley of the Big Sandy River in southeastern Mohave County, Ariz. The area is mainly grazing land, except for a small amount of irrigated pasture and cropland in the central valley. The area is drained to the south by the Big Sandy River and is bounded on the east and west by mountains composed of crystalline rocks.

The central valley is underlain by several hundred to a few thousand feet of semiconsolidated to unconsolidated deposits that store large amounts of ground water; the principal water-yielding units are the stream and flood-plain alluvium, the upper basin fill, the lower basin fill, and the arkosic gravel. In the southern part of the area ground water from the sedimentary deposits drains into the channel of the Big Sandy River and supplies moisture to the dense vegetation along the river. Ground water is replenished by recharge along the mountain fronts and by intermittent flow in the main stream channels in the central valley. The depth to ground water below the land surface ranges from less than 1 foot in places along the Big Sandy River to 750 feet in the northern part of the area.

The mean annual precipitation ranges from 10 inches in the central valley to 20 inches in the mountains and is equivalent to about 1 million acre-feet of water in the 1,770-square-mile drainage basin of the Big Sandy River upstream from the granite gorge near Wikieup. About 4.6 percent of the precipitation leaves the area as surface-water and ground-water outflow; the rest of the precipitation is lost to evaporation or is transpired by vegetation. In general streamflow is intermittent and occurs only in response to precipitation or snowmelt.

1

## Purpose of the Investigation and Scope of the Report

The U. S. Geological Survey in cooperation with the State of Arizona conducted a water-resources investigation in the Big Sandy area to determine the availability, chemical quality, and use of water and to evaluate the potential for additional water development. When the investigation was started in 1959, the State Land Department represented Arizona in the cooperative water-resources investigation program; the newly formed Arizona Water Commission now represents the State in the cooperative program.

The report describes the distribution, lithology, and the water-yielding characteristics of the rock units in the Big Sandy area. The distribution, outflow, storage, and chemical quality of the ground water are described in the detail warranted by the available data; most of the available chemical-quality data and the pertinent water-level data for wells and springs are shown in plates 1 and 2. Brief descriptions of the flow characteristics and the chemical quality of water in the Big Sandy River are included. The report gives estimates of the 1970 water use in the area and indicates that additional water supplies can be obtained by drilling in unexplored areas, by penetrating the entire saturated thickness of the aquifer, and by an intensive well-development program along the Big Sandy River. The report was prepared under the general supervision of H. M. Babcock, district chief of the U. S. Geological Survey in Arizona.

## Location and Description of the Area

The Big Sandy area occupies 700 square miles in the southeastern part of Mohave County in northwestern Arizona (fig. 1). About 150 people live in the area on a year-round basis; the principal population center is Wikieup, which is about 120 miles northwest of Phoenix and about 40 miles southeast of Kingman. The area is traversed from north to south by U. S. Highway 93, which is the principal highway between Kingman and Phoenix. The northern part of the area will be traversed by the east-west Interstate Highway 40, which was partly completed in 1973 (fig. 2).

The Big Sandy area is bounded by the Hualapai and Peacock Mountains on the west and by the Cottonwood Cliffs and the Aquarius



BASE FROM U.S. GEOLOGICAL SURVEY
ARIZONA BASE MAP

Contour interval 500 feet
Datum is mean sea level

E X P L A N A T I O N

▲
Streamflow-
gaging station

Boundary of Big
Sandy River
drainage up-
stream from
gaging station

Common boundary
of Big Sandy
River drainage
upstream from
granite gorge
and gaging station

Boundary of Bill
Williams River
drainage up-
stream from
gaging station

Boundary of Big
Sandy River
drainage up-
stream from
granite gorge
near Wikieup

Area of
report

Boundary of Santa
Maria River
drainage up-
stream from
gaging station

FIGURE 2.--TOPOGRAPHIC MAP SHOWING DRAINAGE BASINS IN AND ADJACENT TO THE BIG SANDY AREA.

Mountains on the east (fig. 2). The northern boundary of the study area is in T. 23 N., and the southern boundary is in T. 15 N.

## Methods of the Investigation

The approximate extent of each water-yielding unit was defined by reconnaissance geologic mapping. The mapping was done on aerial photographs north of 35° lat, on aerial photographs and topographic maps south of 35° lat, and then was transferred to a planimetric base.

An attempt was made to inventory all wells and springs in the area, but some springs and stock wells in the mountains were not inventoried. All well and spring locations are described in accordance with the well-numbering system used in Arizona, which is explained and illustrated in figure 3. Water levels in wells were measured where possible, and a few aquifer tests were conducted, mostly in the central part of the area. Water samples were collected from many wells and springs for chemical analysis. Drillers' logs of wells were examined to determine the water-yielding potential of the rock units and to correlate the rock units penetrated with the units exposed at the land surface. Drill cuttings from new wells were examined to determine the subsurface lithology, and three holes were augered to bedrock in the south end of the area, where the Big Sandy River enters the granite gorge.

The flow of the Big Sandy River through the granite gorge at the south end of the area was measured many times, and these measurements were used to compute the probable annual perennial flow of the river. Additional streamflow measurements were made in Trout and Willow Creeks. Water samples were collected from Trout and Willow Creeks and from the Big Sandy River for chemical analysis.

The fieldwork on which this report is based was done in 1969-70 by E. S. Davidson and F. E. Arteaga, in 1959-60 by William Kam and R. S. Stulik, and in 1939-40 by R. B. Morrison, all of the U.S. Geological Survey. The quantitative surface-water data were compiled by Otto Moosburner of the U.S. Geological Survey.

## Previous Investigations

Hydrologic studies by several investigators were helpful in e-valuating the water resources in the Big Sandy area.  Morrison (1940) described the ground-water resources of the Big Sandy Valley, and Morrison (1941) and Gillespie and others (1966) prepared compilations of the basic hydrologic data available for the area.   The flow regimen of Cottonwood Wash—now called Willow Creek—and the changes in the regimen as a result of the removal of riparian growth were described by Bowie and Kam (1968). Additional water-resources data were available from the files of the U. S. Geological Survey offices in Phoenix and Tucson, Ariz.

## Acknowledgments

The author gratefully acknowledges Dr. W. D. Sellers and Ms. M. S. Rae of the Institute of Atmospheric Physics, University of Arizona, who provided a statistical analysis of temperature data for Wikieup. Dr. P. E. Damon of the Department of Geosciences, University of Arizona, kindly determined the age of a basalt flow by the potassium-argon method in the Big Sandy area from a sample collected by the author.

## PHYSICAL SETTING

The Big Sandy area is an elongate broad north-trending valley bounded by mountains; the central valley contains more than 2,000 feet of unconsolidated sedimentary rocks,  and the mountains are composed of granitoid crystalline rocks. Volcanic rocks overlie the granitic rocks in the mountains in the southeastern and northern parts of the area and are interlayered with sedimentary units in some parts of the central valley.

On the west side of the area, the Hualapai Mountains are more than 6,000 feet above mean sea level,  and Hualapai Peak is at a maximum altitude of 8,266 feet; on the east, the Aquarius Mountains are from 5,000 to 6,000 feet above mean sea level (fig. 2). The Cottonwood Cliffs on the east and the Peacock Mountains on the northwest are about 6,000 feet above mean sea level.  The bed of the Big Sandy River is about 4,000



FIGURE 4. --DIAGRAMMATIC SECTION OF THE BIG SANDY AREA.

The granitic gneiss yields a few gallons per minute of water to wells and springs only where the unit is moderately or strongly fractured and recharge is available from rainfall, snowmelt, or runoff. In general, the water in the granitic gneiss has a small dissolved-solids content and is of good chemical quality for most uses. The dissolved-solids content in the ground water ranges from about 400 to 2,500 mg/l (milligrams per liter); however, a dissolved-solids content of 2,500 mg/l is unusual. Magnesium, calcium, sulfate, bicarbonate, and, less commonly, chloride are the dominant constituents. The fluoride content ranges from 1.6 to 4.4 mg/l (table 1).

## Arkosic Conglomerate

Dark-reddish-brown arkosic conglomerate crops out west of the Big Sandy River. The outcrops are small, and similar rocks have not been identified elsewhere in the area. Because of the appearance, structural position, and strong silica cementation of the rock, it is assumed to be early Tertiary in age.

The arkosic conglomerate consists of angular to subrounded pebbles and boulders of granite and granodioritic gneiss set in a medium- to coarse-grained arkosic sand matrix. The fragments are strongly cemented with silica and are heavily stained with reddish-brown to black iron and manganese oxide. Although the bedding is distinct, the fragments are so angular that the rock resembles a talus breccia. The pebbles and boulders were derived locally from the gneissic rock of the Hualapai Mountains. The bedding attitude of the arkosic conglomerate and the overlying arkosic gravel is similar, but the contact between the two units is erosional and disconformable. The lower contact is not exposed, but the arkosic conglomerate probably overlies an erosional surface on the granitic gneiss.

The arkosic conglomerate apparently is limited in occurrence and is practically impermeable where exposed. No wells or springs are known to occur in the unit.

Table 1. --Chemical analyses of water in the Big Sandy area—Continued

| Location | Date of collection | Probable water-yielding unit | Depth of well (feet) | Approximate depth to water (feet below land surface) | Temperature (°C) | Silica (SiO₂) | Calcium (Ca) | Magnesium (Mg) | Sodium (Na) | Potassium (K) | Bicarbonate (HCO₃) | Carbonate (CO₃) | Sulfate (SO₄) | Chloride (Cl) | Fluoride (F) | Nitrate (NO₃) | Dissolved solids (calculated) | Hardness as CaCO₃ Calcium, magnesium | Non-carbonate | Sodium adsorption ratio (SAR) | Specific conductance (micromhos at 25°C) | pH | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(B-16-13) con.** | | | | | | | | | | | | | | | | | | | | | | | |
| 27bab | 10- 7-59 | Upper basin fill | 95 | 42R | 21 | 48 | 61 | 16 | 102 | | 352 | 0 | 77 | 52 | 2.6 | 1.2 | 536 | 228 | 0 | 2.9 | 840 | 7.7 | W. |
| 27bdd | 10- 8-59 | Upper basin fill; lower basin fill | 116 | 30R | 23 | 45 | 56 | 22 | 142 | | 332 | 0 | 103 | 108 | 2.8 | 1.6 | 643 | 232 | 0 | 4.1 | 1,040 | 7.5 | W. |
| 34bc | 6-16-67 | Lower basin fill | ----- | -------- | 25 | 22 | 79 | 24 | 67 | 5.7 | 342 | 0 | 110 | 48 | 1.0 | 2 | 527 | 296 | 0 | 1.7 | 800 | 7.8 | W; Dutt and McCreary, 1970; well could not be located. |
| 35bcd | 10- 7-59 | Lower basin fill | 74 | 40R | 27 | 48 | 54 | 26 | 151 | | 374 | 0 | 129 | 82 | 3.7 | 1.8 | 680 | 240 | 0 | 4.2 | 1,060 | 7.4 | W. |
| **(B-16-14)** | | | | | | | | | | | | | | | | | | | | | | | |
| 8aba | 7-29-69 | Granitic gneiss | ----- | -------- | ---- | 44 | 40 | 33 | 43 | | 123 | 0 | 43 | 126 | 1.6 | ----- | 392 | 234 | 133 | 1.2 | 791 | 7.7 | S; Cowboy Spring. |
| 36acad | 7-24-69 | Granitic gneiss | ----- | 84 | 27 | 35 | 81 | 28 | 79 | | 313 | 0 | 63 | 116 | 1.8 | ----- | 558 | 318 | 61 | 1.9 | 935 | 7.9 | W. |
| **(B-16½-13)** | | | | | | | | | | | | | | | | | | | | | | | |
| 27cdbb | 10- 6-60 | Upper basin fill; stream and flood-plain alluvium | 117 | 32 | 20 | 45 | 56 | 16 | 56 | | 295 | 0 | 36 | 36 | 1.2 | .9 | 394 | 212 | 0 | 1.7 | 614 | 8.0 | W. |
| **(B-16½-14)** | | | | | | | | | | | | | | | | | | | | | | | |
| 26cbac2 | 7-16-69 | Lower basin fill | 225 | 122R | ---- | 26 | 114 | 67 | 9.0 | | 80 | 0 | 320 | 126 | 1.2 | ----- | 702 | 560 | 494 | .2 | 1,390 | 7.6 | W. |
| 32bdaa | 7-17-69 | Granitic gneiss; stream and flood-plain alluvium | ----- | -------- | 24 | 40 | 54 | 70 | 103 | | 266 | 14 | 214 | 125 | 2.5 | ----- | 754 | 425 | 32 | 2.2 | 1,265 | 8.5 | S. |
| **(B-17-13)** | | | | | | | | | | | | | | | | | | | | | | | |
| 10aaa | 11-30-67 | Upper basin fill | 98 | 77 | ---- | 48 | 86 | 20 | 69 | 3.0 | 336 | 0 | 49 | 46 | 1.5 | ----- | 466 | 245 | 0 | 1.9 | 781 | 7.4 | W. |
| 11abb | 11-16-60 | Stream and flood-plain alluvium; upper basin fill | 89 | 21 | 18 | 48 | 44 | 15 | 44 | | 277 | 0 | 18 | 14 | .8 | 1.1 | 319 | 172 | 0 | 1.5 | 529 | 7.3 | W. |
| 23baa | 8- 3-59 | Stream and flood-plain alluvium; upper basin fill | 115 | 21 | 20 | 54 | 52 | 17 | 56 | | 293 | 0 | 25 | 35 | 1.1 | 1.1 | 385 | 198 | 0 | 1.7 | 597 | 7.4 | W. |
| 31dabb | 7-16-59 | Lower basin fill | 147 | 121 | 27 | 33 | 122 | 62 | 71 | | 408 | 0 | 246 | 82 | 3.0 | ----- | 820 | 560 | 225 | 1.3 | 1,215 | 8.2 | W. |
| **(B-17-14)** | | | | | | | | | | | | | | | | | | | | | | | |
| 23bad | 8-27-59 | Granitic gneiss | ----- | -------- | 26 | 48 | 78 | 13 | 44 | | 318 | 0 | 33 | 33 | 1.8 | .7 | 408 | 250 | 0 | 1.2 | 629 | 7.6 | S. |
| **(B-18-13)** | | | | | | | | | | | | | | | | | | | | | | | |
| 14c | 6-23-60 | -------------------------- | | | 30 | 60 | 24 | 11 | 54 | | 180 | 16 | 13 | 24 | .7 | .2 | 291 | 106 | 0 | 2.3 | 415 | 8.7 | F; Trout Creek; sample from irrigation ditch, flow 0.11 cfs. |

Table 1. --Chemical analyses of water in the Big Sandy area—Continued

| Location | Date of collection | Probable water-yielding unit | Depth of well (feet) | Approximate depth to water (feet below land surface) | Temperature (°C) | Silica (SiO₂) | Calcium (Ca) | Magnesium (Mg) | Sodium (Na) | Potassium (K) | Bicarbonate (HCO₃) | Carbonate (CO₃) | Sulfate (SO₄) | Chloride (Cl) | Fluoride (F) | Nitrate (NO₃) | Dissolved solids (calculated) | Hardness as CaCO₃ Calcium, magnesium | Hardness as CaCO₃ Noncarbonate | Sodium adsorption ratio (SAR) | Specific conductance (micromhos at 25°C) | pH | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (B-20-13) con. | | | | | | | | | | | | | | | | | | | | | | | |
| 22dddc | 7-25-69 | Granitic gneiss | 125R | 80R | 27 | 35 | 44 | 22 | 51 | | 263 | 5 | 23 | 42 | 1.2 | ----- | 352 | 200 | 0 | 1.6 | 552 | 8.3 | W. |
| (B-20-14) | | | | | | | | | | | | | | | | | | | | | | | |
| 7ddaa | 7-25-69 | Lower basin fill; granitic gneiss(?) | 260 | 130R | 22 | 20 | 94 | 17 | 65 | | 174 | 0 | 177 | 111 | 2.6 | ----- | 593 | 306 | 163 | 2.1 | 1,095 | 8.1 | W. |
| 19bdab | 7-15-69 | Granitic gneiss; lower basin fill | 165 | 26 | 18 | 30 | 590 | 157 | 15 | | 128 | 0 | 900 | 760 | 3.5 | ----- | 2,540 | 2,120 | 2,015 | .2 | 4,410 | 7.5 | W; abandoned well at edge of cattle corral. |
| 21acab2 | 7-15-69 | Lower basin fill; granitic gneiss(?) | 230 | 80 | 20 | 26 | 152 | 68 | 26 | | 66 | 0 | 518 | 80 | 2.9 | ----- | 906 | 660 | 604 | .4 | 1,490 | 7.8 | W; two wells at site; sample from newer well. |
| 32baaa | 7-15-69 | Lower basin fill; granitic gneiss(?) | 102R | -------- | ---- | 24 | 80 | 51 | 30 | | 106 | 0 | 166 | 148 | 2.2 | ----- | 553 | 410 | 323 | .6 | 1,025 | 7.9 | W. |
| 33bdad | 7-15-69 | Lower basin fill; stream and flood-plain alluvium | 130R | 11 | 18 | 28 | 53 | 24 | 28 | | 89 | 0 | 171 | 22 | 3.2 | ----- | 373 | 230 | 157 | .8 | 591 | 7.5 | W. |
| (B-21-11) | | | | | | | | | | | | | | | | | | | | | | | |
| 29b | 2- 1-71 | ------------------- | ----- | -------- | 11 | 40 | 51 | 24 | 15 | 3.4 | 272 | 0 | 12 | 20 | .3 | ----- | 300 | 228 | 5 | .4 | 476 | 8.2 | F; Willow Creek; flow 1.02 cfs. |
| | 8- 2-71 | ------------------- | ----- | -------- | 16 | 38 | 52 | 25 | 16 | 3.8 | 279 | 0 | 12 | 23 | .3 | ----- | 305 | 234 | 6 | .5 | 498 | 8.1 | F; Willow Creek; flow 0.53 cfs. |
| (B-21-13) | | | | | | | | | | | | | | | | | | | | | | | |
| 10ccac | 3- 4-44 | Granitic gneiss(?) | ----- | 614 | ---- | ----- | 18 | 27 | 28 | | 212 | 0 | 15 | 15 | ----- | 8.0 | | 156 | ----- | | 410 | ---- | W. |
| 24bcdc | 11-17-60 | Arkosic gravel(?); lower basin fill | 400± | 377 | 22 | 46 | 28 | 22 | 32 | | 165 | 0 | 20 | 38 | 1.1 | 3.6 | 282 | 162 | 10 | 1.1 | 450 | 7.4 | W. |
| 30cadd | 7-25-69 | Granitic gneiss; arkosic gravel(?) | 820 | 663 | 29 | 39 | 16 | 73 | 625 | | 948 | 24 | 119 | 530 | 4.4 | ----- | 1,900 | 342 | 0 | 14.5 | 3,300 | 8.4 | W. |
| (B-21-14) | | | | | | | | | | | | | | | | | | | | | | | |
| 24dacb | 5- 4-80 | Arkosic gravel | 980 | 885 | 31 | 43 | 24 | 21 | 48 | | 244 | 0 | 17 | 11 | 5.2 | 4.2 | 293 | 145 | 0 | 1.7 | 457 | 7.8 | W. |

Well (B-16-13)27abc

| Probable unit penetrated and rock description | Thickness (feet) | Depth (feet) |
|---|---|---|
| Stream and flood-plain alluvium: | | |
|     Sand and gravel . . . . . . . . . . . . . . . . | 34 | 34 |
| Calcium carbonate cemented stream and flood-plain alluvium: | | |
|     Hardrock . . . . . . . . . . . . . . . . . . | 6 | 40 |
| Upper basin fill: | | |
|     Sand and gravel . . . . . . . . . . . . . . . . | 65 | 105 |
| Silt facies of the lower basin fill: | | |
|     Clay, brown . . . . . . . . . . . . . . . . . | 20 | 125 |
| Tuffaceous agglomerate of the volcanic rocks of Sycamore Creek(?): | | |
|     Gravel, white . . . . . . . . . . . . . . . . | 5 | 130 |
| Oxidized top of andesitic flow in the volcanic rocks of Sycamore Creek(?): | | |
|     Clay, red . . . . . . . . . . . . . . . . . . | 20 | 150 |

      Most of the irrigation and domestic wells along the flood plain of the Big Sandy River obtain their water from both the upper basin fill and the stream and flood-plain alluvium; wells that are more than about 40 feet deep probably tap ground water in the upper basin fill. The unit probably is capable of yielding as much as 1,000 gpm of water to wells, and specific capacities of tested wells generally range from 100 to 120 gpm per foot of drawdown. The transmissivity determined from two aquifer tests near Wikieup ranges from about 13,000 to 20,000 cubic feet

to 40,000 cubic feet per day per foot (250,000 to 300,000 gpd per foot). Many wells in Tps. 16 and 16½ N., R. 13 W. tap both the alluvium and the underlying upper basin fill; the wells that have the largest yields obtain their water from both units. The water from shallow wells drilled in the alluvium is similar in chemical quality to that of the low flows in the Big Sandy River. The dissolved-solids content in the ground water ranges from about 300 to 900 mg/l (table 1), and the water generally is a mixed calcium magnesium sodium bicarbonate type. The fluoride content generally is between 1.5 and 2 mg/l. The sulfate and chloride content of water in the alluvium increases south of Wikieup, probably because of upward leakage of poor-quality water through the fine-grained deposits of the lower basin fill.

## HYDROLOGY

The only source of water in the Big Sandy area is the precipitation that falls within the drainage basin; of this precipitation, 95 percent or slightly more is evaporated from the land surface or near-surface soil or is transpired by plants. The small amount of precipitation that does not return to the atmosphere flows out of the area in the channel of the Big Sandy River or is recharged to the ground-water reservoir, where it eventually is transpired by plants or is discharged to become base flow in the Big Sandy River. Most of the flow of the Big Sandy River is not utilized by the inhabitants of the area; the flow moves downstream to become part of the flow of the Bill Williams and Colorado Rivers (fig. 1).

