**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Hualapai Indian Tribe,

            Plaintiff,

v.

Debra Haaland, et al.,

            Defendants.

No. CV-24-08154-PCT-DJH

**ORDER**

On August 16, 2024, Plaintiff Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona ("Plaintiff") filed a "Motion for Temporary Restraining Order Followed by a Preliminary Injunction and Memorandum in Support" ("TRO") (Doc. 11). The Court received Defendants' expedited Response on August 19, 2024 (Doc. 15) and set the matter for a telephonic hearing that afternoon. (Doc. 17). Arizona Lithium Limited ("AZ Lithium") moved to intervene and appear at the hearing. (Docs. 18, 19).[1] The Court granted AZ Lithium's requests. (Doc. 20).

After considering these initial papers, the evidence attached thereto, and the arguments made by counsel at the hearing, the Court granted Plaintiff's TRO and set a Preliminary Injunction Hearing for September 17, 2024, at 10:00 a.m. This Order memorializes the Court's findings supporting the TRO.

---

[1] AZ Lithium attached a proposed Answer and a proposed Opposition to Plaintiff's TRO as exhibits to its Motion to Intervene. (Doc. 18-2 and 18-3, respectively). The Court permitted AZ Lithium to file those proposed documents at the August 19, 2024, TRO hearing. AZ Lithium filed its Response (Doc. 28) and a Notice of Errata (Doc. 30) the following day.

## I.      Background

On August 2, 2024, Plaintiff filed a "Complaint for Vacatur, Declaratory and Injunctive Relief" ("Complaint") against Defendants Debra Haaland in her official capacity as the United States Secretary of the Interior; the United States Bureau of Land Management ("BLM"); Ray Suazo in his official capacity as State Director of the BLM; and Amanda Dodson in her official capacity as Field Office Manager of the BLM Kingman Field Office.  (Doc. 1).  The Complaint challenges the BLM's approval of a lithium exploration project that threatens a medicinal spring sacred to Plaintiff called Ha'Kamwe'.[2] (hereafter, the "Sandy Valley Exploration Project" or the "Project") (*Id.* ¶ 1).

Plaintiff alleges that the BLM violated the National Historic Preservation Act, 16 U.S.C.§ 479, *et seq.* ("NHPA") when it found that no historic properties were affected by the Project; the National Environmental Policy Act of 1969, 42 U.S.C. § 4332, *et seq.* ("NEPA") by failing to consider a reasonable range of alternatives to the proposed project and by failing to take a "hard look" at the impacts on water resources; and the Administrative Procedures Act, 5 U.S.C. § 706(2)(a) ("APA"), by engaging in actions that are not in accordance with law.  (*See generally* Doc. 1).

### A.      Ha'Kamwe'

Ha'Kamwe', also known as Cofer Hot Springs, is located at the Cholla Canyon Ranch, on lands recently taken into trust by the Department of the Interior ("DOI") for the benefit of the Hualapai Tribe.  (Doc. 11 at 7–8); *see also* Hualapai Tribe Water Rights Settlement Act of 2022, Pub. L. No. 117-349, § 12); 136 Stat. 6225, 6252 (2023)). Ha'Kamwe' is recognized as a Traditional Cultural Property ("TCP") eligible for listing on the National Register of Historic Places.  (Doc. 11 at 7–8).  The Hualapai Tribe uses Ha'Kamwe' for cultural and traditional purposes, including for ceremonies related to birth, young women's coming of age, and other important life transitions.  (*Id.* at 7).  Ha'Kamwe' features prominently in tribal songs and stories about their history and connection to their land. (Doc. 1 ¶ 1).  Plaintiff alleges that both the historic flow and temperature of the spring

---

[2] In the Hualapai language, Ha'Kamwe' means "warm spring."  (Clarke Decl. at Doc. 11-3 ¶ 4).

