**KRISTIN MAYES**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)
Jennine Burns (State Bar No. 031133)
Kristin M. Wrobel (State Bar No. 031147)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3725
ENVProtect@azag.gov
Kristin.Wrobel@azag.gov

*Attorneys for Amicus Curiae State of Arizona*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona,<br><br>      Plaintiffs,<br>v.<br><br>Debra Haaland, et al.,<br><br>      Defendants,<br><br>and<br><br>Arizona Lithium, Ltd.,<br><br>      Intervenor Defendants. | No. 24-CV-08154-PCT-DJH<br><br>**BRIEF OF AMICUS CURIAE STATE OF ARIZONA IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER FOLLOWED BY A PRELIMINARY INJUNCTION**<br><br>(Hon. Judge D. Humetewa) |

**STATEMENT OF INTEREST**

After reviewing the Bureau of Land Management's ("Bureau") Environmental Assessment ("EA") for the Project and the filings before the Court to date, the State of Arizona is concerned that the Bureau did not fulfill its statutory duty under the National Environmental Policy Act ("NEPA") to take a "hard look" at the Project's impact on local water resources, including the sacred spring Ha'Kamwe'. The State thus submits this amicus in support of Plaintiff Hualapai Tribe's ("Tribe") request for injunctive relief. A preliminary injunction will prevent likely, irreparable harm caused by exploratory drilling while this Court hears the case on the merits.

The instant case reflects a central tension in Arizona life: how to safeguard the state's water resources while also promoting economic development and human flourishing. Attentive use of Arizona's water resources—and particularly its groundwater—is a matter of existential concern for the State. More than 40% of Arizona's water supply comes from groundwater.[1] In many areas of the state, groundwater is the only source of water available. The state's groundwater reliance may increase in the coming years as Arizona continues growing and as surface water allocations from the Colorado River system decline due to new demand, twenty-plus years of drought, and climate change-driven flow reductions.[2]

Water is a matter of life and death. It is also a vital ingredient in every aspect of economic life in Arizona—from home building, to semiconductor manufacturing, to farming, to outdoor recreation in Arizona's wonderful and wild places. Springs like Ha'Kamwe' exemplify how water can sustain physical and cultural life for generations against an often harsh and unforgiving desert climate.

---

[1] Mary Beth Faller, *The Future of Water in Arizona* (November 15, 2022), https://news.asu.edu/20221115-arizona-impact-future-water-arizona.
[2] Colorado River Shortage, Arizona Water Blueprint, https://storymaps.arcgis.com/stories/a1a782ce054d4ad28a0d7d0845e6c03d (last visited, Sept. 13, 2024).

At the same time, Arizona is at the beginning of a new mining boom. Companies have flocked to Arizona to develop mineral resources that will fundamentally transform the American and global economy and produce a new era of low-carbon prosperity. Many of these projects are on federal land or require federal approval.

The Arizona Attorney General's Office has heard from people all over Arizona that are excited about new economic opportunities, and about contributing to the next generation of American energy production. Many of those same people explain that they are worried that new mines will permanently transform their communities and could make it untenable for them to stay in their homes or to fully enjoy their land. The most common concern is about water: will a mine dewater wells, or inadvertently pollute drinking water? Indeed, Arizona is full of abandoned mines and mining towns, and many of our groundwater basins have been permanently, negatively affected by careless or inattentive mine operators of decades past.

Companies can and should responsibly develop new mines in Arizona. The question, of course, is how to balance these exciting economic opportunities with communities' well-founded concerns about their access to water.

Unfortunately, the instant case is an example of an inattentive environmental review process that did not adequately address how the Project will impact local water resources, including Ha'Kamwe'. Rather than take a "hard look" at the Project's potential impacts on water resources, the Bureau relied on outdated data collected for a different purpose to characterize the Project area's complex hydrogeology, and, contrary to available scientific evidence, inappropriately minimized the impact of the Project on Ha'kamwe and the near-surface aquifer that feeds the spring.

