TODD KIM
Assistant Attorney General

DANIEL LUECKE
Trial Attorney
MATTHEW MARINELLI
Senior Attorney
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 353-1389
daniel.luecke@usdoj.gov
(202) 305-0293
Matthew.marinell@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| HUALAPAI INDIAN TRIBE OF THE HUALAPAI INDIAN RESERVATION, ARIZONA,<br><br>*Plaintiff*,<br><br>vs.<br><br>DEBRA HAALAND, et al.,<br><br>*Federal Defendants.*<br><br>and<br><br>ARIZONA LITHIUM LIMITED,<br><br>*Defendant-Intervenor* | Case No. 3:24-cv-08154-DJH<br><br>**FEDERAL DEFENDANTS' POST-HEARING SUMMATION BRIEF** |

A preliminary injunction is an "extraordinary remedy" only warranted if the plaintiff proves that imminent irreparable harm is likely, success on the merits is likely, and the equities tip in the plaintiff's favor. *Stensrud Inc. v. Unknown Parties*, CV-24-00334-PHX-DJH, 2024 WL 894674, at *2 (D. Ariz. Mar. 1, 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Hualapai has not carried those burdens. The hearing confirmed that Hualapai's asserted harm is a speculative possibility, not a likelihood. And Hualapai is unlikely to prevail on the merits of its claims that the Bureau of Land Management (BLM) violated the National Environmental Policy Act (NEPA) and National Historic Preservation Act (NHPA). The Court should therefore deny Hualapai's request for a preliminary injunction.

## I. Hualapai Failed to Carry Its Burden to Prove Likely Irreparable Harm.

Hualapai failed to establish that imminent, "irreparable harm is *likely*, not just possible." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter*, 555 U.S. at 22). To the contrary, the evidence establishes that it is unlikely that Phase 3 will irreparably injure Hualapai.

The science does not support Hualapai's speculation about impacts to Ha'Kamwe's flow or temperature. Hydrologist Peter Burck testified at the hearing that any non-pressurized water encountered during drilling will simply remain in the borehole until it is plugged, causing no effects to Ha'Kamwe'. Sept. 17, 2024 Tr. of Inj. Hr'g ("Tr.") at 142:4–24; 144:17–21. And even if pressurized artesian water is encountered, all three experts agreed that immediately plugging such holes with cement grout via tremie pipe—as BLM requires—would prevent vertical movement of water. *Id.* at 80:23–81:8; 145:10–147:11; 204:21–25, 205:1–20. In other words, BLM's plugging requirements create a very low chance that water in the upper aquifer—if such water exists—could somehow escape that aquifer if encountered during drilling.

Nor has Hualapai demonstrated that encountering artesian water in the upper aquifer is likely in the first place. Both Mr. Burck and Dr. Moravec, another hydrologist, disagreed with Hualapai's theory that Ha'Kamwe' is fed by a shallow karst aquifer

riddled with pressurized pockets of water. *Id*. at 154:10–20; 211:4–7. Hualapai's expert provides poor support for his theory, *id.* at 86:17–87:12, 151:15–154:20, 211:4–214:14; cites no other studies finding the Big Sandy Basin is characterized by karst, *id.* at 88:7–12; and fails to explain why neither prior phases of exploration nor the many wells drilled elsewhere in the basin encountered shallow pressurized water, *id.* at 89:10–20; 150:23–151:14. Ha'Kamwe's water likely emanates from a deep, confined aquifer rather than a shallow artesian source, making it unlikely that the planned 360-foot deep, 3.5-inch wide boreholes will encounter artesian water. *Id*. at 154:21–25; 210:11–18.

