**THORPE SHWER, P.C.**
William L. Thorpe (No. 005641)
Mitchell W. Fleischmann (No. 021075)
Bree Nevarez (035671)
3200 North Central Avenue, Suite 1560
Phoenix, Arizona 85012-2441
Telephone: (602) 682-6100
Email:  docket@thorpeshwer.com
Email:  wthorpe@thorpeshwer.com
Email:  mfleischmann@thorpeshwer.com
Email:  bnevarez@thorpeshwer.com

**Attorneys for Intervenor Defendant Arizona Lithium Limited**

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona,<br><br>          Plaintiff,<br><br>v.<br><br>Debra Haaland in her official capacity as the United States Secretary of the Interior; United States Bureau of Land Management; Ray Suazo in his official capacity as State Director of the United States Bureau of Land Management; and Amanda Dodson in her official capacity as Field Office Manager of the United States Bureau of Land Management Kingman Field Office,<br><br>          Defendants.<br><br>Arizona Lithium Limited,<br><br>          Intervenor Defendant | NO. 3:24-cv-08154-DJH<br><br>**INTERVENOR DEFENDANT ARIZONA LITHIUM LIMITED'S POST-HEARING SUMMATION BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

9508176

Intervenor Defendant Arizona Lithium Limited ("AZL") submits this post-hearing brief in opposition to the Hualapai's preliminary injunction request and to address the Court's questions raised at the hearing. (Transcript ("Tr.") 11:19-13:2, 230:10-231:11).

## I.   LIMITED SCOPE OF THE EXPLORATORY DRILLING PROJECT

### A.   Phase 3 Encompasses Exploratory Drilling, Not Lithium Mining.

Phase 3 is a "standard exploratory model" to perform "exploration drilling." (Tr. 226:4-19). AZL partnered with the Navajo Transitional Energy Company ("NTEC") to oversee execution of Phase 3. (Tr. 164:16-19). Phase 3 is comprised entirely of one bulk drilling site and 131 core drilling sites. (Tr. 166:1-6). Any hypothetical future mining project, if justified by the exploratory drilling, would require a separate plan for approval, which would require its own independent NEPA and NHPA review, and would be at least three years in the future. (Tr. 226:14-227:4; DX5).

### B.   The Phase 3 Exploratory Drilling is Small in Scale.

Phase 3 is purposefully narrow and minimized in scale to balance the Project's efficacy with AZL's commitment to cultural and environmental sensitivity. The bulk drilling portion has been fully completed. (Tr. 166:7-9). Notably, no groundwater was encountered during the bulk drilling. (Tr. 183:6-13)

The remaining 131 core drill holes are divided into three distinct geographic sections: NM, NZ and SZ. (Tr. 166:13-18). These "Phase 3 drill sites are farther away than the previously completed Phase 2 drill sites." (Tr. 174:23-175:7). The SZ sites, consisting of 31 holes, are south of Ha'Kamwe' with the nearest drill site "close to four miles away." (Tr. 167:10-168:1, 169:8-10). Consequently, none of the SZ sites provide any visual line-of-sight to Ha'Kamwe' or its surrounding area. (Tr. 168:4-12, 169:11-13). The NM sites, consisting of 61 holes, are north of Ha'Kamwe', but only approximately 20 provide visual line-of-sight due to distance and "a lot of elevation change." (Tr. 169:3-7, 169:14-170:3; AZL2_00002). Finally, the NZ sites, consisting of the remaining 39 holes, are east/southeast of Ha'Kamwe', but only two of these sites provide visual line-of-sight due, again, to topography and distance. (Tr. 170:8-19, 173:25-174:3). Thus, only

THORPE SHWER, P.C.

about 22 sites are visible to/from Ha'Kamwe'. (Tr. 174:4-13).

In terms of the drilling operation itself, the following facts are uncontested:

- NTEC facilitated a safety and awareness training workshop prior to Phase 3 drilling, which included "all our subcontractors, tribal monitors and representatives from the fire department and the police department" and a safety binder was provided to "every crew." (Tr. 175:11-176:16; AZL1).

- Each drill site is biologically surveyed prior to preparation "to check for any vegetation or animals that are present" and to remain in compliance with BLM approval of Phase 3. (Tr. 178:23-179:14).

- The 131 drill sites are not prepped at the same time; instead, only "[u]p to five" drill pads will exist at any given time. (Tr. 185:18-186:1).

