**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hualapai Indian Tribe, | No. CV-24-08154-PCT-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Debra Haaland, et al., | |
| Defendants. | |

Before the Court is the Hualapai Indian Tribe's ("Plaintiff" or "the Tribe") challenge to the U.S. Bureau of Land Management's ("BLM") decision to approve Phase 3 of the Sandy Valley Exploration Project ("the Project"). Phase 3 of the Project would allow Intervenor, Defendant Arizona Lithium Limited ("AZL") to conduct exploratory drilling for lithium on BLM lands adjacent to Cofer Hot Springs, or Ha'Kamwe', an area the Tribe holds sacred and uses for culturally significant activities. The Tribe specifically seeks to enjoin Phase 3. It alleges that the BLM violated (1) the National Historic Preservation Act, 16 U.S.C.§ 479, *et seq.* ("NHPA") when it found that no historic properties were affected by the Project; (2) the National Environmental Policy Act of 1969, 42 U.S.C. § 4332, *et seq.* ("NEPA") by failing to consider a reasonable range of alternatives to the proposed project and by failing to take a "hard look" at the impacts on water resources; and (3) the Administrative Procedures Act, 5 U.S.C. § 706(2)(a) ("APA"), by engaging in actions that are not in accordance with law. (*See generally* Doc. 1).

On August 22, 2024, the Court issued a Temporary Restraining Order ("TRO")

(Doc. 32).  The Court found that Plaintiff raised credible concerns that the Phase 3 drilling was likely to imminently threaten the aquifer feeding Ha'Kamwe's waters, causing irreparable harm; raised sufficiently serious questions regarding the BLM's NPHA compliance; and that the balance of equities and public interest tipped in Plaintiff's favor. (*Id*. at 6, 9).  Defendants[1] were thus temporarily enjoined from authorizing or allowing any ground disturbance, construction, operation, or other activity approved by the BLM related to Phase 3 of the Project.  (Doc. 32 at 11).  On September 17, 2024, the Court held an evidentiary hearing (the "Hearing") to determine whether the TRO should convert to a Preliminary Injunction ("PI") (Doc. 54).

The Court has considered the parties' briefing (Docs. 11, 15, 28, 35, 36, 37), the evidence and testimony they presented at the Hearing, their written closing summations (Docs. 70, 72, 74), and the applicable law.  It now makes the following findings and conclusions.

## I.    Background

### A.    Ha'Kamwe'

Ha'Kamwe' is located at Cholla Canyon Ranch and is surrounded by the Big Sandy River Valley near Wikiup, Arizona.  (*See* Tribe's June 10, 2021, letter to BLM (Doc. 11-7 at 13)).  The land Ha'Kamwe' is located on were taken into trust by the Department of the Interior ("DOI") for the benefit of Plaintiff, the Hualapai Tribe.  (Doc. 11 at 7–8); *see also* Hualapai Tribe Water Rights Settlement Act of 2022, Pub. L. No. 117-349, § 12); 136 Stat. 6225, 6252 (2023)).  The proposed drilling in Phase 3 of the Project is set to occur on three sides of Cholla Canyon Ranch.  (Doc. 15-2).

---

[1] In addition to the BLM, Defendants are Debra Haaland in her official capacity as the United States Secretary of the Interior; Ray Suazo in his official capacity as State Director of the BLM; and Amanda Dodson in her official capacity as Field Office Manager of the BLM Kingman Field Office ("the Federal Defendants").  Before the hearing, AZL moved to intervene and appear at the hearing (Docs. 18 & 19) and the Court granted AZL's requests. (Doc. 20).  AZL is a lithium exploration and development company headquartered in Perth, Australia.  (Doc. 18 at 3).  It operates the Project to explore for high-grade lithium around Wikiup, Arizona, on existing mining claims on public lands managed by the BLM, including those in proximity to Cholla Canyon Ranch (Doc. 18-4 at 2; Doc. 15-15 at 3).

Ha'Kamwe' is deemed a Traditional Cultural Property ("TCP") eligible for listing on the National Register of Historic Places. (Doc. 11 at 7–8). Tribal members testified that the natural characteristics surrounding Ha'Kamwe, including its water, and its flow and temperature, are important attributes for its traditional uses. (*See e.g.*, testimony of Ms. Ka-Voka Jackson, Doc. 71 at 29 ("Ms. Jackson's testimony")). Ha'Kamwe' means "warm water" in the Hualapai language and is referred to in traditional stories and songs. (*Id*. at 19). Tribal members use Ha'Kamwe' and its surrounding area for a variety of traditional and cultural purposes, including gathering native plants, clay and other materials, observing wildlife, and holding ceremonies that are central to their cultural life and traditions. (*See e.g*., Decl. of Chairman Duane Clarke at Doc. 11-3, ¶ 4 ("Clarke Decl.")).

**B.    Previous Studies for Resource Extraction near Ha'Kamwe'**

Prior to the current drilling project, the area around Ha'Kamwe' has been studied for a variety of reasons. During the 1970s, the Department of Energy ("DOE") collected streambed sediment samples and water samples for geochemical analyses as part of the National Uranium Resource Evaluation. (Preliminary Assessment of the Hydrology and Geochemistry of Ha'Kamwe' (Cofer Hot Spring), Mohave County, Arizona, 2023, by Mr. Winfield Wright at Doc. 11-7 at 63 ("the Wright Report")). In 1973, the Arizona Water Commission, in cooperation with the United States Geological Survey ("USGS"), issued a report showing that Ha'Kamwe' may be located on a small fault line. (*Id*.) Subsequently, in 1983, the USGS published maps of groundwater levels, locations of springs, and spring water temperatures, including those in the Big Sandy area and Ha'Kamwe'. (*Id*. at 65).

In the 1990s the DOE also initiated an effort to construct a power plant near Sycamore Creek south of Wikieup, within 2.5 miles of Ha'Kamwe'. (Doc. 11-7 at 63). As part of that effort, Mr. Paul Manera and Caithness Big Sandy, LLC, studied the water resources in the Big Sandy Valley and issued a report in October of 2000. (Water Resources of the Southern Portion of the Big Sandy Valley, Doc. 15-16 at 2 ("the 2000

Manera Report")).  The 2000 Manera Report found, in pertinent part, that there are three separate aquifers in the Big Sandy Basin south of Wikieup:

> The Upper Aquifer: composed of the Recent Stream and Flood-Plain Alluvium and the underlying Upper Basin fill. In the southern portion of the basin, this aquifer is partially saturated in the entrenched riverbed and flood plain of the Big Sandy River.
>
> The Middle Aquifer: composed of the Older Basin fill. The Middle Aquifer is saturated in most of the southern portion of the Big Sandy basin; [and]
>
> The Lower Aquifer: composed of the Volcanic Rocks of Sycamore Creek. Four hundred and fifty (450) feet of these volcanics were penetrated by the drill. However, only 300 feet or 66 percent of the volcanic penetrated was considered aquifer as a conservative consideration. The confined aquifer is fully saturated with a piezometric surface elevation of 2,079 feet.

(*Id*. at 17).  After the 2000 Manera Report was issued, the project was abandoned by the DOE out of concern that groundwater development for the project would diminish or dry up Ha'Kamwe'.  (Doc. 11-7 at 63).  Then, in 2012 and 2013, AZGS investigated the geochemical makeup of groundwater from selected thermal springs and wells throughout Arizona. (Doc. 11-7 at 65).  This report concluded that water from Ha'Kamwe' is a mixture of different sources of shallow and deep water.  (*Id*.)

The Tribe retained Mr. Wright in 2021 to educate tribal council and the tribal members on Phase 3 of the Project and its potential impacts.  (Doc. 71 at 60).  Mr. Wright holds a Master of Science in Civil Engineering Hydrosystems from Virginia Polytechnic Institute.  (*Id*. at 57).  He stated that he specializes in surface water hydrology, groundwater hydrology, water quality, and geochemistry and has authored sixty peer reviewed publications.  (*Id*. at 58).  At the preliminary injunction hearing, Mr. Wright was qualified as an expert in the fields of surface and groundwater hydrology, geochemistry and water quality.  (*Id*. at 59).  As part of his analysis, Mr. Wright tested the water quality of Ha'Kamwe' and concluded its source "derives from a mixture of deep and shallow water, which is produced by rising deep circulation water, mixed with shallow meteoric water,

geochemically reacting with limestone, basin-fill, and evaporite deposits." (Doc. 11-7 at 81).

### C.    Phase 1 and 2 of the Project

In 2019, AZL conducted two phases of exploratory drilling looking for lithium resources within the Project site. (Final Environmental Assessment, June 2024, Doc. 15-1 at 5 ("the final EA")).  BLM states that demand for lithium is expected to "explode" because of its use in technology and that the Project at issue here is one part of the United States' larger effort to transition to renewable sources of energy. (Doc. 15 at 24–25). Phase 1 of the Project consisted of drilling 16 holes, twelve of which were accessed, drilled, and reclaimed. (Doc. 15-1 at 5).  Phase 2 of the Project consisted of drilling 37 holes, all of which were accessed, drilled, and reclaimed. (*Id*.)    Neither phase encountered any groundwater. (*Id*. at 26).  Defendant represents that approximately 39 of the exploratory holes drilled in Phases 1 and 2 were located between 700 and 3,200 feet from Ha'Kamwe'. (Federal Defendant's Proposed Findings of Fact and Conclusions of Law, Doc. 47-1 at ¶ 14 ("Federal Defendants FOFs")).  Plaintiff does not dispute this.

