Laura Berglan (AZ Bar No. 022120)
Heidi McIntosh* (CO Bar No. 48230)
Thomas Delehanty* (CO Bar No. 51887)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
(303) 623-9466
lberglan@earthjustice.org
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

Roger Flynn* (CO Bar No. 21078)
Jeffrey C. Parsons* (CO Bar No. 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

*Attorneys for Plaintiff Hualapai Tribe*        *Admitted Pro Hac Vice*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona,<br><br>   *Plaintiff*,<br><br>v.<br><br>Debra Haaland, et al.,<br><br>   *Defendants*,<br><br>and<br><br>Arizona Lithium, Ltd.<br><br>   *Intervenor Defendants.* | No.  CV-24-08154-PCT-DJH<br><br><br>**FIRST AMENDED COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This suit challenges the U.S. Bureau of Land Management's ("BLM") approval of a lithium exploration project that threatens a medicinal spring sacred to the Hualapai Tribe called Ha'Kamwe'. For generations and through modern day, Tribal members have used Ha'Kamwe' (also known as Cofer Hot Spring) for cultural and traditional purposes. It features prominently in tribal songs and stories about their history and connection to their land, including those known as the Salt Song Trail. Both the historic flow and temperature of the spring are important attributes for its traditional uses. Located at Cholla Ranch on lands recently taken into trust by the Department of the Interior for the benefit of the Hualapai Tribe, Ha'Kamwe' is recognized as a Traditional Cultural Property ("TCP") eligible for listing on the National Register of Historic Places. On June 6, 2024, BLM issued a Decision Record ("DR"), Finding of No Significant Impact ("FONSI"), and Final Environmental Assessment ("Final EA") for the proposed Project. On July 9, 2024, based on the DR, FONSI, and Final EA, BLM issued its decision approving the company's Plan of Operations, authorizing the Project.



1

2.    As approved, the Sandy Valley Exploration Project (Phase 3) ("Project") will allow Arizona Lithium ("Company") to drill 131 exploratory wells in search of lithium on BLM-controlled lands directly adjacent to the spring. These exploratory wells—some of which will be drilled close to Ha'Kamwe'—will penetrate deep below ground into the aquifer that supports the spring's flows. The Project will also create noise, light, vibrations, and other disturbances that will degrade Ha'Kamwe's character and harm Tribal members' use of the spring for religious and cultural ceremonies. It will adversely impact other resources important to the Tribe too, like plants and wildlife. The area contains designated critical habitats for three threatened and endangered species: the western yellow-billed cuckoo, southwestern willow flycatcher, and northern Mexican gartersnake. Despite repeated efforts by the Tribe to protect its sacred property, BLM ignored these harms and approved the Project. In doing so, it violated its mandates under the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the Endangered Species Act ("ESA"). The Tribe brings suit under these statutes to stop harm to Ha'Kamwe' and other natural resources.

3.    The Hualapai Tribe repeatedly attempted to secure protection for Ha'Kamwe' and other resources important to the Tribe from impacts of this Project throughout the NEPA process, including by becoming a Cooperating Agency, providing comments about (among other things) the critical importance of Ha'Kamwe' to Tribal members and the impact of the Project on critical aspects of their culture, and attempting to discuss its concerns with BLM.

4.    Among other requests, the Tribe asked BLM to consider alternatives to the Project—like drilling fewer wells or moving them farther from the spring—to reduce its negative effects. However, BLM refused to consider a reasonable range of alternatives to Big Sandy, Inc.'s proposal, considering only denying or approving the full exploration plan as proposed by the Company. As explained below, BLM violated NEPA by failing to consider a middle-ground alternative that would address the Tribe's concerns.

5.    NEPA also requires BLM to take a "hard look" at the environmental impacts of the exploration activity. Here, BLM failed to consider a recent study concluding that the Project is likely to cause impacts to Ha'Kamwe'. Instead, it relied on a single twenty-four-year-old study conducted for a different purpose to conclude that there will be no impact on Ha'Kamwe'. BLM's failure to consider the most recent study, which focused specifically on the impacts of this Project on Ha'Kamwe', violated its obligation to take a "hard look" at the Project's impacts.

6.    The NHPA requires BLM to consider the impact of its actions on historic properties. BLM concluded that the Project will have no effect on Ha'Kamwe', even though it is located very close to the Project, and even though BLM identified a list of impacts to Ha'Kamwe' in its Final EA for the Project. BLM attempted to avoid a finding of adverse effect by simply labeling these impacts as temporary. BLM's unsupported and self-contradicted finding of no effect under the NHPA is arbitrary and capricious.