The mean annual precipitation at Wikieup is 9.5 inches (M. S. Rae, Institute of Atmospheric Physics, University of Arizona, oral commun., 1971). In the central valley the normal annual precipitation for 1931-60 ranged from 10 to 14 inches, 4 to 6 inches of which fell from May through September (University of Arizona, 1965a; 1965b). Precipitation increases proportionately to altitude, and at Hualapai County Park—a small area in the highest part of the Hualapai Mountains—the normal annual precipitation for 1931-60 was about 20 inches, almost 8 inches of which fell from May through September (University of Arizona, 1965a; 1965b).

Summer precipitation results mainly from convective thunderstorms that cool moist air blown over Arizona from the Gulf of Mexico (Green and Sellers, 1964). The precipitation is very localized, intense, and showery. Infrequent large storms that originate as tropical hurricanes off the west coast of Mexico occur in late August, September, and

The approximate long-term mean annual flow in the 1,770-square-mile area of the Big Sandy River drainage at the granite gorge near Wikieup (fig. 2) is

$$\frac{1,770}{2,800} \times 39,400 = 24,900 \text{ acre-feet.}$$

As a check, calculations based on probable runoff from precipitation show that the probable range of mean annual flow is between 20,000 and 28,000 acre-feet per year (Moosburner, written commun., 1970). The mean annual flows of the small tributaries were not calculated owing to insufficient data. The mean annual flow of the Big Sandy River at the granite gorge is taken as 24,900 acre-feet.

The dissolved-solids content in the streamflow increases progressively toward the southern outlet of the Big Sandy area. Only the low flows — most of which are perennial — have been sampled for chemical analysis, but floodflow probably has a smaller dissolved-solids content than low flow. Generally, the low flows are a mixed sodium calcium magnesium bicarbonate type, and the fluoride content ranges from about 1 to 2 mg/l (table 1). In the northern part of the Big Sandy area low flows contain from about 300 to 500 mg/l dissolved solids (table 1), and in the Big Sandy River south of Wikieup the dissolved-solids content of the low flow increases to about 900 mg/l. Although all the ion concentrations increase southward in the low flow of the Big Sandy River, the increase in sulfate and chloride is greater than the increase in bicarbonate because of the sulfate and chloride in the ground water that mixes with the flow of the Big Sandy River.

## Ground Water

Most of the ground water is stored in void spaces in the sedimentary rocks; much smaller amounts of water per unit area are stored in the other rock units. The ground water seeps very slowly through the rocks to discharge points along the Big Sandy River and at the south end of the area. The streamflow that results from snowmelt and precipitation replenishes the ground water by infiltration, primarily along the bases of the Hualapai and Aquarius Mountains, along the channels of the major tributaries to the Big Sandy River, and along the Big Sandy River where the water table is below the channel.

volume of water that will drain by gravity to the volume of aquifer. The ratio is t h e specific yield of the aquifer and is expressed in percent in this report. The amount of recoverable ground water in storage was not estimated in areas where the aquifer is known to be less than 200 feet thick or where it consists entirely of silt or finer grained material. Based on comparisons with similar aquifers in southern Arizona, the specific yield is estimated to be 15 percent in Tps. 16½-19 N. where the average depth to water is not more than 50 feet below the land surface and 10 percent where the average depth to water is more than 50 feet. The amount of water that can drain to wells is the product of specific yield and the volume of the aquifer. The estimated amount of recoverable ground water from the water table (pl. 2) to a depth of 700 feet below the land surface is 13 million acre-feet.

Movement and depth to water. --Ground water moves downgradient generally in the same direction as the streamflow in the Big Sandy area. Several springs issue along the Big Sandy River, Cane Springs Wash, and Deluge Wash where the water table locally intersects the land surface; but only along the Big Sandy River is ground water consistently near the surface during most of the year. Few wells have been drilled beyond the flood plain, and, therefore, the shape of much of the regional water table is inferred. The contours that reflect the shape of the water table are restricted to the general area of the aquifer and are compatible with the assumption that all wells and most springs penetrate or intercept the same body of ground water (pl. 2). The general movement of ground water is downgradient at right angles to the water-table contours. Where ground water is recharged mainly in t h e upgradient part of the aquifer and the amount of recharge and the thickness of the aquifer are similar, the water-level gradient can be used to estimate the relative hydraulic conductivity of the aquifer from place to place; under these conditions, the gentler the gradient the greater the hydraulic conductivity.

The water-level gradient is southward at 30 to 70 feet per mile in the central valley (pl. 2). On the east side of the area, water-level data are extremely sparse, but the gradient toward the central valley seems to be about 200 feet per mile. The gradient on the west side of the central valley is about 200 feet per mile except south of Cane Springs Wash, where the gradient is about 400 feet per mile, probably owing to the low hydraulic conductivity of the aquifer. In the northwestern part of the area the gradient is 300 to 500 feet per mile, which is also indicative of low hydraulic conductivity of the aquifer. In the extreme northern part of the area the water-level gradient is only 30 feet per mile, but judging from

is the dominant ion in much of the water (table 1). The sodium concentration is about equivalent or slightly greater than that of calcium and magnesium in some of the water samples analyzed. The source of the sodium probably is the lower basin fill, particularly the silt and marl facies that contain interbeds of sodium zeolites. Where the aquifer consists of sand or finer material, the sodium content of the water is likely to be greater than that of water in sandy gravel or coarser material, and the ionic concentration of sodium may be greater than that of calcium and magnesium combined.

Fluoride concentrations in the ground water generally are greater than 1. 2 mg/l (table 1), and in many of the water samples analyzed the fluoride content is greater than 2. 0 mg/l (table 1). Limits of acceptability for fluoride in drinking water differ according to the annual average maximum daily air temperature (U. S. Public Health Service, 1962). Based on the annual average maximum daily air temperature at Wikieup, which is 83. 4°F (W. D. Sellers, oral commun., 1971), the optimum fluoride content in drinking water is 0. 7 mg/l; the presence of fluoride in average concentrations of 1. 4 mg/l or more is cause for rejection of the water for public supply (U. S. Public Health Service, 1962, p. 8). Analyses indicate that most of the ground water south of T. $16\frac{1}{2}$ N. contains more than 1. 4 mg/l but less than 3 mg/l fluoride. North of T. $16\frac{1}{2}$ N., ground water contains less than 1. 8 mg/l fluoride and generally contains less than 1. 4 mg/l fluoride except in the northwestern part of the area and near the Peacock Mountains. The fluoride content ranges from 1. 1 to 3. 2 mg/l in the northwestern part of the area and from 4. 4 to 5. 2 mg/l near the Peacock Mountains.

The ground water in the Big Sandy area is suitable for irrigation use because it is not highly mineralized and the sodium concentrations generally are smaller than those of calcium and magnesium. The water in much of the area contains fluoride in amounts greater than 1. 4 mg/l, which is grounds for rejection of the water for public supply (U. S. Public Health Service, 1962, p. 8).

Ground-water outflow. --Ground-water outflow comprises primarily natural consumptive use and secondarily use by people. As used in this report, the term "outflow" is the total discharge of ground water from the area. The dominant loss of ground water is to the atmosphere through transpiration by riparian vegetation; the consumptive use of water pumped for irrigation and for public supply and underflow out of the area account for the small remainder of ground-water outflow. The small

The volume of water pumped for irrigation and public supply is small and varies from year to year. About 530 acres of grain and alfalfa is irrigated fairly regularly, and 100 to 200 acres of pasture is irrigated from time to time (J. N. McDougal, Mohave County Extension Agent, and C. Williams, Soil Conservation Service, oral commun., 1970). The consumptive use of ground water for irrigation is estimated to be about 2,300 acre-feet per year. About 150 inhabitants live in the area, and, assuming a use of 175 gallons per day per person, about 30 acre-feet per year is used for domestic supply.

A small amount of underflow leaves the south end of the area through the stream and flood-plain alluvium along the Big Sandy River. The volume of underflow is the product of the hydraulic conductivity of the aquifer, the hydraulic head into the cross section, and the saturated cross-sectional area. The saturated cross-sectional area is calculated at about 9,000 square feet, based on data from three auger holes bored to the granitic gneiss at the cross section (Kam, written commun., 1966). The hydraulic conductivity is estimated to be about 1,000 cubic feet per day per square foot (8,000 gpd per square foot) —a transmissivity of about 27,000 cubic feet per day per cross-sectional foot (200,000 gpd per foot) for the average 25-foot thickness of aquifer. The hydraulic gradient is about 10 feet in a horizontal distance of 1,000 feet. Integrating the hydraulic conductivity across the saturated cross-sectional area and multiplying by the hydraulic gradient gives an underflow of about 800 acre-feet per year.

The annual ground-water discharge is about 21,500 acre-feet and comprises about 18,400 acre-feet of evapotranspiration, 2,300 acre-feet of pumpage (consumptive use), and 800 acre-feet of underflow. In addition, ground water is forced to the surface in the Big Sandy River near and south of Wikieup (Kam, written commun., 1966), and about 1,800 acre-feet per year leaves the area as perennial flow.

## ADDITIONAL WATER DEVELOPMENT

Additional water supplies can be developed in several parts of the Big Sandy area, either by drilling additional wells or by deepening existing wells. The flood plain of the Big Sandy River is the most accessible and convenient area from which additional water can be obtained, but wells, leveled fields, and buildings in this area may be destroyed during major floods. The main water-yielding units along the flood plain are

REFERENCES CITED

Bowie, J. E., and Kam, William, 1968, Use of water by riparian veg-
etation, Cottonwood Wash, Arizona, with a section on Vegetation,
by F. A. Branson and R. S. Aro:    U. S. Geol. Survey Water-
Supply Paper 1858, 62 p.

Dutt, G. R., and McCreary, T. W., 1970, The quality of Arizona's do-
mestic, agricultural, and industrial waters: Arizona Univ., Agr.
Exp. Sta. Bull. 256, 83 p.

Gillespie, J. B., Bentley, C. B., and Kam, William, 1966, Basic hydro-
logic data of the Hualapai, Sacramento, and Big Sandy Valleys,
Mohave County, Arizona:  Arizona State Land Dept. Water-
Resources Rept. 26, 39 p.

Green, C. R., and Sellers, W. D., eds., 1964, Arizona climate: Tucson,
Arizona Univ. Press, 503 p.

Hanson, R. L., Kipple, F. P., and Culler, R. C., 1972, Changing the
consumptive use on the Gila River flood plain, southeastern Ari-
zona, in Age of changing priorities for land and water: Am. Soc.
Civil Engineers Irrigation and Drainage Div. Specialty Conf.,
Spokane, Wash., 1972, p. 309-330.

Krieger, M. H., Creasey, S. C., and Marvin, R. F., 1971, Ages of some
Tertiary andesitic and latitic volcanic rocks in the Prescott-
Jerome area, north-central Arizona, in Geological Survey Re-
search, 1971: U. S. Geol. Survey Prof. Paper 750-B, p. 157-
160.

Lance, J. F., 1960, Stratigraphic and structural position of Cenozoic
fossil localities in Arizona:  Arizona Geol. Soc. Digest, v. 3,
p. 155-159.

McKee, E. H., and Anderson, C. A., 1971, Age and chemistry of Tertiary
volcanic rocks in north-central Arizona and relation of the rocks
to the Colorado Plateaus:  Geol. Soc. America Bull., v. 82,
no. 10, p. 2767-2782.

# APPENDIX B

Pumping Test, Field Data Sheets

# RANCH AT WIKIEUP

## SW1/4, NW1/4, NE1/4 of Section 13, T. 15 N., R. 13 W.

### Pump Test Data

### October 29-30, 1999

Well 105 feet total depth
Perforated area, 20 feet at bottom of well
Static Water Level 24 feet
Average discharge = 386.85 gpm

| Date Time | Pumping Level in feet | Drawdown in feet | Time Since Start minutes | Remarks |
|-----------|------------------------|-------------------|---------------------------|---------|
| 10/29/99 | | | | |
| 0800 | 24.00 | -0- | -0- | Pump on, meter 027691 x 1000 |
| 0801 | 24.50 | .50 | 1 | |
| 0802 | | | | |
| 0803 | 26.60 | 2.60 | 3 | |
| 0804 | 26.80 | 2.80 | 4 | |
| 0805 | 26.90 | 2.90 | 5 | |
| 0806 | 27.10 | 3.10 | 6 | |
| 0807 | 27.15 | 3.15 | 7 | |
| 0808 | 27.30 | 3.30 | 8 | |
| 0809 | 27.35 | 3.35 | 9 | |
| 0810 | 27.40 | 3.40 | 10 | |
| 0812 | 27.45 | 3.45 | 12 | |
| 0814 | 27.50 | 3.50 | 14 | |
| 0816 | 27.55 | 3.55 | 16 | |
| 0818 | 27.60 | 3.60 | 18 | |
| 0820 | 27.65 | 3.65 | 20 | |
| 0825 | 27.80 | 3.80 | 25 | |
| 0830 | 28.00 | 4.00 | 30 | |
| 0840 | 28.20 | 4.20 | 40 | |
| 0850 | 28.50 | 4.50 | 50 | |
| 0900 | 28.70 | 4.70 | 60 | |
| 0915 | 28.90 | 4.90 | 75 | |

RANCH AT WIKIEUP PUMPING TEST DATA, PAGE 1

| Date Time | Pumping Level in feet | Drawdown in feet | Time Since Start minutes | Remarks |
|---|---|---|---|---|
| 0930 | 29.10 | 5.10 | 90 | |
| 0945 | 29.20 | 5.20 | 105 | |
| 1000 | 29.60 | 5.60 | 120 | |
| 1030 | 29.90 | 5.90 | 150 | |
| 1100 | 30.50 | 6.50 | 180 | |
| 1130 | 30.80 | 6.80 | 210 | |
| 1200 | 31.20 | 7.20 | 240 | |
| 1230 | 31.55 | 7.55 | 270 | |
| 1300 | 32.00 | 8.00 | 300 | |
| 1330 | 32.55 | 8.50 | 330 | |
| 1400 | 33.33 | 9.33 | 360 | |
| 1500 | 35.20 | 11.20 | 420 | |
| 1600 | 36.80 | 12.80 | 480 | |
| 1700 | 37.10 | 13.10 | 540 | |
| 1800 | 37.55 | 13.55 | 600 | |
| 1900 | 40.40 | 16.40 | 660 | |
| 2000 | 42.40 | 18.40 | 720 | |
| 2100 | 49.10 | 25.10 | 780 | |
| 2200 | 50.70 | 26.70 | 840 | |
| 2400 | 54.10 | 30.10 | 960 | |
| 10/30/99 | | | | |
| 0200 | 57.40 | 33.40 | 1,080 | |
| 0400 | 59.20 | 35.20 | 1,200 | |
| 0600 | 60.60 | 36.60 | 1,320 | |
| 0800 | 62.40 | 38.40 | 1,440 | Temperature 20 degrees C. |
| 0900 | 62.80 | 38.80 | 1,500 | |
| 1145 | 62.80 | 38.80 | 1,635 | Pump off, meter 028323.5 x 1000 |

28,323,500 - 27,691,000 = 632,500 / 1635 = 386.85 gpm average discharge during test.

# RANCH AT WIKIEUP

## SW1/4, NW1/4, NE1/4 of Section 13, T. 15 N., R. 13 W.

### Observation Well Data
Approximately 200 feet South of Pumped Well

### October 29-30, 1999

Total Depth of Well 60 feet, Perforations Unknown

| Date Time | Water Level in feet | Residual Drawdown in feet | Time Since Start in minutes | Remarks |
|---|---|---|---|---|
| 10/29/99 | | | | |
| | | | | |
| 0735 | 18.90 | -0- | -0- | Static Water Level |
| 0800 | | | -0- | Pump on |
| 0900 | 19.00 | .10 | 60 | |
| 1100 | 19.25 | .35 | 180 | |
| 1300 | 19.70 | .80 | 300 | |
| 1500 | 20.00 | 1.10 | 420 | |
| 1700 | 20.20 | 1.30 | 540 | |
| 1900 | 20.30 | 1.40 | 660 | |
| 2000 | 20.35 | 1.45 | 720 | |
| 2100 | 20.45 | 1.55 | 780 | |
| 2200 | 20.50 | 1.60 | 840 | |
| 2400 | 20.55 | 1.65 | 960 | |
| | | | | |
| 10/30/99 | | | | |
| | | | | |
| 0200 | 20.60 | 1.70 | 1,080 | |
| 0400 | 20.65 | 1.75 | 1,200 | |
| 0600 | 20.65 | 1.75 | 1,320 | |
| 0800 | 20.66 | 1.76 | 1,440 | |
| 1145 | 20.75 | 1.85 | 1,635 | |

# APPENDIX C

Estimated Cost, Test Hole

10-19-99   04:17P   P.02



**Layne Christensen Company**
12030 E. Riggs Road
Chandler, Arizona 85249
Office: 602.895.9336
Fax: 602.895.9536

# Project Estimate

| | | | | |
|---|---|---|---|---|
| Company: | Manera Inc | Date: | October 20, 1999 |
| Contact: | Paul Manera | Project: | Kingman, AZ |
| Address: | | Location: | Kingman, AZ |
| City: | | Estimated By: | Koal C. Hirschi |
| State: | | Proposal Number: | 429 |
| Zip Code: | | Estimated Footage: | 1500 |
| Phone: | 948-9818 | Average Depths: | 1500 |
| FAX: | 586-8776 | Number of Holes: | 1 |

| Description | Unit | Quantity | Cost | Total |
|---|---|---|---|---|
| Mobilization and Demobilization drilling crew and equipment | L.S. | 1 | $1,200.00 | $1,200.00 |
| Furnish and install 20' of 6" LCS surface casing | L.S. | 1 | $1,600.00 | $1,600.00 |
| Drill 5 1/2" Reverce Circulation air rotary | | | | |
| 0-500 feet | Foot | 500 | $12.50 | $6,250.00 |
| 500-1000 feet | Foot | 500 | $14.50 | $7,250.00 |
| 1000-1500 feet | Foot | 500 | $16.50 | $8,250.00 |
| Miscellaneous drill rig time to move between holes, haul water, split-spoon sample, clean site, water sampling, etc. | Hour | 30 | $265.00 | $7,950.00 |
| Abandonment with a cement bentonite grout (if required) | Foot | 0 | $4.50 | $0.00 |
| Client directed Stand-by time | Hour | 0 | $225.00 | $0.00 |
| Per Diem Per Crew Day | Day | 5 | $225.00 | $1,125.00 |
| Miscellaneous materials and equipment consumed on project. | Cost ● 20% | | | |
| | | | **Total Estimated Cost** | $33,625.00 |

1) Subject to review of HASP and terms and conditions.
2) Availability of manpower and equipment.
3) Actual cost based upon actual quantities consumed.
4) Utility clearance by others.
5) Storage, transport and disposal of drill cuttings by others.

**Comments:**

Estimate to drill test holes
Cost per test hole + cost of downhole Logging

# APPENDIX D
## TEST HOLE DRILLING RESULTS

# RESULTS

# TEST HOLE DRILLING PROGRAM

# WIKIEUP, MOHAVE COUNTY, ARIZONA

### CAITHNESS BIG SANDY, L.L.C.

MANERA, INC.
8316 NORTH 53RD STREET
PARADISE VALLEY, AZ 85253
TELEPHONE (480) 948-9818



March 22, 2000

INTRODUCTION

Caithness Big Sandy, L.L.C. (Caithness) proposes to construct a gas fired, electrical generating plant southeast of Wikieup, Mohave County, Arizona. Caithness Big Sandy, L.L.C. purchased one thousand plus acres with the intention of siting the plant on property in the southwest quarter of Section 5, T. 15 N., R. 12 W., G&SR B&M and using the remaining land, as required to develop the water supply required for the generating plant. The property purchased is illustrated on Figure 1.

Initially, the surface flow and underflow, comprising the total "surface" flow of the Big Sandy River was measured in Section13, T. 15 N., R. 13 W. to determine if sufficient surface water was present to satisfy the Surface Water Rights appurtenant to the land purchased. Although the water supply that could be harvested from the Big Sandy River appeared sufficient to satisfy the demand of the proposed plant, the results of the removal of this volume of water from the river was unacceptable to Caithness.

Davidson (1973) stated that the central valley (of the Big Sandy basin) is underlain by several hundred to a few thousand feet of semiconsolidated to uncosolidated deposits that store large amounts of ground water. He further states "wells drilled into gravel in the lower basin fill yield small of water, however naturally developed or gravel packed and screened wells may increase yields from this unit. Caithness elected to test the alluvial fill of the basin to determine if there was sufficient ground water to supply the demands of the plant and to determine the effect of withdrawal of this volume of water on the flow of the Big Sandy River.

This report presents the preliminary results of the first phase of that determination.


PURPOSE AND SCOPE OF PHASE 1

Caithness authorized the drilling, downhole logging and abandonment of one test hole with a target depth of 1,500 feet. Based on the results of the drilling of the first test hole, two additional wells were authorized. Upon completion of the third test hole, one additional test hole was authorized expand the known lateral extent of the aquifer.

The purpose of the test holes was to determine the types of subsurface formations present, the presence or absence of water in the subsurface formations, the quality of the water encountered and some concept of the value of additional testing.


METHODOLOGY

It was elected to drill a 5.75 inch diameter slim hole using the dual wall, reverse circulation drilling method. This method is normally fast drilling, clean drill cutting samples can be obtained and formation water samples can be collected for analysis.


LOCATION OF THE TEST SITES

The locations of the test holes and the rationale for selecting these sites were:

> Test Hole 1    SW corner, NW1/4, SW1/4 of Section 36, T. 16 N., R. 13 W.
>
> This site was near the river and on the western edge of the lacustrine clay deposits termed the Big Sandy formation (Sheppard and Gude,

1972) shown on Figure 2. Prior to drilling the thickness of the Big Sandy formation was not known.

Test Hole 2    NW1/4, NW1/4, NW1/4 of Section 7, T. 15 N., R. 12 W.

The westernmost point on the upland property and closest point on the upland property to the center of the basin.

Test Hole 3    SW1/4, SW1/4, SW1/4 of Section 5, T. 15 N., R. 12 W.

The point on the Plant Site nearest the center of the basin.

Test Hole 4    SE1/4, SE1/4, NW1/4 of Section 7, T. 15 N., R. 12 W.

Extended the known lateral extent of the subsurface materials which would allow the drilling and construction of four production wells in the northwest quarter of Section 7.