1    are important attributes for its traditional uses.  (*Id.*)

2         **B.    The BLM's Approval to Drill on Lands Adjacent to Ha'Kamwe'**

3         In September 2019, AZ Lithium asked the BLM Kingman Field Office for

4    permission to explore for lithium deposits near Ha'Kamwe' (the "Project").  (Doc. 11 at

5    8).  On June 6, 2024, BLM issued a Decision Record ("DR"), Finding of No Significant

6    Impact ("FONSI"), and Final Environmental Assessment ("Final EA") for the Project.  On

7    July 9, 2024, based on the DR, FONSI, and Final EA, BLM approved the AZ Lithium's

8    Plan of Operations, authorizing it to begin Phase 3 of the Project.  Plaintiff describes Phase

9    3 and its potential effects on Ha'Kamwe' in its TRO as follows:

10              The Project would allow the Company to drill 131 wells and a bulk sample
11              site, which would remove 100–150 tons of material from three bore holes,
                on lands adjacent to Ha'Kamwe', requiring significant truck traffic,
12              generators, heavy machinery, and other industrial activity. The Project would
                disturb 21 acres of public land, and the drill holes are expected to reach
13              depths of approximately 300 feet, which could perforate the aquifer that
14              sustains the flows to Ha'Kamwe'. The Tribe has consistently communicated
                to BLM that drilling activities will create significant surface and subsurface
15              disturbances that will impair Tribal members' traditional use and enjoyment
16              of Ha'Kamwe'.  In addition to the noise, vibrations, and construction activity
                associated with the Project, the Project will disrupt Ha'Kamwe's natural
17              flows by drilling through and into the local aquifer. That threatens to
18              permanently destroy Ha'Kamwe's sacred character, as water flow and
                temperature are essential attributes of the spring's cultural and ceremonial
19              uses. Impacts on the spring—whether on flow, temperature, or otherwise—
20              "would result in unnatural physical and spiritual state of the spring, which
                would be detrimental to [] ceremonies … at Ha'Kamwe'." Jackson Decl.
21              ¶ 13. Ha'Kamwe' and the Big Sandy area are uniquely valuable features
22              essential to the Tribe's culture, and their diminishment would be an
                irreparable loss. There is no substitution or alternative to Ha'Kamwe' and
23              the Big Sandy area, including the Project area, for the Hualapai people. *See*
24              Jackson-Kelly Decl. ¶ 14; Jackson Decl. ¶ 13. Drilling would impact not only
                the wildlife, flora and fauna, gathering areas, the aquifer, and the flow of
25              water but also the integrity, spirituality, and future of the area itself. *See*
26              Jackson-Kelly Decl. ¶ 15; Craynon Decl. ¶ 10; Powskey Decl. ¶ 8-9.

27    (Doc. 11 at 2–3).

28         Plaintiff represents that "ground-disturbing work at the site" has already started and

"additional work related to drill pad and road construction is expected to start August 20, 2024." (Doc. 11 at 9). In its TRO, Plaintiff seeks to bar Defendants "from taking any action implementing or relying on the adequacy of the Decision Record, Finding of No Significant Impact, and Final Environmental Assessment, or otherwise authorizing activity related to lithium exploration drilling in the Project area." (Doc. 11 at 23).

## II.    Discussion

A TRO preserves the status quo pending a hearing on a preliminary injunction motion in order to avoid irreparable harm in the interim. *See Ariz. Recovery Housing Ass'n v. Ariz. Dep't of Health Servs.*, 2020 WL 8996590, at *1 (D. Ariz. May 14, 2020); *Bronco Wine Co. v. U.S. Dept. of Treasury*, 997 F. Supp. 1309, 1313 (E.D. Cal. 1996). The standards governing temporary restraining orders and preliminary injunctions are "substantially identical." *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (citation omitted). Preliminary injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief were denied, (3) that the equities weigh in the Plaintiff's favor, and (4) that the public interest favors injunctive relief. *Id.* at 20. The movant carries the burden of proof on each element of the test. *See Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). The last two factors merge when, as here, the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The Ninth Circuit employs a "sliding scale" approach to preliminary injunctions, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "The moving party may meet [its] burden by showing either: (1) a combination of probable success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." *Nouveau Riche Corp. v. Tree*, 2008 WL

- 4 -

55381513, at *4 (D. Ariz. Dec. 23, 2008) (citing *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003)). "[C]ourts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" and should be particularly mindful, in exercising their sound discretion, of the "public consequences in employing the extraordinary remedy of injunction." *Id*. at 24 (citations omitted).