## ARGUMENT

**I.     NEPA requires the Bureau to take a "hard look" at the Project's impact on water resources, but the Bureau did not do so.**

The Court is undoubtedly familiar with NEPA, its requirements for federal agency review of proposed actions, and the standard by which courts review whether a federal

3

agency complied with NEPA's dictates. This brief focuses solely on the Bureau's non-compliance with NEPA's "hard look" requirement.

NEPA requires federal agencies to take a "hard look" at a proposal's potential environmental consequences. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). A "hard look" includes "considering all foreseeable direct and indirect impacts." *Idaho Sporting Congress, Inc. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir. 2002). Agencies that improperly rely on stale data for their environmental reviews do not satisfy NEPA's "hard look" requirement. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1086 (9th Cir. 2011). An agency's "hard look" should discuss adverse impacts without improperly minimizing negative side effects. *Native Ecosystems Council v. U.S. Forest Service,* 428 F.3d 1233, 1241 (9th Cir. 2005).

The Bureau here failed to meet this requirements, instead relying on outdated, inapplicable data when characterizing local hydrogeologic conditions and improperly minimizing the Project's potential harm to local water resources.

### A. The Bureau improperly relied on stale data about the Project's impact on local water resources.

Only the Tribe produced an up-to-date study analyzing the hydrological conditions of Ha'Kamwe' and its immediate vicinity. (Doc. 11, Delehanty Decl., Att. 6.) Ha'Kamwe's source waters likely include a near-surface aquifer and a deeper aquifer connected to the shallow aquifer by vertical faults. (Doc. 11, Delehanty Decl., Att. 6 Memo at 1.) Isotopic studies of Ha'Kamwe's waters indicate that the spring is fed by newer water from shallow, near-surface sources and by older water from deeper sources. (Doc. 11, Delehanty Decl., Att. 6 Assessment at i.) The shallow aquifer has a recharge area that extends ten miles east from the immediate vicinity of the spring. (*Id.* at 17.)

By contrast, the Bureau's conclusions are based on a 2000 study that was not designed to identify the sources of Ha'Kamwe's waters. (EA at 20.) The 2000 study incorrectly asserts that the Big Sandy basin's aquifers are neatly separated. (*Id*.) Instead,

most scholarly assessments of the basin—including ones cited by the Bureau's 2000 study—characterize the basin as one large aquifer divided by clay layers but connected by vertical faults. (Doc. 11, Delehanty Decl., Att. 6 Memo at 2.)

The Bureau said that it is "unclear" if Ha'Kamwe' is fed by the shallower aquifer and declined to investigate further, instead opting to rely on outdated, largely inapplicable data to conclude that the spring is only fed by a deeper aquifer. (EA at 21.) Indeed, the EA is silent on the conclusions of the Tribe's 2023 study. Where a newer, more specific study has undermined the central logic of the Bureau's older, less applicable analysis, the Bureau's reliance on stale data concerning local hydrogeologic conditions does not satisfy NEPA's "hard look" requirement. At the very least, the EA should have addressed the conclusions of the 2023 study, even if it did not ultimately agree with them.

> **B.    The Bureau improperly minimized the Project's negative effects on local water resources.**

The Bureau failed NEPA's "hard look" requirement by improperly minimizing the potential effects of the Project on local water resources despite specific evidence to the contrary. The Tribe's study concludes that drilling 131 boreholes 360 feet below the surface in the immediate vicinity of Ha'Kamwe' "will cause irreversible negative effects to the spring and its environs." (Doc. 11, Delehanty Decl., Att. 6 Assessment at 18.) The borehole field is likely to harm the spring by disrupting the shallow aquifer's temperature, chemistry, and rechargeability. (*Id.* at i.) Boreholes could also strike underground faults, permanently changing local water travel patterns, prompting artesian water flow out of the borehole, and even dewatering Ha'Kamwe'. (*Id.*) Well logs and field investigations suggest the water table in the immediate vicinity of Ha'Kamwe' is about 70 feet below the surface level, meaning boreholes could very well perforate the local, shallow aquifer. (*Id.* at 18.)