The same is true with respect to noise or visual impacts. *See* ECF No. 15 at 4–5, 14–18 and ECF No. 40 at 1–6.[1] Though Federal Defendants recognize noise and visual impacts can affect cultural practices, the Project-specific circumstances here do not warrant preliminary injunctive relief. First, Hualapai members are not constantly present at Ha'Kamwe' and drilling will not be occurring around the clock. Tr. at 32:13–14; 35:1–16; 48:3–6; 118:5–9; 119:25–121:17; 125:25–126:5; PX11_8. Second, most Phase 3 activity is miles away or hidden by hills, Tr. at 167:23-174:4-10; 185:18-186:1, and Phase 3 drilling locations are generally farther from Ha'Kamwe' than prior phases. PX12_3–5. BLM also addressed visual concerns by consolidating and relocating staging areas away from Ha'Kamwe'. PX11_6, 11–12. Third, temporary noise already occurs at Ha'Kamwe'. Tr. at 123: 6–17. Noise from equipment and vehicles is potentially disruptive if it occurs during cultural activities. Tr. at 124:2–15; *id*. at 37:8–19; 48:7–49:10; 53:15-21. But any chance coring noise aligns with those activities is diminished by distance, topography, and the drill's 1-to-12-hour operational time per site. *Id.* at 167:23–168:8; PX11_8.

Finally, BLM provided a mechanism to address visual and noise concerns through

[1] Nor do dust impacts warrant preliminary injunctive relief. Tr. at 28:18–25; 117:1–3. BLM's requires the use of off-site water to suppress dust. PX11_5, 24–25; Tr. at 128:4–9. The same is true for plants, as BLM required Arizona Lithium to minimize plant impacts and reclaim disturbed areas. PX11_6–7, 19–20, 23, 28.

coordination to "ensure that cultural practices are either not disrupted or will be subject to only limited, temporary disruption." PX11_18, 26. The Navajo Transitional Energy Company (NTEC) committed to implementing this requirement to avoid disrupting Hualapai. DX12_5. No Hualapai witness testified to attempting to coordinate with NTEC, much less that coordination failed. Tr. at 33:16–19; 36:15–37:2; 125:25–126:8. The hearing instead proved that Ha'Kamwe's use is typically scheduled more than 48 hours ahead, Tr. at 27:11–21; 33:1–15; 36:6–14; 40:5–10; 121:18–122:1; and that NTEC could shift its schedule to address Hualapai concerns within 48 hours. Tr. at 178:7–19.

The hearing thus established that: 1) the Project is unlikely to affect Ha'Kamwe's flow or temperature; 2) the Project will create a narrow set of conceivable visual and noise impacts; and 3) BLM provided a means to avoid cultural injuries. Hualapai thus fell short of establishing a likelihood that the Project will irreparably injure it.

## II. BLM Properly Invoked the Arizona Protocol and Complied with the NHPA.

Hualapai also has not established that it is likely to prevail on its claim that BLM violated the NHPA. As the Court requested, BLM further explains its compliance with the NHPA under the Arizona Protocol Agreement (Protocol). *See* ECF No. 15 at 12–14.

The first step of the Section 106 process was for BLM to determine if Phase 3 "has the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a). If not, then BLM "has no further obligations under section 106." *Id.* at § 800.3(a)(1). In making this determination, BLM "shall follow" any applicable "program alternative." *Id.* at § 800.3(a)(2). "When a governing programmatic agreement is in place, compliance with the procedures in that agreement satisfies the agency's NHPA Section 106 responsibilities." *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 846 (10th Cir. 2019) (applying New Mexico protocol agreement).[2]

The Protocol is one such agreement and applies here. It was approved pursuant to

[2] The NEPA and NHPA processes are distinct and need not encompass the same scope or follow the same timeline. ECF No. 15 at 14 (citing 36 C.F.R. 800.3(b)).

an Advisory Council on Historic Preservation (ACHP) agreement that tasks BLM and State Historic Preservation Officers (SHPO) to develop agreements to "encourag[e] streamlined consultations." Protocol § 1, DX6_4. The Protocol modifies the standard Section 106 process by providing that BLM "may act without consulting the SHPO on BLM administered lands on those undertakings that culminate in No Historic Properties Affected or No Adverse Effect findings." *Id*. § 4, DX6_5. But the Project falls under section 5.L. of the Protocol, and thus requires formal SHPO consultation unless the SHPO agrees to "continue proceeding under this protocol." *Id*. at § 5, DX6_5-6. If the SHPO agrees that BLM may proceed under the Protocol, it "eliminate[s] the need for" further SHPO consultation. *Id*. § 4, DX6_5.