- The vast majority of the Phase 3 drilling will be performed with a single sonic drill, which will move from drill site to drill site as it is utilized. (Tr. 180:9-12, 180:24-181:12; AZL6).

- Each drill hole will be approximately 3.5" in diameter. (Tr. 188:17-189:1).

- Drilling will go to a maximum depth of 360 feet, but all drill holes will not be drilled to the maximum depth because drilling will stop once any "lithium clays" are encountered. (Tr. 182:14-18, 184:1-5).

- Following completion of drilling at each site, each will get "regraded and eventually reclaimed," which puts "the earth back to the way that it was" prior to drilling. (Tr. 184:14-23).

Additionally, it is uncontroverted that no groundwater has ever been encountered during the Project, inclusive of all Phase 1, Phase 2 and Phase 3 drilling completed to-date. (Tr. 186:6-13, 193:1-8, 227:22-228:7).

**C.    The Abandonment and Mitigation Procedures Are Proven Reliable and Consistent with Arizona Administrative Code.**

Phase 3 also puts into place well-established mitigation procedures to plug and abandon a drill site if water is encountered. (Tr. 193:22-24). The abandonment procedures are not only proven effective and consistent with Arizona Administrative Code and ADWR requirements, but they are the precise measures that the Hualapai's own expert (as well as Federal Defendants' and AZL's experts) agrees are proper and adequate to seal a well. (Tr. 73:8-13, 104:1-3, 143:18-144:10, 194:8-22, 204:21-205:20).

The Hualapai's expert testified that as long as "a driller…knows what they are doing," the mitigation and hole-abandonment procedures would stop the flow of any

2

9508176

water encountered. (Tr. 103:16-20, 104:4-18). Here, all drillers utilized in Phase 3 are licensed in Arizona and trained and experienced to handle these water mitigation procedures. (Tr. 194:15-19). A driller would immediately be aware if water was encountered during drilling. (Tr. 193:14-21). If groundwater is encountered, the driller would "stop drilling and abandon the hole according to the regulations and according to the plan of operations by using concrete grout." (Tr. 193:25-194:7). If artesian water is encountered, the driller would "stop operations, notify the BLM, and do a well abandonment, and similar procedure using concrete grout." (Tr. 193:25-194:7). All supplies necessary to implement these abandonment mitigation procedures are on-site and available immediately if needed. (Tr. 194:23-195:2).

## II. BLM'S NHPA COMPLIANCE

### A. BLM Fulfilled its Section 106 Responsibilities.

BLM defined the area of potential effects ("APE") as the area of ground disturbance guided by "the limited scope and magnitude of the undertaking." (DX5-002). The APE "is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." 36 C.F.R. § 800.16(d). BLM consulted and conducted a site visit with the Hualapai. (PX1; DX1; DX2; DX3). BLM conducted a consulting parties meeting with the Hualapai, Fort Mojave, SHPO, and ACHP to "discuss the BLM's definition of the undertaking, [APE], the BLM's efforts to identify historic properties, and the BLM's finding of No Historic Properties Affected." (DX5-001). BLM determined "the exploration plan is temporary in nature and does not propose any permanent infrastructure," thus it "would not cause visual, audible, atmospheric, or cumulative impacts to a historic property." (*Id.*).

BLM and SHPO "agreed that the undertaking may proceed under" BLM's agreement with SHPO, known as the "Arizona Protocol Agreement" ("Protocol"). (DX6). Section 106 authorizes agencies to enter a programmatic agreement, like the Protocol. 36 C.F.R. § 800.14(b). "Compliance with the procedures in that [programmatic] agreement satisfies the agency's NHPA Section 106 responsibilities for all covered

3

undertakings." *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 847 (10th Cir. 2019). The Protocol establishes a means of complying with the NHPA based on a model protocol adopted by BLM and ACHP.[1] (DX-6 at 4). BLM fulfilled its Section 106 obligations because it considered Phase 3's potential effects, reasonably defined its APE, provided information to and consulted with the required parties, and did not receive an objection from SHPO or ACHP. *See Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1091 (10th Cir. 2004) ("establishing an [APE] requires a high level of agency expertise, and as such, the agency's determination is due a substantial amount of discretion," and must be upheld unless arbitrarily defined).