### D.    Phase 3 of the Project

In Phase 3, AZL will drill 131 boreholes and three "auger holes" to explore for lithium in the Big Sandy River Basin. (*See* Final EA, Doc. 15-1 at 5; Decl. of Paul Lloyd at Doc. 18-4 at 2 ("Lloyd Decl.")).  The 613-acre exploration area for Phase 3 drilling is split between a northern and southern area. (Final EA, Doc. 15-1 at 5).  Defendant represents that, in the northern area, Phase 3 involves drilling 100 exploratory core holes. (Federal Defendant's FOFs, Doc. 47-1 at ¶ 23).  Those drill sites are located between approximately 1,200 and 4,000 feet from Ha'Kamwe. (*Id*.)  The northern area of drilling is further split between 61 core holes to the north of Ha'Kamwe' and 39 core holes to the south, southeast, and east of Ha'Kamwe'. (*Id*.)  In the southern area, Phase 3 involves drilling 31 exploratory core holes located approximately 3.8 miles south of Ha'Kamwe'. (*Id*. at ¶ 24.)  Plaintiff does not dispute these factual assertions either.

/ / /

### E.    The NHPA and NEPA Processes

#### 1.    The NHPA Process

The NHPA created the Advisory Council on Historic Preservation ("ACHP") and charges it with the responsibility to "advise the President and the Congress on matters relating to historic preservation," and to "review the policies and programs of Federal agencies and recommend" methods for harmonizing those policies and programs with the NHPA. 16 U.S.C. § 470j(a)(1), (6).   The NHPA established a national preservation program to protect historic properties as a cooperative effort between the federal government and states, local governments, Tribes, Native Hawaiian organizations, and private organizations. 54 U.S.C. § 300101.  Section 106 of NHPA requires federal agencies to consider the impact of their actions on historic properties.  54 U.S.C. § 306108.  In that process, the agency must determine the area of potential effects ("APE"), which is the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties. 36 C.F.R. § 800.16(d).  The agency must then determine whether the project will affect any historic properties within the area of potential effects.  *Id.* § 800.4.  An "effect" is defined as an alteration to the characteristics of a historic property qualifying it for inclusion in the National Register.  *Id.* § 800.16(i).

If the agency concludes that a historic property will be affected, it must then determine whether the effects are adverse.  *Id.* § 800.5.  Effects are adverse if the proposal "may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."  *Id.* § 800.5(a)(1).   If adverse effects are found, then the agency must explore measures to avoid, minimize, or mitigate adverse effects on historic properties and reach a written agreement with the State Historic Preservation Officer ("SHPO") or Tribal Historic Preservation Officer ("THPO") on measures to resolve them.[2]  *Id.* § 800.6.

---

[2] A State Historic Preservation Officer, or SHPO, "means the official appointed or designated pursuant to section 101(b)(1) of the act to administer the State historic preservation program or a representative designated to act for the State historic preservation officer." 36 C.F.R. §800.16(v). A Tribal Historic Preservation Officer, or

1    Federal agencies "shall" consult with any Tribe that "attaches religious and cultural

2    significance" to a historic property affected by an undertaking. 54 U.S.C. § 302706(b); 36

3    C.F.R. § 800.2(c)(2)(ii).  This consultation must recognize the government-to-government

4    relationship between the Federal Government and Tribes and give the Tribe the opportunity

5    to "advise on the identification and evaluation of historic properties, including those of

6    traditional religious and cultural importance" and "participate in the resolution of adverse

7    effects." 36 C.F.R. § 800.2(c)(2)(ii).

8                    **2.    The NEPA Process**

9    Federal agencies must ensure "that environmental information is available to public

10   officials and citizens before decisions are made and before actions are taken.  The

11   information must be of high quality.  Accurate scientific analysis, expert agency comments,

12   and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).  NEPA

13   requires federal agencies, like the BLM, to assess the environmental impact of proposed

14   actions that "significantly affect[ ] the quality of the human environment." 42 U.S.C. §

15   4332(C).  NEPA mandates the preparation of an Environmental Impact Statement ("EIS")

16   for "major Federal actions significantly affecting the quality of the human environment."

17   *Id*. at 4332(2)(C).

18    A threshold question in a NEPA case is "whether a proposed project will

19   'significantly affect' the environment, thereby triggering the requirement for an EIS." *Blue*

20   *Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)

21   (quoting 42 U.S.C. § 4332(2)(C)).  "Before deciding whether to complete an EIS,

22   government agencies may prepare a less formal EA which 'briefly provides sufficient

23   evidence and analysis for determining whether to prepare an environmental impact

24   statement or a finding of no significant impact.' " *Anderson v. Evans*, 371 F.3d 475, 488

25   (9th Cir. 2004) (quoting *Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140,

26   1144 (9th Cir. 2002)).  "If an agency decides not to prepare an EIS, it must supply a

27
28   THPO, "means the tribal official appointed by the tribe's chief governing authority or
     designated by a tribal ordinance or preservation program who has assumed the
     responsibilities of the SHPO for purposes of section 106 compliance on tribal lands in
     accordance with section 101(d)(2) of the act." 36 C.F.R. § 800.16(w).

'convincing statement of reasons' to explain why a project's impacts are insignificant." *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1111 (9th Cir. 2015) (citation omitted).

### 3.    The BLM's NHPA and NEPA Processes

AZL applied to conduct Phase 3 of the Project with BLM on September 20, 2019. (*See* AZL's April 15, 2024, Revised Plan of Operations for Mineral Exploration, Doc. 18-4 at 13 ("AZL's Plan")). On June 6, 2020, BLM initiated consultation with the Tribe on Phase 3 of the Project, as required by Section 106 of the NHPA. (*See* June 6, 2020, Letter to Chairman Clarke, Doc. 15-3). The letter invited the Tribe "to initiate consultation and comment on this proposed undertaking in accordance with the [NHPA and implementing regulations] to ensure that any concerns your tribe may have about the project are fully considered." (*Id.* at 6). The BLM also requested the Tribe's "assistance in identifying any cultural properties or other areas of tribal concern that may be affected by" the Project. (*Id.*) The Tribe thereafter requested and was provided "the shape files for the project APE. . . and the footprint for the completed drill holes from previous exploration, the proposed drill holes for this exploration, the proposed access routes, and proposed bulk sample sites, and the proposed staging areas." (June 22, 2020, email from BLM Archaeologist Thomas Thompson to Director/THPO of Hualapai Dept. of Cultural Resources Peter Bungart, Doc. 15-4 ("BLM's June 22, 2020, email").

Chairman Clarke represents that, on June 29, 2020, the Tribe sent a letter accepting the invitation for consultation. (Clarke Decl., Doc. 11-3 at ¶ 7). He also represents that the Tribe informed BLM of Ha'Kamwe's existence and status as a Traditional Cultural Property, expressed concern over the Project's effects on the spring, and requested Cooperating Agency status under NEPA in this letter. (*Id.*) Chairman Clarke states that BLM failed to respond to this letter, so, the Tribe sent another letter on November 2, 2020, again raising these concerns. (*Id.*) Clarke avers that BLM responded on November 10th and told the Tribe that it would coordinate with the tribe but denied its request to participate as a cooperating agency. (*Id.* at 8). Clarke also notes that that BLM explained that it had

determined one historic property existed within the APE but would ensure that the Project's operations would avoid the site, so, it made a finding that no historic properties would be affected.  (*Id.*)[3]

The record shows that the next interaction with the Tribe was a site visit the BLM conducted with the THPO Peter Bungart and other tribal representatives on March 19, 2021.  (Site Visit Report, Doc. 15-6).  It is unclear why this visit happened and Plaintiff makes no mention of the visit in its briefing.  (*See e.g.*, Doc. 11).  Next, on April 12, 2021, BLM sent Plaintiff a letter wishing to "continue consultation on the proposed Sandy Valley Exploration Project (Project) located near Wikieup, Arizona."  The letter stated:

> Cultural resource investigations for the Project included a Class I inventory of existing information to identify previous investigations and cultural resources within a one-mile buffer of the Project Area of Potential Effect (APE).  A 100% Class III archaeological survey of the entire Project APE totaling 613 acres within three discontinuous parcels was also conducted. The results of the Class I and Class III investigations resulted in the identification of four cultural resource sites. *The BLM has determined one of these sites eligible for inclusion in the National Register of Historic Places (NRHP) under Criterion D, and three as not eligible for inclusion in the NRHP under any criteria.*  The BLM would ensure that Project operations avoid the NRHP eligible site for a finding of no historic properties affected.

The BLM invited Plaintiff to further comment on the proposed action.  (BLM's April 12, 2021, letter, Doc. 11-7 at 9).  This letter also informed the Tribe of a Preliminary Environmental Assessment ("the preliminary EA") which was available for review.  (*Id.*)

On May 6, 2021, the ACHP and SHPO suggested that BLM meet with the consulting parties.  (Doc. 15-7).  The acting Arizona SHPO, Mary-Ellen Walsh, noted in her request to meet that the "AZ SHPO has not heard anything about this undertaking since November 2019, at which time we requested additional consultation."  (May 6, 2021, email thread, Doc. 15-7 at 3).   On May 7, 2024, Mr. Thompson of the BLM responded to the

---

[3] The Court notes that these letters are not available in the record and are only referenced in Chairman Clarke's declaration.  (Doc. 11-3).  The record in this matter has some gaps, especially as it pertains to the events which occurred from 2019 through 2021.  So, the Court will rely on Chairman Clarke's declaration to fill in these gaps as Defendants do not dispute the above facts.  (*Id.*)

requests for additional consultation.  (*Id.* at 2).  In an email addressed specifically to Ms. Walsh, he wrote:

> I am writing this to follow-up on our phone conversation on the afternoon of May 6th concerning the Sandy Valley Mineral Exploration Project and to clarify the specific scope of this project. I am including Peter Bungart, Linda Otero and Bill Marzella on this update as you requested. You had contacted me in an email dated May 5th after being contacted by Hualapai THPO Peter Bungart enquiring whether the BLM Kingman field office had invited AZ SHPO for formal Section 106 consultation on this project. During our conversation, I clarified that this project only included operations related to mineral exploration and not future mineral extraction mining operations, that this project was contained within BLM jurisdiction lands, and that this project would result in No Historic Properties Affected. After this clarification, you agreed that this project could be processed under the guidelines of the State Protocol Agreement instead of formal Section 106 consultation with AZ SHPO.