7.    BLM failed to reconsider its finding of no effect under the NHPA despite requests from both the Tribe and the Advisory Council on Historic Preservation ("ACHP")—the expert agency on NHPA matters—to reconsider that finding in light of impacts to Ha'Kamwe' as set out in the Final EA.

8.    The ESA requires BLM to ensure that its actions are not likely to jeopardize threatened or endangered species or their habitat. The Project sits immediately adjacent to designated critical habitat for three threatened or endangered species: the western yellow-billed cuckoo, southwestern willow flycatcher, and northern Mexican gartersnake.  Some of the Project's drill holes would be less than 3,000 feet from this habitat, and the Project's main access road runs through and along it, sandwiching the habitat between the main highway and the access road. The Project, including its noise, light, vibrations, increased truck traffic, and other impacts, "may affect" these species. 50 C.F.R. § 402.14.  BLM was therefore required to consult with the Service before approving the project.  *Id*.; 16 U.S.C. § 1536(a).

9.    In short, BLM approved the Project without appropriately considering a reasonable range of alternatives or taking a hard look at water resources under NEPA, without mitigation measures under the NHPA for Ha'Kamwe' and other resources important to the Tribe, and without appropriately consulting with the U.S. Fish and Wildlife Services ("FWS") thus violating NEPA, the NHPA, and the ESA.

10.    This action is brought by the Hualapai Tribe against Debra Haaland, Secretary of the Interior, BLM; Ray Suazo, State Director of the BLM Arizona State Office; and Amanda Dodson, Field Office Manager of the BLM Kingman Field Office. The Hualapai Tribe seeks vacatur of the illegal agency decisions, as well as declaratory and injunctive relief under the Administrative Procedure Act. Specifically, the Hualapai Tribe challenges BLM's June 6, 2024, DR, FONSI, and Final EA for the Project and BLM's July 9, 2024, Decision Letter approving the exploration plan and the required financial guarantee, which authorized the Project to proceed. *See* U.S. Bureau of Land Mgmt., *Big Sandy Inc. Phase 3 Sandy Valley Exploration Project*, DOI-BLM-AZ-C010-2021-0029-EA (June 2024), https://eplanning.blm.gov/eplanning-ui/project/2012598/510.

## JURISDICTION AND VENUE

11.    This action arises under NEPA, 42 U.S.C. § 4321 *et seq.*, the NHPA, 54 U.S.C. § 300101 *et seq.*, the ESA, 16 U.S.C. § 1536 *et seq.*, and the APA, 5 U.S.C. § 500 *et seq*, which waives the Defendants' sovereign immunity. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–2202, 16 U.S.C. § 1540(g), and 5 U.S.C. §§ 705–706.

12.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant). An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

13.    Venue is proper in this district court pursuant to 28 U.S.C. § 1391(e)(1) because officers of the United States are named defendants in their official capacities, and the federal land that is the subject of this action lies in this district. Venue is also proper

1    in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the decision to approve the

2    Project occurred in BLM offices in this district.

3          14.    This case should be assigned to the Prescott Division of this Court because

4    the Project area lies within the counties of this Division and the challenged agency

5    actions were taken within these counties. LR Civ. 77.1(a)

6                                    **PARTIES**

7          15.    Plaintiff Hualapai Tribe ("Tribe") is a federally recognized Indian tribe

8    located in northwestern Arizona. The Tribe is formally recognized by the Secretary of the

9    Interior as enjoying the privileges and immunities that accompany tribal status. *See*

10   Indian Entities Recognized by and Eligible to Receive Services from the United States

11   Bureau of Indian Affairs, 89 Fed. Reg. 944 (Jan. 8, 2024). The Tribe currently has

12   approximately 2,300 enrolled members.

13         16.    Hualapai, or "People of the Tall Pines," historically inhabited an area of up

14   to seven million acres, with archaeological evidence dating to 600 A.D. The Tribe's

15   homeland stretches from the Grand Canyon southward to the Bill Williams and Santa

16   Maria Rivers and from the Black Mountains eastward to the San Francisco Peaks, located

17   near what is today Flagstaff, Arizona.