The four test hole sites are illustrated on Figure 1.

## RESULTS OF DRILLING

### Test Hole 1

The materials encountered during the drilling of Test Hole 1 consisted of layers of intrusive igneous rocks alternating will layers of a sandstone describe by Lease (1981 as a siltstone and sandstone, very fine to fine grained, white to medium gray, friable to well cemented with calcite, micaceous. A few particles of igneous extrusive rocks were seen in the sand and gravel layers.

Water was encountered at approximately 20 feet and the volume of water continued to increase with depth. At 400 feet the hydrostatic head of the water required a weighting material to be added to the drilling fluid to maintain drilling capability. When the drill reached 700 feet the hydrostatic head of the confined water pushed the drilling fluid out of the hole and a flow of approximately 15 gallons per minute (gpm) occurred. Drilling terminated at 700 feet.

A water sample was collected and analyzed by Zalco Laboratories. The total dissolved solids contained in the water was reported to be 900 milligrams per liter (mg/l). Water samples for this and all test holes are representative of the water quality in the formation, however, as the samples were taken during the drilling process, the minor constituents such as iron, manganese and turbidity and color may not be representative of clean water from the formation which will be delivered following cleaning of the well by pumping or long term flow.

The lithologic log and the results of the chemical analysis of the water from Test Hole 1 is included as Appendix A.

### Test Hole 2

The Big Sandy formation lacustrine clays extend from the surface (with the exception of a thin layer of sand and gravel concentrated at the surface) to a depth of 350 feet.

Below the clay, alternating layers of igneous intrusive (granitic) sand and gravel alternated with igneous extrusive (volcanic) rocks to the total depth of the test hole at 1,155 feet.

Although water was encountered directly below the clay, the hydrostatic head was limited above a depth of 1,060 feet. At that depth the bit penetrated a volcanic layer that apparently formed a confining layer, at which time the well began to flow under artesian pressure. Drilling continued to the total depth of 1,155 feet.

The well was downhole logged by Geophysical Logging Services.

A water sample was collected for submission for analysis. Aquatic Consulting and Testing, Inc. submitted the results of the analysis. The total dissolved solids content of this water was reported as 811 mg/l. The manganese and iron contents in the waters from Test Hole 2 were significantly lower than in the waters of Test Hole 1.

The artesian flow from this well was measured as 125 gpm with a closed in pressure of 30 pounds per square inch (psi).

The water temperature was measured at 37 C (99 F).

All data sheets for Test Hole 2 are included as Appendix B.

Test Hole 3

The Big Sandy formation lacastrine clay is present from 55 feet to 160 feet. Above the clay is a layer of igneous intrusive sand and gravel mixed with clay. Below the clay, 160 feet to the total depth of 780 feet, all materials encountered are volcanic (igneous extrusive) rocks or sand and gravel. The volcanic materials had a wide range of color from almost white, pink, red, purple, brown, a wide range of gray and black.

The test hole was downhole logged from the surface to approximately 375 feet, where the hole was bridged. The drill pipe was extended through the bridge and the bottom of the hole, 650 feet to 780 feet was logged. The gamma and density logs were made through the drill pipe. Therefore, the density and gamma are correct for the entire depth of the hole, and the remaining logs are accurate from the surface to 375 feet and from 650 to 780 feet.

A water sample was collected for submission for analysis. Aquatic Consulting and Testing, Inc. submitted the results of the analysis. The total dissolved solids content of this water was reported as 770 mg/l. The analysis indicates a high sodium sulphate water and pH of 8.3.

The static water level in this well rose to 20 feet but did not flow.

The water temperature was measured at 37 C (99 F).

All data sheets for Test Hole 3 are included as Appendix C.

Test Hole 4

The materials encountered in Test Hole 4 consisted of a hundred feet of granitic sand and gravel with the Big Sandy formation lacastrine clay extending from 120 feet to 260 feet with transition zones both above and below the clay. Below 300 feet to the total

    b.       The well at Site 4 would be cemented off to a depth of 1,070 feet , then perforated from 1,070 feet to 1,250 feet to observe the effect of pumping on the confined aquifer.

2.    Three shallow, 250 feet, piezometric wells would be drilled and perforated from the surface to 250 feet to observe if the upper aquifer has been isolated from the effect of withdrawal from the lower aquifer(s);

    a.       One well would be located at Site 2;

    b.       Locations for the remaining two shallow piezometric wells have not yet been determined;

3.    Five deep, 1,500 feet total depth, production wells would be drilled;

    a.       The first production well would be on the plant site in Section 5, T. 15 N., R. 12 W. This well would be completed and tested prior to the drilling and construction of the remaining wells;

    b.       The remaining four wells would be located at the four corners of the northwest quarter of Section 7, T. 15 N., R. 12 W. unless the results of the testing of the first production well indicates that a greater spacing than one half mile is required.

The generalized design of the piezometric wells are included as Appendix E.

TEST HOLE RESULTS, PAGE 5



FIGURE 1

CAITHNESS BIG SANDY, L.L.C.

LOCATION OF TEST HOLES 1 - 4



MAP SHOWING THE DISTRIBUTION OF THE

BIG SANDY FORMATION (Stippled)

FIGURE 2

# CAITHNESS BIG SANDY L.L.C.

## TEST HOLE 1

### SW1/4, NW1/4, SW1/4 of Section 36, T. 16 N., R. 13 W.

### LITHOLOGIC LOG

December 1999

| Depth feet | Percent S & G | Average Size, in | Maximum Size, in | Description |
|---|---|---|---|---|
| 0 - 95 | 75 - 80 | 1/8 | 1 | Granitic sands and gravels, coarse, acidic igneous intrusive rock particles, somewhat stained with iron oxides. Large percentage of free quartz. Occasional particles of acidic volcanics |
| 95 - 120 | - | - | - | Sandstone, cream to light gray |
| 120- 160 | 75 - 80 | 1/8 | ½ | Granitic sands and gravels |
| 160 - 180 | - | - | - | Sandstone, cream to light gray |
| 180 - 190 | 75 - 80 | 1/8 | 3/4 | Granitic sands and gravels |
| 190 - 210 | - | - | - | Sandstone, cream to light gray |
| 210 - 220 | 75 - 80 | 1/8 | 3/4 | Granitic sands and gravels |
| 220 - 310 | - | - | - | Sandstone, cream to light gray |
| 310 - 460 | 75 - 80 | 1/8 | ½ - 1 | Granitic sands and gravels |
| 460 - 480 | - | - | - | Sandstone, darker gray |
| 480 - 700 | 75 - 85 | 1/8 | ½ - 1 | Granitic sands and gravels |

Note:   Lease (1981) describes the sandstone as "siltstone and sandstone, very fine to fine grained, white to medium gray, friable to well cemented with calcite, micaceous."

LOG BY MANERA, INC.

Zalco Laboratories, Inc.
4309 Armour Avenue
Bakersfield, CA  93308

*Test Hole 1*
*SW¼ Sec 36 T1LN R13*
*Confined Water 400'-700'*

GENERAL MINERAL & PHYSICAL & INORGANIC ANALYSIS (9/99)

te of Report: 00/01/21                      Sample ID No.0001181-1
boratory                                   Signature Lab
me: ZALCO LABORATORIES, INC.                   Director:
ne of Sampler:T. DeRoucher           Employed By: Coso Operating
te/Time Sample           Date/Time Sample          Date Analyses
llected:99/12/18/0900    Received @ Lab:00/01/13/1100    Completed:00/01/20

stem                                           System
ne:COSO OPERATING COMPANY                      Number: 15CXX15
ne or Number of Sample Source:Well Pump Test

User ID: 15C                             Station Number:
Date/Time of Sample: |99|12|18|0900|           Laboratory Code: 7625
                  YY MM DD TTTT                       YY MM DD
                                     Date Analysis completed: |00|01|20|
Submitted by:_____           Phone #:_____

| MCL | REPORTING UNITS | CHEMICAL | ENTRY # | ANALYSES RESULTS | DLR |
|-----|-----------------|----------|---------|------------------|-----|
|     | mg/L | Total Hardness (as CaCO3) (mg/L) | 00900 | 140 | |
|     | mg/L | Calcium (Ca) (mg/L) | 00916 | 36 | |
|     | mg/L | Magnesium (Mg) (mg/L) | 00927 | 13 | |
|     | mg/L | Sodium (NA) (mg/L) | 00929 | 260 | |
|     | mg/L | Potassium (K) (mg/L) | 00937 | 15 | |

Total Cations       Meq/L Value: 14.55

| MCL | REPORTING UNITS | CHEMICAL | ENTRY # | ANALYSES RESULTS | DLR |
|-----|-----------------|----------|---------|------------------|-----|
|     | mg/L | Total Alkalinity (AS CaCO3) (mg/L) | 00410 | 250 | |
|     | mg/L | Hydroxide (OH) (mg/L) | 71830 | 0 | |
|     | mg/L | Carbonate (CO3) (mg/L) | 00445 | 0 | |
|     | mg/L | Bicarbonate (HCO3) (mg/L) | 00440 | 310 | |
| *   | mg/L+ | Sulfate (SO4) (mg/L) | 00945 | 190 | .5 |
| •   | mg/L+ | Chloride (Cl) (mg/L) | 00940 | 140 | |
| 45  | mg/L | Nitrate (as NO3) (mg/L) | 71850 | 2.4 | 2.0 |
| **  | mg/L | Fluoride (F) Temp. Depend. (mg/L) | 00951 | 3.8 | .1 |

Total Anions       Meq/L Value: 13.22

| MCL | REPORTING UNITS | CHEMICAL | ENTRY # | ANALYSES RESULTS | DLR |
|-----|-----------------|----------|---------|------------------|-----|
|     | Std.Units+ | PH (Laboratory) (Std.Units) | 00403 | 8.1 | |
| *** | umho/cm+ | Specific Conductance (E.C.) (umho/cm) | 00095 | 1300 | |
| **** | mg/L+ | Total Filterable Residue@180C(TDS)(mg/L) | 70300 | 900 | |
|     | Units | Apparent Color (Unfiltered) (Units) | 00081 | 40 | |
|     | TON | Odor Threshold at 60 C (TON) | 00086 | < 1.0 | |
|     | NTU | Lab Turbidity (NTU) | 82079 | 83 | |
| 0.5 | mg/L+ | MBAS (mg/L) | 38260 | < 0.05 | |

* 250-500-600    ** 0.6-1.7    *** 900-1600-2200    **** 500-1000-1500

# CAITHNESS BIG SANDY L.L.C.

## TEST HOLE 2

### NW1/4, NW1/4, NW1/4 of Section 7, T. 15 N., R. 12 W.

### LITHOLOGIC LOG

FEBRUARY, 2000

| Depth feet | Percent S & G | Average Size, in | Maximum Size, in | Description |
|---|---|---|---|---|
| 0 - 50 | 85 | 1/8 | ½ | Granitic sand and gravel |
| 50 - 350 | - | - | - | Gray lacustrine clay |
| 350 - 400 | 60 | 1/8 | 1/4 | Clay with igneous sand and gravel |
| 400 - 700 | 80 | 1/8 | 1/4 | volcanic sand and gravel |
| 700 - 715 | - | - | - | Dark red clay |
| 715 - 780 | 80 | 1/8 | 1/4 | Red volcanics,    sand and gravel ? |
| 780 - 840 | 80 | 1/8 | 1/4 | Red volcanics with malachite |
| 840 - 860 | 80 | 1/8 | 1/4 | Red volcanics with zeolites |
| 860 - 1,030 | 80 | 1/8 | 1/4 | Igneous intrusive sand and gravel |
| 1,030 - 1,060 | 50 | 1/8 | 1/4 | Clay with intrusive sand and gravel |
| 1,060 - 1,155 | 80 | 1/8 | 1/4 | Volcanics, confined water |

Artesian flow = 125 gpm
Closed in pressure = 30 psi

LOG BY MANERA, INC.





# AQUATIC CONSULTING & TESTING, INC.

1525 W. University Drive, Suite 106
P.O. Box 1510
Tempe, Arizona 85281
Phone: (480) 921-8044 • FAX: (480) 921-0049

Lic. No. AZ0003

## LABORATORY REPORT

**Client:** Manera, Inc.
8316 N. 53rd St.
Paradise Valley, AZ 85253

**Date Submitted:** 1/31/00
**Date Reported:** 03/09/00

**Attn:** Paul Manera

**Sample Type:** Drinking Water
**Sample Time:** 01/28/00 17:00

**Client ID:** BS2
**ACT Lab No.:** BG00950

## RESULTS

| Parameter | Analysis Date Start | End | Method No. | Result | Unit |
|-----------|---------|---------|-----------|--------|------|
| Alkalinity | 2/25/00 | 2/25/00 | SM 2320 | 276. | mg/L as CaCO3 |
| Chloride | 2/25/00 | 2/25/00 | 325.3 | 140. | mg/L |
| Cyanide | 2/7/00 | 2/7/00 | SM4500CN CE | <0.01 | mg/L |
| Fluoride | 2/1/00 | 2/1/00 | SM4500F C | 3.5 | mg/L |
| Silica | 2/11/00 | 2/11/00 | SM4500Si DE | 6.21 | mg/L as SiO2 |
| Sulfate | 2/28/00 | 2/28/00 | 375.4 | 212. | mg/L |
| Total Hardness | 2/25/00 | 2/25/00 | 130.2 | 182. | mg/L as CaCO3 |
| Antimony | 2/11/00 | 2/11/00 | 200.9 | <0.003 | mg/L |
| Arsenic | 2/11/00 | 2/11/00 | 200.9 | <0.005 | mg/L |
| Barium | 2/8/00 | 2/8/00 | 200.7/6010 | 0.11 | mg/L |
| Beryllium | 2/3/00 | 2/3/00 | 200.7/6010B | <0.002 | mg/L |
| Cadmium | 2/3/00 | 2/3/00 | 200.7 | <0.002 | mg/L |
| Calcium | 2/28/00 | 2/28/00 | 200.7 | 60. | mg/L |
| Chromium | 2/3/00 | 2/3/00 | 200.7 | <0.01 | mg/L |
| Copper | 2/7/00 | 2/7/00 | 200.7 | <0.01 | mg/L |
| Iron | 2/28/00 | 2/28/00 | 200.7 | 0.17 | mg/L |
| Lead | 2/25/00 | 2/25/00 | 200.9 | <0.005 | mg/L |
| Magnesium | 2/28/00 | 2/28/00 | 200.7 | 18. | mg/L |
| Manganese | 2/7/00 | 2/7/00 | 200.7 | 0.05 | mg/L |
| Mercury | 2/9/00 | 2/9/00 | 245.1 | <0.0002 | mg/L |
| Nickel | 2/3/00 | 2/3/00 | 200.7 | <0.01 | mg/L |

**Sample Type:** Drinking Water

**Sample Time:** 01/28/00 17:00

**Client ID:** BS2

**ACT Lab No.:** BG00950

## RESULTS

| Parameter | Analysis Date Start | End | Method No. | Result | Unit |
|-----------|---------|-----|-----------|--------|------|
| Selenium | 2/10/00 | 2/10/00 | 200.9 | <0.005 | mg/L |
| Silver | 3/1/00 | 3/1/00 | 200.9 | <0.002 | mg/L |
| Sodium | 2/28/00 | 2/28/00 | 200.7 | 229. | mg/L |
| Thallium | 2/3/00 | 2/3/00 | 200.9 | <0.001 | mg/L |
| Zinc | 2/28/00 | 2/28/00 | 200.7 | <0.01 | mg/L |
| Total Dissolved Solids | 2/25/00 | 2/25/00 | 160.1 | 811. | mg/L |

**Reviewed by:** _____

Frederick A. Amalfi, Ph.D.

**Laboratory Director**

bma

**AQUATIC CONSULTING & TESTING, INC.**
1525 W. University Drive, Suite 106 • Tempe, AZ 85281
Phone: (480) 921-8044 • Fax: (480) 921-0049

# CHAIN OF CUSTODY

PAGE____ OF ____

Client: MANERO INC.
Address: 8316 N 53RD ST
Street
Paradise Valley, AZ
City, State, Zip
Phone/Fax: 4809489818
Contact: PAUL MANERO
Sampler Signature: Paul Manero

Remarks:
See
attached #
-w /silica

| | Metals / TCLP | TDS / TSS / TS / SETT | O-G / TPHC / MBAS | BOD / COD | Tot. P / O-PO₄ | Nitrate + Nitrite / Nitrate / Nitrite | TKN / Ammonia | VOC / THM's | IOC # | | Tot. Coliform: P/A | Tot. Coliform: MPN | Fecal Coliform | Coliert (24hr) | Plate Count | | Acute | Chronic | AWET (SWRC) | MPA | ACID | NONE | OTHER | Laboratory Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | BG00980 |
| BS 2 | 1/08 17:00 | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |

Sample Receiving:

Intact: X Yes ____ No

Temp: 20°C

Preserved: 1 Yes 12 No

Total # containers: 3 V8

| 1. Relinquished By: Paul Manero | 2. Relinquished By: | 3. Relinquished By: |
|---|---|---|
| Date/Time 31JAN00 17:05 | Date/Time | Date/Time |
| 1. Received By: Carla Sleep | 2. Received By: | 3. Received By: |
| Date/Time 1-31-00 17:05 | Date/Time | Date/Time |

***Using the "Remarks:" area, please specify which metals are to be analyzed.**

By signing this chain of custody, the designated client and agent agree to pay Aquatic Consulting & Testing, Inc. for all services rendered in
conjunction with the submitted samples within 30 days of invoice. It is the client's responsibility to note purchase order numbers or other

White-Laboratory          Yellow-Report          Pink-Client

APPENDIX C

TEST HOLE 3

# CAITHNESS BIG SANDY L.L.C.

## TEST HOLE 3

### SW1/4, SW1/4, SW1/4 of Section 5, T. 15 N., R. 12 W.

### LITHOLOGIC LOG

February, 2000

| Depth feet | Percent S & G | Average Size, in | Maximum Size, in | Description |
|---|---|---|---|---|
| 0 - 55 | 85 | 1/8 | ½ | Granitic sand and gravel with a few particles of volcanic materials |
| 55 - 160 | < 5 | - | - | Greenish-tan clay |
| 160 - 210 | 50 | 1/8 | 1/4 | Transition, clay to sand and gravel |
| 210 - 280 | 85 | 1/8 | 1/4 | Volcanic layers, various colors ranging from greenish gray to gray black |
| 280 - 340 | 85 | 1/8 | 1/4 | Scoreaceous volcanics, gray black with copper (malachite) deposits on the particles |
| 340 - 370 | - | - | - | Dense brown clay |
| 370 - 390 | 65 | 1/8 | 1/4 | Brown volcanic materials |
| 390 - 440 | 85 | 1/8 | 1/4 | Gray-black volcanics |
| 440 - 500 | 80 | 1/8 | 1/4 | Light gray volcanics |
| 500 - 520 | 80 | 1/8 | 1/4 | Pink volcanics |
| 520 - 550 | 80 | 1/8 | 1/4 | Light gray volcanics |
| 550 - 600 | 80 | 1/8 | 1/4 | Greenish white volcanics |
| 600 - 630 | 80 | 1/8 | 1/4 | Brown volcanics |
| 630 - 650 | 80 | 1/8 | 1/4 | Gray green volcanics |
| 650 - 710 | 80 | 1/8 | 1/4 | White to purple volcanics |
| 710 - 780 | 80 | 1/8 | 1/4 | Red to red-purple volcanics |

Static Water Level = 20 + or - feet

Note:

The materials from 210 feet to the total depth of 780 feet consisted of a volcanic series which varied in color from almost white through pink, gray green, gray, brown, black.

The size and maximum size is probably the result of the bit rather than the materials being sand and gravel and the percent sand and gravel reflects the volume cut that was not pulverized.

LOG BY MANERA, INC.