Injunctive relief is an equitable remedy, and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (citing *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987)). The temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods*, *Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

## A.    Irreparable Harm

In the context of a motion for a temporary restraining order, the issue is whether irreparable harm is likely to occur before the Court can determine whether to issue a preliminary injunction. Under *Winter*, plaintiffs seeking a preliminary injunction must establish that "irreparable harm is likely, not just possible." *All. for the Wild Rockies*, 632 F.3d at 1131. Irreparable harm is harm "that cannot be redressed by a legal or equitable remedy following trial." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007) (internal quotation marks omitted). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Sierra Club v. Bosworth*, 510 F.3d 106, 1033 (9th Cir. 200) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

On the basis of Plaintiff's TRO and supporting documentation, Defendants' Response, and the brief arguments heard at the August 19, 2024, hearing, the Court finds

that Plaintiff is likely to suffer irreparable injury if the Court does not grant the TRO until it can hold a full hearing on the PI.  AZ Lithium is prepared and ready to drill 100+ boreholes on land that is immediately adjacent to Ha'Kamwe' on three sides.  There is evidence in the record that water feeding the Ha'Kamwe' may be sourced, at least in part, by an upper aquifer that AZ Lithium will be drilling into in the next few days.  (Doc. 11-7 at 123).  Though Defendants point out that they have failed to encounter any groundwater in their past exploratory drilling, they conceded at the hearing that the Phase 3 drilling will be on a much larger scale and in different locations.  For purposes of this TRO, Plaintiff has raised credible concerns that the Phase 3 drilling is likely to imminently threaten the aquifer feeding the Ha'Kamwe' waters, causing irreparable harm and affecting its status to be placed on the National Register of Historic Places.

### B.     Likelihood of Success on the Merits

The record before the Court also suggests that Plaintiff has a "fair chance of success" of establishing a NPHA violation.[3]  A reasonable probability of success is all that need be shown for preliminary injunctive relief—an overwhelming likelihood is not necessary. *Candrian v. RS Indus., Inc.*, 2013 WL 2244601, at *3 (D. Ariz. May 21, 2013) (citing *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991)).  "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.' " *Gilder*, 936 F.2d at 422 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2nd Cir. 1953)).  "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

The record calls into question the adequacy of BLM's Section 106 process and specifically whether Defendants erred in failing to include Ha'Kamwe' in the Project's APE.  NHPA's requirement that a government agency "take into account the effect of [an]

---

[3] Plaintiff need only show a likelihood of success on the merits or that serious questions exist as to one of their claims to justify the TRO they seek.  *See e.g.*, *Californians for Alternatives to Toxics v. Troyer*, 2005 WL 2105343, n.8 (E.D. Cal. Aug. 31, 2005).

1  undertaking on any historic property" is governed by numerous federal regulations which

2  establish a procedure generally referred to as the Section 106 process. *See* 54 U.S.C. §

3  306108; 36 C.F.R. § 800 *et seq.*

4      The section 106 process seeks to accommodate historic preservation
5      concerns with the needs of Federal undertakings through consultation among
        the agency official and other parties with an interest in the effects of the
6      undertaking on historic properties, commencing at the early stages of project
        planning. The goal of consultation is to identify historic properties potentially
7      affected by the undertaking, assess its effects and seek ways to avoid,
8      minimize or mitigate any adverse effects on historic properties.

9  36 C.F.R. § 800.1

10      Where an agency determines that an "undertaking" has the potential to cause effects

11  on "historic properties," the regulations provide for a four-step process: (1) initiate the

12  Section 106 process; (2) identify, through reasonable and good faith efforts, historic

13  properties within the area of potential effects ("APE"); (3) assess whether effects of the

14  undertaking on any eligible historic property is adverse; and (4) seek to resolve any adverse

15  effects. 36 C.F.R. § 800.3-800.6. The APE is defined as "the geographic area or areas

16  within which an undertaking may directly or indirectly cause alterations in the character or

17  use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d). "The area

18  of potential effects is influenced by the scale and nature of an undertaking and may be

19  different for different kinds of effects caused by the undertaking." *Id.*

20      These steps are accomplished through consultation with interested parties. *Id.* at

21  §§ 800.1(a), 800.2. Specifically, an agency must consult with any Native American Tribe

22  "that attaches religious and cultural significance to [the affected] property" and provide the

23  Tribe "a reasonable opportunity to identify its concerns about historic properties, advise on

24  the identification and evaluation of historic properties, including those of traditional

25  religious and cultural importance, . . . and participate in the resolution of adverse effects."