The Bureau handwaves at these concerns, noting that the first two exploratory drilling programs did not strike water, and that boreholes that hit water will be plugged according to Arizona Department of Water Resources regulations. (EA at 22.) As the

Court's motion granting the Temporary Restraining Order correctly notes, however, the proposed third round of exploratory drilling is substantially larger in scope than the first two rounds; previously dry boreholes are no guarantee of future ones. (Doc. 32, TRO at 6.)

The EA is also silent on drilling contractors' ability to quickly plug boreholes that strike water. At best, capping the borehole will prevent further injury, but it cannot reverse any injury to the aquifer's water chemistry, temperature, pressure, or subsurface flow pathways. The Tribe's study concludes that the Intervenor Defendant's previous failures to properly cap and abandon boreholes during its first and second exploratory drilling programs has already affected the shallow aquifer. (Doc. 11, Delehanty Decl., Att. 6 Assessment at i.)

The Bureau's decision to minimize the Project's impacts on local groundwater resources—without addressing specific evidence to the contrary—does not satisfy NEPA's "hard look" requirement.

## II.   A preliminary injunction is appropriate to prevent likely, irreparable damage to Arizona's water resources.

The State supports a preliminary injunction because the Tribe has established that the Project will likely cause irreparable harm to Arizona's water resources. The Intervenor Defendant will likely complete exploratory drilling activities by the time this matter reaches trial. At the very least, this important matter deserves a close look by the Court before such irreversible steps are taken.

A party seeking a preliminary injunction must show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013).

The Tribe explained why they are likely to succeed on the merits in its Complaint and Motion for Temporary Restraining Order Followed by a Preliminary Injunction. The

important cultural and water issues involved here also tip the balance of harms in favor of the Tribe.

The State writes here to emphasize the importance of the "irreparable harm" and "public interest" factors, which are uniquely intertwined in this case because any harm to water resources is a matter of public interest in Arizona. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). The possibility of irreparable injury need not be certain or inevitable—a preliminary injunction may be issued when irreparable injury is "likely." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citations omitted). Environmental harm should be afforded particular deference under the "irreparable harm" analysis, as it cannot 'be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.'" *All. For the Rockies,* 632 F.3d at 1135.

The alleged injuries at issue here are likely. The cultural harm to the Tribe is already occurring and is fully explored in the Tribe's pleadings. Likewise, the Project's harm to water resources cannot be redressed by equitable remedies following trial. No injunction can restore the shallow aquifer's water chemistry, revitalize the aquifer's rechargeability, or un-puncture a subterranean fault. Only the Tribe produced evidence specific to the Project area's water resources; said evidence concludes that exploratory drilling near Ha'Kamwe' "will cause irreversible negative effects to the spring and its environs." (Doc. 11, Delehanty Decl., Att. 6 Assessment at 18.) And if the Tribe is correct, issuance of a preliminary injunction now is the only way to avoid irreparable and catastrophic harm.

The Court should grant a preliminary injunction to ensure this matter can receive close attention from the Court before irrevocable action is taken. And ultimately, the Court should conclude that the Bureau must do more to fully consider the Project's impact on a unique Arizona water resource—a spring with incalculable cultural value that has supported life in Arizona for generations.

## CONCLUSION

The Bureau did not satisfy its obligations under NEPA to take a "hard look" at the Project's impacts on water resources. The Bureau's reliance on an outdated hydrogeology study and its inappropriate minimization of the Project's impacts on water resources to buttress its conclusion that the Project will not have a significant environmental impact is inconsistent with the Ninth Circuit's well-trod approach to evaluating federal agencies' performance of their NEPA obligations.

The State supports the issuance of a preliminary injunction because the specific deficiencies of the Bureau's NEPA analysis risk likely, irreparable harm to Ha'Kamwe' and nearby water resources.

RESPECTFULLY SUBMITTED this 16th day of September 2024.

**KRIS MAYES**
**ATTORNEY GENERAL**

By: */s/ Jennine Burns*

Jennine Burns
Kristin K. Wrobel
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-3725
ENVProtect@azag.gov
Kristin.Wrobel@azag.gov

*Attorneys for Amicus Curiae State of Arizona*