This case centers on whether BLM arbitrarily defined the Project's Area of Potential Effects (APE). ECF No. 11 at 8. Hualapai's disagreement with BLM's definition of the APE does not render BLM's decision arbitrary. To the contrary, "[e]stablishing an area of potential effects requires a high level of agency expertise, and as such, the agency's determination is due a substantial amount of discretion." *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1091 (10th Cir. 2004). Here, BLM defined the Project's APE to include only the BLM lands that might actually be disturbed. DX6_1–2. Because the "exploration plan is temporary in nature and does not propose any permanent infrastructure, the BLM determined that this undertaking would not cause visual, audible, atmospheric, or cumulative impacts to a historic property." *Id.*; 36 C.F.R. § 800.16(d) ("The APE 'is influenced by the scale and nature of an undertaking.'"). BLM explained this decision to Arizona's SHPO (as well as ACHP, Hualapai, and Fort Mojave) on May 6 and 28, 2021. DX4_1; DX5_1–2. BLM documented both its explanation and the SHPO's concurrence that the Project could proceed under the Protocol on May 7 and June 17, 2021. *Id*. ACHP and Hualapai were copied on BLM's explanation of its application of the Protocol. *Id*. In sum, BLM complied with the ACHP-approved Arizona Protocol agreement and, thus, Section 106.

As the ACHP's regulations recognize, the window for challenging such a "no

historic properties affected" determination must close in order to finalize any agency decision. *See* 36 C.F.R. § 800.4(d)(1)(i) (requiring objections within 30 days). Indeed, while it advised BLM to reconsider its NHPA analysis, ACHP recognized that because "the Section 106 review has concluded, there is no formal dispute resolution or objection process available to the Tribe or other consulting parties at this time" and it is thus "not incumbent upon the BLM to reconsider." PX10_2.

**III. BLM Gave a Hard Look to Water Impacts.**

Nor has Hualapai demonstrated likelihood of success on its "hard look" NEPA claim. The EA reasonably determined that Phase 3 drilling will have "no impact on groundwater." PX11_25. This conclusion was based on three key considerations.

First, AZL will not pump any water from the aquifer to support the Project's exploratory activities. *Id.* Instead, all necessary water will be trucked in from the nearby town of Wikieup. *Id.* at 24.

Second, Phase 3 drilling "is not anticipated to reach" the deep artesian aquifer that provides Ha'Kamwe's geothermal water. *Id.* at 25. The data BLM reviewed supports this conclusion, as neither the boreholes drilled near Ha'Kamwe' in prior phases nor the dozen holes and wells drilled a couple miles away for the Manera study encountered artesian water at less than 1,000 feet. *Id.*; PX17_25–27. And when the drilling for the Manera study did encounter artesian water, it was only after penetrating a "ten feet thick" confining layer of "volcanic" rock that slowed the drill. PX17_17.

Finally, to the extent the upper aquifer could contribute at all to Ha'Kamwe', the EA determined that "protection of water resources would be provided by promptly plugging and abandoning all core holes" consistent with Arizona Administrative Code R12-15-816. PX11_24. Specifically, BLM requires that boreholes encountering artesian water be plugged with cement grout via tremie pipe, *id.* at 12—a procedure found appropriate for all types of aquifer scenarios contemplated in the Arizona Department of Water Resources' (ADWR) Well Abandonment Handbook, DX16_12–15.

Hualapai is incorrect that, because the EA notes that some water from the upper

aquifer *may* contribute to Ha'Kamwe', BLM had to further analyze the effects of drilling through the upper aquifer. ECF No. 35 at 9. NEPA mandates no such analysis where, as here, BLM imposed mitigation measures that prevent such "potential effects" from occurring in the first place. *Id.*; *see Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006); Hualapai's minimization of these BLM requirements as a mere direction to follow Arizona law, ECF No. 35 at 11, ignores that Arizona Administrative Code R12-15-816 does not mention tremie pipe and references cement grout as one of several recommended materials. In any event, BLM selected the exact plugging method that Hualapai's expert recommended in his report. PX6_29. Hualapai has not explained the inadequacy of this procedure or identified a superior option that was before BLM. *See Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 937 (D. Ariz. 2017) (faulting plaintiffs for failing to explain inadequacy of EA's discussion of "well-recognized" mitigation methods to prevent "cross-contamination of groundwater layers").