### B. Cultural Review Under NEPA Satisfies Section 106.

"[G]iven the flexibility allowed by the NHPA itself," an agency satisfies Section 106 if "the conditioned permit fulfills the goals of the NHPA…." *Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234, 251 (D. Vt. 1992), *aff'd*, 990 F.2d 729 (2d Cir. 1993). "[T]he fundamental purpose of [NHPA] is to protect our historical heritage from extinction but not necessarily from every conceivable threat resulting from the exigencies of modern life," and NHPA "was not enacted to review temporary effects…." *Cobble Hill Assoc. v. Adams*, 470 F. Supp. 1077, 1090–91 (E.D.N.Y. 1979). Here, BLM properly considered impacts on historic properties in at least three documents—(1) a Cultural Resource Survey ("CRS"), (2) a site-specific EA (PX11_019-20, 24-26), and (3) the Decision Record (PX13_008-17)—culminating in significant mitigation measures at the project site and "[t]o minimize impacts to Ha'Kamwe'." (PX11_020).

## III. BLM'S NEPA COMPLIANCE

### A. BLM Took a "Hard Look."

A "hard look" considers the impacts of agency action by providing "a reasonably thorough discussion of the significant aspects of the probable environmental

---

[1] The "National Programmatic Agreement is a 'Program Alternative' created under the NHPA Section 106 regulations, which allows the BLM to develop 'State Protocol Agreements' tailored to the individual historic properties management needs and interests of each state where BLM has surface management responsibilities." https://www.blm.gov/programs/cultural-resource/national-programmatic-agreement-NHPA (visited 9/22/24).

4

consequences." *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998). This reasonableness review "does not materially differ from an 'arbitrary and capricious' review." *Id.* BLM took *3 years* to review Phase 3, to address the Hualapai's concerns, and to work with AZL to modify the project by changing the number of drill holes and eliminating groundwater pumping. (PX11_007, 20). BLM satisfied NEPA's "hard look."

### B. BLM Satisfied Its Obligations to Consider Alternatives.

The Ninth Circuit has "repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023). BLM addressed concerns, in part, by requesting changes to AZL's Plan of Operation and requiring the additional protective and mitigation measures discussed above. (Tr. 227:10-21). With those in place, and following its lengthy review, BLM reasonably concluded that "[a]ny possible alternative actions would be limited given the narrow focus of the exploration drilling program," particularly because no "alternative actions…were identified that would have fewer impacts than the Proposed Action." (PX11_014). Plaintiff submitted no scientifically backed evidence to support the existence or viability of other adequate alternatives. BLM thus satisfied this requirement.

## IV. THE TEMPORARY AND SPECULATIVE "EFFECTS" OF DRILLING

The Hualapai assert various Project potential effects, including "visual disturbances," "noise disturbances," and "impacts to the water and the hydrology of the system." (Tr. 28:18-25.) The alleged effects are too speculative to support a preliminary injunction. *See All. For the Wild Rockies v. Cattrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

### A. No Scientifically Valid or Peer-Reviewed Data Supports the Likelihood of Any Effects to Ha'Kamwe' Due to Phase 3 Drilling.

AZL's expert testified to a reasonable degree of scientific certainty that Phase 3 drilling would not affect Ha'Kamwe' and, specifically, that he does "not envision that the…Phase 3 drilling program will encounter water" and he does not believe Phase 3 presents "any threat to the water quality, temperature, or chemistry at Ha'Kamwe'." (Tr.

5

9508176

203:14-204:3, 211:24-212:4). Federal Defendants' expert echoed the similar scientifically based opinion: "I think the likelihood of the Phase 3 drilling impacting the flow or temperature of Ha'Kamwe is low." (Tr. 141:23-142:2).

There is no evidence that "that the previous Phase 1 and Phase 2 drilling program affected flow rates at Ha'Kamwe' or the temperatures at that location" and "no recorded interactions with shallow groundwater" during any Project drilling. (Tr. 204:5-14). The only purported evidence elicited about effects to Ha'Kamwe' came from a Hualapai tribal monitor who (a) is neither a geologist nor a hydrologist, (b) could not provide any causal relationship regarding his observations and the drilling project, and (c) never raised any of the alleged concerns during "several" conversations with NTEC's project manager or within his written tribal monitor observation reports. (Tr. 50:3-5, 50:24-51:2, 52:14-53:8, 191:8-192:1). The only undisputed portion of his testimony is that he never saw or reported any water encountered during any drilling process. (Tr. 51:7-21).