(*Id.*)

Pursuant to the requests, on May 28, 2021, BLM held a teleconference with Hualapai, Fort Mojave, Arizona SHPO, and ACHP to "discuss the BLM's definition of the undertaking, the [APE], the BLM's efforts to identify historic properties, and the BLM's finding of No Historic Properties Affected."  (June 17, 2021, Letter from BLM Field Manager Amanda Dodson to SHPS Kathryn Leonard at Doc. 15-8 (summarizing the "Section 106 findings and determinations for [the Project], as discussed in a teleconference on May 28, 2021")).  At that meeting, the BLM stated that "because the exploration plan is temporary in nature and does not propose any permanent infrastructure, . . . this undertaking would not cause visual, audible, atmospheric, or cumulative impacts to a historic property." (*Id.* at 3).  It further conveyed that because "the APE for the undertaking was appropriate for the scope and magnitude of the project, the BLM met the good faith identification standard required by the regulations found at 36 C.F.R. 800.4(b)(1), and that the BLM finding of No Historic Properties Affected is appropriate."  (*Id.*).

On June 10, 2021, Plaintiff sent a letter to the BLM stating that it had not properly identified all cultural resources that would be affected by the Plan either through proper NHPA Section 106 review or standalone cultural resource identification under NEPA.

(Plaintiff's June 10, 2021, letter, Doc. 11-7 at 18).  Specifically, Plaintiff asserted that the BLM was aware of Ha'Kamwe's TCP status but completely omitted any documented analysis of it in the preliminary EA.  (*Id.* at 19).  Plaintiff asked BLM to halt any further consideration or review of the "legally inadequate EA and instead conduct NEPA review that properly considers impacts on [Plaintiff's] interests, rights, and resources-including cultural resources."  (*Id.* at 30).

On June 17th, BLM sent the Arizona SHPO a letter summarizing the meeting and noting that BLM archeologist Thompson had spoken with the Arizona SHPO on May 6, 2021, to "agree" that the undertaking could "proceed under the 2014 'Arizona Protocol Agreement.'"  (BLM's June 17, 2021, letter to SHPO, Doc. 15-8 at 2).   This letter also stated that BLM had "conducted an intensive [] survey of the entire 613-acre project area to account for not only the exploratory drill holes, associated drill pads, staging areas, and the bulk sample site, but to also account for overland travel of vehicles."  (Doc. 15-8 at 3).

BLM represents that the Arizona Protocol Agreement modifies the standard process for complying with Section 106 of the NHPA "by developing a set of understandings and standard operating procedures that eliminate the need for SHPO consultation prior to project authorization for those projects that will not cause adverse effects to historic properties."  (Doc. 47-1 at ¶ 45 (citing Doc. 15-9 at 4)).  The Protocol Agreement provides that BLM "may act without consulting the SHPO on BLM administered lands on those undertakings that culminate in No Historic Properties Affected or No Adverse Effect findings."  (Doc. 15-9 at 6).  The Arizona Protocol Agreement was entered into in 2014 by the BLM and the Arizona SHPO and automatically terminates in 10 years if not extended.  (*Id.* at 21-22).  The Tribe is not a signatory to this agreement.  (*See id.*).

Plaintiff submitted a supplement to its June 10th comments on July 9, 2021, arguing that it is entitled to be a cooperating agency and that tribal consultation had not properly been carried out.  (Doc. 11-7 at 34–35).  It does not appear that BLM ever responded to the Plaintiff's 2021 comments.  (*See* Doc. 15 at 9).

On January 11, 2023, the ACHP sent BLM a letter advising it to "reinitiate consultation with the Hualapai Tribe to consider whether its determination is adequately supported, and to reexamine its identification and evaluation measures as necessary." (Doc. 11-7 at 48).  Over a year later, on February 9, 2024, BLM and Plaintiff entered into the MOU making the Tribe a cooperating agency under NEPA.  (Doc. 15-11).  Under the MOU, BLM agreed to provide Plaintiff with a draft of the final EA so that Plaintiff could provide comments to it.  (*Id*. at 2).  That same month, BLM provided the draft EA to Plaintiff and Plaintiff provided comments to BLM on March 13, 2024.  (Doc. 15-12). Plaintiff's comments included the Wright Report.  (Doc. 15-13).

Mr. Wright's Report discusses his "mixture" theory that all three aquifers are interconnected and feed into Ha'Kamwe'.  (Doc. 11-7 at 81).  Therein, he concludes that Phase 3 could harm Ha'Kamwe's flow, temperature and chemistry.  (Wright Report, Doc. 15-13 at 13).  The Report details that the Big Sandy River Valley contains various fractures and lineaments.  (*Id*. at 19).  He states that fractures are present as "joints, faults, and bedding-plane separations.  Fractures in the rocks create features on the land surface, and the fractures may extend into the subsurface.  These features are referred to as lineaments. Lineaments are indicated by aligned valleys, wind and water gaps, upland sags and depressions, soil-tonal features, springs, sinkholes, and caves." (*Id*.)  The Wright Report further states that "[l]ineaments in the Ha'Kamwe' area are mapped by automation using different bands of Landsat Thematic Mapper 8 (TM-8) images.  Because small scale fractures and joints reflect vertical fractures, lineaments represent possible conduits and planes for movement of groundwater." (*Id*.)  The Wright Report includes a map showing these faults, lineaments, and the Project's boreholes which it has drilled already and have proposed to drill:

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



(Doc. 15-13 at 5).

25

26      The Wright Report detailed that based on a mixing of elements found in each

27   aquifer, Ha'Kamwe' is fed by all three aquifers, not just the lower aquifer.  (Doc. 71 at 69).

28   BLM responded by updating the EA to require more rigorous procedures to plug boreholes

if water is encountered during drilling, but does not directly address the report or opinions

which challenge the basis of the final EA.  (Doc. 15-14 at 2; Doc. 15 at 9).

### i. The Final Environmental Assessment

BLM issued the Final EA and a Finding of No Significant Impact ("FONSI") on June 5, 2024.  (Final EA, Doc. 15-1; Finding of No Significant Impact, Doc. 15-15 ("FONSI")).  The Final EA relies on the 2000 Manera Report's conclusion that there are three separate confined aquifers in the area around Ha'Kamwe': the upper aquifer, composed of "recent stream and floodplain alluvium;" the middle aquifer, composed of "older basin fill;" and the lower aquifer, composed of "volcanic rocks of Sycamore Creek." (Final EA, Doc. 15-1 at 20).  The Final EA notes that the upper aquifer is "isolated from the Middle Aquifer by the Wikieup formation, a lacustrine clay that has a very low permeability rate and varies in thickness from 200 feet to more than 600 feet."  (*Id*. at 21).

The Final EA states that "[t]he Wikieup formation clay hosts the lithium mineralization that is the target of the Proposed Action.  The depth of drilling of the proposed Project is 360 feet below ground surface, which would not advance below this confining layer into the Middle Aquifer."  (*Id*.)  As for the other aquifers, the lower aquifer "receives groundwater recharge from areas where the volcanic rocks of Sycamore Creek are exposed outside of the Project area."  (*Id*.)  The Final EA also notes, relying on the Manera Report, that the "aquifer that supplies the Cofer Hot Spring (Ha'Kamwe') is a deeper confined aquifer (Lower Aquifer) that is geologically isolated from the overlying aquifers (Upper and Middle Aquifers) by an aquitard."  (*Id*.)  It also details that the lower aquifer is located approximately 1,100 feet below the surface.  (*Id*.)  Because of this, the Final EA concludes that the drilling to be done in Phase 3 is not anticipated to reach the lower aquifer supplying Ha'Kamwe'.  (*Id*. at 25).  The Final EA also states, however, that it is unclear whether there is any contribution of water to Ha'Kamwe' from the upper aquifer.  (*Id*.)  The Final EA uses the following diagram ("Figure 4") to show the "generalized cross-section of the Project area hydrography, including the three aquifers,

the depth of drilling, and the aquifer source for" Ha'Kamwe':



(Doc. 15-2 at 9).[4]

       Chapter 3 of the Final EA addresses the affected environment and environmental

---

[4] Mr. Wright stated at the hearing that Figure 4 is an oversimplification of the subsurface geology and that it is not an accurate diagram because it does not show the interbedded nature of the drill site.  (Doc. 71 at 66).

consequences.  (Final EA, Doc. 15-1 at 14).  It finds that there are no "Areas of Critical Environmental Concern" within the Project area.  (*Id*.)  Due to Plaintiff's concerns over the groundwater supply near Wikiup, the Final EA notes that AZL has agreed to purchase water from the municipal supply of Wikieup and remove the potential use of the well in the Exploration Plan.  (*Id*. at 7).  The EA details that "protection of water resources would be provided by promptly plugging and abandoning all core holes, especially those that intersect water in accordance with Arizona Administrative Code R12-15-816."  (*Id*. at 25).  However, the Final EA did not address the conclusions in the Wright Report; specifically, that Phase 3 could harm Ha'Kamwe's flow, temperature and chemistry.  (*Compare* final EA, Doc. 15-1 *with* the Wright Report, Doc. 15-13).