18         17.    The Tribe's ancestral lands include the Big Sandy River Valley, where

19   Ha'Kamwe' and the Project are located. The Big Sandy River Valley is a sacred

20   interconnected landscape for the Tribe. Ha'Kamwe' is located on land known as Cholla

21   Canyon Ranch, which is held in trust for the Tribe. Pub. L. No. 117-349, § 12; 136 Stat.

22   6225, 6252 (2023). Cholla Canyon is directly adjacent to the Project site and will be

23   surrounded on three sides by proposed exploratory drilling.

24         18.    Tribal members use the area where the Project is situated for a variety of

25   traditional and cultural purposes, including gathering native plants and other materials,

26   observing and appreciating wildlife, including the endangered species that reside in the

27   area, and holding ceremonies that are central to their cultural life and traditions. The

28   Tribal members' ability to continue these practices, especially with respect to the sacred

site of Ha'Kamwe', will be severely adversely impacted by the proposed drilling activity. The Project risks depleting the flow and altering the temperature of Ha'Kamwe', both of which are essential to the hot spring's medicinal and sacred qualities. The Tribe's members intend to continue to use the public lands on which the Project is located on an ongoing basis in the future although their experience would be negatively impacted by the Project.

19.    The Tribe brings this action in its own capacity and as *parens patriae* on behalf of its members. The Tribe and its members' cultural, spiritual, recreational, conservation, and wildlife preservation values have been, are being, and will continue to be adversely and irreparably injured by Defendants' failure to follow federal law. These are actual, concrete injuries caused by the BLM's refusal to comply with environmental and cultural resource preservation laws. The Tribe's injuries will be redressed by the relief sought.

20.    The Tribe has a substantial interest in ensuring that BLM complies with all applicable laws, including the procedural requirements of NEPA, the NHPA, the ESA, and the APA. The Tribe was a Cooperating Agency under NEPA and submitted extensive comments to BLM during both the public comment period for the Draft EA and as a Cooperating Agency. The Tribe also filed a State Director Review request that was denied. All of the issues and claims raised in this complaint were previously raised to the agency and are properly before this Court for judicial review. The Tribe has exhausted its administrative remedies.

21.    Defendant BLM is an administrative agency within the U.S. Department of the Interior, responsible for managing federal lands and subsurface mineral estates underlying federal, state, and private lands across the United States, including the land and mineral estate at issue in this Project.

22.    Defendant Debra Haaland, sued in her official capacity, is the U.S. Secretary of Interior. As Secretary, Ms. Haaland is the official ultimately responsible for

managing federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

23.    Defendant Ray Suazo is sued in his official capacity as the State Director of BLM in Arizona. As State Director, Mr. Suazo is the official ultimately responsible for managing Arizona's federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

24.    Defendant Amanda Dodson, sued in her official capacity, is the Field Office Manager for BLM's Kingman Field Office. As Field Office Manager, Ms. Dodson is responsible for administering and managing public lands and resources within the Kingman Planning Area, including the lands and resources located within and around the Project area. Ms. Dodson is the official responsible for reviewing staff recommendations on the proposed action, reviewing the environmental assessment for the Project, considering and rejecting alternatives, and ultimately approving the Project. Ms. Dodson signed the July 9, 2024 decision approving the Project's Plan of Operations.

## STATUTORY BACKGROUND

### A.  National Historic Preservation Act of 1966

25.    The NHPA established a national preservation program to protect historic properties as a cooperative effort between the federal government and states, local governments, Tribes, Native Hawaiian organizations, and private organizations. 54 U.S.C. § 300101.

26.    The NHPA charges the ACHP with the responsibility to "advise the President and the Congress on matters relating to historic preservation," and to "review the policies and programs of Federal agencies and recommend" methods for harmonizing those policies and programs with the NHPA. 16 U.S.C. § 470j(a)(1), (6).

27.    Section 106 of NHPA requires federal agencies to consider the impact of their actions on historic properties. 54 U.S.C. § 306108. As a part of this process, the agency must determine the area of potential effects, which is the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character

or use of historic properties. 36 C.F.R. § 800.16(d). The agency must then determine whether the Project will affect any historic property within the area of potential effects. *Id.* § 800.4. An effect is defined as an alteration to the characteristics of a historic property qualifying it for inclusion in the National Register. *Id.* § 800.16(i).