# AQUATIC CONSULTING & TESTING, INC.

1525 W. University Drive, Suite 106
P.O. Box 1510
Tempe, Arizona 85281
Phone: (480) 921-8044 • FAX: (480) 921-0049

Lic. No. AZ0003

## LABORATORY REPORT

**Client:** Manera, Inc.
8316 N. 53rd St.
Paradise Valley, AZ 85253

**Date Submitted:** 2/11/00
**Date Reported:** 03/03/00

**Attn:** Paul Manera

**Sample Type:** Aqueous
**Sample Time:** 02/10/00 17:00

**Client ID:** B(15-12) 5ccc
**ACT Lab No.:** BG01481

## RESULTS

| Parameter | Analysis Date Start | End | Method No. | Result | Unit |
|---|---|---|---|---|---|
| Alkalinity | 2/18/00 | 2/18/00 | SM 2320 | 265. | mg/L as CaCO3 |
| Cyanide | 2/22/00 | 2/22/00 | SM4500CN CE | <0.01 | mg/L |
| Fluoride | 2/17/00 | 2/17/00 | SM4500F C | 4.0 | mg/L |
| Langelier Index | 2/15/00 | 2/15/00 | SM2330 D | See Attached * | |
| Nitrate + Nitrite - N | 2/16/00 | 2/16/00 | SM4500NO3 E | 1.43 | mg/L as N |
| Nitrite - N | 2/11/00 | 2/11/00 | SM4500NO2 B | <0.01 | mg/L as N |
| Silica | 2/11/00 | 2/11/00 | SM4500Si DE | 5.97 | mg/L as SiO2 |
| Sulfate | 2/28/00 | 2/28/00 | 375.4 | 208. | mg/L |
| Total Hardness | 2/16/00 | 2/16/00 | 130.2 | 182. | mg/L as CaCO3 |
| Antimony | 2/17/00 | 2/17/00 | 200.9 | <0.003 | mg/L |
| Arsenic | 2/16/00 | 2/16/00 | 200.9 | 0.048 | mg/L |
| Barium | 2/18/00 | 2/18/00 | 200.7/6010 | 0.04 | mg/L |
| Beryllium | 2/18/00 | 2/18/00 | 200.7/6010B | <0.002 | mg/L |
| Cadmium | 2/18/00 | 2/18/00 | 200.7 | <0.002 | mg/L |
| Calcium | 2/18/00 | 2/18/00 | 200.7 | 42. | mg/L |
| Chromium | 2/18/00 | 2/18/00 | 200.7 | <0.01 | mg/L |
| Copper | 2/18/00 | 2/18/00 | 200.7 | <0.01 | mg/L |
| Lead | 2/15/00 | 2/15/00 | 200.9 | <0.005 | mg/L |
| Magnesium | 2/18/00 | 2/18/00 | 200.7 | 16. | mg/L |
| Mercury | 2/25/00 | 2/25/00 | 245.1 | <0.0002 | mg/L |
| Nickel | 2/18/00 | 2/18/00 | 200.7 | <0.01 | mg/L |

**Sample Type:** Aqueous
**Sample Time:** 02/10/00 17:00

**Client ID:** B(15-12) 5ccc
**ACT Lab No.:** BG01481

## RESULTS

| Parameter | Analysis Date Start | End | Method No. | Result | Unit |
|---|---|---|---|---|---|
| Selenium | 2/16/00 | 2/16/00 | 200.9 | <0.005 | mg/L |
| Sodium | 2/23/00 | 2/23/00 | 200.7 | 234. | mg/L |
| Thallium | 2/18/00 | 2/18/00 | 200.9 | <0.001 | mg/L |
| pH | 2/11/00 | 2/11/00 | 150.1 | 8.3 | SU |
| Total Dissolved Solids | 2/15/00 | 2/15/00 | 160.1 | 770. | mg/L |

Reviewed by: _____
Frederick A. Amalfi, Ph.D.
Laboratory Director

bma

Sample Calculation

# Langelier Index

| Measured Characteristics of the water | |
|---|---|
| Sample ID | BG01481 |
| Calcium (mg/L) | 42 |
| pH | 8.3 |
| Temperature (C) | 20 |
| Alkalinity (mg/L as CaCO3) | 265 |
| TDS (mg/L) | 770 |

| Calculated Langelier Index | |
|---|---|
| Langelier Index | 0.630 |
| [If the Index is Negative, the water may be corrosive] | |
| Saturation Index | 7.670 |
| Ryzner (stability) Index | 7.040 |
| (>6.0 = corossive; <6.0 = Scale forming) | |

| Calculated Data | |
|---|---|
| Ionic Strength | 0.019 |
| Activity Coeff (m) | 0.869 |
| Activity Coeff (d) | 0.571 |
| Ca (moles/L) | 0.00105 |
| Alkalinity (moles/L) | 0.00265 |
| pK2 | 10.378 |
| K2 | 4.19E-11 |
| K2' | 7.33E-11 |
| pK2' | 10.135 |
| pKs | 8.267 |
| Ks | 5.41E-09 |
| Ks' | 1.66E-08 |
| pKs' | 7.780 |
| pCa | 2.979 |
| pHs | 7.670 |

**AQUATIC CONSULTING & TESTING, INC.**
1525 W. University Drive, Suite 106 • Tempe, AZ 85281
Phone: (480) 921-8044 • Fax: (480) 921-0049

# CHAIN OF CUSTODY

PAGE 1 OF 1

Client: Manera Inc.
Address: 8316 N 53rd St
Street
Paradise Valley 85253
City, State, Zip
Phone/Fax: 4809489818
Contact: Paul A. Manera
Sampler Signature: Paul A Manera

Remarks:
See attached *

| | Metals / TCLP | TDS / TSS / TS / SETT | O-G / TPHC / MBAS | BOD / COD | Tot. P / O-PO4 | Nitrate + Nitrite / Nitrate / Nitrite | TKN / Ammonia | VOC / THM's | Tocs 12 + Silica | | Tot. Coliform: P/A | Tot. Coliform: MPN | Fecal Coliform | Colilert (24hr) | Plate Count | | Acute | Chronic | AWET (SWRO) | MPA | ACID | NONE | OTHER | Laboratory Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B (15-12) 5ccc | | 2/10 | 1700 | G | | | | | | | | | | | | | | | | | | | | BG0148/ |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |

| Sample Receiving: | 1. Relinquished By: Paul A Manera | 2. Relinquished By: | 3. Relinquished By: |
|---|---|---|---|
| Intact: X Yes ___ No | Date/Time Feb 11-00 1330 | Date/Time | Date/Time |
| Temp: 14°C | 1. Received By: Owen Sleep | 2. Received By: | 3. Received By: |
| Preserved: ___ Yes 1 No | Date/Time 2-11-00 1330 | Date/Time | Date/Time |
| Total # containers: 1 | * Using the "Remarks:" area, please specify which metals are to be analyzed. | | |

By signing this chain of custody, the designated client and agent agree to pay Aquatic Consulting & Testing, Inc. for all services rendered in conjunction with the submitted samples within 30 days of invoice. It is the client's responsibility to note purchase order numbers or other responsibilities...

White-Laboratory ___ Yellow-Report ___ Pink-Client

**APPENDIX D**

**TEST HOLE 4**

# CAITHNESS BIG SANDY L.L.C.

## TEST HOLE 4

### SE1/4, SE1/4, NW1/4 of Section 7, T. 15 N., R. 12 W.

### LITHOLOGIC LOG

March, 2000

| Depth feet | Percent S & G | Average Size, in | Maximum Size, in | Description |
|---|---|---|---|---|
| 0 - 100 | 85 | 1/8 | ½ | Granitic sand and gravel |
| 100 - 120 | 50 | 1/8 | 1/4 | Transition, sand to clay |
| 120 - 260 | < 5 | - | - | Greenish-tan clay |
| 260 - 300 | 50 | 1/8 | 1/4 | Transition, clay to sand and gravel |
| 300 - 415 | 80 | 1/8 | 1/8 | Volcanic ash |
| 415 - 420 | - | - | - | Basalt layer |
| 420 - 570 | 80 | 1/16 | 1/8 | Volcanic sand and gravel, large amount of quartz |
| 570 - 600 | 80 | 1/16 | 1/4 | Granitic sand and gravel |
| 600 - 650 | 80 | 1/16 | 1/4 | Reddish-brown igneous intrusive sand and gravel |
| 650 - 720 | 80 | 1/16 | 3/4 | Volcanic sands and gravels or fractured rocks, with deposition of copper minerals |
| 720 - 890 | 80 | 1/16 | ½ | Gabbro type igneous intrusive sand and gravels, large percentage of dark minerals. |
| 890 - 930 | 80 | 1/16 | 3/8 | Pink granitic sand and gravel |
| 930 - 1,060 | 80 | 1/16 | 3/8 | Sand and gravel composed of a mixture of intrusive and extrusive rocks, color brownish red |
| 1,060 - 1,120 | - | - | - | Basalt flow |
| 1,120 - 1,190 | 80 | 1/16 | 1/4 | Reddish black igneous intrusive sand and gravel |
| 1,190 - 1,200 | - | - | - | Basalt flow |

LOG BY MANERA, INC.

APPENDIX E

PIEZOMETRIC WELL DESIGN



ground surface
Water Level
Surface casing
8" well bore
concrete or other seal
5" steel, blank casing
400'
4½" well bore
3" perforated
stablizer casing
gravel pack if possible
1250'

## SCHEMATIC DESIGN

## MONITORING WELLS AT WIKIEUP

### WELL AT TEST SITE 2

Northwest corner of Section 7, T. 15 N., R. 12 W.



## SCHEMATIC DESIGN

## MONITORING WELLS AT WIKIEUP

### WELL AT TEST SITE 4

Center of Section 7, T. 15 N., R. 12 W.



|← 8" →|

|← 5" →|

— ground surface
— surface casing
— 8" well bore

— gravel pack

— 5" perforated casing

water level - unknown

|— 250'

## SCHEMATIC DESIGN

## MONITORING WELLS AT WIKIEUP

### General Design of Shallow Wells

Sites to be Determined

# APPENDIX E
# LITHOLOGIC LOGS AND WELL CONSTRUCTION DIAGRAMS



Well Description

Surface Casing
Cement

9 7/8 Well Bore

5" Well Screen

Gravel Pack

Lithologic

Coarse sand and gravel (1/2") predominantly granite materials

Coarse sand with 10% gravel

Coarse sand (up to 3/16)

Clay

One quarter inch gravel

Clay

**BIG SANDY ENERGY PROJECT**

*OSB WELL SITE 1
LITHOLOGIC AND WELL COMPLETION LOG*

| DATE: 10/13/00 | AutoCAD File:891_obs-1.dwg |
| SCALE: AS NOTED | DRAWN BY: EC |

MANERA INC.



Well Description

Lithologic

Cement

200

28/17.5" Well Bore

400

600

800

1000

20/12" Well Screen

1200

Gravel Pack

1400

1600

Granitic sand and gravel with some clay, rocks to 2 inches

Granitic sand

Gray lacustrine clay

Clay with igneous sand and gravel

Basic intrusive sand and gravel, dark gray, some reddish particles

Iron stained intrusive sand

Andesite, appear as gravel with visible crystalline structure, dark red to dark gray becoming lighter in color 810-840, may indicate a fractured material that is broken by the bit

Intrusive (granitic) sand and gravel, with layers of dense clay, tan brown to gray in color

Dense red-brown clay

Volcanic sands, fine to coarse grained, confining cap

Fine grained volcanic sand, clay

Volcanic- probably basalt, fractured or scoriaeous

## BIG SANDY ENERGY PROJECT

### *PROD. WELL SITE 2*
### *LITHOLOGIC AND WELL COMPLETION LOG*

| DATE: 10/13/00 | AutoCAD File:891_prod-2.dwg |
|---|---|
| SCALE: AS NOTED | DRAWN BY: MM |

MAKRA INC.

891_prod-2.dwg
10/13/00



Well Description

Lithologic

Surface casing

Granitic sand and gravel with some clay, rocks to 2 inches

Granitic sand

Gray lacustrine clay

**200**

Cement

**400**

Clay with igneous sand and gravel

12 1/4" Well Bore

**600**

Basic intrusive sand and gravel, dark gray, some reddish particles

Iron stained intrusive sand

Andesite, appear as gravel with visible crystalline structure, dark red to dark gray becoming lighter in color 810-840, may indicate a fractured material that is broken by the bit

**800**

Intrusive (granatic) sand and gravel, with layers of dense clay, tan brown to gray in color

**1000**

Dense red-brown clay

5" Well Screen

Volcanic sands, fine to coarse grained

**1200**

Fine grained volcanic sand, clay

Gravel Pack

Fine grained extrusive sands, varying shades of gray

**1400**

**1600**

## BIG SANDY ENERGY PROJECT

### OBS WELL OWC SITE 2
### LITHOLOGIC AND WELL COMPLETION LOG

| DATE:  10/13/00 | AutoCAD File:891_owc-2.dwg |
| SCALE: AS NOTED | DRAWN BY:  MM |

MANERA INC.

891_owc-2.dwg
10/11/00



| Well Description | Lithologic |
|---|---|

Granitic sand and gravel with some clay, rocks to 2 inches

Granitic sand

Gray lacustrine clay

Cement — 200

400

28/17.5" Well Bore —

Clay with igneous sand and gravel

600

Basic intrusive sand and gravel, dark gray, some reddish particles

Iron stained intrusive sand

Andesite, appear as gravel with visible crystalline structure, dark red to dark gray becoming lighter in color 810-840, may indicate a fractured material that is broken by the bit

800

Intrusive (granitic) sand and gravel, with layers of dense clay, tan brown to gray in color

1000

Dense red-brown clay

Volcanic sands, fine to coarse grained, confining cap

20/12" Well Screen — 1200

Fine grained volcanic sand, clay

Gravel Pack —

Volcanic- probably basalt, fractured or scoriaeous

1400

1600

**BIG SANDY ENERGY PROJECT**

*OSB WELL OWMA SITE 2*
*MIDDLE AQUIFER*
*LITHOLOGIC AND WELL COMPLETION LOG*

MANRA INC.

| DATE: 10/13/00 | AutoCAD File:891_obs-2.dwg |
|---|---|
| SCALE: AS NOTED | DRAWN BY: MM |



Well Description

Lithologic

6 7/8" Well Bore →

Granite sand and gravel with a few particles of volcanic materials

Greenish tan clay- Wikieup formation

Transition clay to sand and gravel

Volcanic layers, various colors ranging from greenish gray to gray black

Scoreaceous volcanics, gray black with copper (malachite) deposits

Dense brown clay

Brown volcanic materials

Gray black volcanics

Light gray volcanics

Pink volcanics

Light gray volcanics

Greenish white volcanics

Brown volcanics

Gray green volcanics

White to purple volcanics

Red to red purple volcanics

## BIG SANDY ENERGY PROJECT

### *TESTHOLE #3*
### *LITHOLOGIC AND WELL COMPLETION LOG*

| DATE: 10/13/00 | AutoCAD File:891_test-hole-3.dwg |
| SCALE: AS NOTED | DRAWN BY: EC |

MANRA INC.



Well Description

Lithologic

Surface Casing

Sand , gravel and clay

Lacustrine clay with some
thin, fine grained sand layers

200

Cement

400

Lacustrine clay

17 1/2" Well Bore

600

12" Well Screen

Highly fractured andesite

800

Slightly fractured andesite

1000

Gravel Pack

Highly fractured andesite

1200

1400

1600

**BIG SANDY ENERGY PROJECT**

*OBS WELL SITE 3
LITHOLOGIC AND WELL COMPLETION LOG*

MANRA INC.

| DATE: 10/13/00 | AutoCAD File:891_obs-3.dwg |
|---|---|
| SCALE: AS NOTED | DRAWN BY: MM |

891_obs-3.dwg



Well Description

Lithologic

Surface Casing

200 — Cement

400

12 1/4" Well Bore

600

3" Well Screen

800

1000

1200

Gravel Pack

1400

1600

Surface soil, sand, gravel and clay, grayish tan >1/8"

Coarse granitic sand and gravel, up to 1/2 inch

Lacustrine clay

Granitic coarse sand 1/16" with volcanic particles, the materials increase in the volcanic content from top to bottom

Intrusive sand and gravel grading from reddish brown at the top to dark gray at 1140 feet

Dark gray volcanic material

Reddish brown granitic sand, encountered increasing water from 1315 to 1375; at 1375 encountered the top (?) of the confined water

Dark gray volcanic material with rugs lined with small crystals

**BIG SANDY ENERGY PROJECT**

*OBS WELL SITE 4*
*LITHOLOGIC AND WELL COMPLETION LOG*



| DATE:  10/13/00 | AutoCAD File:891_obs-4.dwg |
| SCALE: AS NOTED | DRAWN BY:  MM |



Well Description

Lithologic

Surface Casing

Cement

10

30

Predominantly igneous intrusive sand with a few clay layers

50

70

6 7/8 Well Bore

90

5" Well Screen

110

Gravel Pack

130

150

170

**BIG SANDY ENERGY PROJECT**

*OBS WELL SITE 8*
*LITHOLOGIC AND WELL COMPLETION LOG*

| DATE: 10/13/00 | AutoCAD File:891_obs-8.dwg |
| SCALE: AS NOTED | DRAWN BY: EC |

MANERA INC.



Well Description

Lithologic

Surface Casing
Cement
10

Clay, sand and gravel

30

50

70

6 7/8 Well Bore

90

Lacustrine clay (Wikieup Formation)

110

3" Well Screen
130

150

Gravel Pack
170

190

**BIG SANDY ENERGY PROJECT**

*OBS WELL SITE 7*
*LITHOLOGIG AND WELL COMPLETION*

| | |
|---|---|
| DATE: 10/13/00 | AutoCAD File:891_ob7.dwg |
| SCALE: AS NOTED | DRAWN BY: EC |

MANERA INC.

891_obs7.dwg

# APPENDIX F
# WELL HYDROGRAPHS




Big Sandy  Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30

**PW2 Orifice Pressure**
**Constant Rate Test (2,000 gpm)**





Big Sandy  Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30



**Harris**
**Upper Aquifer**
**Constant Rate Test (2,000 gpm)**

Start of Constant Rate Test
9/11/00 15:30

Elapsed Time (min)

Harris     Orifice Pressure






Big Sandy  Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30







Big Sandy  Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30










Big Sandy  Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30







Big Sandy  Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30







**OW1 (Detail)**
**Upper Aquifer**
**Constant Rate Test (2,000 gpm)**



Big Sandy Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30



OW1
Upper Aquifer
Constant Rate Test (2,000 gpm)














Big Sandy  Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30








OW3
Lower Aquifer*
Constant Rate Test (2,000 gpm)

*Depth 1200'; did not encounter confined aquifer

6.9 days

Start of Constant Rate Test

Elapsed Time (min)

Drawdown (ft)

Pressure (psi)

OW3    Orifice Pressure



**OW2**
**Lower Aquifer**
**Constant Rate Test (2,000 gpm)**



Big Sandy  Aquifer Test
Constant Rate Test
Start Time : 9-11-00  15:30



**PW 2**
**Lower Aquifer**
**Constant Rate Test (2,000 gpm)**



Private Wells
Upper Aquifer



Upper Aquifer Observation Wells
Constant Rate Test - 10 days
Begin 9/11/00



### Middle Aquifer Well
### Constant Rate Test - 10 days
### Begin 9/11/00








## Lower Aquifer Wells
## Constant Rate Test – 10 days
## Begin 9/11/00



# APPENDIX G
## AQUIFER TEST ANALYSES PLOTS AND DATA



## BIG SANDY ENERGY PROJECT

Data Set: C:\891-06\OW3.aqt
Date: 10/09/00          Time: 12:42:01

## PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Test Location: Wikieup, Arizona
Test Well: PW2
Test Date: 9/11/00

## SOLUTION

Aquifer Model: Confined
Solution Method: Theis

$T = 7.773$ ft$^2$/min
$S = 0.0006952$

## AQUIFER DATA

Saturated Thickness: 300. ft                Anisotropy Ratio (Kz/Kr): 1.

## WELL DATA

| Pumping Wells | | | Observation Wells | | |
| Well Name | X (ft) | Y (ft) | Well Name | X (ft) | Y (ft) |
|---|---|---|---|---|---|
| PW 1 | 0 | 0 | · OW3 | 4880 | 0 |

AQTESOLV for Windows                                              Big Sandy Energy Project

Data Set: C:\891-06\OW3.aqt
Title: Big Sandy Energy Project
Date: 10/09/00
Time: 12:42:16

## PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Location: Wikieup, Arizona
Test Date: 9/11/00
Test Well: PW2

## AQUIFER DATA

Saturated Thickness: 300. ft
Anisotropy Ratio (Kz/Kr): 1.

## PUMPING WELL DATA

Number of pumping wells: 1

### Pumping Well No. 1: PW 1

X Location: 0. ft
Y Location: 0. ft

No. of pumping periods: 2

#### Pumping Period Data

| Time (min) | Rate (cu. ft/min) | Time (min) | Rate (cu. ft/min) |
|------------|-------------------|------------|-------------------|
| 0.         | 256.7             | 1.584E+04  | 256.7             |

## OBSERVATION WELL DATA

Number of observation wells: 1

### Observation Well No. 1: OW3

X Location: 4880. ft
Y Location: 0. ft

No. of observations: 269

#### Observation Data

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|------------|-------------------|------------|-------------------|------------|-------------------|
| 0.005      | 0.005             | 5.915      | 0.032             | 1059.1     | 1.963             |
| 0.01       | 0.005             | 6.266      | 0.037             | 1121.9     | 2.058             |
| 0.015      | 0.005             | 6.64       | 0.042             | 1188.4     | 2.136             |
| 0.02       | 0.005             | 7.035      | 0.037             | 1258.8     | 2.18              |
| 0.025      | 0.005             | 7.453      | 0.046             | 1333.4     | 2.212             |

AQTESOLV for Windows                                          Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.03 | 0.005 | 7.896 | 0.051 | 1412.4 | 2.221 |
| 0.035 | 0.009 | 8.366 | 0.051 | 1496.1 | 2.235 |
| 0.04 | 0.005 | 8.865 | 0.051 | 1584.8 | 2.274 |
| 0.045 | 0.009 | 9.391 | 0.055 | 1678.7 | 2.371 |
| 0.05 | 0.009 | 9.95 | 0.055 | 1778.2 | 2.514 |
| 0.055 | 0.009 | 10.54 | 0.06 | 1883.5 | 2.664 |
| 0.06 | 0.009 | 11.17 | 0.06 | 1995.1 | 2.763 |
| 0.065 | 0.009 | 11.83 | 0.065 | 2113.4 | 2.819 |
| 0.07 | 0.009 | 12.53 | 0.065 | 2238.6 | 2.863 |
| 0.075 | 0.005 | 13.28 | 0.069 | 2371.2 | 2.98 |
| 0.08 | 0.009 | 14.07 | 0.076 | 2511.8 | 3.158 |
| 0.085 | 0.005 | 14.91 | 0.076 | 2660.6 | 3.305 |
| 0.09 | 0.009 | 15.79 | 0.081 | 2818.3 | 3.342 |
| 0.095 | 0.009 | 16.73 | 0.09 | 2985.3 | 3.338 |
| 0.1 | 0.009 | 17.72 | 0.09 | 3162.1 | 3.469 |
| 0.1058 | 0.009 | 18.78 | 0.095 | 3342.1 | 3.686 |
| 0.112 | 0.009 | 19.89 | 0.104 | 3522.1 | 3.794 |
| 0.1185 | 0.009 | 21.07 | 0.108 | 3702.1 | 3.831 |
| 0.1255 | 0.009 | 22.32 | 0.113 | 3882.1 | 3.956 |
| 0.1328 | 0.009 | 23.65 | 0.118 | 4062.1 | 4.143 |
| 0.1407 | 0.009 | 25.05 | 0.122 | 4242.1 | 4.21 |
| 0.149 | 0.009 | 26.54 | 0.127 | 4422.1 | 4.182 |
| 0.1578 | 0.009 | 28.12 | 0.131 | 4602.1 | 4.265 |
| 0.1672 | 0.009 | 29.79 | 0.136 | 4782.1 | 4.445 |
| 0.177 | 0.009 | 31.55 | 0.145 | 4962.1 | 4.558 |
| 0.1875 | 0.009 | 33.43 | 0.155 | 5142.1 | 4.572 |
| 0.1985 | 0.009 | 35.41 | 0.164 | 5322.1 | 4.666 |
| 0.2102 | 0.009 | 37.51 | 0.168 | 5502.1 | 4.807 |
| 0.2227 | 0.009 | 39.74 | 0.173 | 5682.1 | 4.869 |
| 0.2358 | 0.009 | 42.1 | 0.182 | 5862.1 | 4.835 |
| 0.2498 | 0.009 | 44.6 | 0.187 | 6042.1 | 4.879 |
| 0.2647 | 0.009 | 47.24 | 0.198 | 6222.1 | 5.047 |
| 0.2803 | 0.009 | 50.05 | 0.203 | 6402.1 | 5.172 |
| 0.297 | 0.009 | 53.01 | 0.212 | 6582.1 | 5.172 |
| 0.3147 | 0.009 | 56.16 | 0.226 | 6762.1 | 5.218 |
| 0.3333 | 0.009 | 59.49 | 0.235 | 6942.1 | 5.363 |
| 0.3532 | 0.009 | 63.02 | 0.245 | 7122.1 | 5.388 |
| 0.3742 | 0.009 | 66.76 | 0.249 | 7302.1 | 5.349 |
| 0.3963 | 0.009 | 70.72 | 0.268 | 7482.1 | 5.386 |
| 0.4198 | 0.009 | 74.91 | 0.272 | 7662.1 | 5.52 |
| 0.4447 | 0.009 | 79.35 | 0.286 | 7842.1 | 5.656 |
| 0.4697 | 0.009 | 84.06 | 0.3 | 8022.1 | 5.674 |
| 0.4963 | 0.009 | 89.05 | 0.307 | 8202.1 | 5.693 |
| 0.5247 | 0.005 | 94.33 | 0.321 | 8382.1 | 5.774 |
| 0.5547 | 0.005 | 99.92 | 0.334 | 8562.1 | 5.824 |
| 0.5863 | 0.009 | 105.8 | 0.348 | 8742.1 | 5.82 |
| 0.6213 | 0.009 | 112.1 | 0.362 | 8922.1 | 5.845 |
| 0.658 | 0.009 | 118.8 | 0.381 | 9102.1 | 5.958 |
| 0.6963 | 0.009 | 125.8 | 0.394 | 9282.1 | 6.103 |
| 0.738 | 0.009 | 133.3 | 0.418 | 9462.1 | 6.15 |
| 0.7813 | 0.005 | 141.2 | 0.429 | 9642.1 | 6.154 |