26  *Id.* at § 800.2(c)(2)(ii). "If the agency official finds. . . there are historic properties present

27  but the undertaking will have no effect upon them as defined in § 800.16(i), the agency

28  official shall provide documentation of this finding, as set forth in § 800.11(d), to the

SHPO/THPO.[4] The agency official shall notify all consulting parties, including Indian tribes and Native Hawaiian organizations, and make the documentation available for public inspection prior to approving the undertaking." *Id*. at § 800.4(d)(1).

On or about May 31, 2024, the BLM concluded that the Project would not have any effect upon historic properties (including Ha'Kamwe') under § 800.4(d)(1). (Doc. 15-8 at 2). Accordingly, and though recognized as a TCP, Ha'Kamwe' was not included in the APE of the Project at all. Due to this finding, the Section 106 consultation process as it would have pertained to Ha'Kamwe' and the Hualapai Tribe never occurred. Plaintiff contends that "BLM's failure to include Ha'Kamwe' undermined the required consultation process and violated the NHPA." (Doc. 11 at 15). The Court finds merit in this argument.

First, as Plaintiff points out, the BLM's Section 106 decision to exclude Ha'Kamwe' from the APE conflicts with the BLM's NEPA analysis. Unlike the determination that the Project would *not* affect Ha'Kamwe' during the Section 106 process, the Final EA conducted under NEPA identifies numerous impacts the Project would have on the springs, including:

> (1) temporary visual effects from drilling equipment and surface disturbance; (2) temporary noise and vibration from drilling activities and vehicular travel through the area; (3) temporary disruption to cultural practices at and/or near Ha'Kamwe'; (4) impacts to native wildlife and vegetation (removal of vegetation, noise, human presence); (5) the potential for cumulative effects to natural and cultural environments.

(Doc. 15-1 at 19). When this discrepancy was brought to BLM's attention by the Advisory Council on Historic Preservation ("ACHP"), BLM's "initial response was that they consider these impacts to be temporary and non-physical, and do not meet the definition of 'effects' under Section 106." (Doc. 11-7 at 111). The ACHP disagreed and stated:

---

[4] A State Historic Preservation Officer, or SHPO "means the official appointed or designated pursuant to section 101(b)(1) of the act to administer the State historic preservation program or a representative designated to act for the State historic preservation officer. 36 C.F.R. §800.16(v). A Tribal Historic Preservation Officer, or THPO, "means the tribal official appointed by the tribe's chief governing authority or designated by a tribal ordinance or preservation program who has assumed the responsibilities of the SHPO for purposes of section 106 compliance on tribal lands in accordance with section 101(d)(2) of the act." 36 C.F.R. § 800.16(w).

1
2
3
4
5
6

> As defined in 36 CFR § 800.16(i), effect 'means alternation to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register.' In this case, the characteristics of the historic property qualifying it for inclusion in the National Register include (in addition to the physical components of the property, such as the spring itself and surrounding landscape features) the setting and feeling of Ha'Kamwe' and its environs and the cultural practices conducted there, both of which will be altered (albeit temporarily) by the drilling equipment and ground disturbance proposed in close proximity.

7
8
9
10
11
12
13
14
15
16

(Doc. 11-7 at 111).  Though the ACHP encouraged the BLM to reconsider its evaluation in light of the perceived discrepancies between the Section 106 and NEPA analysis, it did not do so.  (*Id.*)  The Court finds the BLM's refusal to reevaluate concerning.  Like the ACHP, the Court disagrees with BLM that the impacts identified in the Final EA, as well as others not identified, "do not meet the definition of 'effects' under Section 106."  Indeed, it is unclear to the Court why potential effects to the aquifer feeding the waters of the Ha'Kamwe' were also not considered in making the APE determination.  Plaintiff persuasively points out that even the 2000 Manera Study used by BLM to support the Final EA findings indicates that the water feeding the Ha'Kamwe may be sourced from the upper aquifer—areas that Defendants concede will be subject to drilling in Phase 3.