Nor does Hualapai identify any study on the upper aquifer's contribution to Ha'Kamwe' that BLM ignored. BLM adopted the Wright Report's suggestion to prepare for the possibility of encountering artesian water, PX6_2; DX9; DX10, but was not required by NEPA to alter its analysis in response to the report's unsupported karst aquifer theory. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1048 (9th Cir. 2013) (declining to "substitute [the court's] judgment" for that of BLM where BLM considered studies but "did not draw the same conclusions" as the plaintiff); *see also Patagonia Area Res. All. v. U.S. Forest Serv.*, 2023 WL 5723395, at *6 (D. Ariz. Sept. 5, 2023) (rejecting plaintiff's request for groundwater study as "impractical" for exploratory drilling project). Rather, BLM was well within its discretion to rely on the Manera Report and the prior phases of drilling—the most recent sources of lithographic data in the immediate area—to determine that intersecting shallow, artesian water is not expected. PX11_24–25. The EA's conclusions are thus "founded on reasonable inferences from scientific data" and satisfy NEPA. *Concerned Citizens*, 279 F. Supp. 3d at 936 (quotation omitted).

## IV. BLM's Consideration of Alternatives Complied with NEPA.

BLM's determination that only two alternatives warranted detailed consideration was also appropriate given the Project's purpose and scope. BLM published the Draft EA on April 12, 2021, and accepted comments through July 10, 2021. PX11_6. Hualapai suggested that there may be "other approaches" to meeting the Project's purpose and need, and thus BLM should "revisit its alternatives analysis" to better "meet Hualapai's concerns." DX7_11. This vague language was insufficient to identify a specific middle-ground alternative requiring analysis in the Final EA. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004).

Nonetheless, while BLM did not add an additional alternative to the EA, it did address Hualapai's concerns by analyzing the effects of approving the proposed project with more mitigation features. The alternative BLM analyzed added requirements that AZL truck in water from off-site, PX11_6, relocate the Project's staging areas, *id.*, reduce access roads. *id.*, provide an opportunity for tribal monitoring, *id.* at 9–10, immediately cease work if human remains or cultural resources are found, *id.* at 10, travel at speeds of no more than 25 miles per hour on site, *id.* at 11, minimize idling equipment, *id.* at 12, and plug holes using cement grout and tremie pipe if water is found, *id.*

After a negotiation regarding the scope of its involvement, Hualapai became a cooperating agency in 2024. DX8_3. Under a Memorandum of Understanding (MOU) with BLM, Hualapai was to provide input on potential changes to specific sections of the Final EA. *Id.* at 1–2. But Hualapai's comments exceeded the MOU's scope by asserting that the EA failed to consider middle-ground alternatives, such as "approving only one or two" drill sites or relocating drill sites father from Ha'Kamwe'. PX8_6. In addition to ignoring the changes to the draft EA and the Project's purpose of allowing AZL to "explore its valid existing mining claims," PX11_5, Hualapai's suggestion to analyze the Project's impacts for a brand-new alternative after nearly four years of review was never contemplated by the MOU. BLM thus did not act arbitrarily in concluding that no reasonable alternatives with fewer impacts had been proposed. *Id.* at 13.

Respectfully submitted this 24th day of September, 2024.

TODD KIM
Assistant Attorney General

*/s/ Daniel Luecke*
DANIEL LUECKE (CA Bar No. 326695)
Trial Attorney
MATTHEW MARINELLI
Senior Attorney
Natural Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 353-1389
daniel.luecke@usdoj.gov
(202) 305-0293
Matthew.marinell@usdoj.gov

*Attorneys for Federal Defendants*