Even the Hualapai's expert validates the conclusion that Ha'Kamwe' is sourced almost exclusively, if not entirely, by the deep lower confined aquifer and, thus, his own report "suggests the likelihood [of encountering pressurized water] is low unless one drills to a deep enough zone." (Tr. 100:24-101:2, 150:23-151:14; PX6_020, 022). As his testimony and report bore out, the Hualapai's expert brought no new data to the analysis, but rather sought to manipulate historic data to fit his end-goal hypothesis. He remains the only person–inclusive of all the authors of the peer-reviewed studies that form the basis for his report and EA decision–to suggest the existence of a "karst aquifer" in the Big Sandy Valley. (Tr. 88:2-16, 90:13-16, 92:5-7). In light of his admission that there are no "mapped karst features" in the area and otherwise unanimous expert testimony to the contrary (supported by extensive hydrogeologic studies in the record) that "there are no karstic features in that area that would suggest that shallow groundwater is existing," this Court should determine the Hualapai have not satisfied their burden to demonstrate likely irreparable harm to Ha'Kamwe', particularly when coupled with the mitigation plug-and-abandon effectiveness. (Tr. 92:8-10, 204:5-14; PX12; PX17; PX19; AZL1_0150-56).

6

### B. No Irreparable Harm Will Arise from Visual Effects.

A mere fraction of the Phase 3 drill sites exist in visual line-of-sight to the area surrounding Ha'Kamwe'. (Tr. 174:4-13). Even the Hualapai's Cultural Resources Director testified that while "more than a few" drill sites will be visible from Ha'Kamwe', a "majority of drill sites" cannot be seen. (Tr. 34:16-24). No evidence was submitted as to how a person's temporary view of a drill operating "1 to 12 hours," while potentially located miles away from Ha'Kamwe', creates irreparable harm. (PX11_008).

### C. No Irreparable Harm Will Arise from Noise Effects.

The noise from a drill is roughly equal to "a very loud restaurant or a bar or standing at a very busy intersection." (Tr. 192:2-15). Such temporary noise would be located at sites often miles away from Ha'Kamwe' and the degree of noise does not even warrant observers on-site (including tribal monitors) to wear noise protection headwear. (Tr. 174:23-175:7, 192:18-25). Moreover, because Phase 3 utilizes a sonic drill for most of the drilling (different from the diamond drill used previously), nobody from the Tribe was able to offer evidence as to how far the noise will carry or whether it will have any impact on their cultural practices. (Tr. 34:4-7). Additionally, evidence demonstrates that other manufactured noise exists at the Ranch and Ha'Kamwe', including buses, vans and personal vehicles, and groundskeeper tools, such as weed whackers, lawnmowers, chainsaws, and other "power tools." (Tr. 37:12-19, 123:6-17).

### D. AZL and NTEC Have Tried to Coordinate with the Hualapai.

AZL and NTEC are "committed to working with [the Hualapai] to minimize the impact of Phase 3 drilling" and their "goal is that traditional cultural practices are not disrupted or will be subjected to only limited, temporary disruption in coordination with the tribes." (AZL41_0003; Tr. 36:15-19). The Haulapai are yet to provide any advance notice of cultural ceremonies or practices despite many of these ceremonies or practices being scheduled "at least several days" and up to "a month ahead" of time. (Tr. 33:13-19, 36:25-37:2, 40:24-41:16, 121:12-122:7). The Hualapai's lack of engagement to minimize drilling effects should not justify the imposition of injunctive relief.

7

DATED this 24th day of September, 2024.

**THORPE SHWER, P.C.**

By */s/ William L. Thorpe*
   William L. Thorpe
   Mitchell W. Fleischmann
   Bree G. Nevarez
   ***Attorneys for Intervenor Defendant Arizona Lithium Limited***

8

9508176

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of September, 2024, the foregoing document was electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing, to the following CM/ECF registrants:

Laura Berglan
Heidi McIntosh
Thomas Delehanty
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, Colorado 80202
lberglan@earthjustice.com
hmcintosh@earthjustice.com
tdelehanty@earthjustice.com

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
440 Main Street, #2
Lyons, Colorado 80540
roger@wmaplaw.org
jeff@wmaplaw.org

*Attorneys for Plaintiffs*

Todd Kim
Daniel Luecke
Matthew Marinelli
NATURAL RESOURCES SECTION
UNITED STATES DEPARTMENT OF JUSTICE
P.O. Box 611
150 M Street NE
Washington, D.C. 20044-7611
Daniel.luecke@usdoj.gov
Matthew.marinelli@usdoj.gov

*Attorneys for Defendants Debra Haaland;
United States Bureau of Land Management;
Ray Suazo; and Amanda Dodson*

/s/   Brandi Kline
Legal Assistant

9

9508176