BLM also notes that Plaintiff had concerns about the impacts to the visual setting and auditory impacts to Tribal uses near Ha'Kamwe' and surrounding areas.  (Final EA, Doc. 15-1 at 14).  To reduce these impacts, AZL agreed to relocate a Project staging area that was originally proposed at the existing airstrip near Ha'Kamwe'.  (*Id*.)  The new location consolidates two originally proposed staging areas into one and is "approximately 0.45 miles east" of Ha'Kamwe'.  (*Id*.)  Finally, it notes that because of concerns about the footprint of the Project, AZL has refined access roads to drill sites by removing redundant routes to reduce overland travel disturbance and to keep all proposed drilling and access for the project on public lands.  (*Id*.)

The FONSI, which relies on the Final EA, finds that the Project will result in the disturbance of approximately 21 acres of land with exploration activities expected to occur over an 18-month period.  (FONSI, Doc. 15-15 at 5).  It details the following short- and long-term effects of the Project:

- Temporary visual effects from drilling equipment and surface disturbance.
- Temporary noise and vibration from drilling activities and vehicular travel through the area.
- Temporary disruption to cultural practices at and/or near Ha'Kamwe'.
- Impacts to native wildlife and vegetation (removal of vegetation, noise, human presence) on up to 21 acres.
- Fugitive dust and vehicle emissions from vehicles and drill rigs during

exploration activities.

- There may be minor local dispersion of recreation away from active drilling and construction areas. However, access in the area would not be restricted to any recreation sites and there are other routes for travel in the area.

- New access roads would be constructed which would remove and/or crush vegetation, disturb soil structures, increase the potential for invasives, nonnatives, and noxious weeds to spread and increase potential for soil erosion from stormwater runoff.

- The Proposed Action would result in minor contributions to local communities and the local tax base due to the presence of up to 4 personnel working over the life of the project (18 months).

- The Proposed Action would result in the loss or disturbance of up to 21 acres of potential habitat and forage for wildlife, migratory birds, and special-status species. Exploration drilling noise, human presence, and vibrations would have some potential to cause wildlife to vacate from or temporarily avoid the project vicinity during the 18-month duration of the Proposed Action.

- There would be a collection and removal of core and rock chip samples from the exploration drilling.

(*Id*.)  BLM also issued a Decision Record ("DR") for the Project concurrent with the FONSI detailing its approval of the proposed action.  (DR, Doc. 15-15 at 8).  The DR lays out the following pertinent environmental protection measures and best management practices:

- The ability for tribal members to monitor ground disturbing activities during Phase 3;
- Relocation of drill pads;
- The exclusive use of BLM-approved, certified weed-free seed for reseeding;
- The reduction of speed on access roads to twenty-five miles-per-hour;
- The plugging of boreholes in accordance with Arizona law.

(*Id*. at 13–17).

Based on the Final EA, BLM determined that the Project "is not a major federal action and will not significantly impact the quality of the human environment."  (*Id*. at 7).  The FONSI also states that an EIS is not needed.  (*Id*.)  On July 9, 2024, based on the DR, FONSI, and Final EA, BLM approved the AZL's Plan of Operations, authorizing it to begin Phase 3 of the Project.  (*Id*. at 11).

## II.    Legal Standard

Preliminary injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief were denied, (3) that the equities weigh in the Plaintiff's favor, and (4) that the public interest favors injunctive relief.  *Id.* at 20.  The movant carries the burden of proof on each element of the test.  *See Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).  The last two factors merge when, as here, the government is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

A "sliding scale" approach is used for preliminary injunctions, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  "The moving party may meet [its] burden by showing either: (1) a combination of probable success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." *Nouveau Riche Corp. v. Tree*, 2008 WL 55381513, at *4 (D. Ariz. Dec. 23, 2008) (citing *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003)).  "[C]ourts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" and should be particularly mindful, in exercising their sound discretion, of the "public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citations omitted).  Injunctive relief is an equitable remedy, and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (citing *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987)).

Neither NEPA nor the NHPA contain a private right of action, so Plaintiff's claims under both statutes are reviewed under the Administrative Procedures Act ("APA"), 5

U.S.C. §§ 701–706.  *See WildEarth Guardians v. Provencio*, 923 F.3d 655, 664 (9th Cir. 2019).  To prevail in an APA challenge, a plaintiff must show that an agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Review is "deferential and narrow, and the court is not to substitute its judgment for the agency's judgment." *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021).  This standard also applies to how an agency considers and responds to "significant comments" that raise points that could change a decision. *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (internal quotation omitted)).

## III.    Discussion

Plaintiff argues that it can show a likelihood of success on the merits that the BLM violated the APA because: (1) BLM erroneously found no historic properties were affected by the Project under NHPA; (2) BLM failed to consider reasonable alternatives under NEPA; and (3) BLM failed to take a hard look at impacts on water resources under NEPA. (Doc. 1 at ¶¶ 35–37; Doc. 11 at 5, 9 and 11).  The Tribe also argues that it can show it will suffer irreparable harm because the Phase 3 drilling will cause degradation of Ha'Kamwe's character and surrounding environment—specifically, changes to its chemistry, flow and temperature.  (*Id*. at 14).  It further argues that the balance of harms tips toward it and a preliminary injunction will advance the public interest because the Project will cause permanent harm to the Tribe's sacred property.  (*Id*. at 15–16).  It finally argues that the Court should not require the Tribe to post a bond, or alternatively, only require a nominal one.  (*Id*. at 16).

The Federal Defendants argue that Plaintiff has not established that harm to Ha'Kamwe's flow and temperature is likely.  (Doc. 40 at 3).  They argue that any alleged harm to Ha'Kamwe' is speculative, especially since Plaintiff has not shown that the upper aquifer meaningfully contributes to it.  (*Id*.)  Additionally, the Federal Defendants argue that Plaintiff's asserted harm to cultural activities is also speculative as these "vague

1    assertions do not suffice to support an injunction." (*Id*. at 7 (citing *Bartell Ranch LLC v.*

2    *McCullough*, 570 F. Supp. 3d 945, 953 (D. Nev. 2021) (rejecting "insufficiently specific

3    evidence of irreparable harm")).

4         AZL similarly argues that its Phase 3 drilling project will not harm Ha'Kamwe' as

5    it will not affect the lower aquifer which feeds it. (Doc. 42 at 2). It specifically argues that

6    the lower aquifer "starts at 1,390" feet below surface and that it only plans on drilling 360

7    feet in depth, leaving a 1,000-foot buffer between its exploration and the lower aquifer.

8    (*Id*. at 2–3). It also argues that, on the off-chance they encounter groundwater, the EA has

9    planned for this and requires it to immediately plug the bore holes—so there is little risk

10   of any irreparable harm. (*Id*. at 3).

11        The Court will now address the *Winter* factors.

### A.    Likelihood of Success on the Merits

13        A reasonable probability of success is all that need be shown for preliminary

14   injunctive relief—an overwhelming likelihood is not necessary. *Candrian v. RS Indus.,*

15   *Inc.*, 2013 WL 2244601, at *3 (D. Ariz. May 21, 2013) (citing *Gilder v. PGA Tour, Inc.*,

16   936 F.2d 417, 422 (9th Cir. 1991)). "Serious questions are 'substantial, difficult and

17   doubtful, as to make them a fair ground for litigation and thus for more deliberative

18   investigation.' " *Gilder*, 936 F.2d at 422 (quoting *Hamilton Watch Co. v. Benrus Watch*

19   *Co.*, 206 F.2d 738, 740 (2nd Cir. 1953)). "Serious questions need not promise a certainty

20   of success, nor even present a probability of success, but must involve a 'fair chance of

21   success on the merits.'" *Id*. (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513,

22   1517 (9th Cir. 1985)).

### 1.    The NHPA

24        Plaintiff first argues that BLM violated the NHPA by excluding Ha'Kamwe' from

25   the APE and then concluding that no historic properties—and specifically Ha'Kamwe'—

26   would be affected by the Project. (Doc. 11 at 11). Plaintiff asserts that "BLM attempted

27   to avoid a finding of adverse effects by labeling the identified impacts as temporary," which

28   is arbitrary and capricious. (Doc. 1 at 4). In response, Defendants argue that BLM

complied with the Section 106 consultation process required by the NHPA. (Doc. 15 at 18; Doc. 28 at 6). The BLM asserts that it was not arbitrary in determining that "limited, temporary noise and visual effects . . . would not adversely affect the characteristics that qualify Ha'Kamwe' for inclusion in the National Register." (*Id*. at 19).

The NHPA requires federal agencies to "make a reasonable and good faith effort to identify historic properties; determine whether identified properties are eligible for listing on the National Register . . . [and] assess the effects of the undertaking on any eligible historic properties found." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 676 (9th Cir. 2019). The NHPA involves "a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1093–94 (9th Cir. 2005) (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 108 n. 1 (1978)).

Section 106 "requires that federal agencies take into account the effect of their undertakings on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." *Id*; 54 U.S.C. § 306108. This requirement is governed by numerous federal regulations which establish a procedure generally referred to as the Section 106 process. *See* 54 U.S.C. § 306108; 36 C.F.R. § 800 *et seq*.