28.     If the agency concludes that a historic property will be affected, it must then determine whether the effects are adverse. *Id.* § 800.5. Effects are adverse the proposal "may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1). If adverse effects are found, then the agency must explore measures to avoid, minimize, or mitigate adverse effects on historic properties and reach a written agreement with the State or Tribal Historic Preservation Officer on measures to resolve them. *Id.* § 800.6.

29.     Federal agencies must consult with any Tribe that "attaches religious and cultural significance" to a historic property affected by an undertaking. 54 U.S.C. § 302706(b); 36 C.F.R. § 800.2(c)(2)(ii). This consultation must recognize the government-to-government relationship between the Federal Government and Tribes and give the Tribe the opportunity to "advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance" and "participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii). Tribes "possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." 36 C.F.R. § 800.4(c)(1).

**B. National Environmental Policy Act**

30.     NEPA is the "basic national charter for protection of the environment." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020). The law has "twin aims." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983). First, a federal agency must "consider every significant aspect of the environmental impact of a proposed action"; and second, the agency must "inform the public that it has

indeed considered environmental concerns in its decisionmaking process." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (internal quotations and citations omitted). The Fiscal Responsibility Act ("FRA") amended NEPA on June 3, 2023. However, BLM's review of the proposed Project began prior to FRA's enactment, so the pre-FRA NEPA requirements apply.

31.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

32.     NEPA also requires an agency to prepare a detailed statement regarding the alternatives to a proposed action. *See* 42 U.S.C. § 4332(C)(iii), (E). Consideration of reasonable alternatives is necessary to ensure that the agency has taken into account all possible approaches to, and potential environmental impacts of, a particular project.

33.     Courts review an EA "with two purposes in mind: to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment, and whether its determination that no EIS is required is a reasonable conclusion." *Env't Def. Ctr.,* 36 F.4th at 872 (9th Cir. 2022) (citation omitted).

34.     The Department of Interior's implementing regulations, codified at 43 C.F.R. §§ 46.10–46.450, specify that EAs "must contain objective analyses that support conclusions concerning environmental impacts." 43 C.F.R. § 46.310(g).

35.     Additionally, the Department of Interior's regulations require BLM to "consult, coordinate, and cooperate with . . . tribal governments . . . concerning the environmental effects of any Federal action" that is "within the jurisdictions or related to the interests" of the Tribe. 43 C.F.R. § 46.155.

**C. Endangered Species Act**

36.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its purpose is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16. U.S.C. § 1531(b).

37.     Section 7 is the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). It requires each federal agency to ensure that its actions are "not likely to jeopardize the continued existence of threatened or endangered species or result in the destruction or adverse modification of designated critical habitat." 16 U.S.C. § 1536(a)(2). Consultation is required under Section 7 of the ESA for any action that "may affect" a listed species or designated critical habitat. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (citations omitted). *See also* 16. U.S.C. § 1536(c)(1); 50 C.F.R. § 402.14(a).

38.     The bar for engaging in Section 7 consultation is "low." *Kraayenbrink*, 632 F.3d at 496. "*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character, triggers the requirement." *Karuk Tribe*, 681 F.3d at 1027 (emphasis in original, citations omitted). In assessing potential impacts on listed species, agencies must use "the best scientific and commercial data available." 16 U.S.C. § 1536(c)(1).

**D. Administrative Procedure Act (APA)**

39.     The APA provides a right of review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA

include final agency actions "for which there is no other adequate remedy in a court." *Id.* § 704.

40.    Under the APA, reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

41.    While a court's review of an agency decision under the arbitrary and capricious standard is narrow, an agency must nevertheless "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168 (1962)). In general, an agency decision is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## FACTUAL BACKGROUND

### A. Ha'Kamwe' and the Interconnected Cultural Landscape

42.    The Hualapai Tribe holds sacred an interconnected cultural landscape in the area surrounding Ha'Kamwe' near Wikieup, Arizona. The landscape consists of archaeological sites, traditional cultural places, the final resting place of Hualapai people, native plants, wildlife, and water resources, including the sacred medicinal hot spring Ha'Kamwe'.

43.    The site of Ha'Kamwe', as well as the surrounding Big Sandy River Valley, mountains, hills, and deserts, are part of the ancestral homelands of the Hualapai Tribe.

44.    Ha'Kamwe' is part of a sacred cultural landscape recounted in what is known collectively as the Salt Spring Trail. Ha'Kamwe' means "warm spring." The

spring is specifically recounted by one of the Hualapai keepers of the Salt Song Trail cycle as part of the song cycle and documented in highly sensitive oral history interviews and audio recordings of Salt Songs that the Tribe keeps privately.