AQTESOLV for Windows                                   Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.828 | 0.005 | 149.5 | 0.452 | 9822.1 | 6.184 |
| 0.8763 | 0.009 | 158.4 | 0.475 | 1.E+04 | 6.203 |
| 0.928 | 0.005 | 167.8 | 0.494 | 1.018E+04 | 6.203 |
| 0.983 | 0.009 | 177.7 | 0.521 | 1.036E+04 | 6.24 |
| 1.041 | 0.009 | 188.3 | 0.537 | 1.054E+04 | 6.325 |
| 1.103 | 0.009 | 199.4 | 0.57 | 1.072E+04 | 6.433 |
| 1.168 | 0.009 | 211.3 | 0.597 | 1.09E+04 | 6.484 |
| 1.238 | 0.009 | 223.8 | 0.625 | 1.108E+04 | 6.491 |
| 1.311 | 0.009 | 237. | 0.66 | 1.126E+04 | 6.479 |
| 1.39 | 0.009 | 251.1 | 0.692 | 1.144E+04 | 6.486 |
| 1.473 | 0.009 | 266. | 0.734 | 1.162E+04 | 6.5 |
| 1.561 | 0.009 | 281.7 | 0.773 | 1.18E+04 | 6.542 |
| 1.655 | 0.009 | 298.4 | 0.814 | 1.198E+04 | 6.618 |
| 1.753 | 0.009 | 316.1 | 0.86 | 1.216E+04 | 6.722 |
| 1.858 | 0.009 | 334.9 | 0.9 | 1.234E+04 | 6.805 |
| 1.968 | 0.014 | 354.7 | 0.946 | 1.252E+04 | 6.849 |
| 2.085 | 0.009 | 375.7 | 0.992 | 1.27E+04 | 6.839 |
| 2.21 | 0.014 | 398. | 1.04 | 1.288E+04 | 6.816 |
| 2.341 | 0.014 | 421.6 | 1.086 | 1.306E+04 | 6.844 |
| 2.481 | 0.014 | 446.6 | 1.135 | 1.324E+04 | 6.904 |
| 2.63 | 0.014 | 473. | 1.186 | 1.342E+04 | 6.948 |
| 2.786 | 0.018 | 501.1 | 1.227 | 1.36E+04 | 7.012 |
| 2.953 | 0.018 | 530.8 | 1.276 | 1.378E+04 | 7.088 |
| 3.13 | 0.018 | 562.2 | 1.317 | 1.396E+04 | 7.151 |
| 3.316 | 0.018 | 595.6 | 1.352 | 1.414E+04 | 7.125 |
| 3.515 | 0.023 | 630.8 | 1.389 | 1.432E+04 | 7.056 |
| 3.725 | 0.023 | 668.2 | 1.421 | 1.45E+04 | 7.061 |
| 3.946 | 0.023 | 707.8 | 1.453 | 1.468E+04 | 7.139 |
| 4.181 | 0.028 | 749.8 | 1.497 | 1.486E+04 | 7.197 |
| 4.43 | 0.028 | 794.2 | 1.539 | 1.504E+04 | 7.25 |
| 4.693 | 0.028 | 841.3 | 1.596 | 1.522E+04 | 7.342 |
| 4.973 | 0.028 | 891.1 | 1.675 | 1.54E+04 | 7.451 |
| 5.27 | 0.028 | 943.9 | 1.765 | 1.558E+04 | 7.462 |
| 5.583 | 0.032 | 999.9 | 1.859 | | |

## SOLUTION

Aquifer Model: Confined
Solution Method: Theis

## VISUAL ESTIMATION RESULTS

## Estimated Parameters

| Parameter | Estimate | |
|---|---|---|
| T | 7.773 | $ft^2$/min |
| S | 0.0006952 | |



## BIG SANDY ENERGY PROJECT

Data Set: C:\891-06\OW3.aqt
Date: 10/09/00          Time: 12:44:56

### PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Test Location: Wikieup, Arizona
Test Well: PW2
Test Date: 9/11/00

### SOLUTION

Aquifer Model: Confined
Solution Method: Cooper-Jacob

$T = 8.783$ ft$^2$/min
$S = 0.0005753$

## AQUIFER DATA

Saturated Thickness: 300. ft

Anisotropy Ratio (Kz/Kr): 1.

## WELL DATA

| Pumping Wells | | | Observation Wells | | |
|---|---|---|---|---|---|
| Well Name | X (ft) | Y (ft) | Well Name | X (ft) | Y (ft) |
| PW 1 | 0 | 0 | + OW3 | 4880 | 0 |

AQTESOLV for Windows                                                      Big Sandy Energy Project

Data Set: C:\891-06\OW3.aqt
Title: Big Sandy Energy Project
Date: 10/09/00
Time: 12:45:42

## PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Location: Wikieup, Arizona
Test Date: 9/11/00
Test Well: PW2

## AQUIFER DATA

Saturated Thickness: 300. ft
Anisotropy Ratio (Kz/Kr): 1.

## PUMPING WELL DATA

Number of pumping wells: 1

Pumping Well No. 1: PW 1

X Location: 0. ft
Y Location: 0. ft

No. of pumping periods: 2

### Pumping Period Data

| Time (min) | Rate (cu. ft/min) | Time (min) | Rate (cu. ft/min) |
|------------|-------------------|------------|-------------------|
| 0.         | 256.7             | 1.584E+04  | 256.7             |

## OBSERVATION WELL DATA

Number of observation wells: 1

Observation Well No. 1: OW3

X Location: 4880. ft
Y Location: 0. ft

No. of observations: 269

### Observation Data

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|------------|-------------------|------------|-------------------|------------|-------------------|
| 0.005      | 0.005             | 5.915      | 0.032             | 1059.1     | 1.963             |
| 0.01       | 0.005             | 6.266      | 0.037             | 1121.9     | 2.058             |
| 0.015      | 0.005             | 6.64       | 0.042             | 1188.4     | 2.136             |
| 0.02       | 0.005             | 7.035      | 0.037             | 1258.8     | 2.18              |
| 0.025      | 0.005             | 7.453      | 0.046             | 1333.4     | 2.212             |

AQTESOLV for Windows                                                    Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.03 | 0.005 | 7.896 | 0.051 | 1412.4 | 2.221 |
| 0.035 | 0.009 | 8.366 | 0.051 | 1496.1 | 2.235 |
| 0.04 | 0.005 | 8.865 | 0.051 | 1584.8 | 2.274 |
| 0.045 | 0.009 | 9.391 | 0.055 | 1678.7 | 2.371 |
| 0.05 | 0.009 | 9.95 | 0.055 | 1778.2 | 2.514 |
| 0.055 | 0.009 | 10.54 | 0.06 | 1883.5 | 2.664 |
| 0.06 | 0.009 | 11.17 | 0.06 | 1995.1 | 2.763 |
| 0.065 | 0.009 | 11.83 | 0.065 | 2113.4 | 2.819 |
| 0.07 | 0.009 | 12.53 | 0.065 | 2238.6 | 2.863 |
| 0.075 | 0.005 | 13.28 | 0.069 | 2371.2 | 2.98 |
| 0.08 | 0.009 | 14.07 | 0.076 | 2511.8 | 3.158 |
| 0.085 | 0.005 | 14.91 | 0.076 | 2660.6 | 3.305 |
| 0.09 | 0.009 | 15.79 | 0.081 | 2818.3 | 3.342 |
| 0.095 | 0.009 | 16.73 | 0.09 | 2985.3 | 3.338 |
| 0.1 | 0.009 | 17.72 | 0.09 | 3162.1 | 3.469 |
| 0.1058 | 0.009 | 18.78 | 0.095 | 3342.1 | 3.686 |
| 0.112 | 0.009 | 19.89 | 0.104 | 3522.1 | 3.794 |
| 0.1185 | 0.009 | 21.07 | 0.108 | 3702.1 | 3.831 |
| 0.1255 | 0.009 | 22.32 | 0.113 | 3882.1 | 3.956 |
| 0.1328 | 0.009 | 23.65 | 0.118 | 4062.1 | 4.143 |
| 0.1407 | 0.009 | 25.05 | 0.122 | 4242.1 | 4.21 |
| 0.149 | 0.009 | 26.54 | 0.127 | 4422.1 | 4.182 |
| 0.1578 | 0.009 | 28.12 | 0.131 | 4602.1 | 4.265 |
| 0.1672 | 0.009 | 29.79 | 0.136 | 4782.1 | 4.445 |
| 0.177 | 0.009 | 31.55 | 0.145 | 4962.1 | 4.558 |
| 0.1875 | 0.009 | 33.43 | 0.155 | 5142.1 | 4.572 |
| 0.1985 | 0.009 | 35.41 | 0.164 | 5322.1 | 4.666 |
| 0.2102 | 0.009 | 37.51 | 0.168 | 5502.1 | 4.807 |
| 0.2227 | 0.009 | 39.74 | 0.173 | 5682.1 | 4.869 |
| 0.2358 | 0.009 | 42.1 | 0.182 | 5862.1 | 4.835 |
| 0.2498 | 0.009 | 44.6 | 0.187 | 6042.1 | 4.879 |
| 0.2647 | 0.009 | 47.24 | 0.198 | 6222.1 | 5.047 |
| 0.2803 | 0.009 | 50.05 | 0.203 | 6402.1 | 5.172 |
| 0.297 | 0.009 | 53.01 | 0.212 | 6582.1 | 5.172 |
| 0.3147 | 0.009 | 56.16 | 0.226 | 6762.1 | 5.218 |
| 0.3333 | 0.009 | 59.49 | 0.235 | 6942.1 | 5.363 |
| 0.3532 | 0.009 | 63.02 | 0.245 | 7122.1 | 5.388 |
| 0.3742 | 0.009 | 66.76 | 0.249 | 7302.1 | 5.349 |
| 0.3963 | 0.009 | 70.72 | 0.268 | 7482.1 | 5.386 |
| 0.4198 | 0.009 | 74.91 | 0.272 | 7662.1 | 5.52 |
| 0.4447 | 0.009 | 79.35 | 0.286 | 7842.1 | 5.656 |
| 0.4697 | 0.009 | 84.06 | 0.3 | 8022.1 | 5.674 |
| 0.4963 | 0.009 | 89.05 | 0.307 | 8202.1 | 5.693 |
| 0.5247 | 0.005 | 94.33 | 0.321 | 8382.1 | 5.774 |
| 0.5547 | 0.005 | 99.92 | 0.334 | 8562.1 | 5.824 |
| 0.5863 | 0.009 | 105.8 | 0.348 | 8742.1 | 5.82 |
| 0.6213 | 0.009 | 112.1 | 0.362 | 8922.1 | 5.845 |
| 0.658 | 0.009 | 118.8 | 0.381 | 9102.1 | 5.958 |
| 0.6963 | 0.009 | 125.8 | 0.394 | 9282.1 | 6.103 |
| 0.738 | 0.009 | 133.3 | 0.418 | 9462.1 | 6.15 |
| 0.7813 | 0.005 | 141.2 | 0.429 | 9642.1 | 6.154 |

AQTESOLV for Windows                                                      Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|------------|-------------------|------------|-------------------|------------|-------------------|
| 0.828 | 0.005 | 149.5 | 0.452 | 9822.1 | 6.184 |
| 0.8763 | 0.009 | 158.4 | 0.475 | 1.E+04 | 6.203 |
| 0.928 | 0.005 | 167.8 | 0.494 | 1.018E+04 | 6.203 |
| 0.983 | 0.009 | 177.7 | 0.521 | 1.036E+04 | 6.24 |
| 1.041 | 0.009 | 188.3 | 0.537 | 1.054E+04 | 6.325 |
| 1.103 | 0.009 | 199.4 | 0.57 | 1.072E+04 | 6.433 |
| 1.168 | 0.009 | 211.3 | 0.597 | 1.09E+04 | 6.484 |
| 1.238 | 0.009 | 223.8 | 0.625 | 1.108E+04 | 6.491 |
| 1.311 | 0.009 | 237. | 0.66 | 1.126E+04 | 6.479 |
| 1.39 | 0.009 | 251.1 | 0.692 | 1.144E+04 | 6.486 |
| 1.473 | 0.009 | 266. | 0.734 | 1.162E+04 | 6.5 |
| 1.561 | 0.009 | 281.7 | 0.773 | 1.18E+04 | 6.542 |
| 1.655 | 0.009 | 298.4 | 0.814 | 1.198E+04 | 6.618 |
| 1.753 | 0.009 | 316.1 | 0.86 | 1.216E+04 | 6.722 |
| 1.858 | 0.009 | 334.9 | 0.9 | 1.234E+04 | 6.805 |
| 1.968 | 0.014 | 354.7 | 0.946 | 1.252E+04 | 6.849 |
| 2.085 | 0.009 | 375.7 | 0.992 | 1.27E+04 | 6.839 |
| 2.21 | 0.014 | 398. | 1.04 | 1.288E+04 | 6.816 |
| 2.341 | 0.014 | 421.6 | 1.086 | 1.306E+04 | 6.844 |
| 2.481 | 0.014 | 446.6 | 1.135 | 1.324E+04 | 6.904 |
| 2.63 | 0.014 | 473. | 1.186 | 1.342E+04 | 6.948 |
| 2.786 | 0.018 | 501.1 | 1.227 | 1.36E+04 | 7.012 |
| 2.953 | 0.018 | 530.8 | 1.276 | 1.378E+04 | 7.088 |
| 3.13 | 0.018 | 562.2 | 1.317 | 1.396E+04 | 7.151 |
| 3.316 | 0.018 | 595.6 | 1.352 | 1.414E+04 | 7.125 |
| 3.515 | 0.023 | 630.8 | 1.389 | 1.432E+04 | 7.056 |
| 3.725 | 0.023 | 668.2 | 1.421 | 1.45E+04 | 7.061 |
| 3.946 | 0.023 | 707.8 | 1.453 | 1.468E+04 | 7.139 |
| 4.181 | 0.028 | 749.8 | 1.497 | 1.486E+04 | 7.197 |
| 4.43 | 0.028 | 794.2 | 1.539 | 1.504E+04 | 7.25 |
| 4.693 | 0.028 | 841.3 | 1.596 | 1.522E+04 | 7.342 |
| 4.973 | 0.028 | 891.1 | 1.675 | 1.54E+04 | 7.451 |
| 5.27 | 0.028 | 943.9 | 1.765 | 1.558E+04 | 7.462 |
| 5.583 | 0.032 | 999.9 | 1.859 | | |

## SOLUTION

Aquifer Model:  Confined
Solution Method:  Cooper-Jacob

## VISUAL ESTIMATION RESULTS

## Estimated Parameters

| Parameter | Estimate | |
|-----------|----------|---|
| T | 8.783 | $ft^2$/min |
| S | 0.0005753 | |



## BIG SANDY ENERGY PROJECT

Data Set: C:\891-06\OW4.aqt
Date: 10/11/00          Time: 16:50:36

### PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Test Location: Wikieup, Arizona
Test Well: PW2
Test Date: 9/11/00

### SOLUTION

Aquifer Model: Confined
Solution Method: Theis

$T = 1.105E+04$ ft$^2$/day
$S = 0.001636$

## AQUIFER DATA

Saturated Thickness: 300. ft                    Anisotropy Ratio (Kz/Kr): 1.

## WELL DATA

| Pumping Wells | | | Observation Wells | | |
|---|---|---|---|---|---|
| Well Name | X (ft) | Y (ft) | Well Name | X (ft) | Y (ft) |
| PW 1 | 0 | 0 | + OW4 | 3150 | 0 |

AQTESOLV for Windows                                      Big Sandy Energy Project

Data Set: C:\891-06\OW4.aqt
Title: Big Sandy Energy Project
Date: 10/11/00
Time: 16:51:00

PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Location: Wikieup, Arizona
Test Date: 9/11/00
Test Well: PW2

AQUIFER DATA

Saturated Thickness: 300. ft
Anisotropy Ratio (Kz/Kr): 1.

PUMPING WELL DATA

Number of pumping wells: 1

Pumping Well No. 1: PW 1

X Location: 0. ft
Y Location: 0. ft

No. of pumping periods: 2

Pumping Period Data

| Time (min) | Rate (cu. ft/min) | Time (min) | Rate (cu. ft/min) |
|---|---|---|---|
| 0. | 256.7 | 1.584E+04 | 256.7 |

OBSERVATION WELL DATA

Number of observation wells: 1

Observation Well No. 1: OW4

X Location: 3150. ft
Y Location: 0. ft

No. of observations: 269

Observation Data

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.005 | 0. | 5.915 | 0.051 | 1059.1 | 2.062 |
| 0.01 | -0.014 | 6.266 | 0.051 | 1121.9 | 2.145 |
| 0.015 | -0.014 | 6.64 | 0.069 | 1188.4 | 2.251 |
| 0.02 | 0. | 7.035 | 0.055 | 1258.8 | 2.256 |
| 0.025 | -0.014 | 7.453 | 0.069 | 1333.4 | 2.284 |

AQTESOLV for Windows                                           Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|------------|-------------------|------------|-------------------|------------|-------------------|
| 0.03 | -0.014 | 7.896 | 0.069 | 1412.4 | 2.325 |
| 0.035 | -0.014 | 8.366 | 0.088 | 1496.1 | 2.371 |
| 0.04 | -0.014 | 8.865 | 0.074 | 1584.8 | 2.404 |
| 0.045 | -0.014 | 9.391 | 0.088 | 1678.7 | 2.51 |
| 0.05 | -0.014 | 9.95 | 0.088 | 1778.2 | 2.657 |
| 0.055 | -0.014 | 10.54 | 0.088 | 1883.5 | 2.814 |
| 0.06 | 0. | 11.17 | 0.106 | 1995.1 | 2.897 |
| 0.065 | 0. | 11.83 | 0.106 | 2113.4 | 2.953 |
| 0.07 | 0. | 12.53 | 0.106 | 2238.6 | 3.017 |
| 0.075 | -0.014 | 13.28 | 0.106 | 2371.2 | 3.128 |
| 0.08 | -0.014 | 14.07 | 0.125 | 2511.8 | 3.303 |
| 0.085 | 0. | 14.91 | 0.125 | 2660.6 | 3.428 |
| 0.09 | -0.014 | 15.79 | 0.125 | 2818.3 | 3.451 |
| 0.095 | 0. | 16.73 | 0.125 | 2985.3 | 3.511 |
| 0.1 | 0. | 17.72 | 0.138 | 3162.1 | 3.658 |
| 0.1058 | -0.014 | 18.78 | 0.138 | 3342.1 | 3.871 |
| 0.112 | 0. | 19.89 | 0.138 | 3522.1 | 3.981 |
| 0.1185 | 0. | 21.07 | 0.152 | 3702.1 | 4.014 |
| 0.1255 | 0. | 22.32 | 0.152 | 3882.1 | 4.129 |
| 0.1328 | 0. | 23.65 | 0.171 | 4062.1 | 4.341 |
| 0.1407 | 0. | 25.05 | 0.171 | 4242.1 | 4.369 |
| 0.149 | 0. | 26.54 | 0.185 | 4422.1 | 4.369 |
| 0.1578 | 0. | 28.12 | 0.185 | 4602.1 | 4.489 |
| 0.1672 | 0. | 29.79 | 0.203 | 4782.1 | 4.669 |
| 0.177 | 0. | 31.55 | 0.203 | 4962.1 | 4.766 |
| 0.1875 | 0. | 33.43 | 0.203 | 5142.1 | 4.779 |
| 0.1985 | 0. | 35.41 | 0.221 | 5322.1 | 4.876 |
| 0.2102 | 0. | 37.51 | 0.221 | 5502.1 | 5.015 |
| 0.2227 | 0. | 39.74 | 0.235 | 5682.1 | 5.07 |
| 0.2358 | 0. | 42.1 | 0.254 | 5862.1 | 5.052 |
| 0.2498 | -0.014 | 44.6 | 0.254 | 6042.1 | 5.084 |
| 0.2647 | 0. | 47.24 | 0.258 | 6222.1 | 5.278 |
| 0.2803 | 0. | 50.05 | 0.277 | 6402.1 | 5.407 |
| 0.297 | -0.014 | 53.01 | 0.295 | 6582.1 | 5.398 |
| 0.3147 | 0. | 56.16 | 0.295 | 6762.1 | 5.453 |
| 0.3333 | 0. | 59.49 | 0.314 | 6942.1 | 5.554 |
| 0.3532 | 0. | 63.02 | 0.332 | 7122.1 | 5.601 |
| 0.3742 | 0. | 66.76 | 0.346 | 7302.1 | 5.568 |
| 0.3963 | 0.018 | 70.72 | 0.346 | 7482.1 | 5.628 |
| 0.4198 | 0.018 | 74.91 | 0.364 | 7662.1 | 5.776 |
| 0.4447 | 0. | 79.35 | 0.383 | 7842.1 | 5.9 |
| 0.4697 | 0. | 84.06 | 0.397 | 8022.1 | 5.914 |
| 0.4963 | -0.014 | 89.05 | 0.415 | 8202.1 | 5.933 |
| 0.5247 | 0. | 94.33 | 0.434 | 8382.1 | 5.993 |
| 0.5547 | -0.014 | 99.92 | 0.452 | 8562.1 | 6.053 |
| 0.5863 | -0.014 | 105.8 | 0.452 | 8742.1 | 6.067 |
| 0.6213 | -0.014 | 112.1 | 0.457 | 8922.1 | 6.099 |
| 0.658 | -0.014 | 118.8 | 0.475 | 9102.1 | 6.219 |
| 0.6963 | -0.014 | 125.8 | 0.494 | 9282.1 | 6.362 |
| 0.738 | 0. | 133.3 | 0.512 | 9462.1 | 6.403 |
| 0.7813 | -0.014 | 141.2 | 0.549 | 9642.1 | 6.413 |