17
18
19
20
21
22
23
24
25

Had Ha'Kamwe been included in the APE, the Tribe may have been consulted on these issues early in the process.  But the BLM's decision to exclude the Ha'Kamwe' seems to have prematurely ended the consultation process with the Hualapai Tribe as required under Section 106.  At this juncture, the Court concludes that Plaintiff has raised sufficiently serious questions regarding Defendants' NPHA compliance to justify a TRO.  *See Gilder*, 936 F.2d at 422 (" 'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo.") (cleaned up).

26

### C.    Balance of Equities and Public Interest

27
28

The balance of equities and public interest also currently tip in Plaintiff's favor. "The basic function of a preliminary injunction is to preserve the status quo pending a

determination of the action on the merits." *Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 704 (9th Cir. 1988). "Status quo is defined as the last, uncontested status which preceded the pending controversy." *Susanville Indian Rancheria v. Leavitt*, 2007 U.S. Dist. LEXIS 18702, at *21 (E.D. Cal. Feb. 28, 2007) (quoting *Regents of the Univ. of Cal.*, 747 F.2d 511, 514 (9th Cir 1984). "The public interest analysis for the issuance of a[n] injunction requires [the court] to consider whether there exists some critical public interest that would be injured by the grant of [injunctive] relief." *Pure Wafer Inc. v. City of Prescott*, 275 F. Supp. 3d 1173, 1179 (D. Ariz. 2017) (citation omitted).

The BLM says that an injunction would delay domestic lithium exploration at a time when the United States is striving to transition to renewable sources of energy. (Doc. 15 at 24). But that delay, which may be temporary, does not outweigh the potential permanent damage the imminent drilling may cause to Ha'Kamwe', which is central to the Hualapai Tribe life-way. "When the proposed project may significantly degrade some human environmental factor, injunctive relief is appropriate." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001) (internal quotation marks omitted).

### D.    Bond

Plaintiff says a bond should not be required under these circumstances. (Doc. 11 at 22). Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Rule "invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quotation and citation omitted). The court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

Plaintiff says the Hualapai Tribe is unable to pay a large bond, and any sums would "come directly from Tribal resources needed by the Hualapai Tribe to provide essential governmental services." (Doc. 11 at 23). Government Defendants do not respond to

1   Plaintiff's request, but intervenor AZ Lithium says it will incur significant expenses if its
2   operations are enjoined.  (Doc. 28 at 15).  In its discretion, and due to the short nature of
3   the TRO, the Court will waive the bond requirement at this time.  Both the Tribe and AZ
4   Lithium will be expected to substantiate their positions on this issue at the Preliminary
5   Injunction hearing if an injunction ultimately issues.

6            For the aforesaid reasons,

7            **IT IS ORDERED** that Defendants are temporarily enjoined from authorizing or
8   allowing any ground disturbance, construction, operation, or other activity approved by the
9   BLM's July 9, 2024, Decision Letter or its June 6, 2024, Decision Record, Finding of No
10  Significant Impact, and Final Environmental Assessment until further order of the Court.

11           **IT IS FURTHER ORDERED** that a Preliminary Injunction hearing is set on this
12  matter for September 17, 2024, at 10:00 a.m. in Courtroom 605 of the Sandra Day
13  O'Connor U.S. Courthouse, 401 W. Washington Street, Phoenix, Arizona 85003.

14           In preparation for this hearing, **IT IS ORDERED** as follows:

15           **Jointly**, the parties shall prepare and file a pre-hearing statement by Thursday,
16  September 12, 2024, setting forth the following information:[5]

17           **A.     COUNSEL FOR THE PARTIES**

18           Include the mailing addresses, office phone numbers, and email addresses for:
19           Plaintiff(s):
20           Defendants(s):

21           **B.     STATEMENT OF JURISDICTION**

22           Cite the statute(s) giving this Court jurisdiction.

23           State whether jurisdiction is or is not disputed.   If jurisdiction is disputed, the party
24  contesting jurisdiction shall set forth with specificity the bases for the objection.