> The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning. The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

36 C.F.R. § 800.1.

Where an agency determines that an "undertaking" has the potential to cause effects on "historic properties," the regulations provide for a four-step process: (1) initiate the Section 106 process; (2) identify, through reasonable and good faith efforts, historic properties within the APE; (3) assess whether effects of the undertaking on any eligible historic property is adverse; and (4) seek to resolve any adverse effects. 36 C.F.R. § 800.3–

800.6.  The APE is defined as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d).  The APE is "influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.*

These steps are accomplished through consultation with interested parties.  *Id.* at §§ 800.1(a), 800.2.  Specifically, an agency "shall" consult with any Native American Tribe "that attaches religious and cultural significance to [the affected] property" and provide the Tribe "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, . . . and participate in the resolution of adverse effects." *Id.* at § 800.2(c)(2)(ii).  "If the agency official finds. . . there are historic properties present but the undertaking will have no effect upon them as defined in § 800.16(i), the agency official shall provide documentation of this finding, as set forth in § 800.11(d), to the SHPO/THPO. The agency official shall notify all consulting parties, including Indian tribes and Native Hawaiian organizations, and make the documentation available for public inspection prior to approving the undertaking." *Id*. at § 800.4(d)(1).  BLM must "engage in consultation with the [SHPO] to [d]etermine and document the area of potential effects, [g]ather information, and develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *WildEarth Guardians*, 923 F.3d at 676.

"[F]ederal agencies must comply with these regulations." *See Pit River Tribe v. U.S. Forest Serv*., 469 F.3d 768, 787 (9th Cir. 2006). "Early consultation with tribes is encouraged by the [NHPA] regulations." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (citations omitted).  The consultation requirement "is not an empty formality; rather, it 'must recognize the government-to-government relationship between the Federal Government and Indian tribes' and is to be 'conducted in a manner sensitive to the concerns and needs of the Indian tribe.' " *Quechan*

1    *Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1108 (S.D.

2    Cal. 2010) (quoting 36 C.F.R. § 800.2(c)(2)(ii)(C)).  A tribe may, if it wishes, designate

3    representatives for the consultation.  *Id.*  The Tribe must show that it would have provided

4    new information had it been consulted earlier in the Phase three's approval process to

5    prevail on a claim that BLM violated its obligation to consult with the Tribe, thus violating

6    NHPA. *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592,

7    610 (9th Cir. 2010) (citing 36 C.F.R. § 800.1).

8                              **i.    BLM's Failure to Consult with the Tribe**

9            Sometime prior to November 10, 2020, the BLM concluded that the Project would

10   have no effect upon historic properties (including Ha'Kamwe') under § 800.4(d)(1).  (*See*

11   Clarke Decl., Doc. 11-3 at ¶ 7; *see also* June 17, 2021, Letter from BLM to SHPO at

12   Doc. 15-8 at 2 (writing with the intent "to summarize the. . . Section 106 findings and

13   determinations for [the Project]").  Though recognized as a TCP, Ha'Kamwe' was not

14   included in the Project's APE.  (BLMs' April 12, 2021, letter to Plaintiff, Doc. 11-7 at 9–

15   10).  As a result of this finding, the BLM did not consult with the Tribe regarding its cultural

16   reliance on Ha'Kamwe' as would have otherwise been required under Section 106.

17   Plaintiff contends that "BLM's failure to include Ha'Kamwe' undermined the required

18   consultation process and violated the NHPA."  (Doc. 11 at 15).  The Court agrees.

19           Under these facts, the BLM's early finding of No Historic Properties Affected under

20   the NHPA process, and Ha'Kamwe's subsequent exclusion from the APE, was arbitrary

21   and capricious.   The same can be said of the BLM's refusal to revisit its determination that

22   Ha'Kamwe' was not within the APE such that a formal Section 106 consultation with the

23   Tribe should have taken place.  *See W. Radio Servs. Co., Inc. v. Allen*, 147 F. Supp. 3d

24   1132, 1137–38 (D. Or. 2015), *aff'd*, 716 F. App'x 660 (9th Cir. 2018) ("An agency decision

25   is considered arbitrary and capricious 'if [it] entirely failed to consider an important aspect

26   of the problem, ***offered an explanation for its decision that runs counter to the evidence***

27   ***before the agency***, or is so implausible that it could not be ascribed to a difference in view

28

1  or the product of agency expertise.") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*

2  *Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (emphasis added).

3          First, as Plaintiff points out, BLM's Section 106 decision to exclude Ha'Kamwe'

4  from the APE conflicts with the ultimate findings in BLM's Final EA.   Unlike the

5  determination that the Project would *not* affect Ha'Kamwe' during the Section 106 process,

6  the Final EA conducted under NEPA identifies numerous impacts the Project would have

7  on the springs, including:

8              (1) temporary visual effects from drilling equipment and surface disturbance;
9              (2) temporary noise and vibration from drilling activities and vehicular travel
               through the area; (3) temporary disruption to cultural practices at and/or near
10             Ha'Kamwe'; (4) impacts to native wildlife and vegetation (removal of
               vegetation, noise, human presence); (5) the potential for cumulative effects to
11             natural and cultural environments.

12 (final EA, Doc. 15-1 at 19).  When this discrepancy was brought to BLM's attention by the

13 ACHP, BLM's "response was that they consider these impacts to be temporary and non-

14 physical, and do not meet the definition of 'effects' under Section 106."  (May 31, 2024,

15 letter from ACHP to BLM at Doc. 11-7 at 111).  The ACHP noted its disagreement and

16 stated:

17             As defined in 36 CFR § 800.16(i), effect 'means alternation to the
18             characteristics of a historic property qualifying it for inclusion in or eligibility
               for the National Register.'  In this case, the characteristics of the historic
19             property qualifying it for inclusion in the National Register include (in
               addition to the physical components of the property, such as the spring itself
20             and surrounding landscape features) the setting and feeling of Ha'Kamwe'
               and its environs and the cultural practices conducted there, both of which will
21             be altered (albeit temporarily) by the drilling equipment and ground
22             disturbance proposed in close proximity.

23 (*Id.*).  Though the ACHP encouraged the BLM to reconsider its evaluation considering the

24 perceived discrepancies between the Section 106 and NEPA analysis, the BLM did not do

25 so.  (*Id.*)

26         The BLM's decision to exclude Ha'Kamwe' in the APE was arbitrary and based on

27 a definition of "effect" that has no support in the law.  *See* 36 C.F.R. § 800.16(i) (broadly

28 defining "effects" as an "alteration to the characteristics of a historic property qualifying it

for inclusion in or eligibility for the National Register"). There is simply no exception in the NHPA for "temporary" effects. *Id.*

> Area of potential effects means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

*Id.* Though the APE can be "influenced by the scale and nature" of a Project, effects that are unquestionably identified cannot simply be ignored. *Id.* When Ha'Kamwe' was excluded from the APE, the formal Section 106 process was discontinued with the Tribe, and it was denied this early opportunity to identify its concerns. See *Te-Moak Tribe*, 608 F.3d at 609. The BLM is obligated to give full consideration to the impacts identified in the EA, as well as others not identified, *before* determining that they "do not meet the definition of 'effects' under Section 106." 36 C.F.R. § 800.3–800.6.

Indeed, the Tribe pointed out their concerns in its June 10, 2021, letter to BLM asking it to take a hard look at the implications of the project. (Doc. 11-7 at 12–13). In that letter, the Tribe asserted that BLM had failed to properly identify all cultural resources that would be affected by the Plan—specifically, the omission of any effects the project may have on Ha'Kamwe'. (*Id.* at 18–19). The Tribe argued that the APE was too narrowly defined and requested that the APE be expanded to encompass effects on the Tribe's land and cultural resources and historic properties, including Ha'Kamwe'. (*Id.* at 29). The ACHP also wrote BLM on January 11, 2023, to advise it to "reinitiate consultation with the Hualapai Tribe to consider whether its determination is adequately supported, and to reexamine its identification and evaluation measures as necessary." (*Id.* at 48). The BLM did not respond to Plaintiff's June 2021 comments or the ACHP's letter until it entered into the MOU on February 9, 2024. (Doc. 15 at 9). The EA addresses some of Plaintiff's concerns "by updating the EA to require more rigorous procedures to plug boreholes if water is encountered during drilling." (*Id*; final EA, Doc. 15-1 at 7). These accommodations do not constitute reasoned evaluation of the undertaking's effects on the

TCP, however, which is deemed eligible for listing on the National Register of historic places. *See WildEarth Guardians*, 923 F.3d at 676.

Second, the Court finds the BLM arbitrarily substituted the Arizona Protocol Agreement for its Section 106 obligations despite knowing that the Project potentially affected the import and character of Ha'Kamwe'. Setting aside the issue of BLM's statutory authority to enter into an agreement that would purportedly supplant its NHPA obligations,[5] the Court agrees with the Tribe that the plain terms of the Agreement do not allow the BLM to disregard its 106 obligations. The Agreement provides that "NEPA documents should be used to facilitate Section 106 consultations, and the results of the Section 106 process will inform the development and selection of alternatives in the NEPA documents." (Arizona Protocol Agreement of 2014, Doc. 15-9 at 11). The plain language of the Agreement does not give the BLM license to ignore evidence of effects on a TCP like Ha'Kamwe'—effects that are clearly acknowledged in the NEPA process—while undertaking the NHPA process. (*See id*.) To reach such a conclusion would undermine NHPA's mandates and runs counter to a federal agencies' recognition of "the government-to-government relationship between the Federal Government and Indian tribes." *Quechan Tribe of Fort Yuma*, 755 F. Supp. 2d at 1108. The limited consultation BLM had with the Tribe was certainly not "conducted in a manner sensitive to the concerns and needs of the Indian tribe." *Id*.