45.     Since time immemorial, the Hualapai people have gone to Ha'Kamwe' for healing and prayer, and to conduct ceremonies related to birth, young women's coming of age, and other important life transitions.

46.     In 2002, in connection with another unrelated proposal, see infra at 45-46. BLM and the Western Area Power Authority ("WAPA"), under the Department of Energy, determined that Ha'Kamwe' is eligible for listing in the National Register of Historic Places as a Traditional Cultural Property ("TCP").

47.     Ha'Kamwe' is located on a parcel of land held in trust by the Department of the Interior for the Hualapai Tribe and known as Cholla Canyon Ranch. The Hualapai Tribe uses the land at Cholla Canyon for ceremonial purposes, economic pursuits such as horticulture, and tribal use or recreation.

48.     Cholla Canyon Ranch is directly adjacent to the proposed Project site and would be surrounded on three sides by the proposed exploratory drilling.

**B.  Previous Projects and Exploration at the Project Site**

49.     BLM first studied Ha'Kamwe' and the aquifer that feeds it in 1999–2002 when assessing the since canceled Big Sandy Energy Project. Caithness Big Sandy, LLC ("Caithness") had planned to develop a gas-fired power plant in the area southeast of Wikieup.

50.     BLM and WAPA conducted a draft Environmental Impact Statement and Supplemental Analysis that included many relevant findings about the impact of development in the area on Ha'Kamwe' and the Hualapai Tribe's cultural resources. *See* U.S. Bureau of Land Mgmt. & Western Area Power Admin., *Big Sandy Energy Project: Draft Environmental Impact Statement*, BLM/AZ/PL-01/004, DOE/EIS-0315 (June 2001); *see also* U.S. Bureau of Land Mgmt. & Western Area Power Admin., *Big Sandy*

*Energy Project: Supplement Analysis*, BLM/AZ/PL-01/004, DOE/EIS-0315 (May 2002) ("Supp. Analysis").

51.    It was as part of this process that BLM and WAPA determined Ha'Kamwe' to be a TCP eligible for listing on the National Register of Historic Places.

52.    The Big Sandy Energy Project was ultimately abandoned, in part because of impacts to Ha'Kamwe'. *See* Supp. Analysis at 3-9 ("[T]he Hualapai Nation considers the spring a traditional cultural resource and the spring is a National Register-eligible property to which Project impacts cannot be satisfactorily mitigated . . . .").

53.    In 2018 and 2019, Hawkstone Mining, Ltd., an Australian company, under their domestic subsidiary Big Sandy, Inc., conducted two phases of exploratory drilling for lithium clay on BLM-managed public lands adjacent to Ha'Kamwe'.

54.    In 2021, Hawkstone Mining, Ltd. formally changed its name to Arizona Lithium, Ltd.

55.    In Phase 1, the Company drilled 12 holes in the Project area. In Phase 2, it drilled 37 holes in the Project area.

56.    BLM never notified or consulted with the Tribe prior to authorizing these drilling operations.

**C. Phase 3 Sandy Valley Exploration Project**

57.    In September 2019, the Company, doing business under its previous name, Big Sandy Inc., submitted an exploration plan to the BLM Kingman Field Office for the Project, the Big Sandy Inc., Sandy Valley Exploration Project (Phase 3).

58.    The Project would include 131 drilling sites on BLM-managed public lands to explore mining claims for lithium and poly-metal minerals. It would directly disturb 21 acres of public land, and the drill holes are expected to reach depths of approximately 300 feet into the aquifer.

59.    BLM waited until June 6, 2020, eight months after Big Sandy, Inc. submitted its proposed plan of operations in September 2019, to contact the Hualapai Tribe about the Project. BLM's letter invited the Tribe to participate in an NHPA Section

106 consultation and requested the Tribe's help in identifying cultural properties or other areas of concern that may be affected by the Project. Notably, BLM's letter did not mention Ha'Kamwe', even though the Project would surround the spring on three sides.

60.     On June 29, 2020, the Tribe sent a letter accepting the invitation for consultation. The letter also informed BLM of Ha'Kamwe's existence and status as a TCP, expressed concern over the Project's effects on the spring, and requested Cooperating Agency status under NEPA. When BLM did not respond, the Tribe sent another letter dated November 2, 2020, raising these concerns again and requesting a response.