AQTESOLV for Windows                                                      Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.828 | 0. | 149.5 | 0.572 | 9822.1 | 6.431 |
| 0.8763 | 0. | 158.4 | 0.609 | 1.E+04 | 6.436 |
| 0.928 | 0. | 167.8 | 0.6 | 1.018E+04 | 6.468 |
| 0.983 | -0.014 | 177.7 | 0.618 | 1.036E+04 | 6.505 |
| 1.041 | -0.014 | 188.3 | 0.627 | 1.054E+04 | 6.588 |
| 1.103 | 0. | 199.4 | 0.664 | 1.072E+04 | 6.703 |
| 1.168 | 0. | 211.3 | 0.687 | 1.09E+04 | 6.74 |
| 1.238 | 0. | 223.8 | 0.724 | 1.108E+04 | 6.759 |
| 1.311 | 0. | 237. | 0.761 | 1.126E+04 | 6.735 |
| 1.39 | 0. | 251.1 | 0.798 | 1.144E+04 | 6.722 |
| 1.473 | 0. | 266. | 0.835 | 1.162E+04 | 6.763 |
| 1.561 | 0. | 281.7 | 0.886 | 1.18E+04 | 6.819 |
| 1.655 | 0. | 298.4 | 0.918 | 1.198E+04 | 6.892 |
| 1.753 | 0. | 316.1 | 0.955 | 1.216E+04 | 7.003 |
| 1.858 | -0.014 | 334.9 | 1.038 | 1.234E+04 | 7.081 |
| 1.968 | 0. | 354.7 | 1.043 | 1.252E+04 | 7.132 |
| 2.085 | 0. | 375.7 | 1.093 | 1.27E+04 | 7.1 |
| 2.21 | 0. | 398. | 1.144 | 1.288E+04 | 7.077 |
| 2.341 | 0. | 421.6 | 1.181 | 1.306E+04 | 7.118 |
| 2.481 | 0. | 446.6 | 1.264 | 1.324E+04 | 7.206 |
| 2.63 | 0.018 | 473. | 1.278 | 1.342E+04 | 7.234 |
| 2.786 | 0.018 | 501.1 | 1.329 | 1.36E+04 | 7.308 |
| 2.953 | 0.018 | 530.8 | 1.384 | 1.378E+04 | 7.372 |
| 3.13 | 0.018 | 562.2 | 1.416 | 1.396E+04 | 7.446 |
| 3.316 | 0.018 | 595.6 | 1.462 | 1.414E+04 | 7.4 |
| 3.515 | 0.018 | 630.8 | 1.495 | 1.432E+04 | 7.34 |
| 3.725 | 0.018 | 668.2 | 1.536 | 1.45E+04 | 7.349 |
| 3.946 | 0.032 | 707.8 | 1.569 | 1.468E+04 | 7.437 |
| 4.181 | 0.032 | 749.8 | 1.619 | 1.486E+04 | 7.483 |
| 4.43 | 0.037 | 794.2 | 1.652 | 1.504E+04 | 7.543 |
| 4.693 | 0.037 | 841.3 | 1.707 | 1.522E+04 | 7.63 |
| 4.973 | 0.037 | 891.1 | 1.776 | 1.54E+04 | 7.746 |
| 5.27 | 0.037 | 943.9 | 1.882 | 1.558E+04 | 7.764 |
| 5.583 | 0.037 | 999.9 | 1.951 | | |

## SOLUTION

Aquifer Model: Confined
Solution Method: Theis

## VISUAL ESTIMATION RESULTS

## Estimated Parameters

| Parameter | Estimate | |
|---|---|---|
| T | 1.105E+04 | ft$^2$/day |
| S | 0.001636 | |

## AUTOMATIC ESTIMATION RESULTS

Estimated Parameters

| Parameter | Estimate | Std. Error | |
|-----------|----------|------------|-------------|
| T | 1.105E+04 | 967.4 | $ft^2$/day |
| S | 0.002866 | 0.0002485 | |

Parameter Correlations

|   | T | S |
|---|------|------|
| T | 1.00 | -0.88 |
| S | -0.88 | 1.00 |

Residual Statistics

for weighted residuals

Sum of Squares ... 207.6 $ft^2$
Variance........... 0.7775 $ft^2$
Std. Deviation ..... 0.8818 ft
Mean .............. 0.6261 ft
No. of Residuals ... 269.
No. of Estimates ... 2



## BIG SANDY ENERGY PROJECT

Data Set: C:\891-06\OW4.aqt
Date: 10/11/00          Time: 16:51:49

### PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Test Location: Wikieup, Arizona
Test Well: PW2
Test Date: 9/11/00

### SOLUTION

Aquifer Model: Confined
Solution Method: Cooper-Jacob

T = 1.296E+04 ft$^2$/day
S = 0.001181

### AQUIFER DATA

Saturated Thickness: 300. ft                    Anisotropy Ratio (Kz/Kr): 1.

### WELL DATA

| Pumping Wells | | | Observation Wells | | |
| Well Name | X (ft) | Y (ft) | Well Name | X (ft) | Y (ft) |
|---|---|---|---|---|---|
| PW 1 | 0 | 0 | + OW4 | 3150 | 0 |

AQTESOLV for Windows                                              Big Sandy Energy Project

Data Set:  C:\891-06\OW4.aqt
Title:  Big Sandy Energy Project
Date:  10/11/00
Time:  16:52:00

---

PROJECT INFORMATION

Company:  Manera, Inc.
Client:  Caithness
Project:  891-06
Location:  Wikieup, Arizona
Test Date:  9/11/00
Test Well:  PW2

---

AQUIFER DATA

Saturated Thickness:  300. ft
Anisotropy Ratio (Kz/Kr):  1.

---

PUMPING WELL DATA

Number of pumping wells:  1

Pumping Well No. 1:  PW 1

X Location:  0. ft
Y Location:  0. ft

No. of pumping periods:  2

Pumping Period Data

| Time (min) | Rate (cu. ft/min) | Time (min) | Rate (cu. ft/min) |
|------------|-------------------|------------|-------------------|
| 0.         | 256.7             | 1.584E+04  | 256.7             |

---

OBSERVATION WELL DATA

Number of observation wells:  1

Observation Well No. 1:  OW4

X Location:  3150. ft
Y Location:  0. ft

No. of observations:  269

Observation Data

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|------------|-------------------|------------|-------------------|------------|-------------------|
| 0.005      | 0.                | 5.915      | 0.051             | 1059.1     | 2.062             |
| 0.01       | -0.014            | 6.266      | 0.051             | 1121.9     | 2.145             |
| 0.015      | -0.014            | 6.64       | 0.069             | 1188.4     | 2.251             |
| 0.02       | 0.                | 7.035      | 0.055             | 1258.8     | 2.256             |
| 0.025      | -0.014            | 7.453      | 0.069             | 1333.4     | 2.284             |

---

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.03 | -0.014 | 7.896 | 0.069 | 1412.4 | 2.325 |
| 0.035 | -0.014 | 8.366 | 0.088 | 1496.1 | 2.371 |
| 0.04 | -0.014 | 8.865 | 0.074 | 1584.8 | 2.404 |
| 0.045 | -0.014 | 9.391 | 0.088 | 1678.7 | 2.51 |
| 0.05 | -0.014 | 9.95 | 0.088 | 1778.2 | 2.657 |
| 0.055 | -0.014 | 10.54 | 0.088 | 1883.5 | 2.814 |
| 0.06 | 0. | 11.17 | 0.106 | 1995.1 | 2.897 |
| 0.065 | 0. | 11.83 | 0.106 | 2113.4 | 2.953 |
| 0.07 | 0. | 12.53 | 0.106 | 2238.6 | 3.017 |
| 0.075 | -0.014 | 13.28 | 0.106 | 2371.2 | 3.128 |
| 0.08 | -0.014 | 14.07 | 0.125 | 2511.8 | 3.303 |
| 0.085 | 0. | 14.91 | 0.125 | 2660.6 | 3.428 |
| 0.09 | -0.014 | 15.79 | 0.125 | 2818.3 | 3.451 |
| 0.095 | 0. | 16.73 | 0.125 | 2985.3 | 3.511 |
| 0.1 | 0. | 17.72 | 0.138 | 3162.1 | 3.658 |
| 0.1058 | -0.014 | 18.78 | 0.138 | 3342.1 | 3.871 |
| 0.112 | 0. | 19.89 | 0.138 | 3522.1 | 3.981 |
| 0.1185 | 0. | 21.07 | 0.152 | 3702.1 | 4.014 |
| 0.1255 | 0. | 22.32 | 0.152 | 3882.1 | 4.129 |
| 0.1328 | 0. | 23.65 | 0.171 | 4062.1 | 4.341 |
| 0.1407 | 0. | 25.05 | 0.171 | 4242.1 | 4.369 |
| 0.149 | 0. | 26.54 | 0.185 | 4422.1 | 4.369 |
| 0.1578 | 0. | 28.12 | 0.185 | 4602.1 | 4.489 |
| 0.1672 | 0. | 29.79 | 0.203 | 4782.1 | 4.669 |
| 0.177 | 0. | 31.55 | 0.203 | 4962.1 | 4.766 |
| 0.1875 | 0. | 33.43 | 0.203 | 5142.1 | 4.779 |
| 0.1985 | 0. | 35.41 | 0.221 | 5322.1 | 4.876 |
| 0.2102 | 0. | 37.51 | 0.221 | 5502.1 | 5.015 |
| 0.2227 | 0. | 39.74 | 0.235 | 5682.1 | 5.07 |
| 0.2358 | 0. | 42.1 | 0.254 | 5862.1 | 5.052 |
| 0.2498 | -0.014 | 44.6 | 0.254 | 6042.1 | 5.084 |
| 0.2647 | 0. | 47.24 | 0.258 | 6222.1 | 5.278 |
| 0.2803 | 0. | 50.05 | 0.277 | 6402.1 | 5.407 |
| 0.297 | -0.014 | 53.01 | 0.295 | 6582.1 | 5.398 |
| 0.3147 | 0. | 56.16 | 0.295 | 6762.1 | 5.453 |
| 0.3333 | 0. | 59.49 | 0.314 | 6942.1 | 5.554 |
| 0.3532 | 0. | 63.02 | 0.332 | 7122.1 | 5.601 |
| 0.3742 | 0. | 66.76 | 0.346 | 7302.1 | 5.568 |
| 0.3963 | 0.018 | 70.72 | 0.346 | 7482.1 | 5.628 |
| 0.4198 | 0.018 | 74.91 | 0.364 | 7662.1 | 5.776 |
| 0.4447 | 0. | 79.35 | 0.383 | 7842.1 | 5.9 |
| 0.4697 | 0. | 84.06 | 0.397 | 8022.1 | 5.914 |
| 0.4963 | -0.014 | 89.05 | 0.415 | 8202.1 | 5.933 |
| 0.5247 | 0. | 94.33 | 0.434 | 8382.1 | 5.993 |
| 0.5547 | -0.014 | 99.92 | 0.452 | 8562.1 | 6.053 |
| 0.5863 | -0.014 | 105.8 | 0.452 | 8742.1 | 6.067 |
| 0.6213 | -0.014 | 112.1 | 0.457 | 8922.1 | 6.099 |
| 0.658 | -0.014 | 118.8 | 0.475 | 9102.1 | 6.219 |
| 0.6963 | -0.014 | 125.8 | 0.494 | 9282.1 | 6.362 |
| 0.738 | 0. | 133.3 | 0.512 | 9462.1 | 6.403 |
| 0.7813 | -0.014 | 141.2 | 0.549 | 9642.1 | 6.413 |

AQTESOLV for Windows                                    Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.828 | 0. | 149.5 | 0.572 | 9822.1 | 6.431 |
| 0.8763 | 0. | 158.4 | 0.609 | 1.E+04 | 6.436 |
| 0.928 | 0. | 167.8 | 0.6 | 1.018E+04 | 6.468 |
| 0.983 | -0.014 | 177.7 | 0.618 | 1.036E+04 | 6.505 |
| 1.041 | -0.014 | 188.3 | 0.627 | 1.054E+04 | 6.588 |
| 1.103 | 0. | 199.4 | 0.664 | 1.072E+04 | 6.703 |
| 1.168 | 0. | 211.3 | 0.687 | 1.09E+04 | 6.74 |
| 1.238 | 0. | 223.8 | 0.724 | 1.108E+04 | 6.759 |
| 1.311 | 0. | 237. | 0.761 | 1.126E+04 | 6.735 |
| 1.39 | 0. | 251.1 | 0.798 | 1.144E+04 | 6.722 |
| 1.473 | 0. | 266. | 0.835 | 1.162E+04 | 6.763 |
| 1.561 | 0. | 281.7 | 0.886 | 1.18E+04 | 6.819 |
| 1.655 | 0. | 298.4 | 0.918 | 1.198E+04 | 6.892 |
| 1.753 | 0. | 316.1 | 0.955 | 1.216E+04 | 7.003 |
| 1.858 | -0.014 | 334.9 | 1.038 | 1.234E+04 | 7.081 |
| 1.968 | 0. | 354.7 | 1.043 | 1.252E+04 | 7.132 |
| 2.085 | 0. | 375.7 | 1.093 | 1.27E+04 | 7.1 |
| 2.21 | 0. | 398. | 1.144 | 1.288E+04 | 7.077 |
| 2.341 | 0. | 421.6 | 1.181 | 1.306E+04 | 7.118 |
| 2.481 | 0. | 446.6 | 1.264 | 1.324E+04 | 7.206 |
| 2.63 | 0.018 | 473. | 1.278 | 1.342E+04 | 7.234 |
| 2.786 | 0.018 | 501.1 | 1.329 | 1.36E+04 | 7.308 |
| 2.953 | 0.018 | 530.8 | 1.384 | 1.378E+04 | 7.372 |
| 3.13 | 0.018 | 562.2 | 1.416 | 1.396E+04 | 7.446 |
| 3.316 | 0.018 | 595.6 | 1.462 | 1.414E+04 | 7.4 |
| 3.515 | 0.018 | 630.8 | 1.495 | 1.432E+04 | 7.34 |
| 3.725 | 0.018 | 668.2 | 1.536 | 1.45E+04 | 7.349 |
| 3.946 | 0.032 | 707.8 | 1.569 | 1.468E+04 | 7.437 |
| 4.181 | 0.032 | 749.8 | 1.619 | 1.486E+04 | 7.483 |
| 4.43 | 0.037 | 794.2 | 1.652 | 1.504E+04 | 7.543 |
| 4.693 | 0.037 | 841.3 | 1.707 | 1.522E+04 | 7.63 |
| 4.973 | 0.037 | 891.1 | 1.776 | 1.54E+04 | 7.746 |
| 5.27 | 0.037 | 943.9 | 1.882 | 1.558E+04 | 7.764 |
| 5.583 | 0.037 | 999.9 | 1.951 | | |

SOLUTION

Aquifer Model:  Confined
Solution Method:  Cooper-Jacob

VISUAL ESTIMATION RESULTS

Estimated Parameters

| Parameter | Estimate | |
|---|---|---|
| T | 1.296E+04 | $ft^2$/day |
| S | 0.001181 | |

AUTOMATIC ESTIMATION RESULTS

Estimated Parameters

AQTESOLV for Windows                                   Big Sandy Energy Project

| Parameter | Estimate | Std. Error | |
|---|---|---|---|
| T | 5.662E+04 | 5211.1 | $ft^2$/day |
| S | 0.002866 | 0.001308 | |

Parameter Correlations

|   | T | S |
|---|---|---|
| T | 1.00 | 0.55 |
| S | 0.55 | 1.00 |

Residual Statistics

for weighted residuals

Sum of Squares ... 2790.3 $ft^2$
Variance........... 10.45 $ft^2$
Std. Deviation ..... 3.233 ft
Mean .............. 2.878 ft
No. of Residuals ... 269.
No. of Estimates ... 2



### BIG SANDY ENERGY PROJECT

Data Set: C:\891-06\OWC2.aqt
Date: 10/09/00          Time: 12:38:18

### PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Test Location: Wikieup, Arizona
Test Well: PW2
Test Date: 9/11/00

### SOLUTION

Aquifer Model: Confined
Solution Method: Cooper-Jacob

T = 1.252E+04 ft$^2$/day
S = 0.2971

### AQUIFER DATA

Saturated Thickness: 300. ft                    Anisotropy Ratio (Kz/Kr): 1.

### WELL DATA

| Pumping Wells | | |
| Well Name | X (ft) | Y (ft) |
| --- | --- | --- |
| PW 1 | 0 | 0 |

| Observation Wells | | |
| Well Name | X (ft) | Y (ft) |
| --- | --- | --- |
| + OWC2 | 200 | 0 |

AQTESOLV for Windows                                    Big Sandy Energy Project

Data Set: C:\891-06\OWC2.aqt
Title: Big Sandy Energy Project
Date: 10/09/00
Time: 12:38:44

PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Location: Wikieup, Arizona
Test Date: 9/11/00
Test Well: PW2

AQUIFER DATA

Saturated Thickness: 300. ft
Anisotropy Ratio (Kz/Kr): 1.

PUMPING WELL DATA

Number of pumping wells: 1

Pumping Well No. 1:  PW 1

X Location: 0. ft
Y Location: 0. ft

No. of pumping periods: 2

Pumping Period Data

| Time (min) | Rate (cu. ft/min) | Time (min) | Rate (cu. ft/min) |
|---|---|---|---|
| 0. | 256.7 | 1.584E+04 | 256.7 |

OBSERVATION WELL DATA

Number of observation wells: 1

Observation Well No. 1:  OWC2

X Location: 200. ft
Y Location: 0. ft

No. of observations: 269

Observation Data

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.005 | 0. | 5.915 | 0.254 | 1059.1 | 2.214 |
| 0.01 | 0. | 6.266 | 0.254 | 1121.9 | 2.307 |
| 0.015 | 0. | 6.64 | 0.254 | 1188.4 | 2.399 |
| 0.02 | 0. | 7.035 | 0.268 | 1258.8 | 2.413 |
| 0.025 | 0. | 7.453 | 0.268 | 1333.4 | 2.44 |

AQTESOLV for Windows

Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.03 | 0. | 7.896 | 0.281 | 1412.4 | 2.44 |
| 0.035 | 0. | 8.366 | 0.281 | 1496.1 | 2.487 |
| 0.04 | 0. | 8.865 | 0.281 | 1584.8 | 2.523 |
| 0.045 | 0. | 9.391 | 0.281 | 1678.7 | 2.639 |
| 0.05 | 0.014 | 9.95 | 0.281 | 1778.2 | 2.8 |
| 0.055 | 0. | 10.54 | 0.268 | 1883.5 | 2.943 |
| 0.06 | 0. | 11.17 | 0.281 | 1995.1 | 3.059 |
| 0.065 | 0.014 | 11.83 | 0.3 | 2113.4 | 3.137 |
| 0.07 | 0. | 12.53 | 0.3 | 2238.6 | 3.169 |
| 0.075 | 0. | 13.28 | 0.3 | 2371.2 | 3.299 |
| 0.08 | 0.014 | 14.07 | 0.3 | 2511.8 | 3.469 |
| 0.085 | 0. | 14.91 | 0.3 | 2660.6 | 3.603 |
| 0.09 | 0.014 | 15.79 | 0.332 | 2818.3 | 3.631 |
| 0.095 | 0.014 | 16.73 | 0.411 | 2985.3 | 3.631 |
| 0.1 | 0.014 | 17.72 | 0.3 | 3162.1 | 3.769 |
| 0.1058 | 0.014 | 18.78 | 0.332 | 3342.1 | 4.009 |
| 0.112 | 0.028 | 19.89 | 0.397 | 3522.1 | 4.12 |
| 0.1185 | 0.028 | 21.07 | 0.06 | 3702.1 | 4.184 |
| 0.1255 | 0.028 | 22.32 | 0.332 | 3882.1 | 4.309 |
| 0.1328 | 0.028 | 23.65 | 0.346 | 4062.1 | 4.466 |
| 0.1407 | 0.028 | 25.05 | 0.364 | 4242.1 | 4.521 |
| 0.149 | 0.046 | 26.54 | 0.364 | 4422.1 | 4.489 |
| 0.1578 | 0.046 | 28.12 | 0.364 | 4602.1 | 4.59 |
| 0.1672 | 0.06 | 29.79 | 0.364 | 4782.1 | 4.802 |
| 0.177 | 0.06 | 31.55 | 0.378 | 4962.1 | 4.932 |
| 0.1875 | 0.078 | 33.43 | 0.397 | 5142.1 | 4.946 |
| 0.1985 | 0.078 | 35.41 | 0.411 | 5322.1 | 5.042 |
| 0.2102 | 0.111 | 37.51 | 0.411 | 5502.1 | 5.162 |
| 0.2227 | 0.092 | 39.74 | 0.411 | 5682.1 | 5.218 |
| 0.2358 | 0.092 | 42.1 | 0.411 | 5862.1 | 5.185 |
| 0.2498 | 0.092 | 44.6 | 0.429 | 6042.1 | 5.245 |
| 0.2647 | 0.125 | 47.24 | 0.443 | 6222.1 | 5.421 |
| 0.2803 | 0.092 | 50.05 | 0.457 | 6402.1 | 5.564 |
| 0.297 | 0.092 | 53.01 | 0.457 | 6582.1 | 5.564 |
| 0.3147 | 0.111 | 56.16 | 0.457 | 6762.1 | 5.61 |
| 0.3333 | 0.111 | 59.49 | 0.457 | 6942.1 | 5.702 |
| 0.3532 | 0.125 | 63.02 | 0.489 | 7122.1 | 5.757 |
| 0.3742 | 0.125 | 66.76 | 0.489 | 7302.1 | 5.711 |
| 0.3963 | 0.125 | 70.72 | 0.507 | 7482.1 | 5.767 |
| 0.4198 | 0.138 | 74.91 | 0.507 | 7662.1 | 5.914 |
| 0.4447 | 0.138 | 79.35 | 0.521 | 7842.1 | 6.057 |
| 0.4697 | 0.138 | 84.06 | 0.489 | 8022.1 | 6.103 |
| 0.4963 | 0.138 | 89.05 | 0.489 | 8202.1 | 6.117 |
| 0.5247 | 0.157 | 94.33 | 0.507 | 8382.1 | 6.163 |
| 0.5547 | 0.171 | 99.92 | 0.521 | 8562.1 | 6.205 |
| 0.5863 | 0.157 | 105.8 | 0.54 | 8742.1 | 6.205 |
| 0.6213 | 0.171 | 112.1 | 0.554 | 8922.1 | 6.246 |
| 0.658 | 0.171 | 118.8 | 0.572 | 9102.1 | 6.376 |
| 0.6963 | 0.171 | 125.8 | 0.586 | 9282.1 | 6.532 |
| 0.738 | 0.171 | 133.3 | 0.604 | 9462.1 | 6.583 |
| 0.7813 | 0.171 | 141.2 | 0.618 | 9642.1 | 6.579 |