25           **C.     LIST OF WITNESSES**

26           **Separately**, each party shall list the names of witnesses and their respective
27  addresses, whether they're a fact or expert witness, and a brief statement as to the testimony

28  _____
[5] The Court's copy of every document required by this Order shall be **three-hole punched**
on the left side of the document.

of each witness.  The witnesses shall be grouped as follows:  (1) witnesses who <u>shall</u> be called at the hearing; (2) witnesses who <u>may</u> be called at the hearing; and (3) witnesses who are <u>unlikely</u> to be called at the hearing.

Additionally, the parties shall include the following text in this section of the joint pre-hearing statement:  "Each party understands that it is responsible for ensuring that the witnesses it wishes to call to testify are subpoenaed.  Each party further understands that any witness a party wishes to call shall be listed on that party's list of witnesses above and that party cannot rely on that witness having been listed or subpoenaed by another party."

The parties shall deliver one (1) original and two (2) copies of the witness and exhibit lists, using the forms located on the Court's website at http://www.azd.uscourts.gov/judges/judges-orders, to the Courtroom Deputy <u>no later than 48 hours prior to the hearing</u>.

**D.    LIST OF EXHIBITS**

The parties shall submit a list of numbered exhibits with a concise description of each exhibit.  Document admissibility issues should be resolved by stipulation before the hearing.  Following the below format, the parties shall work with the Courtroom Deputy Clerk to mark all exhibits directly into evidence unless a good faith objection will be raised at the hearing.

1.    The following exhibits are admissible in evidence and may be marked in evidence by the Clerk:

a.    <u>Plaintiff's Exhibits</u>:

b.    <u>Defendants' Exhibits</u>:

2.    As to the following exhibits, the parties have reached the following stipulations:

a.    <u>Plaintiff's Exhibits</u>:

b.    <u>Defendants' Exhibits</u>:

3.    As to the following exhibits, the party against whom the exhibit is to be offered objects to the admission of the exhibit and offers the objection stated below:

- 12 -

       a.      <u>Plaintiff's Exhibits</u>:

       b.      <u>Defendants' Exhibits</u>:

If there are more than 20 exhibits, the parties shall submit their exhibit lists in writing at least **five (5) business days** before the hearing in Microsoft Word format by email to Humetewa_Chambers@azd.uscourts.gov.   The parties shall also provide to chambers copies of their exhibits on two (2) USB flash drives.

     4.     The parties shall include the following text in this section of the joint pre-hearing statement:  "Each party hereby acknowledges by signing this joint pre-hearing statement that any objections not specifically raised herein are waived."

## E.   DEPOSITIONS TO BE OFFERED

The parties shall list the depositions that may be used at the hearing.  The portions to be read at the hearing shall be identified by page and line number in the joint pre-hearing statement.  Additionally, the party offering the deposition shall provide the Court with a copy of the offered deposition testimony.  The offering party shall highlight in color the portions of the deposition to be offered.  If multiple parties are offering the same deposition, only one copy of such deposition shall be provided.  Such copy shall contain highlighting by each party, and each party shall use a different highlight color.

The parties shall include the following text in this section of the joint pre-hearing statement:  "Each party hereby acknowledges by signing this joint pre-hearing statement that any deposition not listed as provided herein will not be allowed, absent good cause."

## F.   ESTIMATED LENGTH OF HEARING

The Court has set aside 6 hours for this hearing.

## G.   PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Each party shall submit a **separate** Proposed Findings of Fact and Conclusions of Law no later than the date the joint pre-hearing statement is due.  The Proposed Findings of Fact and Conclusions of Law shall be submitted by:

     1.     **Electronically** filing a Notice of Filing the Proposed Findings of Fact and Conclusions of Law with the Clerk of the Court (the Proposed Findings of Fact and

Conclusions of Law shall be attached to the Notice);

        2.    **Courtesy hard copy** delivered or mailed to chambers (papers shall be three-hole punched); and

        3.    **Courtesy electronic copy in Microsoft Word format** to the chambers e-mail address.[6]  Additionally, Plaintiff shall submit in this fashion a proposed preliminary injunction, including the proposed bond amount.

        Dated this 22nd day of August, 2024.

_____

Honorable Diane J. Humetewa
United States District Judge

---

[6] Humetewa_Chambers@azd.uscourts.gov