Finally, it appears that potential effects to the aquifer that feeds Ha'Kamwe were not considered in BLM's APE determination. *See* 54 U.S.C. § 306108; 36 C.F.R. § 800. Plaintiff persuasively points out that the 2000 Manera Report used to bolster the final EA indicates that Ha'Kamwe's water may be sourced from the upper aquifer through discharge—areas that Defendants concede will be subject to drilling in Phase 3. (Doc. 11-7 at 123, 126; 2000 Manera Report, Doc. 15-16 at 36). Other potential risks are noted in the Wright Report the Tribe provided to BLM and its March 13, 2024, comments, which

---

[5] The Court asked Defendants for the statutory authorities upon which it relies to support its claim that the Protocol Agreement may be substituted for Section 106's mandate, and the Court was generally referred to Defendant's pleadings. (Doc. 71 at 12). Nothing in Defendants' briefing clarifies this for the Court. (*See* Docs. 15, 40, 47 and 70).

note that Phase 3 could harm Ha'Kamwe's flow, temperature and chemistry due to the discharge of pollutants onto stream channels, improper abandonment of boreholes drilled in Phases 1 and 2, and drilling into a fault—which could "drain the entire groundwater system." (Doc. 15-13 at 13; Doc. 71 at 52–53, 71, 81–82). The Wright Report concludes that additional data must be collected to clarify the potential effects of exploratory drilling. (Doc. 71 at 82). BLM responded by updating the EA to require more rigorous procedures to plug boreholes if water is encountered during drilling, but does not directly address the report or Mr. Wright's opinions which challenge the basis of the final EA. (Doc. 15-14 at 2; Doc. 15 at 9). In sum, BLM approved the Phase 3 drilling project with certain conditions, including: bringing in water from outside the Project area, allowing for tribal monitoring, relocating the Project's staging area, refining access roads to drill sites by removing redundant routes to reduce overland travel disturbance and to keep all proposed drilling and access for the project on public lands. (Doc. 15-1 at 7). However, BLM did not address any of Mr. Wright's identified risks associated with the dramatic increase in drilling activity. (*See id*).

BLM's decision to exclude Ha'Kamwe' arbitrarily and prematurely ended the consultation process with the Hualapai Tribe without regard to Section 106. *Pit River Tribe*, 469 F.3d at 787 (noting that the consultation "must be 'initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking.' ") (citing 36 C.F.R. § 800.1(c)). The Tribe has shown that it would have provided new information to refute the BLM's "effects" determination had it been consulted earlier in the Amendment's approval process, such as the discharge of pollutants onto stream channels and potential effects to Ha'Kamwe's flow, chemistry, and temperature. (Doc. 11-7 at 52–53, 81–82)*; see also Te-Moak Tribe of W. Shoshone of Nevada*, 608 F.3d at 610 (noting that a plaintiff must show that it would have provided new information had it been consulted earlier in the approval process). At this juncture, the Court concludes that Plaintiff has shown that it is likely to succeed on its NHPA claim as it has demonstrated that BLMs decision to approve Phase 3 of the Project

1    was arbitrary, capricious and not in accordance with the NHPA.  *See* 5 U.S.C. § 706(2)(A);

2    *Quechan Tribe of Fort Yuma*, 755 F. Supp. 2d at 1108.

3           **2.**    **NEPA**

4           Plaintiff next argues that the Federal Defendants violated NEPA in two ways: (1)

5    by failing to consider reasonable alternatives that would have minimized the Project's

6    adverse effects on Ha'Kamwe' and other resources important to the Tribe; and (2) by

7    failing to take a hard look at impacts on Ha'Kamwe's water resources.  (Doc. 11 at 9, 11).

8    It specifically notes that exploratory drilling is likely to impact Ha'Kamwe's flow and

9    temperature.  (Doc. 35 at 13).

10          NEPA is a purely procedural statute that "does not mandate particular results, but

11   simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*,

12   490 U.S. 332, 350 (1989). Indeed, agencies may decide that "other values outweigh the

13   environmental costs" and may move forward with a proposed action so long as they

14   undergo the necessary process.  *Id.*  A court's role in reviewing an agency decision is

15   "simply to ensure that the agency has adequately considered and disclosed the

16   environmental impact of its actions and that its decision is not arbitrary or capricious." *San*

17   *Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*, 635 F.3d 1109, 1115 (9th Cir.

18   2011).  *See also Indian River Cnty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 527 (D.C. Cir.

19   2019).

20          NEPA has two main aims: requiring agencies to "consider every significant aspect

21   of the environmental impact of a proposed action" and "inform the public that it has indeed

22   considered environmental concerns in its decision-making process." *Baltimore Gas &*

23   *Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).  "NEPA's purpose is to ensure

24   that 'the agency will not act on incomplete information, only to regret its decision after it

25   is too late to correct.' " *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir.

26   2000) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989)).

27          **i.**    **Consideration of Reasonable Alternatives**

28          NEPA mandates that an agency must provide a detailed statement regarding the

alternatives to a proposed action. *See* 42 U.S.C. § 4332(2)(C)(iii); *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006). The alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA, and NEPA's implementing regulations require an EA to include "brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(b)).

Under NEPA, "[c]onsideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account *all* possible approaches to, and potential environmental impacts of, a particular project." *Kempthorne*, 457 F.3d at 978. (emphasis added.). "[A]n agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990). "An agency need not . . . discuss alternatives similar to alternatives actually considered, or alternatives which are 'infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area.' " *Id.* (citations omitted).

"The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citation omitted). The choice of alternatives is "bounded by some notion of feasibility" and an agency is not required to consider "remote and speculative" alternatives. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). The "range of alternatives that must be considered in the [EA] need not extend beyond those reasonably related to the purposes of the project." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir.1994) (citation omitted). However, "failure to examine a reasonable alternative renders an [EA] inadequate." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013) (citation omitted). "Those challenging the failure

1    to consider an alternative have a duty to show that the alternative is viable." *Id.*

2                    **a.    BLM's All or Nothing Approach**

3              The Tribe says the BLM failed to consider any reasonable alternatives before

4    approving the Project. (Doc. 11 at 15). It specifically suggested "approving fewer drilling

5    sites and locating them farther away from Ha'Kamwe', based on further study of the

6    potential impacts on the underlying aquifer" as a reasonable alternative. (Doc. 35 at 13).

7              The Federal Defendants argue that Plaintiff cannot show a likelihood of success

8    here. (Doc. 15 at 16). They argue that Plaintiff cannot show that its proposed alternatives

9    are viable. (*Id.* (citing *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th

10   Cir. 2013) ("Those challenging the failure to consider an alternative have a duty to show

11   that the alternative is viable."). The Federal Defendants state that Plaintiff proposed less

12   drilling, but that this proposal " 'begs the question,' *Alaska Survival*, 705 F.3d at 1087, of

13   how BLM could achieve the Project's purpose of 'provid[ing] [AZL] an opportunity to

14   explore its valid existing mining claims' while limiting its ability to conduct the exploration

15   necessary to assess potential deposits." (*Id.*) The Federal Defendants also argue that BLM

16   reasonably considered "two alternatives" for a narrowly-scoped Project: approval in full or

17   denial in full. (*Id*; Doc. 15-1 at 13–14 ("Under the No Action Alternative, the Proposed

18   Action would not be implemented.")). But this all or nothing approach was arbitrary and

19   capricious because BLM failed to consider an appropriate *range* of alternatives.

20   *Headwaters, Inc.*, 914 F.2d at 1181 ("[A]n agency's consideration of alternatives is

21   sufficient if it considers an appropriate *range* of alternatives, even if it does not consider

22   every available alternative.") (emphasis added); *see also Allen*, 147 F. Supp. 3d at 1137–

23   38 ("An agency decision is considered arbitrary and capricious "if [it] entirely failed to

24   consider an important aspect of the problem.").

25            The Final EA states that there were no "proposed alternatives" to the Phase 3 drilling

26   project. (Final EA, Doc. 15-1 at 14 ("No alternative actions are proposed. . . No alternative

27   actions were evaluated in detail because none were identified that would have fewer

28   impacts than the Proposed Action.")). The Federal Defendants clarify in their Response

that the Tribe did not provide any specific proposals in its 2021 comments. (Doc. 15 at 17).

The Tribe's July 9, 2021, comments asked BLM to "complete its consultation with the Tribes, supplement its EA with analysis that meets NEPA requirements, and then revisit its alternatives analysis with inclusion of additional alternatives that better meet the Hualapai's concerns and provide a more appropriate balance of [AZL's] and the public's interests in resource protection." (Doc. 15-10 at 12). Then, in its March 13, 2024, comments, the Tribe proposed specific alternatives. (Doc. 11-7 at 91). The Tribe proposed approving one less drilling site (two instead of three), relocation of drill sites, approving fewer total wells to be drilled, less new road construction and stricter controls on noise and light pollution. (*Id*.) Again, alongside these comments the Tribe also sent BLM the Wright report. (Doc. 15-12 at 4). So, before BLM filed the Final EA and approved Phase 3, it was made aware of the Tribe's proposed alternatives in its March 13, 2024, comments. (*See id*.) However, the Final EA, which was published in June of 2024, still states that "[n]o alternative actions are proposed. Any possible alternative actions would be limited given the narrow focus of the exploration drilling program. No alternative actions were evaluated in detail because none were identified that would have fewer impacts than the Proposed Action." (Doc. 15-1 at 14).