61.     On November 10, 2020, BLM formally determined that the Project would not affect any historic properties for purposes of the NHPA. under 36 C.F.R. § 800.4(d)(1). It did so having defined an area of potential effects that cut out Cholla Ranch, including Ha'Kamwe'.

62.     In April 2021, the Hualapai Tribal Council passed Resolution 24-2021, the Hualapai Tribe Objection to the Sandy Valley Lithium Project. The resolution opposed the Plan, the Sandy Valley Exploration Project, and any further disturbance of the sacred cultural landscape by mining or exploration activities. The Inter-Tribal Association of Arizona, which comprises 21 Tribal governments in Arizona, passed a similar resolution the same month.

63.     The Hualapai Tribe submitted comments on the Draft EA on June 10, 2021, and supplemental comments on July 9, 2021, both within the public comment period. The Tribe's comments highlighted how BLM failed to consult with the Tribe and failed to analyze affected tribal interests, rights, and resources, including impacts on Ha'Kamwe'.

64.     The ACHP—which, as noted, is the expert agency on NHPA issues—sent a letter to BLM on January 11, 2023, and again on May 31, 2024, urging BLM to revisit its finding of no effect on cultural resources under the NHPA. In its May 31, 2024, letter the ACHP, after reviewing the Draft EA, found "that there is the clear potential for effects on the Ha'Kamwe' historic property, including noise, vibration, and disruption to cultural

practices conducted by the Tribe." Letter from Christopher Koeppel, Office of Federal Agency Program, Advisory Council on Historic Preservation to Amanda Dodson, Field Manager, Bureau of Land Mgmt., 2 (May 31, 2024). The BLM failed to respond to ACHP's May 31, 2024, letter.

65.     The ACHP explained how the proposed drilling activity could harm the spring and its historic character:

> [T]he characteristics of the historic property qualifying it for inclusion in the National Register include (in addition to the physical components of the property, such as the spring itself and surrounding landscape features) the setting and feeling of Ha'Kamwe' and its environs and the cultural practices conducted there, both of which will be altered (albeit temporarily) by the drilling equipment and ground disturbance proposed in close proximity.

ACHP May 31, 2024, letter at 2.

66.     The Tribe submitted comments as a Cooperating Agency on March 13, 2024, and May 24, 2024. As part of the Tribe's March 2024 comments, the Tribe also submitted a hydrology report.

67.     Though the Final EA correctly documented the above-noted effects on Ha'Kamwe' like noise, vibration, and disruption of cultural practices, it falsely concluded that the Project will not impair the spring's flows. BLM's analysis in the Final EA lacks credible evidence that the source of Ha'Kamwe's water would not be impacted. BLM relies on a single twenty-four-year-old study—which was conducted for the earlier Caithness project and focused on a different outcome, using limited test holes—to conclude that the Project will not impact Ha'Kamwe'. However, that study had a different purpose. It was focused on proving a sufficient volume of groundwater existed to satisfy the demand of a proposed electrical power-generating plant and did not determine the source of groundwater for Ha'Kamwe'.

68.     Relying on that study, BLM made a factually flawed assumption when concluding that the Project will not disturb Ha'Kamwe's source. It asserted that the Big Sandy aquifer is divided into an upper, a middle, and a lower aquifer and that drilling will

take place in the Upper Aquifer while the source of Ha'Kamwe' is in the Lower Aquifer. This terminology was lifted from the abandoned Big Sandy Energy Project and was based on that project's corporate interests in establishing groundwater sources as cooling water for the energy project. However, the aquifer divisions were based on observations from only a few deep wells that do not characterize the aquifer as a whole. Further, BLM admitted that water for Ha'Kamwe' may also come from the Upper Aquifer.

69.    In contrast, the hydrology report that the Tribe submitted specifically evaluated whether and how the Project would disrupt Ha'Kamwe's flows—and found that disruptions are likely. That report also pointed out several critical issues regarding the spring's hydrology that BLM had not assessed in its own evaluation. BLM ignored that evidence, however, focusing solely on the inadequate energy project study.

70.    Further, a U.S. Geological Survey report the Tribe submitted to BLM shows that BLM's characterization of the aquifer is wrong. Due to erosional unconformities, the Big Sandy Formation varies widely in thickness, from measured sections ranging from 57 to 245 feet. In addition, the energy project study shows that the aquifer's impermeable layers vary in thickness, undercutting BLM's assumption that the aquifer sits neatly in three distinct and uniform confined units. These variations also indicate that the proposed borehole depths of 360 feet would penetrate thinner confining layers and thus reach pressurized portions of the aquifer, potentially disrupting subsurface flows that feed Ha'Kamwe'. BLM failed to explain how these variations affected its assessment.