AQTESOLV for Windows                                       Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.828 | 0.171 | 149.5 | 0.637 | 9822.1 | 6.592 |
| 0.8763 | 0.157 | 158.4 | 0.683 | 1.E+04 | 6.569 |
| 0.928 | 0.171 | 167.8 | 0.683 | 1.018E+04 | 6.62 |
| 0.983 | 0.171 | 177.7 | 0.715 | 1.036E+04 | 6.657 |
| 1.041 | 0.171 | 188.3 | 0.734 | 1.054E+04 | 6.754 |
| 1.103 | 0.171 | 199.4 | 0.766 | 1.072E+04 | 6.883 |
| 1.168 | 0.171 | 211.3 | 0.798 | 1.09E+04 | 6.929 |
| 1.238 | 0.171 | 223.8 | 0.83 | 1.108E+04 | 6.943 |
| 1.311 | 0.171 | 237. | 0.877 | 1.126E+04 | 6.892 |
| 1.39 | 0.171 | 251.1 | 0.895 | 1.144E+04 | 6.902 |
| 1.473 | 0.171 | 266. | 0.941 | 1.162E+04 | 6.902 |
| 1.561 | 0.171 | 281.7 | 0.992 | 1.18E+04 | 6.957 |
| 1.655 | 0.171 | 298.4 | 1.038 | 1.198E+04 | 7.054 |
| 1.753 | 0.189 | 316.1 | 1.07 | 1.216E+04 | 7.201 |
| 1.858 | 0.203 | 334.9 | 1.135 | 1.234E+04 | 7.266 |
| 1.968 | 0.203 | 354.7 | 1.167 | 1.252E+04 | 7.312 |
| 2.085 | 0.203 | 375.7 | 1.227 | 1.27E+04 | 7.275 |
| 2.21 | 0.189 | 398. | 1.259 | 1.288E+04 | 7.257 |
| 2.341 | 0.203 | 421.6 | 1.324 | 1.306E+04 | 7.271 |
| 2.481 | 0.221 | 446.6 | 1.375 | 1.324E+04 | 7.34 |
| 2.63 | 0.203 | 473. | 1.421 | 1.342E+04 | 7.391 |
| 2.786 | 0.221 | 501.1 | 1.472 | 1.36E+04 | 7.469 |
| 2.953 | 0.221 | 530.8 | 1.532 | 1.378E+04 | 7.566 |
| 3.13 | 0.221 | 562.2 | 1.564 | 1.396E+04 | 7.626 |
| 3.316 | 0.221 | 595.6 | 1.615 | 1.414E+04 | 7.561 |
| 3.515 | 0.235 | 630.8 | 1.629 | 1.432E+04 | 7.529 |
| 3.725 | 0.235 | 668.2 | 1.661 | 1.45E+04 | 7.497 |
| 3.946 | 0.235 | 707.8 | 1.712 | 1.468E+04 | 7.594 |
| 4.181 | 0.203 | 749.8 | 1.758 | 1.486E+04 | 7.658 |
| 4.43 | 0.221 | 794.2 | 1.804 | 1.504E+04 | 7.741 |
| 4.693 | 0.235 | 841.3 | 1.868 | 1.522E+04 | 7.82 |
| 4.973 | 0.235 | 891.1 | 1.951 | 1.54E+04 | 7.944 |
| 5.27 | 0.235 | 943.9 | 2.044 | 1.558E+04 | 7.944 |
| 5.583 | 0.254 | 999.9 | 2.122 | | |

## SOLUTION

Aquifer Model:  Confined
Solution Method:  Cooper-Jacob

## VISUAL ESTIMATION RESULTS

## Estimated Parameters

| Parameter | Estimate | |
|---|---|---|
| T | 1.252E+04 | ft$^2$/day |
| S | 0.2971 | |



## BIG SANDY ENERGY PROJECT

Data Set: C:\891-06\OWC2.aqt
Date: 10/09/00          Time: 12:39:33

## PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Test Location: Wikieup, Arizona
Test Well: PW2
Test Date: 9/11/00

## SOLUTION

Aquifer Model: Confined
Solution Method: Theis

$T = 1.077E+04$ ft²/day
$S = 0.3816$

## AQUIFER DATA

Saturated Thickness: 300. ft                     Anisotropy Ratio (Kz/Kr): 1.

## WELL DATA

| Pumping Wells | | |
| --- | --- | --- |
| Well Name | X (ft) | Y (ft) |
| PW 1 | 0 | 0 |

| Observation Wells | | |
| --- | --- | --- |
| Well Name | X (ft) | Y (ft) |
| OWC2 | 200 | 0 |

AQTESOLV for Windows                                    Big Sandy Energy Project

Data Set: C:\891-06\OWC2.aqt
Title: Big Sandy Energy Project
Date: 10/09/00
Time: 12:39:49

## PROJECT INFORMATION

Company: Manera, Inc.
Client: Caithness
Project: 891-06
Location: Wikieup, Arizona
Test Date: 9/11/00
Test Well: PW2

## AQUIFER DATA

Saturated Thickness: 300. ft
Anisotropy Ratio (Kz/Kr): 1.

## PUMPING WELL DATA

Number of pumping wells: 1

## Pumping Well No. 1: PW 1

X Location: 0. ft
Y Location: 0. ft

No. of pumping periods: 2

### Pumping Period Data

| Time (min) | Rate (cu. ft/min) | Time (min) | Rate (cu. ft/min) |
|------------|-------------------|------------|-------------------|
| 0. | 256.7 | 1.584E+04 | 256.7 |

## OBSERVATION WELL DATA

Number of observation wells: 1

## Observation Well No. 1: OWC2

X Location: 200. ft
Y Location: 0. ft

No. of observations: 269

### Observation Data

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|------------|-------------------|------------|-------------------|------------|-------------------|
| 0.005 | 0. | 5.915 | 0.254 | 1059.1 | 2.214 |
| 0.01 | 0. | 6.266 | 0.254 | 1121.9 | 2.307 |
| 0.015 | 0. | 6.64 | 0.254 | 1188.4 | 2.399 |
| 0.02 | 0. | 7.035 | 0.268 | 1258.8 | 2.413 |
| 0.025 | 0. | 7.453 | 0.268 | 1333.4 | 2.44 |

AQTESOLV for Windows                                                    Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.03 | 0. | 7.896 | 0.281 | 1412.4 | 2.44 |
| 0.035 | 0. | 8.366 | 0.281 | 1496.1 | 2.487 |
| 0.04 | 0. | 8.865 | 0.281 | 1584.8 | 2.523 |
| 0.045 | 0. | 9.391 | 0.281 | 1678.7 | 2.639 |
| 0.05 | 0.014 | 9.95 | 0.281 | 1778.2 | 2.8 |
| 0.055 | 0. | 10.54 | 0.268 | 1883.5 | 2.943 |
| 0.06 | 0. | 11.17 | 0.281 | 1995.1 | 3.059 |
| 0.065 | 0.014 | 11.83 | 0.3 | 2113.4 | 3.137 |
| 0.07 | 0. | 12.53 | 0.3 | 2238.6 | 3.169 |
| 0.075 | 0. | 13.28 | 0.3 | 2371.2 | 3.299 |
| 0.08 | 0.014 | 14.07 | 0.3 | 2511.8 | 3.469 |
| 0.085 | 0. | 14.91 | 0.3 | 2660.6 | 3.603 |
| 0.09 | 0.014 | 15.79 | 0.332 | 2818.3 | 3.631 |
| 0.095 | 0.014 | 16.73 | 0.411 | 2985.3 | 3.631 |
| 0.1 | 0.014 | 17.72 | 0.3 | 3162.1 | 3.769 |
| 0.1058 | 0.014 | 18.78 | 0.332 | 3342.1 | 4.009 |
| 0.112 | 0.028 | 19.89 | 0.397 | 3522.1 | 4.12 |
| 0.1185 | 0.028 | 21.07 | 0.06 | 3702.1 | 4.184 |
| 0.1255 | 0.028 | 22.32 | 0.332 | 3882.1 | 4.309 |
| 0.1328 | 0.028 | 23.65 | 0.346 | 4062.1 | 4.466 |
| 0.1407 | 0.028 | 25.05 | 0.364 | 4242.1 | 4.521 |
| 0.149 | 0.046 | 26.54 | 0.364 | 4422.1 | 4.489 |
| 0.1578 | 0.046 | 28.12 | 0.364 | 4602.1 | 4.59 |
| 0.1672 | 0.06 | 29.79 | 0.364 | 4782.1 | 4.802 |
| 0.177 | 0.06 | 31.55 | 0.378 | 4962.1 | 4.932 |
| 0.1875 | 0.078 | 33.43 | 0.397 | 5142.1 | 4.946 |
| 0.1985 | 0.078 | 35.41 | 0.411 | 5322.1 | 5.042 |
| 0.2102 | 0.111 | 37.51 | 0.411 | 5502.1 | 5.162 |
| 0.2227 | 0.092 | 39.74 | 0.411 | 5682.1 | 5.218 |
| 0.2358 | 0.092 | 42.1 | −0.411 | 5862.1 | 5.185 |
| 0.2498 | 0.092 | 44.6 | 0.429 | 6042.1 | 5.245 |
| 0.2647 | 0.125 | 47.24 | 0.443 | 6222.1 | 5.421 |
| 0.2803 | 0.092 | 50.05 | 0.457 | 6402.1 | 5.564 |
| 0.297 | 0.092 | 53.01 | 0.457 | 6582.1 | 5.564 |
| 0.3147 | 0.111 | 56.16 | 0.457 | 6762.1 | 5.61 |
| 0.3333 | 0.111 | 59.49 | 0.457 | 6942.1 | 5.702 |
| 0.3532 | 0.125 | 63.02 | 0.489 | 7122.1 | 5.757 |
| 0.3742 | 0.125 | 66.76 | 0.489 | 7302.1 | 5.711 |
| 0.3963 | 0.125 | 70.72 | 0.507 | 7482.1 | 5.767 |
| 0.4198 | 0.138 | 74.91 | 0.507 | 7662.1 | 5.914 |
| 0.4447 | 0.138 | 79.35 | 0.521 | 7842.1 | 6.057 |
| 0.4697 | 0.138 | 84.06 | 0.489 | 8022.1 | 6.103 |
| 0.4963 | 0.138 | 89.05 | 0.489 | 8202.1 | 6.117 |
| 0.5247 | 0.157 | 94.33 | 0.507 | 8382.1 | 6.163 |
| 0.5547 | 0.171 | 99.92 | 0.521 | 8562.1 | 6.205 |
| 0.5863 | 0.157 | 105.8 | 0.54 | 8742.1 | 6.205 |
| 0.6213 | 0.171 | 112.1 | 0.554 | 8922.1 | 6.246 |
| 0.658 | 0.171 | 118.8 | 0.572 | 9102.1 | 6.376 |
| 0.6963 | 0.171 | 125.8 | 0.586 | 9282.1 | 6.532 |
| 0.738 | 0.171 | 133.3 | 0.604 | 9462.1 | 6.583 |
| 0.7813 | 0.171 | 141.2 | 0.618 | 9642.1 | 6.579 |

AQTESOLV for Windows                                          Big Sandy Energy Project

| Time (min) | Displacement (ft) | Time (min) | Displacement (ft) | Time (min) | Displacement (ft) |
|---|---|---|---|---|---|
| 0.828 | 0.171 | 149.5 | 0.637 | 9822.1 | 6.592 |
| 0.8763 | 0.157 | 158.4 | 0.683 | 1.E+04 | 6.569 |
| 0.928 | 0.171 | 167.8 | 0.683 | 1.018E+04 | 6.62 |
| 0.983 | 0.171 | 177.7 | 0.715 | 1.036E+04 | 6.657 |
| 1.041 | 0.171 | 188.3 | 0.734 | 1.054E+04 | 6.754 |
| 1.103 | 0.171 | 199.4 | 0.766 | 1.072E+04 | 6.883 |
| 1.168 | 0.171 | 211.3 | 0.798 | 1.09E+04 | 6.929 |
| 1.238 | 0.171 | 223.8 | 0.83 | 1.108E+04 | 6.943 |
| 1.311 | 0.171 | 237. | 0.877 | 1.126E+04 | 6.892 |
| 1.39 | 0.171 | 251.1 | 0.895 | 1.144E+04 | 6.902 |
| 1.473 | 0.171 | 266. | 0.941 | 1.162E+04 | 6.902 |
| 1.561 | 0.171 | 281.7 | 0.992 | 1.18E+04 | 6.957 |
| 1.655 | 0.171 | 298.4 | 1.038 | 1.198E+04 | 7.054 |
| 1.753 | 0.189 | 316.1 | 1.07 | 1.216E+04 | 7.201 |
| 1.858 | 0.203 | 334.9 | 1.135 | 1.234E+04 | 7.266 |
| 1.968 | 0.203 | 354.7 | 1.167 | 1.252E+04 | 7.312 |
| 2.085 | 0.203 | 375.7 | 1.227 | 1.27E+04 | 7.275 |
| 2.21 | 0.189 | 398. | 1.259 | 1.288E+04 | 7.257 |
| 2.341 | 0.203 | 421.6 | 1.324 | 1.306E+04 | 7.271 |
| 2.481 | 0.221 | 446.6 | 1.375 | 1.324E+04 | 7.34 |
| 2.63 | 0.203 | 473. | 1.421 | 1.342E+04 | 7.391 |
| 2.786 | 0.221 | 501.1 | 1.472 | 1.36E+04 | 7.469 |
| 2.953 | 0.221 | 530.8 | 1.532 | 1.378E+04 | 7.566 |
| 3.13 | 0.221 | 562.2 | 1.564 | 1.396E+04 | 7.626 |
| 3.316 | 0.221 | 595.6 | 1.615 | 1.414E+04 | 7.561 |
| 3.515 | 0.235 | 630.8 | 1.629 | 1.432E+04 | 7.529 |
| 3.725 | 0.235 | 668.2 | 1.661 | 1.45E+04 | 7.497 |
| 3.946 | 0.235 | 707.8 | 1.712 | 1.468E+04 | 7.594 |
| 4.181 | 0.203 | 749.8 | 1.758 | 1.486E+04 | 7.658 |
| 4.43 | 0.221 | 794.2 | 1.804 | 1.504E+04 | 7.741 |
| 4.693 | 0.235 | 841.3 | 1.868 | 1.522E+04 | 7.82 |
| 4.973 | 0.235 | 891.1 | 1.951 | 1.54E+04 | 7.944 |
| 5.27 | 0.235 | 943.9 | 2.044 | 1.558E+04 | 7.944 |
| 5.583 | 0.254 | 999.9 | 2.122 | | |

## SOLUTION

Aquifer Model:  Confined
Solution Method:  Theis

## VISUAL ESTIMATION RESULTS

## Estimated Parameters

| Parameter | Estimate | |
|---|---|---|
| T | 1.077E+04 | $ft^2$/day |
| S | 0.3816 | |



$r_o = 200,000,000$

$\Delta S = 0.824$

$\dot{} = \dfrac{70\,Q}{\Delta S}$    $T = \dfrac{70\,(1920\,g\,p\,m.)}{0.824}$    $T = 163\,106$    $S = \dfrac{T\,b}{640\,r_o^2}$    $S = \dfrac{163\,106\,(15590)}{640\,(80,050,000)^2}$

$gpd/ft$

$S = 7.9 \times 10^{-11}$

*Exhibit C - Areas of Biological Wealth*

## EXHIBIT C - AREAS OF BIOLOGICAL WEALTH

*As stated in Arizona Corporation Commission Rules of Practice and Procedure R14-3-219:*

*"Describe any areas in the vicinity of the proposed site or route which are unique because of biological wealth or because they are habitats for rare and endangered species.  Describe the biological wealth or species involved and state effects, if any, the proposed facilities will have thereon"*

## BIOLOGICAL WEALTH

**The area of interest supporting biological resources in the vicinity of the proposed  Project includes the Plant site, ancillary facilities, and the proposed route for the natural gas pipeline along U.S. Highway 93 and Mohave County Hackberry Road and Plant access road. The area supports a complex mosaic of upland Sonoran and Mojave Desert vegetation with xeroriparian vegetation along numerous washes of the Big Sandy basin, and small areas of agricultural and developed lands.  A complete description of the vegetation communities of the Project area is presented in Exhibit C-1.**   The proposed Plant site is located near the transition between Sonoran Desert and Mojave Desert vegetation.

The Sonoran Desert vegetation at the south end of the Project area in the vicinity of the Plant site is characterized by creosote bush flats, interrupted by upland desert scrub on rocky slopes. Creosote bush (*Larrea tridentata*) and white bursage (*Ambrosia dumosa*) are the dominant plant species in the flats, with species such as brittlebush (*Encelia farinosa*), ocotillo (*Fouquieria splendens*), box thorn (*Lycium* spp.), galleta grass (*Hilaria rigida*), rhatany (*Krameria* spp.), and cacti (*Opuntia* spp.) being found in lower densities.  Saguaros (*Carnegia gigantea*) are present in very low numbers in the flats, but can be more abundant on rocky slopes.

The Mojave Desert vegetation, which covers the majority of the Project area along the proposed pipeline route, is dominated by creosote bush and white bursage, with a lesser component of Joshua tree (*Yucca brevifolia*), bladder sage (*Salazaria mexicana*), galleta grass, cacti, catclaw (*Acacia greggii*), and saltbush (*Atriplex* spp.).

**Numerous washes with varying densities of xeroriparian vegetation, including the Big Sandy River, are found in the vicinity of the Plant site and access road.**  Dominant vegetation in these areas includes ironwood (*Olneya tesota*), mesquite (*Prosopis* spp.), palo verde (*Cercidium floridum*), and tamarisk (*Tamarix* spp.).  **Small areas of wetlands have been delineated on the Plant site and at the proposed pipeline crossing of the Big Sandy River.  Delineation of wetlands and waters of the U.S. is contained in Exhibit C-2.**

Agricultural and developed areas are very limited within the area and are found primarily near Wikieup.  Non-native, weedy, and crop species are typically dominant in these areas.

Threatened, endangered, proposed, and candidate plant and wildlife species likely to occur in the Project area were identified by the U.S. Fish and Wildlife Service (USFWS).  Wildlife of Special Concern species were identified by the Arizona Game and Fish Department (AGFD), and Highly Safeguarded Protected Native Plants were identified by the Arizona Department of Agriculture. Sensitive Species were identified by the Bureau of Land Management (BLM) in their Resource

Management Plan. **Special Status Species are those species which are declining in number throughout their range and for which specific threats to existing populations or habitat have been identified. Table C-1 presents the Special Status Species potentially occurring within the region, listed by both common and scientific name, habitat associations, and status.**

The variety of vegetation types present in the area provides habitat for a number of federal and state listed Special Status Species. **The extent of occurrence of Special Status Species in the area and their relationship to the proposed facilities has been determined through literature review and site specific studies. Surveys for Special Status Species have been conducted during baseline studies for the EIS to determine the location and extent of their occurrence and habitat. Specific studies for the southwestern willow flycatcher, western yellow-billed cuckoo, bat species, nesting raptors, and native fish have been conducted. Results of these surveys are presented in Exhibits C-3, Wildlife Resources, and C-4, Aquatic Resources.**

## Potential Effects

The primary potential effects of the proposed Project include short-term disturbance of vegetation and disturbance, injury, or mortality of wildlife species along the pipeline alignment, and both short- and long-term similar impacts to vegetation and wildlife at the Plant site and along the access road. The Plant site is adjacent to an existing transmission line; therefore, no additional transmission lines will be constructed as part of this Project.

The proposed natural gas pipeline alignment is located adjacent to an existing highway. Clearing of the pipeline alignment would not increase the fragmentation of the existing vegetation in the area. The entire route will be surveyed for Special Status Species prior to construction. Site-specific mitigation measures will be implemented that avoid any impacts to federally-listed threatened and endangered species, and minimize any impacts to state and federal listed sensitive species. Upon completion of construction, the alignment will be revegetated and will be available as wildlife habitat or other uses compatible with current or planned highway right-of-way. No long-term impacts to vegetation or wildlife are anticipated along the pipeline alignment.