Here, Plaintiff has demonstrated a likelihood of success on BLM's failure to consider reasonable alternatives claim because it failed to consider an "appropriate range of alternatives." *Kempthorne*, 457 F.3d at 978. Plaintiff identified reasonable, viable, alternatives in its March 13, 2024, comments such as approving fewer drilling sites and locating them farther away from Ha'Kamwe'. (Doc. 11-7 at 91). Other than stating that no alternatives were identified that would have fewer impacts than the Proposed Action, BLM did not explain why it failed to consider any reasonable alternative. (Doc. 15-1 at 14). Likewise, BLM did not argue against the viability of Plaintiff's proposed alternatives. (*See e.g.*, final EA, Doc. 15-1; Doc. 15). BLM addressed some of Plaintiff's concerns, such as effects on groundwater levels, by requiring AZL to bring in its own water from outside the Project area and to relocate a Project staging area. (Final EA, Doc. 15-1

at 7). However, one of the main alternatives the Tribe proposed was reducing the number of total wells drilled (Doc. 11-7 at 6), which BLM did not address in the final EA. (Doc. 15-1).

The Tribe also pointed out that the Final EA provides no analysis of geologic faults and related impacts on the source for Ha'Kamwe' and fails to analyze the potential for exploration boreholes to intersect faults and fractures which could cause this drain Mr. Wright warns of in its March 2024 comments. (Plaintiff's March 13, 2024, comments, Doc. 15-12 at 5). The proposed alternatives of drilling fewer wells and relocating drill sites farther away from Ha'Kamwe' are not "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters, Inc.*, 914 F.2d at 1181. They are reasonable alternatives that BLM should have considered in its range of alternatives—evidenced by Mr. Wright's Report and the Tribes March 2024 comments. (Doc. 15-13 at 33; (Doc. 15-12 at 5). BLM acted arbitrary in its failure to examine these reasonable alternatives, which renders the Final EA inadequate. *Alaska Survival*, 705 F.3d at 1087.

Moreover, Plaintiff has set forth plausible evidence that the dramatic increase in drilling activity also increases the risk of harm to the entire groundwater system. (Mr. Wright's testimony, Doc. 71 at 71 ("if you put in a lot of wells, you have a lot of disturbance to the groundwater system.")). Through this evidence, Plaintiff has met its burden to show that drilling fewer boreholes could be a viable alternative. *See Alaska Survival*, 705 F.3d 1073, 1087 So, the Court finds that Plaintiff has shown that it is likely to prevail on this claim because the Federal Defendants did not consider an appropriate range of alternatives or explain its failure to do so—which is insufficient under NEPA. *See Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 891 (D. Mont. 2020) ("BLM cannot satisfy NEPA without some explanation.").

### ii. NEPA's Hard Look Requirement

Plaintiff also argues that Defendants failed to take a hard look at the potential effects of the drilling project prior to approval. (Doc. 11 at 18). It also argues that BLM's basis

is unsupported because it does not know for certain whether the upper aquifer contributes to Ha'Kamwe'. (*Id*.)  The Federal Defendants argue that "BLM's analysis for the Project satisfies NEPA's hard look standard by reasonably assessing impacts related to groundwater conditions in the Project area and incorporating mitigation methods to preserve water resources." (Doc. 15 at 12).  They also assert that Plaintiff's insistence that BLM should have conducted an independent hydrological study lacks merit.  (*Id*. at 15 (citing *Patagonia Area Research Alliance v. United States Forest Service*, 2023 WL 5723395, at *2 (D. Ariz. Sept. 5, 2023) (rejecting a similar demand as "impractical" given the limited scope of the exploratory drilling project at issue)).  AZL argues that "[t]he existence of a competing study that differently defines the aquifers does not undermine the BLM's ability to take a hard look at water resources." (Doc. 28 at 11).

NEPA is a procedural statute, not mandating particularresults but requiring agencies to take a "hard look" at the environmental consequences of their decisions. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). The hard look requirement includes "both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island Inst. v. U.S. Forest Serv*., 442 F.3d 1147, 1172 (9th Cir. 2006), *abrogated on other grounds by Winter*, 555 U.S. 7.  When reviewing that discussion, courts "ensure that the procedure followed by the Service resulted in a reasoned analysis of the evidence before it." *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985).  To support their analysis, agencies shall "identify any methodologies used and reference . . . the scien[ce] . . . relied upon" to support these methodologies. *Earth Island Inst*., 442 F.3d at 1159–60. NEPA and its implementing regulations set forth "action-forcing" procedures designed to (1) ensure agencies take a "hard look" at the environmental effects of proposed actions and (2) foster meaningful public participation. *Wildlands v. Adcock*, 2024 WL 2187671, at *4 (D. Or. Apr. 10, 2024) (citation omitted).  A "hard look" requires consideration of all foreseeable direct, indirect, and cumulative impacts. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002); 40 C.F.R. § 1508.25(c) (stating that an agency "shall

consider" direct, indirect, and cumulative impacts).  An agency fails to take a hard look when an EA is speculative and conclusory.  *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335–36 (9th Cir. 1992).  Importantly, if the "hard look" reveals the effects of the action "may" be significant, the decision-maker cannot approve the action "unless it is either analyzed in an EIS or modified to avoid significant effects." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001).  At the same time, "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." 40 C.F.R. § 1500.1(b).

### a.    BLM's Hard Look

The Final EA concludes, based on the 2000 Manera Report, that Ha'Kamwe' will not be affected because (1) it is exclusively fed by the lower aquifer and (2) the lower aquifer is completely secluded from the other two aquifers.  (Doc. 15-1 at 25–26).  Contrarily, the EA notes that it is unclear whether there is any contribution of water to Ha'Kamwe' from the upper aquifer.  (*Id*. at 25).  Indeed, the 2000 Manera Report notes that the water feeding Ha'Kamwe may be sourced from the upper aquifer through discharge.  (2000 Manera Report, Doc. 15-16 at 36).

The Court finds that it is likely that Plaintiff will prevail on this claim.  The very study on which BLM relied notes that the water feeding Ha'Kamwe may be sourced from the upper aquifer— an area that AZL will reach during the Phase 3 drilling.  This oversight of a potential effect to the source of Ha'Kamwe', by itself, demonstrates that BLM did not consider all foreseeable direct, indirect, and cumulative impacts as it is required to.  *See Idaho Sporting Cong*, 305 F.3d at 963; 40 C.F.R. § 1508.25(c).  Thus, because this part of the EA is speculative and conclusory, BLM has failed its "hard look" requirement. *Greenpeace Action*, 14 F.3d at 1335–36; *see also Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (citation omitted) (holding that "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification" for why the agency could not provide more "definitive information").

Furthermore, the Wright Report contradicts the soundness of the EA's conclusion

that the lower aquifer is isolated.  Mr. Wright created a map which details several lineaments and faults where AZL plans to drill.  Mr. Wright testified that the "hydrogeology of the site is riddled with fractures, and fractures in these types of hydrogeologic systems transmit groundwater more quickly, more rapidly, than water would be transmitted without the presence of the fractures." (Doc. 71 at 62).  The Wright Report detailed that, based on a mixing of elements found in each aquifer, Ha'Kamwe' is fed by all three aquifers; not just the lower aquifer.  (*Id*. at 69).  The Wright Report was submitted to BLM with the Tribe' March 13, 2024, comments.  (Doc. 11-7 at 86).  BLM responded by updating the EA to require more rigorous procedures to plug boreholes if water is encountered during drilling, but does not directly address the report or opinions which challenge the basis of the final EA.  (Final EA, Doc. 15-1 at 7; Doc. 15 at 9).  As Plaintiff notes, where "the commenters' evidence and opinions directly challenge the scientific basis upon which the [EA] rests and which is central to it, [BLM is] required to disclose and respond to such viewpoints . . . [Its] failure to disclose and analyze these opposing viewpoints violates NEPA." *Ctr. for Biological Diversity v. U.S. Forest Serv*., 349 F.3d 1157, 1167 (9th Cir. 2003) (citations omitted); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011) ("BLM was required to 'assess and consider . . . both individually and collectively' the public comments received during the NEPA process") (quoting *Ctr. for Biological Diversity*, 349 F.3d at 1167).   Plaintiff has shown that BLM failed to address the Tribe's comments, including Mr. Wright's findings and report which challenges the scientific basis upon which the Final EA rests.  So, it has demonstrated a likelihood of success on the merits of its failure to take a hard look claim.

In sum, Plaintiff has demonstrated a likelihood of success on the merits of its claims that BLM violated the NHPA and NEPA.  The Court will next address the second *Winter* factor: whether Plaintiff has shown a likelihood of irreparable harm.

### B.    Irreparable Harm

Plaintiff argues that the Project's impairment of cultural practices and degradation of the area's sacred character is irreparable even though the Project itself is temporary.

(Doc. 11 at 8, 20).    For example, Plaintiff says members of the Tribe rely upon Ha'Kamwe's natural and cultural environment to hold or participate in funerals and coming-of-age ceremonies and these ceremonies may be undertaken only at a single, specific time, and are not reparable with monetary or equitable relief.  (*E.g.*, Mapatis Decl. ¶¶ 6–7 at Doc. 35-1).   Plaintiff also argues that impacts to Ha'Kamwe's flow and temperature are likely to occur if AZL is not enjoined from completing Phase 3 of the Project.  (Doc. 35 at 19).  Plaintiff has also offered testimony that the spring's waters were recently observed to be diminished—Mr. Wright testified that these testimonials are evidence that impacts to the spring have already manifested.  (Testimony of Mr. Brandon Siewiyumptewa, Doc. 71 at 44; Testimony of Mr. Frank Mapatis, Doc. 71 at 108).