71.    BLM also failed to analyze or consider geologic faults and related impacts on the source for Ha'Kamwe'. Faults and fractures can become conduits for water between aquifers. The drilling proposed in the Project would encounter subsurface faults and fractures, providing a pathway for the transmission of groundwater to or from the Ha'Kamwe' spring. The Final EA does not analyze the potential for exploration boreholes to intersect faults and fractures, which would further impact the source of groundwater for Ha'Kamwe'.

72.     The Final EA provides that if a water intersection occurs during the drilling process, then the hole will be plugged. However, there is no analysis in the Final EA that demonstrates this measure will be effective in mitigating harmful effects on Ha'Kamwe'. Further, there is no analysis regarding the potential impacts to hydrology by plugging these wet holes.

73.     The incomplete and inaccurate hydrologic data in the Final EA undermines BLM's finding that the Project will not harm Ha'Kamwe'. Final EA at 3. The only study to directly assess this question determined that harmful effects are likely—a reality BLM ignored.

74.     BLM also failed to consult with FWS regarding impacts of the Project on three ESA-listed species in the area: southwestern willow flycatcher (endangered), western yellow-billed cuckoo (threatened), and northern Mexican gartersnake (threatened). The FWS advised BLM that it was required to consider these species in an "effects analysis" to comply with the ESA. The FWS further advised that this analysis should include the entire action area, which can extend outside the Project boundary. However, the BLM's biological evaluation excluded all of the listed species from evaluation, finding that there is no habitat in the Project area. In taking that approach, BLM ignored the species' designated critical habitat immediately adjacent to the Project site, ignored recent findings showing that the Project may in fact contain cuckoo habitat, and failed to consider harms on all three species stemming from the Project's noise, light, vibration, traffic, and other effects which "may affect" the listed species and their habitat.

75.     The Tribe sent BLM (and the Secretary of the Interior) a letter on July 15, 2024 notifying the agency of its unlawful failure to consult and the Tribe's intent to sue over the BLM's violation of the ESA. *See* 16 U.S.C. § 1540(g)(2)(A)(i) (citizen suit provision). The letter is attached as Exhibit 1. BLM took no action in response to the Tribe's notice letter.

## **FIRST CLAIM FOR RELIEF**

**Violation of the NHPA: Erroneous Finding of No Historic Properties Affected**

76.     The Tribe hereby realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

77.     The NHPA required BLM to identify the Project's effects on "any historic property." 54 U.S.C.A. § 306108. To do so, BLM was required to identify the "[a]rea of potential effects," meaning "the geographic area or areas within which [the Project] may directly or indirectly cause alterations in the character or use of historic properties." 36 C.F.R. § 800.16(d).

78.     Ha'Kamwe' is a recognized TCP. A "traditional cultural property" is a historic property "that is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." National Park Service, U.S. Dep't of the Interior, *National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties*, 1 (1998).

79.     Although BLM was aware of Ha'Kamwe's existence, status as a TCP, and its importance to the Tribe, BLM narrowly defined the area of potential effects to exclude Cholla Ranch and Ha'Kamwe', concluding that no historic properties will be affected.

80.     As the ACHP recognized, however, the Final EA contradicts this finding. The EA expressly states that the Project will cause "visual effects" and "[n]oise and vibration" that may, among other harms, "[d]isrupt[] . . . cultural practices at and/or near *Ha'Kamwe'*." Final EA at 15. After reviewing the Project's EA, the ACHP concluded— as did the Tribe—that "there is the clear potential for effects on the Ha'Kamwe' historic property, including noise, vibration, and disruption to cultural practices conducted by the Tribe." ACHP's May 31, 2024 letter. These findings in the EA mean that BLM was obligated to include in the area of potential effects for its NHPA analysis and make a finding of "[h]istoric properties affected" under 36 C.F.R. § 800.4(d)(2).

81.     For these reasons, BLM's narrow definition of the area of potential effects; subsequent finding of "[n]o historic properties affected"; project approval; and the DR,

FONSI, and Final EA violate the NHPA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706. BLM's violation of law prejudices and adversely affects the Tribe's rights and interests.