The Plant site is located in upland desert scrub vegetation, some of which will be cleared during construction. The natural gas pipeline and the new access road will be built in the same right-of-way from the highway to the Plant site to minimize impacts. Following construction, areas outside of the power island, switchyard, and access roadwell field that were disturbed during construction will be revegetated. Areas occupied by surface facilities will not be revegetated, and these areas will be lost as wildlife habitat. The entire site will be surveyed for Special Status Species prior to construction. Site-specific mitigation measures will be implemented that avoid any impacts to federally-listed threatened and endangered species, and minimize any impacts to state and federal listed sensitive species. Compared to the total amount of habitat available in the Project area, the amount of long-term disturbance and habitat loss at the Plant site is considered minimal.

The construction and operation of the Project is not expected to have any adverse effect on any federally listed threatened or endangered species, or any state or BLM designated sensitive species. Further, the permanent loss of suitable habitat for these species in the Project area will be negligible in extent.

*Exhibit C - Areas of Biological Wealth*

| Table C-1<br>Big Sandy Energy Project<br>Special Status Species That May Occur in the Project Area | | | | | | |
|---|---|---|---|---|---|---|
| **Common Name**<br>*(Scientific Name)* | **Federal**<br>**Status[1]** | **State**<br>**Status[2]** | **Habitat Types Utilized** | | | |
| | | | **Sonoran**<br>**Desert Scrub** | **Mojave**<br>**Desert Scrub** | **Xeroriparian**<br>**Wash** | **Agricultural/**<br>**Developed** |
| ***BIRDS*** | | | | | | |
| Bald eagle (*Haliaeetus leucocephalus*) | T | SC | | ✔ | ✔ | ✔ |
| Common black hawk (*Buteogallus anthracinus*) | SS | SC | ✔ | ✔ | ✔ | ✔ |
| Cooper's hawk (*Accipiter cooperii*) | SS | SC | | ✔ | ✔ | |
| Ferruginous hawk (*Buteo regalis*) | SS | SC | ✔ | ✔ | ✔ | ✔ |
| Golden eagle (*Aquila chrysaetos*) | SS | SC | ✔ | ✔ | ✔ | ✔ |
| Merlin (*Falco columbarius*) | SS | SC | ✔ | ✔ | ✔ | ✔ |
| Mountain plover (*Charadrius montanus*) | PT | SC | | | | ✔ |
| Peregrine falcon (*Falco peregrinus*) | | SC | ✔ | ✔ | ✔ | ✔ |
| Sharp-shinned hawk (*Accipiter striatus*) | SS | SC | | ✔ | ✔ | |
| Southwestern willow flycatcher (*Empidonax trailii extimus*) | E | SC | | | ✔ | |
| Western bluebird (*Sialia mexicana*) | SS | SC | | ✔ | ✔ | ✔ |
| Yellow-billed cuckoo (*Coccyzus americanus*) | SS | SC | | | ✔ | |
| Zone-tailed hawk (*Buteo albonotatus*) | SS | SC | ✔ | ✔ | ✔ | ✔ |
| ***MAMMALS*** | | | | | | |
| Big free-tailed bat (*Tadarida macrotis*) | SS | SC | ✔ | ✔ | ✔ | |
| California leaf-nosed bat (*Macrotis californicus*) | SS | SC | ✔ | ✔ | ✔ | |
| Cave myotis (*Myotis velifer*) | SS | SC | ✔ | ✔ | ✔ | |
| Fringed myotis (*Myotis thysanodes*) | SS | SC | | ✔ | ✔ | |

*Exhibit C - Areas of Biological Wealth*

| Table C-1 (continued)<br>Big Sandy Energy Project<br>Special Status Species That May Occur in the Project Area | | | | | | |
|---|---|---|---|---|---|---|
| **Common Name**<br>*(Scientific Name)* | **Federal**<br>**Status**[1] | **State**<br>**Status**[2] | **Habitat Types Utilized** | | | |
| | | | **Sonoran**<br>**Desert Scrub** | **Mojave**<br>**Desert Scrub** | **Xeroriparian**<br>**Wash** | **Agricultural/**<br>**Developed** |
| Greater western mastiff bat (*Eumops perotis californicus*) | SS | SC | ✔ | ✔ | ✔ | |
| Occult little brown bat (*Myotis lucifugus occultus*) | SS | SC | ✔ | ✔ | ✔ | |
| Small-footed myotis (*Myotis ciliolabrum*) | SS | SC | ✔ | ✔ | ✔ | |
| Townsend's big-eared bat (*Plecotus townsendii*) | SS | SC | ✔ | ✔ | ✔ | |
| **Reptiles** | | | | | | |
| Desert night lizard (*Xantusia vigilis vigilis*) | SS | SC | ✔ | ✔ | | |
| Desert rosy boa (*Lichanura trivirgata gracia*) | SS | SC | ✔ | ✔ | | |
| Desert tortoise (*Gopherus agassizii*) | SS | SC | ✔ | ✔ | ✔ | |
| Gila monster (*Heloderma suspectum*) | SS | SC | ✔ | ✔ | ✔ | ✔ |
| ***AMPHIBIANS*** | | | | | | |
| Arizona toad (*Bufo microscaphus microscaphus*) | SS | SC | | | ✔ | |
| Lowland leopard frog (*Rana yavapaiensis*) | SS | SC | | | ✔ | |
| ***FISH*** | | | | | | |
| Desert sucker (*Catostomus clarki*) | SS | SC | | | ✔ | |
| Longfin dace (*Agosia chrysogaster*) | SS | SC | | | ✔ | |
| Roundtail chub (*Gila robusta*) | SS | SC | | | ✔ | |
| Sonoran sucker (*Catostomus insignis*) | SS | SC | | | ✔ | |
| Speckled dace (*Rhinichthys osculus*) | SS | SC | | | ✔ | |
| ***PLANTS*** | | | | | | |

*Exhibit C - Areas of Biological Wealth*

| Table C-1 (continued) Big Sandy Energy Project Special Status Species That May Occur in the Project Area | | | | | | |
|---|---|---|---|---|---|---|
| **Common Name** *(Scientific Name)* | **Federal Status[1]** | **State Status[2]** | **Habitat Types Utilized** | | | |
| | | | **Sonoran Desert Scrub** | **Mojave Desert Scrub** | **Xeroriparian Wash** | **Agricultural/ Developed** |
| Arizona necklace *(Sophora arizonica)* | SS | | ✔ | ✔ | ✔ | |
| Crownless milkweed vine *(Cynanchum utahense)* | SS | | ✔ | ✔ | | |
| Linear-leaf sand spurge *(Stillingia linearifolia)* | SS | | ✔ | ✔ | ✔ | |
| Sand cholla *(Opuntia pulchella)* | SS | | ✔ | ✔ | | |
| Thorn Milkwort *(Polygala acnathoclada)* | SS | | ✔ | ✔ | | |

[1] Federal Status: E = Endangered; T = Threatened; PT = Proposed for Threatened Listing; SS = BLM Sensitive Species
[2] State Status: SC = Species of Special Concern; HS = Highly Safeguarded Protected Native Plants.

References Cited

Arizona Department of Agriculture. 1999. Appendix A. Protected native plants by categories. Downloaded from: http://agriculture.state.az.us/PSD/protplantlst.htm on February 8, 2000.

Barbour, M. G., and J. Major (eds.). 1988. Terrestrial vegetation of California. New Expanded Edition. California Native Plant Society Special Publication Number 9. Sacramento, California.

Hoffmeister, D. F. 1986. Mammals of Arizona. University of Arizona Press. Tucson, Arizona. 602 pp.

Minckley, W. L. 1973. Fishes of Arizona. Arizona Department of Game and Fish. Tempe, Arizona. 293 pp.

National Geographic Society. 1999. Field guide to the birds of North America. Third Edition. National Geographic Society. Washington D. C. 480 pp.

Stebbins, R. C. 1985. A field guide to western reptiles and amphibians. Peterson Field Guides. Houghton Mifflin Co. Boston, Massachusetts. 336 pp.

U. S. Fish and Wildlife Service. 1999. Endangered and threatened wildlife and plants; review of plant and animal taxa that are candidates or proposed for listing as endangered or threatened; annual notice of findings on recycled petitions; annual description of progress on listing actions; proposed rule. Federal Register 64(205): 57533-57547. October 25, 1999.

U. S. Fish and Wildlife Service. 1999. List of threatened and endangered species for the state of Arizona. Downloaded from: http://endangered.fws.gov/statl-r2.html on February 8, 2000.

# ATTACHMENT 13



July 15, 2024

Amanda Dodson
Field Manager, Kingman Field Office
U.S. Bureau of Land Management
2755 Mission Blvd
Kingman, AZ 86401

Debra A. Haaland
Secretary of the Interior
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

*VIA CERTIFIED U.S. MAIL RETURN RECEIPT REQUESTED*

**Re: 60-day notice of violations of the Endangered Species Act related to the U.S. Bureau of Land Management approval of the Phase 3 Sandy Valley Drilling Project**

\* \* \*

Dear Ms. Dodson:

On behalf of the Hualapai Tribe, we hereby provide notice in accordance with the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g), that you are in violation of Section 7 of the ESA, *id.* § 1536.

As approved by the U.S. Bureau of Land Management, the Phase 3 Sandy Valley Exploration Project would authorize Big Sandy, Inc. to conduct lithium exploration drilling activities within the Sandy Valley near Wikieup, Arizona. The project sits immediately adjacent to designated critical habitat for three threatened or endangered species: the western yellow-billed cuckoo, southwestern willow flycatcher, and northern Mexican gartersnake. The project, including its noise, light, vibrations, increased truck traffic, and other impacts, "may affect" these species. 50 C.F.R. § 402.14. BLM was therefore required to consult with the Service before approving the project. *Id.*; 16 U.S.C. § 1536(a).

But it did not. Instead, it concluded that the project will not affect those species on the basis that they lack habitat within the project's physical footprint. BLM's approach ignored the Service's explicit directive that BLM evaluate impacts on these species outside the project boundary. *See* Service June 25, 2020, letter (02EAAZ00-2020-SLI-0513). And it ignored recent scientific findings that the cuckoo may in fact occupy xeroriparian habitat within the project site. BLM's erroneous conclusions and resultant failure to consult with the Service violate the ESA.

If you do not remedy this ESA violation within 60 days, we intend to seek redress through litigation. *See id.* § 1540(g)(2)(A)(i).

TRIBAL PARTNERSHIPS   633 17th STREET, SUITE 1600   DENVER, CO 80202

T: 303.623.9466   F: 720.550.5757   TRIBALPARTNERSHIPS@EARTHJUSTICE.ORG   WWW.EARTHJUSTICE.ORG

## I.      Background

### A. The Endangered Species Act

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its purpose is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

Section 7 is the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). It requires each federal agency to ensure that its actions are "not likely to jeopardize the continued existence of threatened or endangered species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. § 1536(a)(2). In particular, Section 7 provides that a federal agency proposing an action must (1) enlist the Service's help to identify listed species that may be present in the relevant area; if any are, (2) conduct a biological assessment to determine whether any listed species are "likely to be affected" by the action; and, if so, (3) enter into formal consultation with the Service. *Id.* § 1536(c)(1); 50 C.F.R § 402.14(a).

The bar for engaging in Section 7 consultation is "low." *Kraayenbrink*, 632 F.3d at 496. An agency must initiate formal consultation for any activity that "may affect" listed species or critical habitat. 50 C.F.R. § 402.14; 16 U.S.C. § 1536(a)(2). In assessing potential impacts on listed species, agencies must use "the best scientific and commercial data available." 16 U.S.C. § 1536(c)(1).

Regardless of any consultation undertaken, the action agency—here, BLM—has an independent duty to ensure that its actions will not jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. *Id.* § 1536(a)(2).

### B. The Phase 3 Sandy Valley Exploration Project

The Big Sandy project site encompasses 613 acres of BLM land southeast of Wikieup, Arizona and east of the Big Sandy River. The project proponent, Big Sandy, Inc., plans to drill 131 lithium prospecting drill holes and one bulk sampling site while using associated access routes, staging areas, and water facilities. Drilling activity would last about 18 months, with workers using diesel-powered rotary coring equipment to drill the sampling holes. Each of the 131 core holes would require up to 12 hours of drilling, and the bulk sampling site would involve additional drilling and sampling activity. Water for drilling and dust suppression would be trucked in from Wikieup to an on-site storage tank, and trucks would move water between and to drilling sites throughout the project. In total, the project would directly disturb approximately 21 acres of land. Final EA at 4–5.

The project is located immediately adjacent to designated critical habitat for the western yellow-billed cuckoo, southwestern willow flycatcher, and northern Mexican gartersnake along the Big Sandy River.  *See* Designation of Critical Habitat for the Southwestern Willow Flycatcher, 78 Fed. Reg. 344, 517 (Jan. 3, 2013); Designation of Critical Habitat for the Western Yellow-Billed Cuckoo, 86 Fed. Reg. 20,798, 20,967 (Apr. 21, 2021); Designation of Critical Habitat for the Northern Mexican Gartersnake, 86 Fed. Reg. 22,518, 22,575 (Apr. 28, 2021) (maps of habitat along Big Sandy River adjacent to project site).  Some of the project's drill holes would be less than 3,000 feet from this riparian habitat, and the project's main access road runs through and along it, sandwiching the habitat between the main highway and the access road.  Final EA App. C, Figure 2A.

### C. BLM's approval process

After Big Sandy submitted its proposed drilling project to BLM, it enlisted the help of a consultant to conduct a "biological evaluation" of the project's effects.  BLM ultimately adopted this evaluation as its own and included it as Appendix G to its final EA.  As part of that biological evaluation, BLM (via the consultant) requested a list of potentially affected species from the Service.  The Service responded in a June 25, 2020 letter identifying five ESA-listed species present in the area:

- California least tern (endangered)

- southwestern willow flycatcher (endangered)

- western yellow-billed cuckoo (threatened)

- northern Mexican gartersnake (threatened)

- Arizona cliffrose (endangered)

2020 Letter at 3–4.

The Service advised BLM that it was required to consider these species in an "effects analysis" to comply with the ESA.  *Id.* at 3.  The Service further advised that "[t]he effects analysis should include the entire action area, *which often extends well outside the project boundary or 'footprint.'*"  *Id.* at 2 (emphasis added).

However, the biological evaluation "excluded" all of these species from evaluation.  BE at 6.  As its "[j]ustification," it stated for each species that there is "[n]o suitable habitat present . . . *in the project area.*"  BE at 10, 12 (emphasis added).  The evaluation therefore provided no assessment of how the project might affect them.

Between 2020 and the present, BLM proceeded to evaluate the project under NEPA, including multiple draft environmental assessments.  The Hualapai Tribe commented on these drafts, explaining that, among other deficiencies, the EA failed

to evaluate all impacts on wildlife, including the cuckoo, flycatcher, and other species.

On June 6, 2024, BLM approved the project in a record of decision, final EA, and finding of no significant impacts. BLM did not conduct any further assessment of impacts to threatened and endangered species beyond the 2020 biological evaluation, and it did not request or engage in consultation with the Service under Section 7 of the ESA.

On July 1, 2024, the Tribe submitted a request for State Director review of BLM's decision, which is pending.

## II.   BLM's failure to consult under Section 7 violates the ESA.

An agency "must initiate formal consultation if its proposed action 'may affect' listed species or critical habitat, and any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Kraayenbrink*, 632 F.3d at 496 (cleaned up). An agency's decision to forgo consultation is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem or offered an explanation that runs counter to the evidence." *Id.* (cleaned up).

Here, BLM opted to forgo consultation because it concluded that the project area does not contain habitat for the threatened and endangered species identified by the Service in its June 25, 2020 letter. This finding and consequent decision not to consult violate the ESA in two ways. First, BLM gave no consideration to effects that extend beyond the project's immediate physical boundaries and into the adjacent critical habitat, including noise, light, vibration, and traffic impacts. Second, BLM's conclusion that no cuckoo habitat is present within the project area ignores the best available science, which shows that cuckoos in fact use xeroriparian habitat like that within the project area.

### A.  The project may harm listed species adjacent to the project area.

The ESA's "may affect" standard requires an agency to evaluate "any possible effect" of its proposed action. *Kraayenbrink*, 632 F.3d at 496 (brackets omitted). The ESA also requires agencies to consider effects within an "action area"— meaning the geographic area within which effects are considered—that encompasses "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02; *see also* 2020 Letter at 2 ("The effects analysis should include the entire action area, which often extends well outside the project boundary or 'footprint.'"). For example, an agency violated Section 7 when it failed to consult with the Service based on the agency's determination that lynx did not occupy a project area, but lynx passed through the area, and it was "surrounded on three sides by Lynx Analysis Units,

two of which contain FWS-designated critical habitat." *All. for the Wild Rockies v. Gassmann*, 678 F. Supp. 3d 1249, 1292–93 (D. Mont. 2023).

Here, BLM ignored effects outside the project footprint, unlawfully constricting its analysis of the project's effects. Even though the Service told BLM to evaluate all impacts to the cuckoo, flycatcher, and gartersnake (and two other species)—and told BLM to consider effects "outside the project boundary or 'footprint,'" 2020 Letter at 2—BLM "excluded" the species from its analysis on the basis that they have no habitat "in the project area," BE at 12. That boundary includes only the area "proposed for exploration." Final EA at 1.

Besides ignoring the Service's direct proviso, BLM's conclusion ignores a host of effects, including increased noise, light, and traffic, that extend beyond the project footprint. *See* Exhibit A (showing the effects of noise, light, and vibration on a range of taxa, including cuckoos and flycatchers). Similarly, the Service has determined that significant threats to the cuckoo's designated critical habitat along the Big Sandy River include "vehicular traffic, and associated noise." 86 Fed. Reg. at 20,852 (Table 2 – code "Q" defined in footnote). Gartersnakes, too, are known to be vulnerable to "vehicular strikes." 86 Fed. Reg. at 22,552. Yet BLM never quantified noise pollution, light pollution, vibration levels, vehicle traffic, or other effects that spill past the project footprint to determine how they will affect listed species.

This oversight violates the ESA. *See, e.g.*, *Nw. Env't Def. Ctr. v. Nat'l Marine Fisheries Serv.*, 647 F. Supp. 2d 1221, 1231–32 (D. Or. 2009) (evaluating agency's defined action area based on the geographic extent of underwater noise and vibrations and the resulting impacts to fish); *cf. Defs. of Wildlife v. U.S. Forest Service*, No. 14-cv-02446, 2015 WL 14070482, at *7 (D. Ariz. Sept. 15, 2015) (finding agency violated NEPA by failing to provide "a convincing explanation" why noise from exploratory drilling project would not impact Mexican spotted owls). At a minimum, BLM was required to provide a scientifically defensible basis for limiting its analysis to the project's footprint, which it did not. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 901–02 (9th Cir. 2002) (enjoining project where the agency failed to "correlate [its] analysis area with the requirements of an 'action area'" under the ESA). Had it considered the projects' full scope of effects, BLM likely would have concluded that the project "may affect" listed species and that Section 7 consultation was required. 50 C.F.R. § 402.14.

To comply with the ESA, BLM must quantify and assess all reasonably foreseeable impacts to listed species, including those from noise, light, vibrations, and vehicle traffic both within and outside the project footprint. This analysis must account for the cuckoo, flycatcher, and gartersnake's critical habitat adjacent to the project site.

**B. Cuckoos may use habitat within the project area.**

BLM also erred by concluding that no cuckoo habitat exists within the project area. As noted, the ESA requires agencies to use "the best scientific and commercial data available." 16 U.S.C. § 1536(c)(1). And an agency's "decision to forgo consultation with [the Service] must be reversed if the [agency] entirely failed to consider an important aspect of the problem or offered an explanation that runs counter to the evidence before the agency." *Kraayenbrink*, 632 F.3d at 496 (cleaned up).

Here, BLM failed to consider recent scientific findings indicating that cuckoos likely occupy habitat within the project area. BLM's biological evaluation was completed in June 2020 and, as discussed above, excluded cuckoos from further analysis because "there is no riparian habitat in the project area." BE at 12. However, when the Service finalized its designation of cuckoo critical habitat in 2021, it explained that "in addition to the known use of riparian woodlands," the western yellow-billed cuckoo is now known to breed in "ephemeral drainages with relatively high humidity" along with "woody side drainages, terraces, and hillsides immediately adjacent to the main drainage." 86 Fed. Reg. at 20,813, 20,836 (characterizing this as a "new understanding"). In the southwestern United States specifically, cuckoos have "only recently been discovered" to use "ephemeral tree-lined xeroriparian drainages." *Id.* at 20,815; *see also id.* at 20,836.

That new scientific understanding applies to the project site. The biological evaluation explained that "Bitter Creek, a wide and sandy-bottomed ephemeral wash, borders the southern edge of the northern drill area," and that "Bitter Creek and the various smaller washes in the project area are lined with xeroriparian vegetation." BE at 5. Thus, the project site contains precisely the type of habitat that cuckoos are now known to use, undercutting BLM's conclusion that no cuckoo habitat exists within the project area. BLM did not consider this scientific information—an "important aspect of the problem"—thus violating the ESA. *Kraayenbrink*, 632 F.3d at 496.

## III. Conclusion

In short, BLM improperly restricted the scope of its analysis with respect to the project's effects on the cuckoo, flycatcher, and gartersnake. As a result, BLM erroneously concluded that the project would not affect those species and failed to consult with the Service before approving the project, in violation of the ESA. BLM must stay its approval of the Phase 3 Big Sandy Drilling Project and engage in formal consultation with the Service before allowing the project to move forward.

Should you fail to do so—in a manner that complies with the ESA and addresses the concerns described in this letter—we intend to seek redress through litigation.

Sincerely,

*/s/Laura Berglan*
Laura Berglan
Heidi McIntosh
Thomas Delehanty
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
(303) 623-9466
lberglan@earthjustice.org
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

*/s/Roger Flynn*
Roger Flynn
Jeffrey C. Parsons
Western Mining Action Project
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org