Defendants argue that Plaintiff identifies no concrete evidence to support its claim that exploratory drilling is likely to impact Ha'Kamwe's flow and temperature, much less prove it a likelihood.  (Doc. 40 at 2; Doc. 42 at 2).  They argue that harm to its flow and temperature are not likely because there is no evidence of harm from the planned exploration as Ha'Kamwe' is fed by the lower aquifer, not the upper.  (Doc. 40 at 3).  The Federal Defendants also argue that Phase 3 will only "temporarily impact a small amount of land near a single cultural property without disturbing the ground of that cultural property.  And tribal monitors may observe ground disturbing activities to provide assurance that ground disturbances will avoid cultural resources."  (Doc. 15 at 21).

Under *Winter*, plaintiffs seeking a preliminary injunction must establish that "irreparable harm is likely, not just possible."  *All. for the Wild Rockies*, 632 F.3d at 1131.  Irreparable harm is harm "that cannot be redressed by a legal or equitable remedy following trial."  *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007) (internal quotation marks omitted).  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Sierra Club v. Bosworth*, 510 F.3d 106, 1033 (9th Cir. 200) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  "Damage to or destruction of any" cultural or religious sites "easily" meets the irreparable harm

requirement. *Quechan Tribe of Fort Yuma*, 755 F.Supp.2d at 1120.

The Court finds that Plaintiff is likely to suffer irreparable injury if the Court does not convert the TRO into a PI. AZL is prepared and ready to drill 131 boreholes on land that is immediately adjacent to, and on three sides of, Ha'Kamwe'. The Phase 3 drilling project is a dramatic increase in drilling from Phases 1 and 2—increasing from 49 total holes in the first two phases to 131 holes in Phase 3. (Doc. 46-1 at 5; 47-1 at 3). At the hearing, Mr. Wright testified that this increase in drilling activity similarly increases the risk of groundwater disturbance due to the "the horizontal and vertical hydrologic connectivity permeability of the groundwater system." (Mr. Wright's testimony, Doc. 71 at 71). The 2000 Manera Report used to bolster the BLM's Final EA also indicates that Ha'Kamwe's water may be sourced from the upper aquifer through discharge—areas that Defendants concede will be subject to drilling in Phase 3. (2000 Manera Report, Doc. 15-16 at 36). Though Defendants point out that they have failed to encounter any groundwater in their past exploratory drilling, the Phase 3 drilling project will be on a much larger scale and in different locations closer to Ha'Kamwe'. Notably, Mr. Wright testified that these locations lay on fault lines, which could be impacted by AZL's planned drilling depth. (Mr. Wright's testimony, Doc. 71 at 62, 72).

Furthermore, as discussed above, Mr. Wright's report raises various issues as to the soundness of the Final EA's conclusion that the lower aquifer is isolated. Mr. Wright testified that the "hydrogeology of the site is riddled with fractures, and fractures in these types of hydrogeologic systems transmit groundwater more quickly, more rapidly, than water would be transmitted without the presence of the fractures." (Mr. Wright's testimony, Doc. 71 at 62). Mr. Wright has also detailed that, based on a mixing of elements found in each aquifer, Ha'Kamwe' is fed by all three aquifers; not just the lower aquifer. (*Id*. at 69). The Court found Mr. Wright credible and his testimony persuasive. His testimony and corresponding report demonstrate that irreparable harm is likely, not just possible. *All. for the Wild Rockies*, 632 F.3d at 1131. So, Plaintiff meets the irreparable harm requirement because it has shown that damage to Ha'Kamwe', a culturally significant

1    site for the Tribe, is likely.  *Quechan Tribe of Fort Yuma*, 755 F.Supp.2d at 1120 (stating

2    that "[d]amage to or destruction of any" cultural or religious sites "easily" meets the

3    irreparable harm requirement).

4        Because the Court finds that Plaintiff has demonstrated irreparable harm through its

5    impact to Ha'Kamwe's character argument, the Court will not address its impairment of

6    cultural practices argument as they are substantially intertwined.  The Court will next

7    jointly address the last two *Winter* factors: the balance of equities and the public interest.

8    ### C.    Balance of Equities and Public Interest

9        Because the last two factors merge when the government is a party, the Court will

10   consider together whether the balance of equities weigh in the Plaintiff's favor and whether

11   the public interest favors injunctive relief in conjunction.  *See Drakes Bay Oyster Co.*,747

12   F.3d at 1092; *see also Winter*, 555 U.S. at 20.  Plaintiff argues that the balance of equities

13   tips sharply in its favor and advances the public interest because the Project will cause

14   permanent harm to the Tribe's sacred property: Ha'Kamwe'.  (Doc. 11 at 15).  The Federal

15   Defendants and AZL argue that the balance of equities and public interest weigh against

16   an injunction because drilling for lithium is one part of the United States' larger effort to

17   transition to renewable sources of energy and the public interest may be thwarted by

18   preventing lithium extraction.  (Doc. 15 at 24; Doc. 28 at 14).

19       "[D]istrict courts must give serious consideration to the balance of equities."  *Earth*

20   *Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (citation omitted).  In doing so,

21   courts must consider "all of the competing interests at stake."  *Id*.  "The basic function of

22   a preliminary injunction is to preserve the status quo pending a determination of the action

23   on the merits."  *Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 704 (9th Cir.

24   1988). "Status quo is defined as the last, uncontested status which preceded the pending

25   controversy."  *Susanville Indian Rancheria v. Leavitt*, 2007 U.S. Dist. LEXIS 18702, at

26   *21 (E.D. Cal. Feb. 28, 2007) (quoting *Regents of the Univ. of Cal.*, 747 F.2d 511, 514 (9th

27   Cir 1984)).  "The public interest analysis for the issuance of a[n] injunction requires [the

28   court] to consider whether there exists some critical public interest that would be injured

by the grant of [injunctive] relief." *Pure Wafer Inc. v. City of Prescott*, 275 F. Supp. 3d 1173, 1179 (D. Ariz. 2017) (citation omitted).

Lithium exploration is an important public interest at a time when the United States is striving to transition to renewable sources of energy. (Doc. 15 at 24). However, this interest does not outweigh the potential damage the Phase 3 drilling project may cause to Ha'Kamwe', which is central to the Hualapai Tribe life-way. Nor does it permit a federal agency to short-cut its regulatory consultation obligations or reasoned evaluation of the effects of its undertaking. And this Court finds that irreparable harm from the Phase 3 drilling project is not just potential, it is likely. *See supra* Section III.B. "When the proposed project may significantly degrade some human environmental factor, injunctive relief is appropriate." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001) (internal quotation marks omitted). Thus, the balance of equities and public interest tip in Plaintiff's favor and require an injunction to preserve the status quo pending a determination of this action on the merits. *See Chalk*, 840 F.2d at 704. Conversely, refraining from granting injunctive relief could be fatal to the historic and cultural importance of Ha'Kamwe'. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("we conclude that the balance of equities tips toward [the plaintiffs] because the harms they face are permanent, while the intervenors face temporary delay.") (citing *Amoco Prod. Co.*, 480 U.S. at 545 ("the balance of harms will usually favor the issuance of an injunction to protect the environment.")

**D.    Bond**

Plaintiff argues that the Court should deny AZL's request for a "significant" bond. (Doc. 35 at 18). AZL argues for a bond and states that it will incur significant expenses if its operations are enjoined. (Doc. 28 at 15). AZL has not, however, argued why a bond should be required or proposed an amount. (Doc. 28 at 15). AZL instead argues, in essence, that Plaintiff has not disclosed its financial position, so, the Court should not waive the Bond requirement. (*Id.*) Plaintiff substantiated its financial position at the hearing, so, the Court will waive Rule 65(c)'s bond requirement.

Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Rule "invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quotation and citation omitted). The court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* "It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Central Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). "Federal courts have consistently waived the bond requirement in public interest environmental litigation, or required only a nominal bond." *Id.*

Plaintiff says the Hualapai Tribe is unable to pay a large bond, and any sums would "come directly from Tribal resources needed by the Hualapai Tribe to provide essential governmental services." (Doc. 11 at 23). Chairman Clarke testified at the hearing that a bond of "any dollar" amount in this matter would have "a drastic effect on the tribe." (Doc. 71 at 136). Chairman Clarke stated that the tribe's sources of revenue come from grants, contracts, and the Grand Canyon Resort Corporation. (*Id.* at 133). Clarke stated that the median income for tribal members is approximately $42,000 per year and that their unemployment rate is approximately 13%. (*Id.* at 135).

The Court will waive Rule 65(c)'s bond requirement because of the potential chilling effect to the Hualapai Tribe's general fund and its demonstration that it is unable to pay a large sum. *Connaughton*, 905 F. Supp. 2d at 1198.

**IV.    Conclusion**

For the foregoing reasons, the Court finds Plaintiff has satisfied the four-part standard set forth in *Winter* for preliminary injunctive relief. The Motion will therefore be granted.

1     Accordingly,

2     **IT IS ORDERED** that Plaintiff's Motion for a Temporary Restraining Order

3 followed by a Preliminary Injunction (Doc. 11) is **GRANTED**.

4     **IT IS FURTHER ORDERED** that Defendants are **ENJOINED** from authorizing

5 or allowing any ground disturbance, construction, operations, drilling, or any other activity

6 approved by the BLM's July 9, 2024, Decision Letter or its June 6, 2024, Decision Record,

7 Finding of No Significant Impacts, and Final Environmental Assessment until this case is

8 fully resolved on the merits or until further order of the Court. No bond is required from

9 the Tribe.

10     Dated this 5th day of November, 2024.

Honorable Diane J. Humetewa
United States District Judge

- 41 -