## SECOND CLAIM FOR RELIEF

### Violation of NEPA: Failure to Consider a Reasonable Range of Alternatives

82.     The Tribe hereby realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

83.     NEPA requires federal agencies to rigorously explore and objectively evaluate all reasonable alternatives. Federal agencies must devote substantial treatment to each alternative considered in detail.

84.     The Final EA unlawfully fails to consider a reasonable range of alternatives. It considers only two alternatives: approving or denying the proposed exploration plan in full. It failed to consider a middle-ground alternative that better protects Tribal and environmental interests. BLM's approach in the Final EA (1) ignores other options for meeting the Project's stated purpose and need and (2) lacks factual support given the Final EA's inadequate and superficial assessment of impacts on Tribal interests.

85.     Due to the significant concerns that the Tribe has raised throughout this process, BLM should have evaluated an alternative approving only one or two of the three proposed drill sites; an alternative requiring relocation of drill sites farther from Ha'Kamwe', an alternative approving fewer total wells across the three drill sites; an alternative involving less new road construction; and/or an alternative requiring stricter controls on noise, light, and vibrations. Consideration of one or more such alternatives is consistent with BLM's own observation in the Final EA that the "decision to be made" was to approve the plan, deny the plan, or approve the plan "subject to changes or conditions necessary to meet" regulatory requirements. Final EA at 2.

86.     BLM's issuance of the DR, FONSI, and Final EA and project approval violate NEPA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706. BLM's violation of law prejudices and adversely affects the Tribe's rights and interests.

## THIRD CLAIM FOR RELIEF

### Violation of NEPA: Failure to Take a Hard Look at Impacts on Water Resources

87.     The Tribe hereby realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

88.     NEPA requires an agency preparing an EA to take a "hard look" at all reasonably foreseeable direct, indirect, and cumulative effects before approving a proposed action. 40 C.F.R. § 1508.1(i). These effects include impacts on natural resources, historic values, and cultural values. 40 C.F.R. § 1508.1(i)(4).

89.     BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the Project on water resources, including the source for Ha'Kamwe'.

90.     BLM's failure to take a hard look at the impacts of the Project on water resources, including the source for Ha'Kamwe' in the DR, FONSI, and Final EA and project approval violate NEPA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706. BLM's violation of law prejudices and adversely affects the Tribe's rights and interests.

## FOURTH CLAIM FOR RELIEF

### Violation of ESA: Failure to Consult with Fish and Wildlife Service

91.     The Tribe hereby realleges and incorporates by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

92.     The ESA requires an agency to initiate formal consultation with the FWS if its proposed action may affect listed species or critical habitat. 50 C.F.R. § 402.14; 16. U.S.C. § 1536(a)(2).

93.     BLM failed to initiate consultation with the FWS for any of the three ESA-listed species present in the area.

94.     BLM's failure to initiate consultation with the FWS violates the ESA and is arbitrary, capricious and not in accordance with law. BLM's violation of law prejudices and adversely affects the Tribe's rights and interests.

## REQUEST FOR RELIEF

Therefore, Plaintiff respectfully requests that this Court:

A.     Declare that BLM violated NEPA in issuing its DR, FONSI, and Final EA and otherwise authorizing the Project;

B.     Declare that BLM violated the NHPA in issuing its DR, FONSI, and Final EA and otherwise authorizing the Project;

C.     Declare that BLM violated the ESA by failing to consult with FWS;

D.     Order BLM to consult with FWS under Section 7 of the ESA regarding the Project's effects and prohibit implementation of BLM's Project approval until BLM complies with the ESA;

E.     Set aside and vacate BLM's DR, FONSI, and Final EA and authorization of the Project;

F.     Award the Tribe its reasonable attorneys' fees and costs; and

G.     Grant such other and further relief as the Court deems just, equitable, and proper.

Respectfully submitted this 14th day of December 2024.


*/s/Laura Berglan*
Laura Berglan (AZ Bar No. 022120)
Heidi McIntosh* (CO Bar No. 48230)
Thomas Delehanty* (CO Bar No. 51887)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
(303) 623-9466

21

lberglan@earthjustice.org
hmcintosh@earthjustice.org
tdelehanty@earthjustice.org

*/s/Roger Flynn*
Roger Flynn* (CO Bar No. 21078)
Jeffrey C. Parsons* (CO Bar No. 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

*Attorneys for Plaintiffs*

*\*Admitted Pro Hac Vice*